WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| THE GEO GROUP, INC., | |
| Plaintiff, | No. 3:23-cv-05626 |
| v. | COMPLAINT |
| JAY R. INSLEE, in his official capacity as Governor of the State of Washington; ROBERT W. FERGUSON, in his official capacity as Attorney General of the State of Washington, | |
| Defendants. | |

For its Complaint against Defendants Jay R. Inslee and Attorney General Robert W. Ferguson, Plaintiff The GEO Group, Inc., by counsel, states as follows:

**NATURE OF THIS ACTION**

1. Plaintiff The GEO Group, Inc. ("GEO") brings this action for declaratory and injunctive relief against Defendants Governor Jay R. Inslee and Attorney General Robert W. Ferguson regarding Second Substitute H.B. 1470, 68th Leg., Reg. Sess. (Wash. 2023) ("HB 1470").

2. In this action, GEO seeks a declaration invalidating and preliminarily and permanently enjoining the enforcement of, certain provisions of Washington law. These provisions are preempted by federal law and impermissibly discriminate against the United States and GEO as its contractor and, therefore, violate the Supremacy Clause of the United States Constitution. These provisions also impair GEO's current and future contracts with the United States, in violation of the Contracts Clause of the United States Constitution.

COMPLAINT - 1

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

3.      Two hundred years ago, in the foundational case of *McCulloch v. Maryland*, Chief Justice John Marshall invoked the "great principle" that "the constitution and the laws made in pursuance thereof are supreme; that they control the constitution and laws of the respective states, and cannot be controlled by them." 17 U.S. (4 Wheat.) 316, 426 (1819). This principle "so entirely pervades the constitution, is so intermixed with the materials which compose it, so interwoven with its web, so blended with its texture, as to be incapable of being separated from it, without rending it into shreds." *Id*. Based on this bedrock precept—derived from the Supremacy Clause of the United States Constitution—it has been incontestable from *McCulloch* onward that "the activities of the Federal Government are free from regulation by any state." *Hancock v. Train*, 426 U.S. 167, 178 (1976) (quotation marks omitted).

4.      And just as the activities of the Federal Government may not be directly regulated by any state, "[t]he government of the United States, . . . though limited in its powers, is supreme; and its laws, when made in pursuance of the constitution, form the supreme law of the land, 'anything in the constitution or laws of any state to the contrary notwithstanding.'" *McCulloch*, 17 U.S (4 Wheat.) at 406; *see also Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824) (Marshall, C.J.) (explaining that the Supremacy Clause ensures that States cannot enact laws that "interfere with, or are contrary to the laws of Congress"). This power of Congress to preempt inconsistent state laws is, like the federal government's immunity from state regulation, a "fundamental principle of the Constitution." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).

5.      Like the State of Maryland two hundred years ago, the State of Washington seeks to subvert these principles, asserting the authority to regulate and undermine the United States Government in the exercise of sovereign powers undoubtedly within the supreme sphere of federal action. There is no question that the federal government has the power to detain individuals in anticipation of, or as a consequence of, federal immigration proceedings. *See, e.g., Wong v. United States*, 163 U.S. 228, 235 (1896). Nor is there any question that the federal government has the authority to contract with private entities with expertise in the provision of detention facilities and/or related facility-based services to carry out its detention responsibilities. And, indeed,

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

Congress has enacted statutes that clearly authorize the Executive Branch to house federal detainees in private facilities as that Branch deems appropriate. *See, e.g.*, 6 U.S.C. § 112(b)(2); 8 U.S.C. § 1231(g); 18 U.S.C. § 4013 note "Contracts for Space or Facilities"; 28 U.S.C. § 530C(a)(4).

6.     This lawsuit challenges a Washington statute that reflects a deliberate effort by Washington to obstruct the United States' enforcement of federal immigration law through regulation of private entities that contract with federal authorities to carry out federal immigration enforcement efforts.

7.     The provisions of state law at issue have the express purpose and effect of making it more difficult for federal immigration officers to carry out their responsibilities in the state of Washington. The Supremacy Clause does not allow the state of Washington to obstruct the United States' ability to enforce laws that Congress has enacted or to take actions entrusted to it by the Constitution. Accordingly, the provisions at issue here are invalid.

8.     The federal government has one, and only one, federal immigration detention facility in the state of Washington, the Northwest ICE Processing Center ("NWIPC"). The federal government determined a need for NWIPC in the state of Washington and filled that need by issuing a federal procurement for the provision of the facility and related services. The NWIPC has been in operation as a federal immigration processing center since the award of the first contract (ACL-2-C-004 in 2004) by the federal government.

9.     GEO, as the owner and contracted service provider of the only federal detention facility threatened by HB 1470, brings this action to reassert the foundational principles laid down in *McCulloch v. Maryland* two centuries ago. This Court should declare HB 1470 unconstitutional and enter a preliminary and permanent injunction restraining Defendants from enforcing the statute against GEO.

## JURISDICTION AND VENUE

10.     GEO seeks relief on all claims pursuant to 28 U.S.C. §§ 2201, 2202, 2412, and 42 U.S.C. § 1983.

COMPLAINT - 3

11.     This Court has jurisdiction under 28 U.S.C. § 1331 because the questions of whether HB 1470 violates the Supremacy Clause of the United States Constitution, whether it is preempted by federal law, and whether it violates the Constitution's Contracts Clause are federal questions.

12.     This Court also has jurisdiction under 28 U.S.C. § 1332 because The GEO Group, Inc. and the Defendants are citizens of different states and the value of the declaratory and/or injunctive relief sought by GEO exceeds $75,000.

13.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this claim occurred, or a substantial part of the property that is the subject of this action is situated, in this District. The NWIPC in Tacoma--the sole private federal detention facility threatened by HB 1470—is located in this District, and the effects of HB 1470 will be felt in this District.

## PARTIES

14.     Plaintiff The GEO Group, Inc. is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.

15.     Defendant, Jay R. Inslee is a citizen of Washington and the Governor of the State of Washington. He has "[t]he supreme executive power" of the State of Washington (the "State") and is charged with "see[ing] that the laws are faithfully executed." WASH. CONST. art. III §§ 2, 5. As head of the Executive Branch, he has a duty to "supervise the official conduct of all executive and ministerial officers," including the Attorney General. WASH. REV. CODE §§ 43.06.010(1), (5)-(7); *accord* WASH. CONST. §§ 1, 5. In light of these duties, Governor Inslee has responsibility for enforcing HB 1470. He is sued in his official capacity.

16.     Defendant Robert W. Ferguson is a citizen of Washington and the Attorney General of the State of Washington. He is "legal adviser of the state officers" (WASH. CONST. art. III § 21) and is responsible for enforcing violations of HB 1470. HB 1470 §§ 2-4. In light of these duties, Attorney General Ferguson is sued in his official capacity.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150

**FACTUAL ALLEGATIONS**

**I.     HB 1470**

17.     On January 20, 2023, House Bill 1470 was introduced in the Washington Legislature.  On April 23, 2023, the enrolled bill was presented to Governor Inslee, and he signed HB 1470 on May 11, 2023.

