The Honorable Benjamin H. Settle

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

| | |
|---|---|
| THE GEO GROUP, INC., | NO.  3:23-cv-05626-BHS |
| Plaintiff, | DEFENDANTS' MOTION TO DISMISS |
| v. | NOTE ON MOTION CALENDAR: SEPTEMBER 1, 2023 [1] |
| JAY R. INSLEE, in his official capacity as Governor of the State of Washington; ROBERT W. FERGUSON, in his official capacity as Attorney General of the State of Washington, | |
| Defendants. | |

---

[1] The State has concurrently filed its Opposition to GEO's PI motion, which notes on August 11, 2023, and respectfully requests the Court consider this Motion to Dismiss alongside GEO's PI motion.

**TABLE OF CONTENTS**

I.    INTRODUCTION.................................................................................................... 1

II.   FACTUAL BACKGROUND ................................................................................. 1

III.  ARGUMENT ........................................................................................................ 6

      A.   GEO's Claims Are Not Justiciable .............................................................. 7

           1.   GEO lacks pre-enforcement standing to facially challenge HB 1470 .............. 7

           2.   This case is not prudentially ripe.......................................................... 8

      B.   HB 1470 Does Not Violate Intergovernmental Immunity........................................ 9

           1.   HB 1470 directly regulates private business—not federal activities ................ 9

           2.   HB 1470 does not impermissibly discriminate against GEO.......................... 13

      C.   HB 1470 Is Not Preempted ................................................................... 16

           1.   HB 1470 is not field preempted ......................................................... 17

           2.   HB 1470 is not conflict preempted ..................................................... 19

      D.   HB 1470 Does Not Violate the Contracts Clause......................................... 21

           1.   HB 1470 does not substantially impair GEO's contract ............................. 21

           2.   HB 1470 is a reasonable response to safety and health concerns
                associated with private detention facilities........................................ 23

IV.   CONCLUSION .................................................................................................... 24

# TABLE OF AUTHORITIES

## Cases

*Alaska Right to Life Political Action Comm. v. Feldman,*
  504 F.3d 840 (9th Cir. 2007) ........................................................................ 9

*Am. Petroleum Inst. v. E.P.A.,*
  683 F.3d 382 (D.C. Cir. 2012)...................................................................... 9

*American-Arab Anti-Discrimination Comm. v. Thornburgh,*
  970 F.2d 501 (9th Cir. 1991) ........................................................................ 8

*Apartment Ass'n of L.A. Cnty., Inc. v. City of Los Angeles,*
  500 F. Supp. 3d 1088 (C.D. Cal. 2020), *aff'd,*
  10 F.4th 905 (9th Cir. 2021) ................................................................. 23, 24

*Arizona v. California,*
  283 U.S. 423 (1931) ................................................................................... 12

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ..................................................................................... 6

*Balistreri v. Pacifica Police Dep't,*
  901 F.2d 696 (9th Cir. 1988) ........................................................................ 6

*Boeing Co. v. Movassaghi,*
  768 F.3d 832 (9th Cir. 2014) ...................................................................... 11

*Cetacean Cmty. v. Bush,*
  386 F.3d 1169 (9th Cir. 2004) ...................................................................... 6

*Chandler v. State Farm Mut. Auto. Ins. Co.,*
  598 F.3d 1115 (9th Cir. 2010) ...................................................................... 6

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ..................................................................................... 8

*Cmty. Hous. Improvement Program v. City of New York,*
  492 F. Supp. 3d 33 (E.D.N.Y. 2020), *aff'd,*
  59 F.4th 540 (2d Cir. 2023) ........................................................................ 22

*Dawson v. Steager,*
  139 S. Ct. 698 (2019).................................................................................. 13

*Energy Rsrvs. Grp. v. Kansas Power & Light Co.,*
  459 U.S. 400 (1983).............................................................................. 22, 23

*GEO Group, Inc. v. Newsom,*
  50 F.4th 745 (2022) (en banc) .................................................................... 11

DEFENDANTS' MOTION TO DISMISS
NO.  3:23-CV-05626-BHS

ii

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

*Gill v. U.S. Dep't of Justice*,
913 F.3d 1179 (9th Cir. 2019) ............................................................................ 18

*Goldstein v. California*,
412 U.S. 546 (1973) .................................................................................. 19, 20

*Goodyear Atomic Corp. v. Miller*,
486 U.S. 174 (1988) .................................................................................. 11, 12

*Hancock v. Train*,
426 U.S. 167 (1976) ............................................................................................ 12

*Hillsborough County v. Automated Med. Lab., Inc.*,
471 U.S. 707 (1985) ............................................................................................ 18

*Humanitarian Law Project v. U.S. Treasury Dep't*,
578 F.3d 1133 (9th Cir. 2009) .............................................................................. 7

*Incalza v. Fendi N. Am., Inc.*,
479 F.3d 1005 (9th Cir. 2007) ............................................................................ 19

*Johnson v. Maryland*,
254 U.S. 51 (1920) .............................................................................................. 12

*Matsuda v. City & County of Honolulu*,
512 F.3d 1148 (9th Cir. 2008) ............................................................................ 21

*Mayo v. United States*,
319 U.S. 441 (1943) ............................................................................................ 12

*McCulloch v. Maryland*,
17 U.S. 316 (1819) .............................................................................................. 11

*North Dakota v. United States*,
495 U.S. 423 (1990) (plurality opinion) ................................................ 10, 12, 16

*Owino v. CoreCivic, Inc.*,
No. 17-CV-1112 JLS (NLS),
2018 WL 2193644 (S.D. Cal. May 14, 2018) .................................................... 17

*Penn Dairies v. Milk Control Comm'n of Pa.*,
318 U.S. 261 (1943) ............................................................................................ 10

*Pub. Utils. Comm'n of State of Calif. v. United States*,
355 U.S. 534 (1958) ............................................................................................ 12

*Puente Arizona v. Arpaio*,
821 F.3d 1098 (9th Cir. 2016) ............................................................................ 16

*Renne v. Geary*,
501 U.S. 312 (1991) .............................................................................................. 6

DEFENDANTS' MOTION TO DISMISS
NO.  3:23-CV-05626-BHS

iii

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218 (1947) .................................................................................... 17

*Ry. Mail Ass'n v. Corsi*,
    326 U.S. 88 (1945) ...................................................................................... 12

*Safe Air for Everyone v. Meyer*,
    373 F.3d 1035 (9th Cir. 2004) ...................................................................... 6

*San Diego County Gun Rts. Comm. v. Reno*,
    98 F.3d 1121 (9th Cir. 1996) ..................................................................... 8, 9

*Sveen v. Melin*,
    138 S. Ct. 1815 (2018) ........................................................................... 21, 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ...................................................................................... 6

*Thomas v. Anchorage Equal Rts. Comm'n*,
    220 F.3d 1134 (9th Cir. 2000) (en banc) .................................................. 7, 8

*Twitter, Inc. v. Paxton*,
    56 F.4th 1170 (9th Cir. 2022) ....................................................................... 8

*U.S. Trust Co. of NY v. New Jersey*,
    431 U.S. 1 (1977) ........................................................................................ 23

*United States v. Boyd*,
    378 U.S. 39 (1964) ...................................................................................... 10

*United States v. California*,
    921 F.3d 865 (9th Cir. 2019), *cert. denied*,
    141 S. Ct. 124 (2020) .......................................................................... passim

*United States v. New Mexico*,
    455 U.S. 720 (1982) .................................................................................... 10

*United States v. Nye County*,
    178 F.3d 1080 (9th Cir. 1999) .................................................................... 13

*United States v. Washington*,
    142 S. Ct. 1976 (2022) .................................................................... 9, 12, 13

*Wolfson v. Brammer*,
    616 F.3d 1045 (9th Cir. 2010) ...................................................................... 8

*Wyeth v. Levine*,
    555 U.S. 555 (2009) .................................................................................... 17

## **Constitutional Provisions**

U.S. Const. art. 1, § 10 ................................................................. 1, 21

U.S. Const. art. III .......................................................................... 6