18.     HB 1470 amends and creates various new sections of the Revised Code of Washington (primarily RCW 70.395) all relating to "private detention facilities."

19.     Title 70 ("Public Health and Safety") of the Revised Code of Washington Chapter 70.395.020, as modified by HB 1470, includes the following key definitions:

> (1)"Detention facility" means any facility in which persons are incarcerated or otherwise involuntarily confined for purposes including prior to trial or sentencing, fulfilling the terms of a sentence imposed by a court, or for other judicial or administrative processes or proceedings.
>
> (2)"Private detention facility" means a detention facility that is operated by a private, nongovernmental for-profit entity and operating pursuant to a contract or agreement with a federal, state, or local governmental entity.

20.     During a March 13, 2023 Public Hearing of the Washington Senate Human Services Committee, HB 1470's primary House sponsor expressly acknowledged that *there is only one private detention facility* that would be subject to HB 1470. Washington State Senate Human Services Committee hearing on 2SHB 1470 - Concerning private detention facilities (Mar. 13, 2023 10:30 a.m. at 16:20), available at https://tvw.org/video/senate-human-services-2023031331/?eventID=2023031331.

21.     Similarly, during a March 30, 2023 Public Hearing of the Washington Senate Ways and Means Committee, a representative of the Committee on Human Services confirmed that "only one facility would be covered" by HB 1470—the federal government's Northwest ICE Processing Center  in Tacoma. Washington State Senate Ways & Means Committee hearing on 2SHB 1470 - Concerning private detention facilities (Mar. 30, 2023 12:30 p.m. at 4:07:34), available at https://tvw.org/video/senate-ways-means-2023031607/?eventID=2023031607.

22.     The Washington Multiple Agency Fiscal Note Summary accompanying HB 1470

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

1    expressly acknowledges and reflects this intentional targeting of the NWIPC and explains that

2    "[w]hile *prior versions of the bill could have impacted private detention facilities that DSHS might*

3    *wish to contract with in the future, the new language in Section 10 of this bill exempts those types*

4    *of facilities from the new requirements*." (emphasis added)

5    https://fnspublic.ofm.wa.gov/FNSPublicSearch/GetPDF?packageID=68477 at 15.   The Fiscal

6    Note further explains that:  "New Section 10's criteria *reduced the amount of private detention*

7    *facilities from three to now just one at the Northwest Detention Center in Tacoma.*"  (emphasis

8    added) https://fnspublic.ofm.wa.gov/FNSPublicSearch/GetPDF?packageID=68477 at 24.

9          23.    HB 1470 Section 2 provides the Washington Department of Health broad authority

10   to create rules solely applicable to the NWIPC:

11         (1) The department of health shall adopt rules as may be necessary to effectuate the
12   intent and purposes of this section in order to ensure private detention facilities
     comply with measurable standards providing sanitary, hygienic, and safe conditions
13   for detained persons. The department of health rules shall include that:

14         (a) A detained person should have a safe, clean, and comfortable environment
     that allows a detained person to use the person's personal belongings to the
15   extent possible;

16         (b) Living areas, including areas used for sleeping, recreation, dining,
     telecommunications, visitation, and bathrooms, must be cleaned and
17   sanitized regularly;

18         (c) A private detention facility must provide laundry facilities, equipment,
     handling, and processes for linen and laundered items that are clean and in
19   good repair, adequate to meet the needs of detained persons, and maintained
     according to the manufacturer's instructions. Laundry and linen must be
20   handled, cleaned, and stored according to acceptable methods of infection
     control including preventing contamination from other sources. Separate
21   areas for handling clean laundry and soiled laundry must be provided and
     laundry rooms and areas must be ventilated to the exterior;

22         (d) Basic personal hygiene items must be provided to a detained person
23   regularly at no cost;

25         (e) A private detention facility shall provide a nutritious and balanced diet,
     including fresh fruits and vegetables, and shall recognize a detained person's
26   need for a special diet. A private detention facility must follow proper food
     handling and hygiene practices. A private detention facility must provide at
27   least three meals per day, at no cost, and at reasonable hours;

28         (f) Safe indoor air quality must be maintained;

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150

(g) The private detention facility must have both heating and air conditioning equipment that can be adjusted by room or area. Rooms used by a detained person must be able to maintain interior temperatures between 65 degrees Fahrenheit and 78 degrees Fahrenheit year-round. Excessive odors and moisture must be prevented in the building; and

(h) A private detention facility must implement and maintain an infection control program that prevents the transmission of infections and communicable disease among detained persons, staff, and visitors.

24.     Section 2 further provides that "[t]he office of the attorney general may enforce violations of this section on its own initiative or in response to complaints or violations."

25.     HB 1470 Section 3 grants broad new rule making, inspection, investigation, and testing powers over the NWIPC to the Washington Department of Health and the Washington Department of Labor and Industries:

(1) The department of health shall:

(a) Conduct routine, unannounced inspections of private detention facilities including, but not limited to, inspection of food service and food handling, sanitation and hygiene, and nutrition as provided in (c) of this subsection;

(b) Conduct investigations of complaints received relating to any private detention facility located within the state;

(c) Regularly review the list of food items provided to detained persons to ensure the specific nutrition and calorie needs of each detained person are met, including any needs related to medical requirements, food allergies, or religious dietary restrictions;

(d) Test water used for drinking and bathing and air quality every six months at private detention facilities both inside and outside of the facility; and

(e) Post inspection results on its website and in a conspicuous place viewable by detained persons and visitors to private detention facilities. Results should be posted in English and in languages spoken by detainees, to the extent practicable.

(2) The department of health may delegate food safety inspections to the local health jurisdiction, where the local health jurisdiction is in the county where the private detention facility is located, to conduct inspections pursuant to regulations.

(3) The department of health shall adopt rules as may be necessary to effectuate the intent and purposes of this section in order to ensure private detention facilities allow regular inspections and comply with measurable standards providing sanitary, hygienic, and safe conditions for detained persons.

(4) The department of labor and industries shall conduct routine, unannounced inspections of workplace conditions at private detention facilities, including work undertaken by detained persons.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150

26.     Section 3 further provides that "[t]he office of the attorney general may enforce violations of this section on its own initiative or in response to complaints or violations."