## **Statutes**

8 U.S.C. § 1103(a)(11) ................................................................. 17

8 U.S.C. § 1231(g) ....................................................................... 17

Contract Disputes Act of 1978, 41 U.S.C. §§ 7101-09 ........................................... 23

Engrossed H.B. 1090, 67th Leg., Reg. Sess. (Wash. 2021)
  *enacted as* 2021 Wash. Sess. Laws, ch. 30 ............................................. 4, 14

Engrossed Substitute H.B. 2576, 66th Leg., Reg. Sess. (Wash. 2020)
  *enacted as* 2020 Wash. Sess. Laws, ch. 284 ................................................ 3

Engrossed Substitute S.B. 6442 *enacted as* 2020 Wash. Sess. Laws, ch. 318 ........................... 3

Second Substitute H.B. 1470, 68th Leg., Reg. Sess. (Wash. 2023) *enacted as* 2023
  Wash. Sess. Laws, ch. 419 ........................................................ passim

RCW 43.70.170 ............................................................................ 16

RCW 49.17.070 ............................................................................ 16

RCW 70.129.090 ........................................................................... 15

RCW 70.395.010 ........................................................................... 24

RCW 70.395.020 ........................................................................... 13

RCW 72.10 ................................................................................ 15

  RCW 72.09.190 .......................................................................... 15

  RCW 72.09.225 .......................................................................... 15

  RCW 72.09.760 .......................................................................... 15

  RCW 72.68.010 ........................................................................... 3

  RCW 72.68.110 ........................................................................... 3

730 Ill. Comp. Stat. 141/1-999 .............................................................. 4

Cal. Penal Code §§ 9500-9505 ............................................................... 4

Iowa Code § 904.119 ........................................................................ 4

1    N.Y. Correct. Law § 121 ................................................................................................ 4

2    Nev. Rev. Stat. § 208.280 .............................................................................................4

3

### Regulations

4    Exec. Order No. 13132, 64 Fed. Reg. 43255 (Aug. 4, 1999) ................................. 18

5    Exec. Order No. 14,006, 86 Fed. Reg. 7483 (Jan. 26, 2021)................................... 2

6    WAC 137-55-030 ........................................................................................................ 15

7    WAC 246-337-001 ...................................................................................................... 15

8    WAC 246-337-060 .............................................................................................. 5, 15

9    WAC 246-337-075 ........................................................................................................ 5

10   WAC 246-337-111 ........................................................................................................ 5

11   WAC 246-337-112 .............................................................................................. 5, 15

12   WAC 246-337-128 .............................................................................................. 5, 15

13   WAC 246-337-129 .............................................................................................. 5, 15

14   WAC 246-337-135 .............................................................................................. 5, 15

15   WAC 296-900-12005 .................................................................................................. 16

16

### Rules

17   Fed. R. Civ. P. 12(b)(1) ................................................................................................ 6

18   Fed. R. Civ. P. 12(b)(6) ................................................................................................ 6

19

### Other Authorities

20   John Wiesman, Sec. of Health, Wash. State Dep't of Health, *Report to the Legislature:*
21      *Evaluating State and Local Authority and Practices Regarding Private Detention*
       *Facilities* (Nov. 2020)............................................................................................ 4

22   Mem. from Sally Q. Yates, Deputy Att'y Gen., U.S. Dep't of Just., to the Acting Dir. of
23      the Fed. Bureau of Prisons, *Reducing our Use of Private Prisons* (Aug. 18, 2016),
       https://www.justice.gov/archives/opa/file/886311/download ................................. 2

24   Senate Human Services Committee hearing on 2SHB 1470 (Wash. Mar. 13, 2023),
25      *video recording by* TVW, Washington State's Public Affairs Network,
       https://tvw.org/video/senate-human-services-2023031331/?eventID=2023031331 ............ 14

26

DEFENDANTS' MOTION TO DISMISS       vi       ATTORNEY GENERAL OF WASHINGTON
NO.  3:23-CV-05626-BHS                        1125 Washington Street SE
                                            PO Box 40100
                                      Olympia, WA 98504-0100
                                         (360) 753-6200

U.S. DHS, Off. of the Inspector Gen., *Concerns about ICE Detainee Treatment and Care at Four Detention Facilities* (June 3, 2019), https://www.oig.dhs.gov/ sites/default/files/assets/2019-06/OIG-19-47-Jun19.pdf ........................................................... 2

U.S. DHS, Off. of the Inspector Gen., *ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards* (Jan. 29, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019- 02/OIG-19-18-Jan19.pdf ........................................................................................................... 3

U.S. DHS, Off. of the Inspector Gen., *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements* (July 26, 2018), https://www.oig.dhs.gov/sites/default/ files/assets/2018-06/OIG-18-67-Jun18.pdf .............................................................................. 3

U.S. DHS, Off. of the Inspector Gen., *Results of an Unannounced Inspection of Northwest ICE Processing Center in Tacoma, Washington* (May 22, 2023), https://www.oig.dhs.gov/sites/default/files/assets/2023-05/OIG-23-26-May23.pdf ............ 22

U.S. DHS, Off. of the Inspector Gen., *Results of an Unannounced Inspection of Northwest ICE Processing Center in Tacoma, Washington* (May 22, 2023), https://www.oig.dhs.gov/sites/default/files/assets/2023-05/OIG-23-26-May23.pdf .............. 3

U.S. DOJ, Off. of the Inspector Gen., *Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons* at 2 (Aug. 2016), https://www.oversight.gov/sites/default/files/oig-reports/e1606.pdf .................................... 2

Washington State Legislature, HB 1090 – 2021-22, Bill History, https://app.leg.wa.gov/billsummary?BillNumber=1090&Initiative= false&Year=2021 (last visited July 28, 2023) ........................................................................ 4

DEFENDANTS' MOTION TO DISMISS
NO.  3:23-CV-05626-BHS

vii

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1

## I.      INTRODUCTION

Washington's Legislature passed Second Substitute House Bill 1470 (HB 1470) to ensure that private detention facilities comply with basic health and safety standards for detained persons. Washington has long imposed similar standards on residential treatment facilities and state regulators have regularly inspected correctional and detention facilities operated by the State and localities. But until HB 1470, Washington had no such rules for private detention facilities, even though they have a far worse track record of mistreating detainees.

The GEO Group, Inc., a private prison and detention company with a well-documented history of mistreating detainees, now asks this Court to declare unconstitutional and enjoin application of HB 1470 to its business. Not only are GEO's claims not justiciable, but in making this request, GEO relies on an extraordinary claim of immunity from state regulation that conflicts with binding Ninth Circuit precedent. GEO also suggests that it is being discriminated against as a federal contractor, but in reality, other similar facilities already faced a broad range of regulations and inspections covering the same topics. Ending the special treatment that private detention facilities previously received is no evidence of discrimination. Similarly meritless is GEO's claim of preemption; GEO fails to show any congressional intent, let alone a clear and manifest one, to supersede the states' general authority to ensure the health and welfare of inmates and detainees in facilities within its borders. Finally, GEO brings a Contracts Clause claim, but HB 1470 does not impair GEO's contract, and in any event is a reasonable and appropriate mechanism to advance a legitimate public purpose.

Because none of GEO's claims states a plausible ground for relief, GEO's complaint should be dismissed.

## II.     FACTUAL BACKGROUND

HB 1470 is part of a growing recognition, by both federal and state governments, that action is necessary to address the well-documented, detrimental impacts that private detention facilities inflict on confined individuals.