27.     HB 1470 Section 4 does not apply to private detention facilities operating pursuant to a valid contract that was in effect prior to January 1, 2023, for the duration of that contract, not to include any extensions or modifications made to, or authorized by, that contract.  Section 4 includes numerous mandates regarding clothing, food, telephone access, computer access, visitation, health services etc. that must be provided at private detention facilities:

A private detention facility operating pursuant to a contract or agreement with a federal, state, or local government shall comply with the following:

(a) A detained person, upon admission to a private detention facility, must be issued new clothing and new footwear for both indoor and outdoor use and for protection against cold and heat. Clothing issued must be regularly laundered and replaced at no cost once no longer hygienic or serviceable;

(b) Any food items in the commissary must be available at reasonable prices taking into account the income and financial circumstances of detained persons;

(c) Telecommunications services must be provided free of charge to detained persons and any communication, whether initiated or received through such a service, must be free of charge to the detained person initiating or receiving the communication. Each detained person must be eligible to use these telecommunications services for at least 60 minutes on each day of the person's detainment. Private detention facilities must not use the provision of telecommunications services or any other communication service to supplant in-person contact visits any detained person may be eligible to receive;

(d) In-person visitation must be available daily. Visitation rooms must allow for the presence of children and personal contact between visiting persons and detained persons may not be restricted. A detained person may receive reading and writing materials during visitation;

(e) Solitary confinement is prohibited;

(f) Televisions must be available and accessible to a detained person at no cost. The private detention facility shall make every effort to make television programming available in the language of the detained person;

(g) Handheld radios must be provided to a detained person at no cost;

(h) A detained person may invite persons to the private detention facility to provide legal education, know your rights presentations, and other similar programming;

COMPLAINT - 8

(i) Computer and internet access must be available and accessible to a detained person at no cost;

(j) A law library must be available and accessible;

(k) Communication from the private detention facility to a detained person, either in writing or verbally, must be delivered in the primary language of the detained person;

(l) Sexual violence and harassment grievances must be responded to immediately by culturally competent professionals on-site and reported to local law enforcement in the county where the private detention facility is located;

(m) Mental health evaluations should occur at intake and periodically, at least once a week. Culturally competent mental health therapy must be available and free;

(n) Requested medical care and attention must be provided without delay, including the provision of requested medical accommodations;

(o) Rooms used by a detained person for sleeping must have access to windows, natural light, and natural air circulation. Subject to safety limitations, sleeping rooms must include adjustable curtains, shades, blinds, or the equivalent installed at the windows for visual privacy and that are shatterproof, screened, or of the security type as determined by the private detention facility needs;

(p) A private detention facility must be equipped to respond to natural and human-made emergencies, including earthquakes, lahar threats, tsunami, and industrial accidents. A private detention facility must be earthquake resistant. A private detention facility shall develop emergency operation and continuity of operations plans and provide those plans to the local emergency management department. A private detention facility must stock all necessary personal protective equipment in case of disease outbreaks consistent with large numbers of people detained in close contact to one another.

28.     Section 4 further provides that "[t]he office of the attorney general may enforce violations of this section on its own initiative or in response to complaints or violations."

29.     HB 1470 Section 5 creates a private right of action for detained persons and specifies available monetary damages, injunctive relief, and the recovery of attorneys' fees and costs:

(1) A detained person aggrieved by a violation of this chapter has a right of action in superior court and may recover for each violation as follows:

(a) Against any person who negligently violates a provision of this chapter, $1,000, or actual damages, whichever is greater, for each violation;

COMPLAINT - 9

(b) Against any person who intentionally or recklessly violates a provision of this chapter, $10,000, or actual damages, whichever is greater, for each violation;

(c) Reasonable attorneys' fees and costs if the detained person is the prevailing party; and

(d) Other relief, including an injunction, as the court may deem appropriate. Injunctive relief may be issued without bond in the discretion of the court, notwithstanding any other requirement imposed by statute.

30.    Notably, Section 5 provides that "[t]he state and its agencies are not liable for a violation of this chapter."

31.    HB 1470 Section 6 creates an additional regime of civil penalties applicable to private detention facilities:

(1)  Any person who fails to comply with this chapter may be subject to a civil penalty in an amount of not more than $1,000 per violation per day.

(2)  Subject to the availability of amounts appropriated for this specific purpose, the secretary of the department of health may adopt by rule a penalty matrix that establishes procedures for civil penalties assessed under this chapter.

(3)  Each violation is a separate and distinct offense. The department of health shall impose the civil penalty in accordance with chapter 34.05 RCW. Moneys collected under this section must be deposited into the state general fund.

(4)  If the civil penalty is not paid to the department of health within 15 days after receipt of notice, the office of the attorney general may bring an action to recover the penalty in the name of the state of Washington in the superior court of Thurston county or in the county where the private detention facility is located. In all such actions, the procedure and rules of evidence are the same as in ordinary civil actions. All penalties recovered by the attorney general under this chapter must be paid into the Washington state attorney general humane detention account created in section 7 of this act.

32.    Notably, Section 6 also provides that "[t]he state and its agencies are not liable for a violation of this chapter."

33.    HB 1470 Section 8 amends RCW 70.395.010 and 2021 c 30 s 1, and clarifies (although the stated intent to "prohibit" that which is to meet "minimum standards" is less clear) the intent of the legislature to prohibit private detention facilities in the state:[1]

---

[1] On April 14, 2021, Governor Jay Inslee signed into law Washington's Engrossed House Bill 1090 (EHB 1090) that purports to prohibit the United States from using detention facilities operated by private contractors to house detainees in the custody of U.S. Immigration and Customs Enforcement (ICE). *See* Related Case No. 3:21-cv-05313.  However, Defendants have been forced to stipulate that EHB 1090 is unenforceable and unconstitutional

COMPLAINT - 10

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

Therefore, it is the intent of the legislature to prohibit the use of private, for-profit prisons and detention facilities in the state, and to set minimum standards for the conditions of confinement within private detention facilities in the state and to require the inspection and review of those facilities by appropriate state or local agencies to ensure public health and safety.

34.      HB Section 9 provides the following definitions that apply throughout RCW 70.395:

(1)  "Basic personal hygiene items" means items used to promote or preserve a detained person's health and contribute to the prevention of disease or infection, including soap, toothbrush and toothpaste, shampoo and conditioner, lotion, nail clippers, comb, towels, and menstrual products.

(2)  "Culturally competent" includes: Knowledge of a detained person's cultural histories and contexts, as well as family norms and values in different cultures; knowledge and skills in accessing community resources and community outreach; and skills in adapting services and treatment to a detained person's experiences and identifying cultural contexts for individuals.

(3)  "Detained person" means a person confined in a private detention facility.

(4)  "Detention facility" means any facility in which persons are incarcerated or otherwise involuntarily confined for purposes including prior to trial or sentencing, fulfilling the terms of a sentence imposed by a court, or for other judicial or administrative processes or proceedings.

(5)  "Fresh fruits and vegetables" means any unprocessed fruits or vegetables, not including any processed, canned, frozen, or dehydrated fruits or vegetables, or any fruits or vegetables infected or infested with insects or other contaminants.

(6)  (a) "Personal protective equipment" means equipment worn to minimize exposure to hazards that cause serious injuries and illness, which may result from contact with chemical, radiological, physical, electrical, mechanical, or other hazards.

(b) Personal protective equipment may include items such as gloves, safety glasses and shoes, earplugs or muffs, hard hats, respirators, or coveralls, vests, and full body suits.

(7)  "Private detention facility" means a detention facility that is operated by a private, nongovernmental for-profit entity and operating pursuant to a contract or agreement with a federal, state, or local governmental entity.

(8)  "Solitary confinement" means the confinement of a detained person alone in a cell or similarly confined holding or living space for 20 hours or more per day under circumstances other than a partial or facility wide lockdown.