---

DEFENDANTS' MOTION TO DISMISS
NO.  3:23-CV-05626-BHS

1

At the federal level, President Biden has directed that federal prisoners no longer be held in privately operated criminal detention facilities because "profit-based incentives" cause them to "consistently underperform [government-operated] facilities with respect to correctional services, programs, and resources."[2] This followed findings from the U.S. Department of Justice that private prisons "simply do not provide the same level of correctional services, programs, and resources" as government-operated prisons, and "do not maintain the same level of safety and security."[3] Likewise, DOJ's Office of the Inspector General found that "in most key areas, contract prisons incurred more safety and security incidents per capita than comparable [Bureau of Prisons] institutions."[4]

The U.S. Department of Homeland Security (DHS) has made similar findings for facilities that hold civil immigration detainees. For example, in 2018, in response to complaints about conditions at contract detention centers, the DHS Office of the Inspector General (OIG) conducted unannounced inspections at four locations—three of them operated by GEO.[5] The inspections revealed "significant health and safety risks, including nooses in detainee cells, improper and overly restrictive segregation, and inadequate detainee medical care."[6] OIG also found "significant food safety issues," "detainee bathrooms that were in poor condition, including mold and peeling paint on walls, floors, and showers," and an "absence of recreation" that risked "detainee mental health and welfare[.]"[7] The OIG found these violations flourish

---

[2] Exec. Order No. 14,006, on *Reforming Our Incarceration System to Eliminate the Use of Privately Operated Criminal Detention Facilities*, 86 Fed. Reg. 7483, 7483 (Jan. 26, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/26/executive-order-reforming-our-incarceration-system-to-eliminate-the-use-of-privately-operated-criminal-detention-facilities/.

[3] Mem. from Sally Q. Yates, Deputy Att'y Gen., U.S. Dep't of Just., to the Acting Dir. of the Fed. Bureau of Prisons, *Reducing our Use of Private Prisons* (Aug. 18, 2016), https://www.justice.gov/archives/opa/file/886311/download.

[4] U.S. DOJ, Off. of the Inspector Gen., *Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons* at 2 (Aug. 2016), https://www.oversight.gov/sites/default/files/oig-reports/e1606.pdf.

[5] U.S. DHS, Off. of the Inspector Gen., *Concerns about ICE Detainee Treatment and Care at Four Detention Facilities* at 2 (June 3, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-47-Jun19.pdf.

[6] *Id.* at 3.

[7] *Id.* at 3-4, 7-8.

DEFENDANTS' MOTION TO DISMISS
NO.  3:23-CV-05626-BHS

2

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

because ICE's inspections of contract facilities are "too infrequent," and lack "follow up on identified deficiencies," resulting in "certain deficiencies [that] remain unaddressed for years."[8] Recent inspections have continued to confirm failures at private immigration detention facilities. OIG's August 2022 inspection of the Northwest ICE Processing Center (NWIPC) revealed numerous deficiencies related to detainee health and safety.[9]

At the state level, the Washington Legislature responded to the crisis of private detention facilities with legislation to ensure humane conditions of confinement for persons detained in those facilities. In 2020, the Legislature passed Engrossed Substitute Senate Bill 6442, which bans the Department of Corrections (DOC) from contracting with private prisons for the transfer or placement of state inmates except in emergencies. RCW 72.68.110(1); .010. The Legislature enacted ESSB 6442 after finding that "profit motives lead private prisons to cut operational costs, including the provision of food, health care, and rehabilitative services, because their primary fiduciary duty is to maximize shareholder profits." 2020 Wash. Sess. Laws, ch. 318, § 1(2). While these restrictions applied only to DOC, the Legislature's concerns extend to *all* individuals confined in private detention. And so, during the same session, the Legislature passed a second bill, directing the Department of Health (DOH) to evaluate and report on state and local authority and practices around privately operated detention facilities. Engrossed Substitute House Bill 2576, 66th Leg., Reg. Sess. (Wash. 2020) *enacted as* 2020 Wash. Sess. Laws, ch. 284, § 2. "While public facilities are directly accountable to public institutions," the Legislature concluded, "private facilities lack this oversight structure." *Id.*, § 1.

---

[8] U.S. DHS, Off. of the Inspector Gen., *ICE's Inspections and Monitoring of Detention Facilities Do Not Lead to Sustained Compliance or Systemic Improvements* (July 26, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-06/OIG-18-67-Jun18.pdf; *accord* U.S. DHS, Off. of the Inspector Gen., *ICE Does Not Fully Use Contracting Tools to Hold Detention Facility Contractors Accountable for Failing to Meet Performance Standards* (Jan. 29, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-02/OIG-19-18-Jan19.pdf.

[9] U.S. DHS, Off. of the Inspector Gen., *Results of an Unannounced Inspection of Northwest ICE Processing Center in Tacoma, Washington*, at 9-11 (May 22, 2023), https://www.oig.dhs.gov/sites/default/files/assets/2023-05/OIG-23-26-May23.pdf.

DEFENDANTS' MOTION TO DISMISS
NO.  3:23-CV-05626-BHS                    3                    ATTORNEY GENERAL OF WASHINGTON
                                                                1125 Washington Street SE
                                                                PO Box 40100
                                                                Olympia, WA 98504-0100
                                                                (360) 753-6200

In November 2020, DOH completed its survey of private detention providers in Washington.[10] Its report identified twelve facilities operated by six private entities.[11] One of those facilities contracts with a consortium of local counties; the rest hold contracts with ICE or the U.S. Department of Health and Human Services.[12] The report cited complaints about "improper detainee living conditions and lacking access to proper medical care," obstacles to "accessing the detainee[s] or their health records," and a lack of "transparency and accountability."[13] These complaints were "almost exclusively associated with the Northwest ICE Processing Center," as opposed to any of the other facilities (whether locally or federally contracted) that primarily detain youth.[14]

The following year, the Legislature returned to the problem of private detention, passing Engrossed House Bill 1090, 67th Leg., Reg. Sess. (Wash. 2021) *enacted as* 2021 Wash. Sess. Laws, ch. 30, which prohibited private detention facilities within the state.[15] In passing EHB 1090, the Legislature found that "people confined in for-profit prisons and detention facilities have experienced abuses and have been confined in dangerous and unsanitary conditions." 2021 Wash. Sess. Laws, ch. 30, § 1(3). Washington is among an emerging consensus of states who have determined that for-profit incarceration is inconsistent with the states' interest in the health, safety, and welfare of detained people.[16] After GEO sued to permanently enjoin EHB 1090's enforcement and a Ninth Circuit decision invalidated a similar California statute, the State filed notice that it would not enforce EHB 1090 as to GEO. *See* Defs.' Notice and Stipulation of Enforcement Position, *GEO Group v. Inslee*, No. 3:21-05313-

---

[10] Declaration of Marsha Chien, Exhibit 4, John Wiesman, Sec. of Health, Wash. State Dep't of Health, *Report to the Legislature: Evaluating State and Local Authority and Practices Regarding Private Detention Facilities* (Nov. 2020).

[11] *Id.* at 1.

[12] *Id.*

[13] *Id.* at 18.

[14] *Id.* at 20.

[15] *See* Washington State Legislature, HB 1090 – 2021-22, Bill History, https://app.leg.wa.gov/billsummary?BillNumber=1090&Initiative=false&Year=2021 (last visited July 28, 2023).

[16] *See, e.g.*, Cal. Penal Code §§ 9500-9505; 730 Ill. Comp. Stat. 141/1-999; Iowa Code § 904.119; Nev. Rev. Stat. § 208.280; N.Y. Correct. Law § 121.

1   BHS, ECF No. 65 (citing *GEO Group, Inc. v. Newsom*, 50 F.4th 735, 753 (2022) (en banc)).

2   That case remains pending before this Court. *Id.*

3         Most recently, the Legislature passed Second Substitute House Bill 1470 (HB 1470),

4   68th Leg., Reg. Sess. (Wash. 2023) *enacted as* 2023 Wash. Sess. Laws, ch. 419—the law GEO

5   seeks to enjoin here. HB 1470 does four primary things. *First*, it directs DOH to adopt regulations

6   "to ensure private detention facilities comply with measurable standards providing sanitary,

7   hygienic, and safe conditions for detained persons." *Id.*, §2. Section 2 sets out standards in eight

8   areas to guide the new rules. These standards are drawn directly from Washington's regulations

9   governing residential treatment facilities, and include requirements that facilities provide

10  detainees "a safe, clean, and comfortable environment," that "[l]iving areas . . . must be cleaned

11  and sanitized regularly," that laundry facilities must be "adequate to meet the needs of detained

12  persons," that facilities "shall provide a nutritious and balanced diet" and "follow proper food

13  handling and hygiene practices," and that "[s]afe indoor air quality must be maintained"

14  including comfortable temperatures. *Id.*; *see* WAC 246-337-075, -111, -112, -128, -135, -060,

15  -129 (setting regulations for residents).