---

under the Ninth Circuit's recent decision in *GEO Group, Inc. v. Newsom*, 50 F.4th 745, 763 (2022).   Undeterred, the Washington Legislature now attempts to accomplish the same stated goal of "prohibit[ing] the use of private, for-profit prisons and detention facilities in the state" through the discriminatory imposition of a detailed regime of new rule making, inspections, investigations, private rights of action, civil penalties, and numerous detailed facility characteristics and operational requirements applicable only to the NWIPC.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

(9) "Telecommunications services" means phone calls or other voice communication services, video communications, and email services.

35.      Finally, HB 1470 Section 10 exempts various categories of "detention facilities" from the key requirements of HB 1470:

Sections 2 through 6 of this act do not apply to a facility that is:

(1) Providing rehabilitative, counseling, treatment, mental health, educational, or medical services to juveniles who are subject to Title 13 RCW, or similarly applicable federal law;

(2) Providing evaluation and treatment or forensic services to a person who has been civilly detained or is subject to an order of commitment by a court pursuant to chapter 10.77, 71.05, 71.09, or 871.34 RCW, or similarly applicable federal law, including facilities regulated under chapters 70.41, 71.12, and 71.24 RCW;

(3) Used for the quarantine or isolation of persons for public health reasons pursuant to RCW 43.20.050, or similarly applicable federal law;

(4) Used for work release under chapter 72.65 RCW, or similarly applicable federal law;

(5) Used for extraordinary medical placement;

(6) Used for residential substance use disorder treatment; or

(7) Owned and operated by federally recognized tribes and contracting with a government.

## II.      U.S. Immigration and Customs Enforcement Detention Facilities

36.      In November 2002, Congress assigned the border-enforcement functions of the former Immigration and Naturalization Service to the newly created Bureau of Immigration and Customs Enforcement, housed within the Department of Homeland Security.[2] The Bureau began operations in March 2003 and was renamed U.S. Immigration and Customs Enforcement ("ICE") in March 2007.

37.      Congress has authorized or required the detention of aliens under several different statutes and conditions. *See, e.g.*, 8 U.S.C. §§ 1225(b)(1)(B)(ii), 1225(b)(2)(A), 1226(a), 1226(c); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 836–38 (2018).

38.      Congress has granted the Secretary of Homeland Security broad authority "to make

---

[2] U.S. Immigr. & Customs Enf't. *Celebrating the History of ICE*, U.S. DEP'T of HOMLAND Sec. (Mar. 1, 2019), https://bit.ly/35Jas68.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

contracts . . . as may be necessary and proper to carry out [his] responsibilities," 6 U.S.C. § 112(b)(2), including contracts with private parties. Congress has also granted the Secretary authority to "carr[y] out," "in [his] reasonable discretion," the activities of ICE "through any means, including . . . through contracts, grants, or cooperative agreements with non-Federal parties," except to the extent that such agreements are otherwise precluded by federal law. 28 U.S.C. § 530C(a)(4) (emphasis added).

39.     Congress has also directed that "[t]he [Secretary] shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," 8 U.S.C. § 1231(g)(1), and it has instructed that ICE "shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for [detention]" "[p]rior to initiating any project for the construction of any new detention facility," *id*. § 1231(g)(2).

40.     Finally, in 2000, Congress enacted a statute stating: "Notwithstanding any other provision of law, . . . the [Secretary] hereafter may enter into contracts and other agreements, of any reasonable duration, for detention or incarceration space or facilities, including related services, on any reasonable basis." 18 U.S.C. § 4013 note "Contracts for Space or Facilities."[3]

41.     Thus, Congress has granted ICE, the Secretary's designee, the discretion to use private contractors to arrange for detention. *See United States v. California*, 921 F.3d 865, 882 n.7 (9th Cir. 2019).

42.     Pursuant to this authority, ICE "manages and oversees the nation's civil

---

[3] Although 8 U.S.C. § 1231(g), 28 U.S.C. § 530C(a), and the note accompanying 18 U.S.C. § 4013 all mention the "Attorney General," the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, transferred the immigration-enforcement functions and programs of the Immigration and Naturalization Service (INS) to the Secretary of Homeland Security, see 6 U.S.C. § 202(3); *id*. § 251(2); 8 U.S.C. § 1103(a)(1); provided that the Secretary "shall have all functions relating to the [INS] that any other official could by law exercise in relation to the agency immediately before such transfer," 6 U.S.C. § 551(d)(2); and specified that for those transferred functions "reference in any other Federal law to any . . . officer . . . the functions of which are so transferred shall be deemed to refer to the Secretary," 6 U.S.C. § 557. Therefore, insofar as each of the three provisions listed above relate to the immigration detention-and-removal program, their references to the "Attorney General" shall be deemed to refer to the Secretary. *See, e.g., Reyna ex rel. J.F.G. v. Hott*, 921 F.3d 204, 208 n.* (4th Cir. 2019) (explaining that the mention of the Attorney General in 8 U.S.C. § 1231(g) shall be deemed to refer to the Secretary); *cf. Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

immigration detention system.[4]

43. As of March 2020, ICE "own[ed] only five detention facilities," and "even those are contractor run."[5]

44. Just procuring a new ICE facility, let alone staffing and funding it, is a "years long process."[6] Accordingly, "Congress made decisions many years ago. . . that contract detention facilities were certainly a much more cost effective way to go with regard to detaining individuals in the immigration context."[7] Moreover, during a "massive surge at the border," contractors are necessary to respond effectively.[8]

45. Consequently, efforts to close these private facilities have "created additional expenses for [ICE]," forcing it "to increase transportation cost [and] detail person[nel] to open detention facilities."[9]

### III. Washington's Sole Dedicated ICE Facility: Northwest ICE Processing Center

46. There is currently one dedicated ICE federal detention facility in the State of Washington: the NWIPC at 1623 East J Street in Tacoma, with a capacity of 1,575 beds.

47. NWIPC was built by Corrections Services Corp. under contract with the U.S. Immigration and Naturalization Service ("INS"). It opened for operation in April 2004 under contract ACL-2-C-004 with ICE's predecessor, the Bureau of Immigration and Customs Enforcement (the "Bureau"), to house the Bureau's detainees.

48. GEO acquired the facility and the then-current contract when it acquired Corrections Services Corp. in 2005. Since the acquisition, GEO has expanded the facility, in multiple phases, up to a capacity of 1,575beds.

49. Since that time, GEO has housed federal detainees at NWIPC under contract with the Bureau and—after the Bureau's renaming—with ICE. GEO provides the NWIPC and related

---

[4] U.S. Immigr. & Customs Enf't, Detention Management, DEP'T OF HOMELAND SEC. (Apr. 14, 2021), https://bit.ly/2ZvGnGO.
[5] 2021 ICE Budget Hearing at 26.
[6] 2021 ICE Budget Hearing at 27.
[7] 2021 ICE Budget Hearing at 26.
[8] 2021 ICE Budget Hearing at 27.
[9] 2021 ICE Budget Hearing at 56.

COMPLAINT - 14

detention services pursuant to a contract with ICE.