16        *Second*, Section 3 of HB 1470 directs DOH to conduct inspections of private detention

17  facilities, both routinely and in response to complaints. *Id.*, § 3. It also requires the Department

18  of Labor and Industries (L&I) to conduct "inspections of workplace conditions at private

19  detention facilities, including work undertaken by detained persons." *Id.*

20        *Third*, Section 4 establishes standards for new contracts that go into effect after

21  January 1, 2023. *Id.*, § 4. Among other things, Section 4 will require private detention facilities

22  to provide commissary items "at reasonable prices," to provide telecommunications services,

23  radios, and television access free of charge, and to make in-person visitation available daily.

24  Section 4 also prohibits the use of solitary confinement, and sets requirements for medical care,

25  mental health evaluations, and responding to complaints of sexual violence and harassment.

26  Because GEO's contract for the NWIPC went into effect in 2020 and runs until September 2025,

DEFENDANTS' MOTION TO DISMISS
NO.  3:23-CV-05626-BHS

5

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

these standards do not apply to GEO's current operations.[17] And they may never apply—they only will if DHS chooses to enter into a new contract with GEO once the current contract ends.

*Fourth*, HB 1470 creates monetary penalties for violating its standards and provides for enforcement both by the State and aggrieved detainees. HB 1470, §§ 2-6.

### III.   ARGUMENT

Under Fed. R. Civ. P. 12(b)(1), a complaint must be dismissed if its allegations "are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Without standing, a court lacks article III jurisdiction and the case must be dismissed. *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004). The presumption is that "federal courts lack jurisdiction unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (cleaned up). The plaintiff bears the burden to establish article III standing and ripeness and to show that prudential ripeness concerns support review. *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010).

A motion pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Under Rule 12(b)(6), dismissal may be based either on a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). When ruling on the motion, "courts must consider the complaint in its entirety, as well as other sources . . . , in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

Here, the legal issues in this dispositive motion overlap considerably with those presented through GEO's motion for preliminary relief. *See* Dkt. #8 at 11-22. Because the Court will consider the motions concurrently, and to avoid unnecessary repetition, the State includes arguments responsive to GEO's motion as well.

---

[17] Dkt. #8 at p. 3.

6

## A.    GEO's Claims Are Not Justiciable

### 1.    GEO lacks pre-enforcement standing to facially challenge HB 1470

"Whether the question is viewed as one of standing or ripeness," in pre-enforcement challenges a plaintiff must show a "genuine threat of imminent prosecution." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc) (cleaned up). The Ninth Circuit applies a three-part test asking whether (1) "plaintiffs have articulated a 'concrete plan' to violate the law in question," (2) "the prosecuting authorities have communicated a specific warning or threat to initiate proceedings[]" against the plaintiff; and (3) there is a "history of past prosecution or enforcement" of the challenged law. *Id.* "Any pre-enforcement analysis starts with . . . *Thomas*." *Humanitarian Law Project v. U.S. Treasury Dep't*, 578 F.3d 1133, 1142 (9th Cir. 2009). The analysis in this case should end there, too. Although the third factor is not dispositive and carries little weight when the challenged law is new, even when limited to the first two *Thomas* factors, GEO fails to show a "genuine threat of imminent prosecution." 220 F.3d at 1139.

First, although GEO directs most of its ire against HB 1470, § 4, that section does not even apply to GEO. Section 4 does not apply to contracts in effect prior to 2023—this includes GEO's current contract with ICE, which was modified in 2021 and runs through September 27, 2025. Dkt. #1 ¶¶ 27, 51. To obtain the prospective relief GEO seeks, GEO is unable to describe, based on a future contract that does not yet exist, "when, to whom, where, or under what circumstances" it intends to violate Section 4, and thus cannot establish the first *Thomas* factor. 220 F.3d at 1139.

So too with HB 1470, § 2. DOH has just begun the rulemaking process, but has not yet proposed rules or received comments and testimony from the public and various interest groups, including GEO, on the substance of those rules. Declaration of Joseph Laxson Decl. ¶ 5. GEO couldn't possibly run afoul of the rules under Section 2 where none have yet been adopted. Thus,

GEO cannot meet its burden of establishing standing because it cannot show that harm is "certainly impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

Second, GEO has not alleged that any official has made a "specific threat" of initiating proceedings under HB 1470 against it. *Thomas*, 220 F.3d at 1140. To the contrary, a DOH representative reached out to GEO to introduce himself to "schedule a meet and greet" and noted the Department had met with a number of groups related to the work. Dkt. #1 at 29; Laxson Decl. ¶¶ 21-22. GEO fails to allege L&I has contacted GEO at all. Moreover, the mere existence of penalties under the statute does not suffice where there is no threat of enforcement against the plaintiff. *Thomas*, 220 F.3d at 1139-40 (specific threat means more than that a "proscriptive statute" is "on the books"). GEO must at least allege a "specific threat of enforcement" that was "directed toward" it. *Id.* at 1140 (cleaned up). GEO has not done so.

### 2.       This case is not prudentially ripe

Alternatively, the Court should decline to exercise jurisdiction because this case is not prudentially ripe. The ripeness doctrine "prevents the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1173 (9th Cir. 2022) (cleaned up). To determine whether a case is prudentially ripe, courts consider (1) whether the issues are fit for judicial resolution and (2) the potential hardship to the parties if judicial resolution is postponed. *Wolfson v. Brammer*, 616 F.3d 1045, 1060 (9th Cir. 2010) (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)); *id.* at 1064 (finding certain claims were not prudentially ripe because they rested upon contingent future events that might not occur as anticipated, if at all). Here, neither prong is met.

First, the issues are not fit for judicial resolution at this stage because a decision on the merits of GEO's constitutional claims "would be devoid of any factual context whatsoever," forcing the court to "be umpire to debates concerning harmless, empty shadows." *San Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1132 (9th Cir. 1996) (cleaned up); *American-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 510 (9th Cir. 1991) (declining

to exercise jurisdiction on "sketchy record . . . with many unknown facts"). GEO challenges Section 2 of HB 1470, but DOH has not yet "adopt[ed] rules as may be necessary to effectuate" that section. Laxson Decl. ¶ 4. There is ample time for GEO to provide comment to forthcoming proposed rules, and any final rules adopted will narrow the legal issues involved in this dispute. *Cf. Am. Petroleum Inst. v. E.P.A.*, 683 F.3d 382, 387-88 (D.C. Cir. 2012) (association's challenge was rendered prudentially unripe for review by agency's new proposed regulation). And GEO's facial challenges to Section 4 of HB 1470 are clearly unripe as that section does not apply to GEO's contract at all. This Court cannot possibly determine whether Section 4 conflicts with a hypothetical future contract that may never even exist.

Second, neither GEO nor the State will be harmed if judicial resolution is postponed. GEO has not shown a credible threat of enforcement to justify pre-enforcement judicial review, and so delaying resolution of its claims will not cause hardship. *Alaska Right to Life Political Action Comm. v. Feldman*, 504 F.3d 840, 851 (9th Cir. 2007). Nor will delaying adjudication prejudice GEO's ability to later vindicate its rights with an actual factual record, if that becomes necessary. *See San Diego County*, 98 F.3d at 1131. In a future enforcement action against GEO under HB 1470, GEO could invoke as defenses any of its claims asserted here, and such a case would have the benefit of a factual record regarding how the law is being enforced.

## B.    HB 1470 Does Not Violate Intergovernmental Immunity

A state law runs afoul of the doctrine of intergovernmental immunity "only if it regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *United States v. Washington*, 142 S. Ct. 1976, 1984 (2022) (citing *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion)). Since HB 1470 does neither, GEO's immunity claims should be dismissed.

### 1.    HB 1470 directly regulates private business—not federal activities

GEO sweepingly asserts that it is "clothed with the Federal Government's intergovernmental immunity" and thus "free from regulation by any state" as a federal

DEFENDANTS' MOTION TO DISMISS
NO.  3:23-CV-05626-BHS

9

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

contractor. Dkt. #1 ¶ 68. But that is not the law. A multitude of companies—from Boeing to Microsoft to Amazon—contract with the federal government, but that does not mean that states are powerless to regulate them.