50.    The current contract ("HSCEDM-15-D-00015" or "Current Contract") was signed on September 24, 2015, effective September 28, 2015, for a base period of one year. To extend beyond that period, the contract originally had nine options of one year each and one half-year option. If all of the options were exercised by ICE, the total period of performance would have lasted through March 27, 2026.

51.    ICE exercised its option five times, most recently on May 19, 2020, to extend the Current Contract through September 27, 2021. Then, on January 29, 2021, ICE and GEO modified the Current Contract, removing remaining unexercised option years, and establishing instead a five-year performance period running from September 28, 2020, through September 27, 2025.

52.    GEO has continued to provide the NWIPC and related detention services under the terms of the new ICE modification of January 29, 2021, in much the same manner as it was operating prior to signing this modification.

53.    The Current Contract for the NWIPC includes numerous requirements that mandate strict adherence to various federal regulations and standards. ICE mandates, *inter alia*, that all its contractors (state and private) operate in conformance with the Performance Based National Detention Standards ("PBNDS"). 2011 PBNDS available at: https://www.ice.gov/detention-standards/2011). The PBNDS set forth extensive and detailed requirements for contractors housing ICE detainees. Contractors are expected to implement all standards in the PBNDS and are regularly audited by ICE to ensure compliance.

54.    The current PBNDS were implemented at the direction of Congress.  The Joint Explanatory Statement and House Report 114-668, which accompany the Fiscal Year (FY) 2017 Department of Homeland Security (DHS) Appropriations Act (P.L. 115-31) evince this direction. The Joint Explanatory Statement says: "Within 45 days after the enactment of this Act, ICE shall report on its progress in implementing the 2011 Performance Based National Detention Standards, including the 2016 revisions…"  163 Cong. Rec. H3812 (2017). House Report 114-668 states: "Within 45 days after the date of enactment of this Act, ICE shall report on its progress in

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150

implementing the 2011 PBNDS and requirements related to PREA, including a list of facilities that are not yet in compliance; a schedule for bringing facilities into compliance; and current year and estimated future year costs associated with compliance." H.R. Rep. No. 114-668, at 35 (2016).

55.     The "Preface" to the PBNDS provides, *inter alia*:

ICE is charged with removing aliens who lack lawful status in the United States and focuses its resources on removing criminals, recent border entrants, immigration fugitives, and recidivists. *Detention is an important and necessary part of immigration enforcement*. Because ICE exercises significant authority when it detains people, ICE must do so in the most humane manner possible with a focus on providing sound conditions and care. *ICE detains people for no purpose other than to secure their presence both for immigration proceedings and their removal, with a special focus on those who represent a risk to public safety, or for whom detention is mandatory by law*.

The PBNDS 2011 reflect ICE's ongoing effort to *tailor the conditions of immigration detention to its unique purpose*.

2011 PBNDS at i (emphasis added).

56.     The PBNDS applicable to NWIPC are approximately 500 pages in length, and include detailed standards governing facility: (1) Safety, including detailed requirements relating to Emergency Plans, Environmental Health and Safety, and Transportation; (2) Security, including detailed requirements relating to Admission and Release, Custody Classification, Contraband, Facility Security and Control, Funds and Personal Property, Hold Rooms in Detention Facilities, Key and Lock Control, Population Counts, Post Orders, Searches of Detainees, Sexual Abuse and Assault Prevention and Intervention, Special Management Units, Staff-Detainee Communication, Tool Control, Use of Force and Restraints; (3) Order, including detailed requirements relating to Disciplinary System; (4) Care, including detailed requirements relating to Food Service, Hunger Strikes, Medical Care, Medical Care (Women), Personal Hygiene, Significant Self Harm and Suicide Prevention and Intervention, Terminal Illness, Advance Directives and Death, Disability Identification, and Assessment and Accommodation; (5) Activities, including detailed requirements relating to Correspondence and Other Mail, Trips for Non-Medical Emergencies, Marriage Requests, Recreation, Religious Practices, Telephone Access, Visitation, and Voluntary Work Program; (6) Justice, including detailed requirements relating to Detainee Handbook,

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

Grievance System, Law Library and Legal Materials, and Legal Rights Group Presentations; (7) Administration and Management, including detailed requirements relating to Detention Files, Interviews and Tours, Staff Training, Detainee Transfers and Definitions. *Id.* at ii.

57.     The PBNDS applicable to GEO's provision of detention services at the NWIPC include at Section 2.12, mandatory requirements regarding "segregation" that provide, *inter alia*:

> A detainee may be placed in administrative segregation when the detainee's continued presence in the general population poses a threat to life, property, self, staff, or other detainees; for the secure and orderly operation of the facility; for medical reasons; or under other circumstances as set forth below.
>
> \* \* \*
>
> Protective custody may be initiated at the detainee's request or by staff as needed to protect the detainee from harm. Each facility shall develop procedures to consider continued placement in protective custody as well as provisions for release from protective custody when appropriate.
>
> \* \* \*
>
> To provide detainees in the general population a safe and orderly living environment, facility authorities may discipline anyone whose behavior does not comply with facility rules and regulations. Such discipline may involve temporary confinement in the SMU, apart from the general population.
>
> \* \* \*
>
> The maximum sanction is 30 days in disciplinary segregation per incident, except in extraordinary circumstances, such as incidents involving violations of offense 100 through 109 listed in the "Greatest" offense category in Appendix 3.1.A.
>
> \* \* \*
>
> Generally, these detainees shall have fewer privileges than other detainees in either the general population or in administrative segregation. More specifically, they are subject to more stringent personal property control including, but not limited to, limitations on their reading material and television viewing (which may be completely terminated), and restricted commissary or vending machine purchases.

*Id.* at 171-82.

58.     The PBNDS applicable to GEO's provision of detention services at the NWIPC include at Section 2.5, mandatory requirements regarding personal property that provide, *inter alia:*

> Detainees may keep a reasonable amount of personal property in their possession, provided it poses no threat to detainee safety or facility security. Detainees shall be granted an opportunity to store excess property with a third party or, with the facility administrator's permission, in the facility's personal property storage area.
>
> \* \* \*
>
> Examples of items detainees may not retain include the following:
>
> 1.     cash in excess of the established facility limit;
> 2.     any negotiable instrument;
> 3.     jewelry, other than small religious items and wedding rings;

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

4.      other items of value, for example, cameras, radios, stereos;

5.      personal clothing and hygiene items when the facility provides them;

6.      drugs and medications not prescribed or authorized by facility medical staff and

7.      prohibited publications, including but not limited to: publications depicting activities that present a substantial risk of physical violence or group disruption (e.g., material dealing with self- defense, weaponry, armaments, explosives, or incendiary devices); publications containing sexually explicit material; or publications describing the production of drugs, alcohol, or weapons.

*Id.* at 92.

59.     The Current Contract for GEO's provision of detention services at the NWIPC includes the following mandatory requirement regarding telecommunication services available to detainees:

E. Manage and Maintain a Detainee Telephone System

The Contractor shall provide detainees with reasonable and equitable access to telephones as specified in ICE PBNDS on Telephone Access. Telephones shall be located in an area that provides for a reasonable degree of privacy and a minimal amount of environmental noise during phone calls.