To prove direct regulation, GEO must show that HB 1470 regulates "the United States itself, or . . . an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities." *United States v. New Mexico*, 455 U.S. 720, 735 (1982). In other words, to resist a state regulation, a private company must be "so incorporated into the government structure" that they "must actually 'stand in the Government's shoes.'" *Id.* at 735-36. In *New Mexico*, for example, the Supreme Court refused to extend immunity to federal contractors who managed federally-owned atomic laboratories because the contractors were using the federal property "in furtherance of the contractor's essentially independent commercial enterprise." *Id.* at 740-41, 742. *See also United States v. Boyd*, 378 U.S. 39, 44 (1964) (refusing to extend immunity to federal contractors because contractors remain "distinct" entities pursuing "private ends" and their actions are "commercial activities carried on for profit") (citations omitted); *North Dakota*, 495 U.S. at 437 (where state laws "operate against suppliers, not the Government," direct regulation "[is] not implicated"); *Penn Dairies v. Milk Control Comm'n of Pa.*, 318 U.S. 261, 270-71 (1943) ("[T]hose who contract to furnish supplies or render services to the government are not [government] agencies and do not perform governmental functions").

Here, HB 1470 does not impose any tax, obligation, or prohibition directly on the federal government. *See* Section 1(4)(e) (applying to "private detention facilit[ies]"). Nor is GEO a federal agency or instrumentality "so closely connected to the Government" that it "stand[s] in the [federal] Government's shoes." *New Mexico*, 455 U.S. at 735-36. Like in *New Mexico* and *Boyd*, GEO is a private company and its activities are "commercial [and] carried on for profit." *Boyd*, 378 U.S. at 44. By definition, then, there is no unconstitutional "direct regulation." When GEO advanced identical arguments in a prior case, the Ninth Circuit stated in no uncertain terms:

DEFENDANTS' MOTION TO DISMISS
NO.  3:23-CV-05626-BHS

10

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    "Private contractors do not stand on the same footing as the federal government, so states can

2    impose many laws on federal contractors that they could not apply to the federal government

3    itself." *GEO Group, Inc. v. Newsom*, 50 F.4th 745, 750 (2022) (en banc). *See also Goodyear*

4    *Atomic Corp. v. Miller*, 486 U.S. 174, 180 n.1 (1988) (observing the "fundamental distinction

5    between state regulation of private facilities and state regulation of federal facilities"). While the

6    court in *Newsom* struck down California's law banning private detention facilities, the Ninth

7    Circuit explicitly stated, "the Supremacy Clause therefore leaves considerable room for states to

8    enforce their generally applicable laws against federal contractors." *Newsom*, 50 F.4th at 755.

9    Put another way, the direct regulation prong does not immunize GEO from all state regulation;

10   in fact, the Ninth Circuit emphasized states' ability to subject GEO to "generally applicable

11   health and safety laws" such as HB 1470. *Id.* at 755 n.4.

12   GEO incorrectly insists that under *Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th Cir.

13   2014), intergovernmental immunity forbids a state from "substantially interfere[ing]" with any

14   federal activity. Dkt. #1 at 20-21. GEO's argument fails because *Boeing* is a straightforward

15   example of a state directly regulating the federal government itself. In *Boeing*, California passed

16   a law to govern nuclear waste cleanup at a single piece of property. *Id.* at 834. Though the

17   property was owned in part by the federal government and in part by Boeing, there was no

18   dispute that the federal government was the party "responsible" for the contamination at the

19   property and for remediating the radioactive waste. *Id.* at 835. Because the California statute

20   displaced federal laws and standards with more stringent state ones, *id.* at 839-40, and compelled

21   those stringent steps be taken by the "responsible party," *id.* at 839, the statute "regulate[d] the

22   federal government directly," regardless of whether the federal government hired Boeing to

23   perform its cleanup work. *Id.* at 842. HB 1470, in contrast, neither contains similar language nor

24   otherwise assigns any duty to the federal government.

25   Equally unavailing is GEO's reliance on *McCulloch v. Maryland*, 17 U.S. 316, 317-21

26   (1819), for the proposition that state laws are invalid if they "retard, impede, burden, or in any

manner control" federal activities. Dkt. #8 at 18. The Supreme Court "decisively rejected" this version of intergovernmental immunity nearly a century ago. *North Dakota*, 495 U.S. at 434-35 (reviewing the history of the doctrine). Now, whatever burdens are imposed on the federal government by a neutral state law regulating its suppliers "are but normal incidents of the organization within the same territory of two governments." *Id.* (cleaned up). In fact, the Supreme Court recently stated: "A state law is no longer unconstitutional . . . just because it indirectly increases costs for the federal Government." *Washington*, 142 S. Ct. at 1984 n.11.

None of GEO's remaining cases save its argument. Most involved direct state regulation of federal property or federal employees—whereas, here, GEO owns the property and employs the staff. *See* Dkt. #1 at 48-50; *cf. Pub. Utils. Comm'n of State of Calif. v. United States*, 355 U.S. 534, 542-43 (1958) (state law placed prohibition on federal procurement officers from negotiating transportation rates); *Mayo v. United States*, 319 U.S. 441, 444 (1943) (attempt by Florida to force U.S. Secretary of Agriculture's "compliance with reasonable state regulation [and] payment of reasonable inspection fees"); *Arizona v. California*, 283 U.S. 423, 452 (1931) (Arizona statute explicitly regulated "dams to be erected by the United States"); *Johnson v. Maryland*, 254 U.S. 51, 55 (1920) (criminal charges brought by Maryland against U.S. Post Office employee); *Hancock v. Train*, 426 U.S. 167, 168, 174 (1976) (Kentucky effort to force federal military bases to comply with air-quality rules). Indeed, in every intergovernmental immunity case cited by GEO where the property and employees were *private*, the state regulations were *upheld*. *See, e.g.*, *Goodyear Atomic Corp.*, 486 U.S. at 182 (allowing Ohio to impose workers' compensation rules on federal contractor); *Ry. Mail Ass'n v. Corsi*, 326 U.S. 88, 95-96 (1945) (rejecting immunity claim of "purely private organization" made up of federal postal workers).

In sum, the constitutional prohibition on direct regulation of the federal government is limited to just that—direct regulation of the federal government. Because GEO is a private

company and HB 1470 is a generally applicable health and safety law that regulates private entities, *not* the federal government, GEO's direct regulation claim should be dismissed.

### 2. HB 1470 does not impermissibly discriminate against GEO

A state law violates intergovernmental immunity if it "single[s] out for less favorable treatment" the federal government or federal contractors or "if it regulates them unfavorably on some basis related to their governmental 'status.'" *Washington*, 142 S. Ct. at 1984. As discussed below, Washington already imposes standards akin to those in HB 1470 on a wide swath of private and public entities for the treatment of live-in residents—in effect, HB 1470 added private, civil detention to the list of entities governed by these standards. And even if the NWIPC is the only private *detention center* to which HB 1470 currently applies, GEO cannot demonstrate that HB 1470 discriminates against federal contractors for two reasons.