If authorized to do so under applicable law, the Contractor shall monitor and record detainee conversations. If detainee telephone conversations can be monitored under applicable law, the Contractor shall provide notice to detainees of the potential for monitoring. However, the Contractor shall also provide procedures at the facility for detainees to be able to place unmonitored telephone calls to their attorneys.

Telephone rates shall not exceed the dominant carrier tariff rate and shall conform to all applicable federal, state, and local telephone regulations.

The ICE designated Detainee Telephone Services (DTS) vendor will be the exclusive provider of detainee telephones for this facility. The DTS contractor shall be allowed to install vending debit machines and shall receive 100 percent of all revenues collected by sale of prepaid debit services. The DTS provider shall be responsible for furnishing all inventory and supply of prepaid debit cards to the Contractor. The DTS provider shall be responsible for the costs incurred for installation of the equipment, any monthly telephone charges incurred from the operation of DTS, and the maintenance and operation of the system.

60.     The PBNDS applicable to GEO's provision of detention services at the NWIPC include at Section 5.6, mandatory requirements that provide, *inter alia*:

Generally, detainees or the persons they call shall be responsible for the costs of telephone calls; required exceptions are listed below.

Each facility shall provide detainees with access to reasonably priced telephone services. Contracts for such services shall comply with all applicable state and federal regulations and be based on rates and surcharges comparable to those

COMPLAINT - 18

charged to the general public. Any variations shall reflect actual costs associated with the provision of services in a detention setting.

2011 PBNDS at 386.

61. The PBNDS applicable to GEO's provision of detention services at the NWIPC include at Section 5.7, mandatory requirements that provide, *inter alia*:

Except as otherwise permitted herein, visitors may not give anything directly to a detainee, although it may be permissible for visitors to leave certain items and funds for a detainee with a staff member, at the discretion of the facility administrator.
\* \* \*
Each facility administrator shall decide whether to permit contact visits, as appropriate for the facility's physical plant and detainee population. Exceptions to this standard can be made by the facility administrator on a case-by-case basis when warranted by compelling circumstances or individual needs or conduct.
\* \* \*
Due to the relatively short length of stay and the fact that ICE/ERO provides all necessities, detainees may receive only minimal amounts of personal property, including:

1.    small religious items;
2.    religious and secular reading material (soft cover);
3.    legal documents and papers;
4.    pictures: 10 maximum, measuring 5" x 7" or smaller each;
5.    prescription glasses;
6.    dentures;
7.    personal address book or pages;
8.    correspondence;
9.    wedding rings;
10.   telephone calling cards; and
11.   other items approved by the facility administrator.

Each facility shall establish a visiting schedule based on the detainee population and the demand for visits. Visits shall be permitted during set hours on Saturdays, Sundays and holidays, and to the extent practicable, facilities shall also establish visiting hours on weekdays and during evening hours.

To accommodate the volume of visitors within the limits of space and staff resources, and to ensure adequate security, the facility administrator may restrict visits (e.g., some or all detainees and visitors may be limited to visiting on Saturday or on Sunday, but not both days). ICE/ERO does not require a facility to permit every visitor to visit on both days of a weekend, nor to permit every detainee to have visits on both days of a weekend.
\* \* \*
Written procedures shall detail the limits and conditions of contact visits in facilities that permit them. Ordinarily, within the bounds of propriety, handshaking, embracing and kissing are permitted only at the beginning and end of the visit; however, staff may limit physical contact to minimize opportunities for contraband introduction and to otherwise maintain the orderly operation of the visiting area.

*Id*. at 393-97.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

62.     Numerous operating requirements contained within HB 1470 are inconsistent with or directly conflict with explicit contractual requirements for the operation of the NWIPC in accordance with the requirements of ICE's PBNDS.

**IV.     Financial Impact of HB 1470 on GEO**

63.     On May 31, 2023 the Washington Department of Public Health ("DOH") contacted GEO and asserted that HB 1470 provided "authority for our agency to be involved with the [NWIPC]" and requested a meeting to discuss the scope of HB 1470.  Attachment A.  Pursuant to HB 1470 Section 3, DOH is authorized to immediately conduct unannounced inspections, investigate complaints, and conduct various testing.

64.     Compliance with all the requirements in HB 1470 would place GEO in breach of its contract requirements for services at the NWIPC and could result in contractual penalties and termination of GEO's Current Contract, costing GEO approximately $160,000,000 in lost revenue under the Current Contract.

65.     Compliance with requirements in HB 1470 Section 2 would necessitate significant physical modifications to the NWIPC, including the wholesale redesign of the HVAC system and extensive physical modifications to the building structure currently estimated to cost GEO in excess of $3,000,000.

66.     Compliance with certain requirements in HB 1470 Section 4 (which would be required upon renewal of the Current Contract) is physically impossible based on the current facility configuration and the structural systems of the existing NWIPC.

**COUNT I: VIOLATION OF INTERGOVERNMENTAL IMMUNITY
(DIRECT REGULATION OF THE FEDERAL GOVERNMENT)**

67.     Plaintiff re-alleges and incorporates by reference the allegations of the preceding paragraphs.

68.     GEO, as a contractor for the United States, enjoys and is clothed with the Federal Government's intergovernmental immunity. *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180–81 (1988); *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014).

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

69.     Under the Supremacy Clause of the United States Constitution, "the activities of the Federal government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). State laws run afoul of intergovernmental immunity when they "involve[] a direct, physical interference with federal activities . . . or some direct, immediate burden on the performance of the [federal] functions." *Railway Mail Ass'n v. Corsi*, 326 U.S. 88, 96 (1945).

70.     By prescribing operational requirements regarding numerous aspects of a federal private detention facility, HB 1470 substantially interferes with federal government operations and places immediate burdens on the performance of federal functions.

71.     HB 1470 substantially interferes with ICE's ability to carry out its Congressionally-mandated detention responsibilities.

72.     Congress has not authorized the State of Washington to regulate the federal government's activities with respect to federal detention facilities like GEO's.

73.     HB 1470 is unconstitutional and invalid as applied to GEO's provision of detention services at the NWIPC on behalf of ICE because it directly regulates the physical and operational requirements of its contracted facility. *United States v. Washington*, 142 S.Ct. 1976 (2022); *Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014).

## COUNT II: VIOLATION OF INTERGOVERNMENTAL IMMUNITY (IMPERMISSIBLE DISCRIMINATION)

74.     Plaintiff re-alleges and incorporates by reference the allegations of the preceding paragraphs.

75.     Under the Supremacy Clause, "the activities of the Federal Government are free from regulation by any state."  Accordingly, a state law is invalid if it "regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *North Dakota v. United States,* 495 U.S. 423, 435, (1990); *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir.2010). "A state or local law discriminates against the federal government if it treats someone else better than it treats the government." *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010) (internal quotation marks omitted).