First, intergovernmental immunity does not turn on the happenstance of whether another private detention facility presently exists, but on the statutory language itself. *See Dawson v. Steager*, 139 S. Ct. 698, 704 (2019) ("[W]hat matters" for intergovernmental immunity purposes is "the letter of the law"); *United States v. Nye County*, 178 F.3d 1080, 1084 (9th Cir. 1999) (concluding that the "wording of [a state law] is significant" when it comes to intergovernmental immunity). Here, HB 1470 is written broadly. By its plain terms, it applies to "private, nongovernmental for-profit entit[ies]" that "operat[e] pursuant to a contract or agreement with a federal, state, or local governmental entity." *See* HB 1470, § 1(e); RCW 70.395.020. It is not limited to federal contractors. *Id.* While HB 1470 contains some exemptions for facilities subject to Title 13 of the RCW (juvenile facilities), Title 71 of the RCW (civil commitment facilities), and Title 72 of the RCW (work release), it also exempts facilities subject to "similarly applicable federal law." *See* HB 1470 § 10(1)-(4). In any case, intergovernmental immunity does not shield a company from liability where there is no federal equivalent to exempt. *See, e.g.*, *Nye County*, 178 F.3d at 1088 (concluding a tax exemption for state universities did not impermissibly discriminate against the federal government because there was simply no federal equivalent, i.e.,

DEFENDANTS' MOTION TO DISMISS
NO.  3:23-CV-05626-BHS

13

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

federal   educational   institution,   to   exempt).   EHB 1090 already subjects state and local governments to a more stringent standard than the federal government by prohibiting them from hiring private detention facilities altogether, *see* EHB 1090, but if that law were to change, HB 1470 would apply to those private facilities housing people who are incarcerated or confined for purposes of trial or sentencing. If DOC or a county sought to contract with a private detention facility, including GEO itself, for example, HB 1470 would apply just as it does to the NWIPC. *See* Senate Human Services Committee hearing on 2SHB 1470 (Wash. Mar. 13, 2023), at 16:20, *video   recording   by*   TVW,   Washington   State's   Public   Affairs   Network, https://tvw.org/video/senate-human-services-2023031331/?eventID=2023031331   (primary sponsor testifying that HB 1470 "sets the standard that any private facility that we do business with will adhere to the same standards, so opening it up for any future private detention facilities in our state").

Second, even if HB 1470's language could be read to focus on NWIPC, that alone is not enough. The Ninth Circuit's decision in *United States v. California* is remarkably analogous. In that case, California passed three laws that were "expressly designed to protect its residents from federal immigration enforcement," including AB 103, a law that authorized the California Attorney General to inspect detention facilities housing civil immigration detainees and evaluate, among other things, "the conditions of confinement" as well as "the standard of care and due process provided." 921 F.3d 865, 876 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 124 (2020). Even though AB 103 "relate[d] exclusively to federal conduct," the Ninth Circuit reasoned that, "intergovernmental immunity attaches only to state laws that discriminate against the federal government *and* burden it in some way." *Id.* at 880 (emphasis added). Intergovernmental immunity "is not implicated when a state merely references or even singles out federal activities in an otherwise innocuous enactment." *Id.* at 881. As a result, the only AB 103 provision shielded by intergovernmental immunity was a "novel requirement" that inspectors examine the circumstances surrounding immigrant detainees' apprehension and transfer to the facility. 921

DEFENDANTS' MOTION TO DISMISS
NO.  3:23-CV-05626-BHS

14

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

F.3d at 884. The Ninth Circuit otherwise upheld AB 103's inspection requirements in as much as they "duplicate[d] preexisting inspection demands imposed on state and local detention facilities." *Id.* at 884.

Here, HB 1470 likewise applies requirements already imposed on other facilities. For example, Section 2 is drawn directly from Title 246 of the Washington Administrative Code, which sets minimum health and safety standards for "twenty-four hour private, county or municipal residential treatment facilities." *See* WAC 246-337-001. Those standards include the provision of laundry facilities, *see* WAC 246-337-112; the requirement that laundry rooms be ventilated to the exterior, *see* WAC 246-337-128; the requirement that an infection control program exist to prevent communicable diseases, *see* WAC 246-337-060; and the requirement that heating and air conditioning be available and adjustable by room or area, *see* WAC 246-337-135. Other provisions replicate existing regulatory requirements for DOC facilities, including the provision of basic personal hygiene items, *see* WAC 137-55-030, WAC 137-55-030.

Although section 4 does not apply to the current contract at NWIPC, *see supra* at 7, it too largely replicates existing regulatory requirements for other facilities, including the guarantee that detainee rooms have access to natural light and natural air circulation, *see* WAC 246-337-129; that detainees have access to commissary items, *see* RCW 72.09.760; to legal services and a law library, *see* RCW 72.09.190; the provision of medical care, *see* RCW 72.10; and visitations, *see* RCW 70.129.090; and the requirement that sexual misconduct grievances be responded to immediately, *see* RCW 72.09.225. Other Section 4 provisions extend DOC's policies to private detention facilities, including those related to clothing and bed linens, *see* DOC Policy No. 440.050; the exchange of lost or unserviceable clothing, *see id.*; the provision of mental health services, *see* DOC Policy No. 610.040, DOC Policy No. 630.500; telephone access, *see* DOC Policy No. 450.200; the availability of in-person visits, *see* DOC Policy No. 450.300; interpretation services for Limited English Proficient inmates, *see* DOC

DEFENDANTS' MOTION TO DISMISS
NO.  3:23-CV-05626-BHS

15

ATTORNEY GENERAL OF WASHINGTON
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

1    Policy No. 450.500; the development of emergency plans, *see* DOC Policy No. 890.380; and the

2    provision of personal protective equipment, *see* DOC Policy No. 890.130.

3         Section 3, which authorizes DOH and L&I to conduct unannounced inspections related

4    to food and worker safety, also does not discriminate against GEO. Both DOH and L&I already

5    conduct inspections of state and local correctional and detention facilities and other workplaces.

6    *See* RCW 43.70.170 (authorizing DOH to inspect certain threats to public health);

7    RCW 49.17.070 (authorizing L&I to enter and inspect any workplace); WAC 296-900-12005

8    (setting L&I's standards for "unprogrammed" workplace safety inspections). In short, HB 1470

9    does not treat federal contractors "less favorably"; it simply requires GEO's compliance with

10   state laws that already apply to other public and private actors.

11        Accordingly, HB 1470's extension of those inspections to privately-owned detention

12   facilities does not impose an impermissible burden on the federal government. HB 1470 would

13   apply to GEO in exactly the same way if GEO were a state contractor and sold its detention

14   services to the State. It therefore treats similarly situated parties equally. That is all that the

15   Supremacy Clause requires. *See North Dakota*, 495 U.S. at 438 (regulation is only discriminatory

16   if it treats "similarly situated" parties unequally).

17   **C.    HB 1470 Is Not Preempted**

18        Unable to demonstrate that it is entitled to immunity, GEO seeks refuge in preemption.

19   But, while the federal government undoubtedly has the exclusive power to regulate immigration,

20   that does not mean that any state law that affects an immigrant is preempted. *See, e.g.*, *California*,

21   921 F.3d at 885-86; *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1104 n.5 (9th Cir. 2016). To the

22   contrary, even in the context of immigration detention, courts "assume that the historic police

23   powers of the States are not superseded unless that was the clear and manifest purpose of

24   Congress." *California*, 921 F.3d at 885-86. Since HB 1470 is a core exercise of Washington's

25   historic power to regulate health and safety, GEO must show that preempting such laws was the

26   "clear and manifest purpose of Congress." This, GEO cannot do.

**1.      HB 1470 is not field preempted**

GEO's field preemption claim rests on generic federal statutes that authorize the detention of immigrants generally. Dkt. #1 at 12-13. Even when read together, these statutes do not create a "scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). Again, *United States v. California* is instructive. In *California*, the Ninth Circuit rejected the United States's preemption arguments. 921 F.3d at 885-86. Recognizing that AB 103 "d[id] not regulate whether or where an immigration detainee may be confined, require that federal detention decisions or removal proceedings conform to state law, or mandate that ICE contractors obtain a state license," the Ninth Circuit concluded AB 103 did not "constitute[] an obstacle to the federal government's enforcement of its immigration laws or detention scheme." *Id.* HB 1470 is no different. Since the federal law that permits contracts for immigration detention purposes do not demonstrate *any* intent to supersede a state's general authority to ensure the health and welfare of inmates and detainees, *see, e.g.*, 8 U.S.C. §§ 1103(a)(11), 1231(g), and HB 1470 does not actively frustrate the federal government's ability to discharge its operations, GEO's field preemption claim should be dismissed.