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150

76. A state law "discriminates" against the federal government or its contractors, for purposes of the intergovernmental immunity doctrine, if it singles them out for less favorable "treatment," or if it regulates them unfavorably on some basis related to their governmental "status." *Washington*, 142 S. Ct. at 1984, *quoting North Dakota*, 495 U.S., at 438 (plurality opinion).

77. The legislative record regarding HB 1470 starkly and unmistakably demonstrates that it was specifically designed to target and impose unique burdens on a single facility—the federal Northwest ICE Processing Center—while specifically exempting any similarly-situated Washington State facilities.

78. HB 1470 Section 8 clarifies the intent of the legislature to prohibit private detention facilities in the state: "Therefore, it is the intent of the legislature to prohibit the use of private, for-profit prisons and detention facilities in the state… ."

79. HB 1470 Section 5 creates a private right of action for detained persons and specifies available monetary damages, injunctive relief, and the recovery of attorneys' fees and costs against operators of detention facilities, but then casually notes that "[t]he state and its agencies are not liable for a violation of this chapter."

80. Similarly, HB 1470 Section 6 creates an additional regime of civil penalties while again noting that "[t]he state and its agencies are not liable for a violation of this chapter."

81. During a March 13, 2023, Public hearing of the Washington Senate Committee on Human Services, the bill's primary House sponsor acknowledged that there is *only one* private detention facility that would be subject to HB 1470. Washington State Senate Human Services Committee hearing on 2SHB 1470 - Concerning private detention facilities (Mar. 13, 2023 10:30 a.m. at 16:20), available at https://tvw.org/video/senate-human-services-2023031331/?eventID=2023031331. Similarly, during a March 30, 2023, Public hearing of the Washington Senate Ways and Means Committee, a representative of the Committee on Human Services (Mar. 30, 2023 12:30 p.m. at 4:07) confirmed that *only one* "private detention facility" would be covered by HB 1470—*GEO's Northwest ICE Processing Center (NWIPC) in Tacoma.*

COMPLAINT - 22

Washington State Senate Ways & Means Committee hearing on 2SHB 1470 - Concerning private detention facilities (Mar. 30, 2023 12:30 p.m. at 4:07:34), available at https://tvw.org/video/senate-ways-means-2023031607/?eventID=2023031607.

82.     Finally, the Washington Multiple Agency Fiscal Note Summary accompanying HG 1470 states that "While prior versions of the bill *could have impacted private detention facilities that DSHS might wish to contract with in the future*, the *new language in Section 10 of this bill exempts those types of facilities from the new requirements*." (emphasis added) https://fnspublic.ofm.wa.gov/FNSPublicSearch/GetPDF?packageID=68477 at 15. The Fiscal Note explains that the section 10 exemptions ensured that only the Northwest ICE Processing Center in Tacoma was subject to the requirements of HB 1470: "*New Section 10's criteria reduced the amount of private detention facilities from three to now just one at the Northwest Detention Center in Tacoma.*" *Id*. at 24 (emphasis added).

83.     HB 1470 is unconstitutional and invalid as applied to GEO's provision of detention services at the NWIPC on behalf of ICE because it impermissibly discriminates against the federal government and its contractors. *United States v. Washington*, 142 S.Ct. 1976 (2022).

### COUNT III:   FEDERAL PREEMPTION
### (FIELD PREEMPTION)

84.     Plaintiff re-alleges and incorporates by reference the allegations of the preceding paragraphs.

85.     Federal immigration law provides that the Secretary of Homeland Security "shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," and "[w]hen United States facilities are unavailable or facilities adapted or suitably located for detention are unavailable for rental, the [Secretary] may expend . . . amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities . . . necessary for detention." 8 U.S.C. § 1231(g)(1). Congress has instructed that ICE "shall consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for [detention]" before beginning any project to develop a new detention facility. 8 U.S.C.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

§ 1231(g)(2) (emphasis added).

86.     In enacting Section 1231(g)(1), "Congress . . . placed the responsibility of determining where aliens are detained within the discretion of the [Secretary]." *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1440 (9th Cir. 1986). That discretion is "broad." *Id.* at 62.

87.     To effectively arrange for appropriate places of detention for removal aliens, Congress further granted the Secretary authority "to make contracts . . . as may be necessary and proper to carry out [his] responsibilities," 6 U.S.C. § 112(b)(2), including contracts with private parties.

88.     Congress further authorized the Secretary, in his "reasonable discretion," to carry out the immigration enforcement activities of the Department of Homeland Security "through any means," including "through contracts, grants, or cooperative agreements with non-Federal parties." 28 U.S.C. § 530C(a)(4).

89.     Congress has also authorized the Secretary to "enter into contracts and other agreements, of any reasonable duration, for detention or incarceration space or facilities, including related services, on any reasonable basis." 18 U.S.C. § 4013 note "Contracts for Space or Facilities" (emphasis added).

90.     Where Congress delegates broad discretion to an Executive Branch official to achieve some end, state laws are preempted when they frustrate the natural effect of that delegation and blunt the consequences of Executive acts taken pursuant to the delegation. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–377 (2000).

91.     Federal statutory directives and a comprehensive set of federal detention standards govern the operation of ICE's private detention facilities, including every aspect of detention covered by HB 1470.

92.     The current PBNDS were implemented at the direction of Congress. The Joint Explanatory Statement and House Report 114-668, which accompany the Fiscal Year (FY) 2017 Department of Homeland Security (DHS) Appropriations Act (P.L. 115-31) evince this direction. The Joint Explanatory Statement says: "Within 45 days after the enactment of this Act, ICE shall

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

report on its progress in implementing the 2011 Performance Based National Detention Standards, including the 2016 revisions…"  163 Cong. Rec. H3812 (2017). House Report 114-668 states: "Within 45 days after the date of enactment of this Act, ICE shall report on its progress in implementing the 2011 PBNDS and requirements related to PREA, including a list of facilities that are not yet in compliance; a schedule for bringing facilities into compliance; and current year and estimated future year costs associated with compliance." H.R. Rep. No. 114-668, at 35 (2016).

93.     The comprehensive framework enacted by Congress regarding the detention of aliens for removal leads to the conclusion that the Federal Government has occupied the field. *See Arizona v. U.S.*, 567 U.S. 387 (2012) ("*Arizona II*"); *American Ins. Assn. v. Garamendi*, 539 U.S. 396, 419, n. 11 (2003). *see also* Dinh, *Reassessing the Law of Preemption*, 88 Geo. L.J. 2085, 2098–2099, 2107 (2000).

94.     Where Congress occupies an entire field, as it has in the field of alien detention pending removal, even complementary state regulation is impermissible. Field preemption reflects a congressional decision to foreclose *any state regulation in the area, even if it is parallel to federal standards*. *See Arizona II* at 401; *citing Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 249 (1984).

95.     HB 1470 is unconstitutional and invalid as applied to GEO's provision of detention services at the NWIPC on behalf of ICE because it is preempted by Congress' occupation of the entire field of alien detention pending removal.