To save its argument from *California*, GEO suggests that ICE's Performance-Based National Detention Standards ("PBNDS") establish field preemption. Not so. While an agency can preempt conflicting state requirements via federal regulation, *see Wyeth v. Levine*, 555 U.S. 555, 576 (2009), the PBNDS is not a federal regulation. *See* Dkt. #10-2 at 3 (PBNDS sets forth "detention standards" that are drafted "to include a range of compliance"); *see also Owino v. CoreCivic, Inc.*, No. 17-CV-1112 JLS (NLS), 2018 WL 2193644, at *18 n.10 (S.D. Cal. May 14, 2018) ("The ICE PBNDS is a federal agency publication and cannot provide congressional intent[.]"). Regardless of whether a congressional committee referenced it when making appropriations, the Supremacy Clause is only triggered by "the Laws" of the United States, and PBNDS does not have "the force of law." *See Gill v. U.S. Dep't of Justice*, 913 F.3d 1179, 1186

DEFENDANTS' MOTION TO DISMISS
NO.  3:23-CV-05626-BHS                        17                  ATTORNEY GENERAL OF WASHINGTON
                                                                       1125 Washington Street SE
                                                                       PO Box 40100
                                                                       Olympia, WA 98504-0100
                                                                       (360) 753-6200

1    (9th Cir. 2019). Even if the PBNDS were a regulation, it would not displace state law based on

2    its plain text. Federal agencies must be explicit when they intend to formulate policies that

3    preempt state law. *See Hillsborough County v. Automated Med. Lab., Inc.*, 471 U.S. 707, 717

4    (1985) (refusing to "infer, solely from the comprehensiveness of federal regulations, an intent to

5    pre-empt in its entirety a field related to health and safety" where an agency did not actually

6    speak to the preemption question); Exec. Order No. 13132, 64 Fed. Reg. 43255 (Aug. 4, 1999)

7    (requiring federal agencies consult with state and local officials any time they purport to preempt

8    state law by regulation and include a "federalism summary impact statement" with the preamble

9    to a rulemaking notice).

10            Here, there is no indication that ICE intended for the PBNDS to displace state law.

11    Instead, ICE's own contract with GEO repeatedly and expressly reserves room for state and local

12    laws to apply within contract detention facilities. *See* Dkt. #10-1 at 45 (requiring GEO comply

13    with "[a]pplicable federal, state facility codes, rules, regulations and policies," "[a]pplicable

14    federal, state, and local labor laws and standards," "[a]pplicable federal, state, and local firearm

15    laws, regulations and codes"); *id.* at 53 (requiring all services comply with "all applicable

16    federal, state, and local laws and standards" and, if there is any conflict, "the most stringent shall

17    apply"); *see also id.* at 59-60 (custody and care of detainees to comply with state law); *id.* at 86

18    (building requirements to comply with state law). The PBNDS's preface itself makes clear that

19    ICE expects "future changes" in the standards as well as "future collaboration . . . with state and

20    local governments." Dkt. #10-2 at 3. Although GEO makes much of the length of the PBNDS,

21    GEO nowhere shows ICE ever fulfilled any of the preemption assessment requirements of E.O.

22    13132 to preempt state law. GEO's argument is "tantamount to saying that whenever a federal

23    agency decides to step into a field, its regulations will be exclusive." *Hillsborough County*, 471

24    U.S. at 717. As the Supreme Court explained, such an inference would be "inconsistent with the

25    federal-state balance embodied in [the] Court's Supremacy Clause jurisprudence." *Id.*

26

**2.      HB 1470 is not conflict preempted**

Nor does HB 1470 conflict with any federal law or frustrate any congressional objective. Conflict or obstacle preemption occurs only in "those situations where conflicts will necessarily arise." *Goldstein v. California*, 412 U.S. 546, 554 (1973). "Tension between federal and state law is not enough to establish conflict preemption." *Incalza v. Fendi N. Am., Inc.*, 479 F.3d 1005, 1010 (9th Cir. 2007).

Here, there is no tension and *United States v. California* is again dispositive. The Ninth Circuit has already rejected GEO's argument that state health and safety laws stand as an obstacle to the federal government's detention scheme. 921 F.3d at 885-86. Although GEO's complaint vaguely alleges "numerous operating requirements within HB 1470" conflict with its federal requirements, the reality is that HB 1470's requirements are overwhelmingly consistent with those required in ICE's contract. *Compare* HB 1470, §§ 2, 3, and 4 (requiring laundry facilities, "basic personal hygiene items" and "a nutritious and balanced diet" and authorizing government inspections), *with* Dkt. #10-1 at 58-59, 83 (requiring GEO to keep the facility "clean and vermin/pest free," provide detainees "articles of personal hygiene" and "nutritious, adequately varied meals"); *id.* at 55 (declaring all work in the contract "subject to inspection" and requiring GEO to respond to requests for information and inspection). While, in its request for a preliminary injunction, GEO identifies three HB 1470 provisions as "apodictically" triggering conflict preemption, Dkt. #8 at 27, none show an actual conflict.

First, GEO takes issue with HB 1470's prohibition on solitary confinement, arguing that it conflicts with Section 2.12 of the PBNDS. But—once again—Section 4's prohibition on solitary confinement does not apply to NWIPC's current operations. Even if it does in the future—perhaps because (1) ICE decided to enter into a new contract with GEO in two years; (2) the PBNDS were not amended in that time; and (3) the hypothetical contract required GEO to follow the PBNDS without any allowance for state or local laws—GEO could still not show a necessary conflict. HB 1470 only prohibits the confinement of detainees "alone in a cell or

similarly confined" living space for "20 hours or more per day." While Section 2.12 of the PBNDS authorizes "special management units," or segregation, for administrative or disciplinary reasons, the PBNDS does not require detainees held in special management units to be confined "alone." *See id.* at 181 (referring to the "number of detainees confined to each cell"). Additionally, the PBNDS requires segregated detainees "be afforded basic living conditions that approximate those provided to the general population," "be offered individual recreation or appropriate group recreation," and "be provided opportunities for general visitation." Dkt. #10-2 at 177. Those in segregation for administrative reasons, for example, "may be provided opportunities to spend time outside their cells . . . for such activities as socializing, watching TV and playing board games." *Id.* In short, GEO cannot show the segregation provided for by the PBNDS conflicts *at all* with HB 1470's prohibition on solitary confinement, let alone that it *necessarily* conflicts for purposes of preemption. *See Goldstein*, 412 U.S. at 554.

Second, GEO believes the (presently inapplicable) requirement that detainees receive phone calls "free of charge to the detained person" presents an obstacle to the PBNDS. GEO is again wrong. The intent of HB 1470's requirement is consistent with ICE's own emphasis to "maintain ties with family and others in the community." *Id.* at 366. Not only does Section 5.6 of the PBNDS require GEO "to strive to reduce telephone costs," *id.*, the PBNDS contemplates some free phone use when it guarantees "indigent detainees" "the same telephone access and privileges as other detainees." *Id.* at 369. While Section 5.6 of the PBNDS contemplates phone calls be "generally" paid by "detainees *or* the persons they call," *id.* at 367 (emphasis added), the PBNDS nowhere requires it. Since GEO is a for-profit company perfectly situated to pay for phone charges itself and the PBNDS does not compel GEO to charge detainees for calls at all, there is no conflict.

Finally, GEO's attempt to manufacture a conflict with HB 1470's requirement that in-person, contact visitations be available should likewise fail. While the PBNDS does not require contact visits, the PBNDS nowhere prohibits them. Section 5.7 of the PBNDS leaves it up to the

private detention facility to "decide whether to permit contact visits," and, in fact, "encourages [facilities] to provide opportunities for both contact and non-contact visitation with approved visitors." *Id.* at 373, 375. While GEO points out HB 1470 also requires visitors be able to provide reading and writing materials to detainees "during visitation," that requirement can easily be harmonized with Section 5.7 of the PBNDS, which allows visitors to leave items for a detainee with a staff member. *Id.* at 374. Similarly, while GEO quibbles with HB 1470's language that visitation "be available daily," that requirement need not be read to provide each detainee daily visitations. To comply with both HB 1470 and the PBNDS, GEO may restrict visits to a detainee to certain days, as contemplated by the PBNDS, so long as GEO makes in-person visitation available generally on a daily basis. *See id.* at 377.

The PBNDS does not have the force of law and cannot preempt state law. Even if it could, HB 1470 does not make compliance with the PBNDS impossible. The Court should dismiss GEO's conflict preemption claim.