**COUNT IV:   FEDERAL PREEMPTION**
**(CONFLICT PREEMPTION)**

96.     As early as *Gibbons*, Chief Justice Marshall stated the governing principle—that "acts of the State Legislatures . . . [which] interfere with, or are contrary to the laws of Congress, made in pursuance of the constitution," are invalid under the Supremacy Clause.  22 U.S. at 211 (emphasis added).  More than 100 years later Mr. Justice Black, after reviewing the precedents, wrote in a similar vein that, while "[t]his Court, in considering the validity of state laws in the light of treaties or federal laws touching the same subject, ha[d] made use of the following expressions: conflicting;   contrary   to;   occupying   the   field;   repugnance;   difference;   irreconcilability;

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150

1  inconsistency; violation; curtailment; and interference [,] . . . [i]n the final analysis," our function

2  is to determine whether a challenged state statute "stands as an obstacle to the accomplishment

3  and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52,

4  67 (1941).

5  97. In cases where federal and state law conflict, "federal law prevails and state law is

6  preempted." *Murphy v. NCAA*, 138 S. Ct. 1461, 1476 (2018). Local law will also be found to be

7  preempted by federal law whenever the "challenged state statute 'stands as an obstacle to the

8  accomplishment and execution of the full purposes and objectives of Congress.' " *Perez v.*

9  *Campbell*, 402 U.S. 637, 649 (1971) (*quoting Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). *See*

10  *also Rust v. Johnson*, 597 F.2d 174, 179 (9th Cir.) (local government cannot override federal

11  interest even though local government was engaged in valid state function), *cert. denied*, 444 U.S.

12  964 (1979).

13  98. Compliance with many of the requirements contained in HB 1470 and those

14  contained in the current ICE contract and PBNDS applicable to NWIPC is impossible because of

15  direct conflicts and inconsistencies.

16  99. HB 1470 as a whole constitutes an impermissible obstacle to Congress' purpose for

17  creating a uniform federal framework for the detention of aliens pending removal.

18  **COUNT V:   VIOLATION OF THE CONTRACTS CLAUSE**

19  100. Plaintiff re-alleges and incorporates by reference the allegations of the preceding

20  paragraphs.

21  101. Article 1, Section 10 of the United States Constitution expressly provides that "[n]o

22  State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."

23  102. By imposing requirements and obligations on GEO's provision of detention

25  services at NWIPC that are inconsistent with and directly conflict with GEO's Current Contract

26  with ICE, compliance with HB 1470 will force GEO to breach its Current Contract with ICE and,

27  therefore, HB 1470 operates to substantially impair that contractual relationship.

28  103. It is inappropriate for state governments to try to control federal contracts as a

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

means to achieving their political and policy goals.

104.    Courts have interpreted the Contracts Clause to invalidate a state law that has "operated as a substantial impairment of a contractual relationship," unless that state law "is drawn in an 'appropriate' and 'reasonable' way to advance a 'significant and legitimate public purpose.'" *Sveen v. Melin*, 138 S. Ct. 1815, 1821–22 (2018) (citations omitted).

105.    The Proponents of HB 1470 have expressly stated that the goal of the legislation is to "prohibit the use of private, for-profit prisons."  Additionally, the Washington Legislature has acknowledged that HB 1470 was specifically designed and amended to exempt all similarly-situated state facilities from the burdensome requirements of the statute which are applicable only to GEO's provision of services at the federal NWIPC under contract with ICE. https://fnspublic.ofm.wa.gov/FNSPublicSearch/GetPDF?packageID=68477, p.24.

106.    HB 1470 violates the Contracts Clause because it substantially impairs GEO's contractual relationship with ICE and it is *not* drawn in an 'appropriate' and 'reasonable' way to advance a 'significant and legitimate public purpose"—it was drawn to apply only to NWIPC with the goal of prohibiting the operation of federal private immigration detention in Washington.

107.    It is unreasonable for Washington to impair the Current Contract between the federal government and GEO for the housing of federal immigration detainees by novel legislation taking immediate effect with a targeted impact on only GEO and ICE,  all while refusing to protect similarly situated detainees held in facilities under contract with the State of Washington. Therefore, Washington cannot reasonably assert that the operation of private detention facilities in the State poses a uniquely troubling emergency justifying HB 1470's interference with GEO's contractual relationship with ICE.

## PRAYER FOR RELIEF

WHEREFORE, The GEO Group, Inc., respectfully requests that this Court enter an order and judgment:

a.    Declaring that House Bill 1470 violates the Supremacy Clause and the Contracts
        Clause of the United States Constitution and is unconstitutional as applied to GEO in

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150

1    its provision of detention services for ICE;

2    b.   Preliminarily and permanently enjoining Defendants, as well as their successors,

3         agents, employees, and all those under their supervision, from enforcing, whether

4         prospectively or retroactively, House Bill 1470 against GEO in its provision of

5         detention services for ICE;

6    c.   Awarding attorneys' fees and costs as permitted by law; and

7    d.    Granting such other and further relief as this Court deems just and proper.

8    DATED this 13th day of July, 2023.

9
                                    Davis Wright Tremaine LLP
10                                   *Attorneys for Plaintiff*

11                                   By /s/ Harry Korrell
12                                      Harry J. F. Korrell, WSBA No. 23173
                                        John G. Hodges-Howell, WSBA No. 42151
13                                      920 Fifth Avenue, Suite 3300
                                        Seattle, WA 98104-1610
14                                      Phone:  206.622.3150
                                        Email:  harrykorrell@dwt.com
15                                      Email:  jhodgeshowell@dwt.com

16

17                                   Scott Allyn Schipma,* D.C. Bar No. 450425
                                        Joseph Negron, Jr.,* FL Bar No. 613398
18                                      4955 Technology Way
                                        Boca Raton, FL 99431
19                                      Phone:  561.999.7615
                                        Email:  scott.schipma@geogroup.com
20                                      Email:  jnegron@geogroup.com

21
                                        *Pro Hac Vice* Applications Forthcoming
22

23

25

26

27

28

COMPLAINT - 28

Attachment A

**From:** "Laxson, Joe D (DOH)" <Joe.Laxson@doh.wa.gov>
**Date:** May 31, 2023 at 3:49:29 PM EDT
**To:** Jose Gordo <jgordo@geogroup.com>
**Subject:** [EXTERNAL] WA Department of Health - Connection

Good afternoon Mr. Gordo,

I am the Policy Director for the Division of Environmental Public Health at the Washington Department of Health.  We wanted to connect with you and Geo Group related to recent Washington State legislation establishing authority for our agency to be involved with the Northwest ICE Processing Center in Tacoma, Washington.  It is a new law with a lot of complexity and we are hoping to meet you and anyone in your organization involved in the center related to the scope of the law. Here is a link to the session law (which I'm sure you already aware of):  Washington State Legislature

While we have started meeting with a number of groups related to our future work, I'm hoping we could schedule a meet and greet in the next few weeks.

Let me know and I'd be happy to chat prior to committing to a date for a meet and greet.

Sincerely,

**Joe Laxson**
Gender Pronouns:  he/him
Policy Director
Office of the Assistant Secretary
Environmental Public Health
Washington State Department of Health
joe.laxson@doh.wa.gov
360.236.3012 | www.doh.wa.gov