**D.    HB 1470 Does Not Violate the Contracts Clause**

Courts apply a two-step inquiry under the Contracts Clause. First, courts determine "whether the state law has operated as a substantial impairment of a contractual relationship." *Sveen v. Melin*, 138 S. Ct. 1815, 1821-22 (2018) (cleaned up). Second, if a substantial impairment exists, courts evaluate "whether the state law is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose." *Id.* (cleaned up). Courts construe the Contracts Clause "narrowly" so that "governments retain the flexibility to exercise their police powers effectively." *Matsuda v. City & County of Honolulu*, 512 F.3d 1148, 1152 (9th Cir. 2008) (cleaned up).

**1.    HB 1470 does not substantially impair GEO's contract**

There is no substantial impairment to GEO under step one. The plain terms of GEO's contract and history of past regulation vitiate any argument that HB 1470 "undermines [GEO's] contractual bargain." *Sveen*, 138 S. Ct. at 1817.

First, GEO's contract "expressly recognize[s] the existence of extensive regulation by providing that any contractual terms are subject to relevant present and future state law." *Energy Rsrvs. Grp. v. Kansas Power & Light Co.*, 459 U.S. 400, 416 (1983); *see, e.g.*, Dkt. #10-1 at 43, 53, 59-60, 86 (provisions requiring compliance with all applicable state laws). These types of provisions "could be interpreted to incorporate all future state [business] regulation, and thus dispose of the Contract Clause claim." *Energy Rsrvs.*, 459 U.S. at 416. At minimum, these provisions show that GEO "knew its contractual rights were subject to alteration by state . . . regulation" and forecloses GEO's argument that its reasonable expectations have been impaired. *Id.*

Second, as GEO acknowledges, HB 1470 Section 4 does not apply to its contract. *See* Dkt. #1 ¶ 27. GEO and ICE modified their contract in 2021, and the current contract period runs through September 2025. Dkt. #1 ¶ 51. Since the contract commits ICE to pay for 1,181 guaranteed minimum beds per day, or 75% of the 1,575 beds in the facility, *see* Dkt. #10-1 at 28 (Item No. 7001A); Dkt. #1 ¶ 46,[18] GEO is guaranteed a minimum payment until September 2025 despite housing on average 31% of its guaranteed minimum (and thus getting paid more than $40 million for unused bed space) between October 2021 and August 2022.[19] *See* at 14; Dkt. #10-1. Thus, Section 4 cannot be the basis for any purported impairment because it does not apply to GEO's current contract. But assuming GEO and ICE extend their contract, such that Section 4 applies, GEO's Contracts Clause claim would still fail because "[a] contract cannot be impaired by a law in effect at the time the contract was made." *Cmty. Hous. Improvement Program v. City of New York*, 492 F. Supp. 3d 33, 53 (E.D.N.Y. 2020), *aff'd*, 59 F.4th 540 (2d Cir. 2023) (cleaned up).

---

[18] GEO redacts this information, purportedly to remove trade-secret information, but DHS's OIG report confirms the guaranteed minimum, and that as of October 2021, the daily rate was $138.86 per detainee. *See* U.S. DHS, Off. of the Inspector Gen., *Results of an Unannounced Inspection of Northwest ICE Processing Center in Tacoma, Washington* at 14 (May 22, 2023), https://www.oig.dhs.gov/sites/default/files/assets/2023-05/OIG-23-26-May23.pdf.

[19] *See id.*

Finally, HB 1470 does not "prevent[] [GEO] from safeguarding or reinstating [its] rights" because it does extinguish GEO's ability to recover on the contract. *Sveen*, 138 S. Ct. at 1822. HB 1470 establishes minimum health and safety standards; it does not regulate let alone eliminate the rights or remedies of any party to any existing contract. In the event GEO and ICE disagree about how GEO will be paid, GEO retains a full menu of rights and remedies under the Contract Disputes Act of 1978, 41 U.S.C. §§ 7101-09, including litigation, if necessary, in the U.S. Court of Federal Claims, *id.* § 7104(b)(1). Because HB 1470 "does not excuse [the federal government] from [its] contractual obligations to pay," and leaves GEO "free to sue in contract for [payments] owed," there is no impairment of GEO's contractual rights. *Apartment Ass'n of L.A. Cnty., Inc. v. City of Los Angeles*, 500 F. Supp. 3d 1088, 1095 (C.D. Cal. 2020), *aff'd*, 10 F.4th 905 (9th Cir. 2021). The Court should "stop after step one" and dismiss GEO's claim. *Sveen*, 138 S. Ct. at 1822.

> **2.    HB 1470 is a reasonable response to safety and health concerns associated with private detention facilities**

Even if the Court were to find a substantial impairment, HB 1470 easily satisfies the second step of the inquiry, because it is an appropriate and reasonable way to advance a significant and legitimate public purpose. The "public purpose" requirement asks whether "the State is exercising its police power." *Energy Rsrvs.*, 459 U.S. at 412. In conducting this inquiry, "courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *U.S. Trust Co. of NY v. New Jersey*, 431 U.S. 1, 22-23 (1977).

The Ninth Circuit has already held that a state's interest in "ensur[ing] the health and welfare of inmates and detainees in facilities within its borders" is a legitimate exercise of the historic police power. *California*, 921 F.3d at 886. This is precisely what Washington's Legislature has done. Upon finding that "[s]afety risks and abuses in private prisons and detention facilities at the local, state, and federal level have been consistently and repeatedly documented," and that these harms are linked to private detention facilities' profit motives, *see*

DEFENDANTS' MOTION TO DISMISS
NO.  3:23-CV-05626-BHS                                    23                    ATTORNEY GENERAL OF WASHINGTON
                                                                                       1125 Washington Street SE
                                                                                          PO Box 40100
                                                                                      Olympia, WA 98504-0100
                                                                                         (360) 753-6200

1    RCW 70.395.010 (2)-(3), the Legislature enacted HB 1470 setting minimum standards for

2    private detention facilities, and including enforcement mechanisms for falling below those

3    standards. This was undeniably a reasonable and appropriate response.

4      GEO asks this Court to "second-guess the legislature's identification of the most

5    appropriate ways of dealing with the problem" of ensuring the health and welfare of detainees

6    in Washington. *Apartment Ass'n*, 10 F.4th at 914 (cleaned up). The Court should decline to

7    prevent the Legislature from ensuring the humane treatment of detainees within Washington's

8    borders and dismiss GEO's Contracts Clause claim.

9    **IV. CONCLUSION**

10     This Court should dismiss GEO's complaint.

11     DATED this 7th day of August 2023.

12           ROBERT W. FERGUSON
        *Attorney General*

13

14           *s/ Marsha Chien*
        MARSHA CHIEN, WSBA 47020
        CRISTINA SEPE, WSBA 53609

15           *Deputy Solicitors General*
        1125 Washington Street SE

16           PO Box 40100
        Olympia, WA 98504-0100

17           (360) 753-6200
        Marsha.Chien@atg.wa.gov

18           Cristina.Sepe@atg.wa.gov

19           ANDREW R.W. HUGHES, WSBA 49515
        *Assistant Attorney General*

20           800 Fifth Avenue, Suite 2000

21           Seattle, WA 98104
        (206) 464-7744

22           Andrew.Hughes@atg.wa.gov

23           *Attorneys for Defendants Governor Jay R. Inslee*
        *and Attorney General Robert W. Ferguson*

24           I certify that this memorandum contains 8,212
        words, in compliance with the Local Civil Rules.

25

26

DEFENDANTS' MOTION TO DISMISS   24   ATTORNEY GENERAL OF WASHINGTON
NO.  3:23-CV-05626-BHS           1125 Washington Street SE
                    PO Box 40100
                  Olympia, WA 98504-0100
                   (360) 753-6200

1

**CERTIFICATE OF SERVICE**

2

I hereby declare that on this day I caused the foregoing document to be electronically

3 filed with the Clerk of the Court using the Court's CM/ECF System, which will serve a copy of

4 this document upon all counsel of record.

5

DATED this 7th day of August 2023, at Olympia, Washington.

6

7
*s/ Leena Vanderwood*
LEENA VANDERWOOD

8
*Paralegal*
1125 Washington Street SE

9
PO Box 40100
Olympia, WA 98504-0100

10
(360) 570-3411
Leena.Vanderwood@atg.wa.gov

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26