# EXHIBIT A

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

25

26

27

28

The Honorable Benjamin H. Settle

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

THE GEO GROUP, INC.,

              Plaintiff,

   v.

JAY R. INSLEE, in his official capacity as
Governor of the State of Washington; ROBERT
W. FERGUSON, in his official capacity as
Attorney General of the State of Washington,

              Defendants.

No. 3:23-cv-05626-BHS

**THE GEO GROUP INC.'S**
**OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS**

**Note on motion calendar:  September 1,**
**2023**

THE GEO GROUP INC.'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS (3:23-cv-05626)

# TABLES OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     ARGUMENT ....................................................................................................... 2

    A.      GEO's Claims Are Justiciable and Ripe ................................................. 2

    B.      GEO Is Likely To Succeed On The Merits On All Its Claims ............................... 4

        1.      HB 1470 Impermissibly Directly Regulates. ............................................. 4

        2.      HB 1470 Impermissibly Discriminates. .................................................... 8

        3.      HB 1470 Is Field Preempted. .................................................................. 13

        4.      HB 1470 Is Obstacle And Conflict Preempted. ...................................... 17

        5.      HB 1470 Violates The Contract Clause. .................................................. 20

III.    CONCLUSION ................................................................................................... 22

THE GEO GROUP INC.'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS (3:23-cv-05626) - i

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n,*
   410 F.3d 492 (9th Cir. 2005) ...................................................14

*Ariz. v. U.S.,*
   567 U.S. 387 (2012)...................................................16

*Blanchette v. Conn. Gen. Ins. Corps.,*
   419 U.S. 102 (1974)...................................................3

*Boeing Co. v. Movassaghi,*
   768 F.3d 832 (9th Cir. 2014) ................................... *passim*

*Boyle v. United Tech. Corp.,*
   487 U.S. 500 (1988)...................................................14, 22

*Brandt v. Vill. of Winnetka, Ill.,*
   612 F.3d 647 (7th Cir. 2010) ...................................................3

*Chy Lung v. Freeman,*
   92 U.S. 275 (1876)...................................................15

*Dawson v. Steager,*
   139 S.Ct. 698 (2019)...................................................9

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,*
   458 U.S. 141 (1982)...................................................19

*Garcia v. U.S.,*
   469 U.S. 70 (1984)...................................................16

*GEO Group, Inc. v. Newsom,*
   50 F.4th 745 (2022) (en banc)...................................................6, 14, 17

*Gill v. United States Department of Justice,*
   913 F.3d 1179 (9th Cir. 2019) ...................................................15

*Hancock v. Train,*
   426 U.S. 167 (1976)...................................................22

*Hays v. City of Urbana, Ill.,*
   104 F.3d 102 (7th Cir. 1997) ...................................................3

THE GEO GROUP INC.'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS (3:23-cv-05626) - ii

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

*Hines v. Davidowitz*,
    312 U.S. 52 (1941)......................................................................................................15

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
    959 F.3d 1201 (9th Cir. 2020) ...................................................................................18

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018)....................................................................................................8

*Lusnak v. Bank of Am., N.A.*,
    883 F.3d 1185 (9th Cir. 2018) ...................................................................................18

*Medtronic, Inc., v. Lohr*,
    518 U.S. 470 (1996)..............................................................................................16, 18

*Nelsen v. King Cnty*,
    895 F.2d 1248 (9th Cir. 1990) .....................................................................................3

*Owino v. CoreCivic, Inc.*,
    No. 17-CV-1112 JLS (NLS), 2018 WL 2193644 (S.D. Cal. May 14, 2018) ...................16, 17

*Pub. Utils. Comm'n of Calif. v. U.S.*,
    355 U.S. 534 (1958).......................................................................................................6

*Riva v. Massachusetts*,
    61 F.3d 1003 (1st Cir. 1995).........................................................................................3

*Samantar v. Yousuf*,
    560 U.S. 305 (2010)......................................................................................................16

*Silkwood v. Kerr–McGee Corp.*,
    464 U.S. 238 (1984).......................................................................................................17

*Steinle v. City & Cnty. of San Francisco*,
    919 F.3d 1154 (9th Cir. 2019) ...................................................................................18

*Thomas v. Anchorage Equal Rights Comm'n*,
    220 F.3d 1134 (9th Cir. 2000) (en banc) ..................................................................3

*Toll v. Moreno*,
    458 U.S. 1 .......................................................................................................................15

*U.S. v. Boyd*,
    378 U.S. 39 (1964).....................................................................................................5, 6

*U.S. v. California*,
    2018 WL 3350892 (E.D. Cal. May 4, 2018) ............................................................10

THE GEO GROUP INC.'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS (3:23-cv-05626) - iii

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

*U.S. v. California*,
    921 F.3d 865 (9th Cir 2019) ...................................................................10, 11, 12

*U.S. v. Hynes*,
    759 F. Supp. 1303 (1991), *rev'd in part on other grounds*, 20 F.3d 1437 (7th Cir. 1994) .......9

*U.S. v. Locke*,
    529 U.S. 89 (2000).......................................................................................15

*U.S. v. Nye Cnty, Nev.*,
    178 F.3d 1080 (9th Cir. 1999) .......................................................................10

*Wing v. U.S.*,
    163 U.S. 228 (1896).....................................................................................18

**Federal Statutes**

4 U.S.C. § 111 ....................................................................................................9

6 U.S.C. § 112(b)(2) ....................................................................................8, 15

6 U.S.C. § 205 ..................................................................................................17

6 U.S.C. § 205(a) & (b)...................................................................................16

8 U.S.C. § 1231(g)(1) .................................................................................8, 15, 18

18 U.S.C. § 4013, Pub. L. 106-553, § 1(a)(2)...........................................8, 15, 18

28 U.S.C. § 530C(a)(4) ..............................................................................8, 15

Appropriations Act...........................................................................................16

Foreign Sovereign Immunities Act ..................................................................16

IRCA ................................................................................................................16

**State Statutes**

California statute ("AB 103") .................................................................10, 11, 14, 17

RCW 70.129.005 .............................................................................................12

**Regulations**

48 C.F.R. ¶ 52.249-8 .......................................................................................21

48 C.F.R. ¶ 52.249-8(b) ..................................................................................21

WAC 246-337-001............................................................................................12

THE GEO GROUP INC.'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS (3:23-cv-05626) - iv

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150

WAC 246-337-111 ......................................................................................................13

WAC 246-337-135 ......................................................................................................12

Washington Administrative Code 246-337-110 ........................................................12

**Constitutional Provisions**

U.S. CONST. Article I, § 8, cl. 4 .................................................................................15

U.S. Constitution ...........................................................................................................1

Contracts Clause of the U.S. Constitution .................................................................21

Supremacy Clause of the United States Constitution ........................................... *passim*

**Other Authorities**

163 Cong. Rec. H3812 (2017), H.R. Rep. No. 114-668 (2016) .........................8, 16, 17

DOC Policy No. 450.200 ............................................................................................13

https://fnspublic.ofm.wa.gov/FNSPublicSearch/GetPDF?packageID=68477 .............12

68th Leg., Reg. Sess. (Wash. 2023) ............................................................................2

 Policy No. 450.300 ....................................................................................................13

THE GEO GROUP INC.'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS (3:23-cv-05626) - v

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150

# I.     INTRODUCTION

HB 1470 cannot stand because it violates the Supremacy Clause of the United States Constitution. HB 1470 purports to ensure the health and safety of detainees at the federal NWIPC by imposing state operational requirements and performance standards that would override and replace a set of comprehensive federal operational requirements and performance standards governing detainee health and safety that were included in GEO's contract at the express direction of Congress. This attempt to directly regulate the contracts and functions of the federal government constitutes a violation of the Intergovernmental Immunity Doctrine ("IGI"), a foundational expression of the Supremacy Clause of the U.S. Constitution. HB 1470 also constitutes a "discriminatory" violation of the IGI doctrine because it was drafted and specifically amended to target and impose unique burdens on a single facility—the federal NWIPC—while exempting similarly situated Washington State facilities or those of state contractors. The U.S. Constitution simply does not allow such discriminatory treatment of the federal government or those with whom it deals.

Likewise, HB 1470 clearly violates Constitutional principles of preemption because Congress has occupied the field of immigration detention, and the requirements of HB 1470 conflict with and stand as an obstacle to the Congressional objective of implementing uniform requirements and standards tailored to federal immigration detention. The intent of Congress is the "ultimate touchstone" of preemption analysis; in the present case, Congress empowered ICE with responsibility and discretion to enter contracts on any reasonable basis for immigration detention and explicitly directed ICE to include the PBNDS in those contracts. HB 1470's attempt to replace ICE's contractual decisions and Congressionally directed uniform detention standards with the state's own inconsistent and often conflicting standards is preempted. This legislation is merely a thinly veiled attempt to shut down all federal detention operations within Washington by making it impossible for continued operation of the only one that exists, but the U.S. Constitution requires the Washington legislature to yield to Congress on the standards applicable to immigration detention.

THE GEO GROUP INC.'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS (3:23-cv-05626)- 1

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

## II.      ARGUMENT

### A.      GEO's Claims Are Justiciable and Ripe

The State argues this Court lacks jurisdiction because Second Substitute H.B. 1470, 68th Leg., Reg. Sess. (Wash. 2023) ("H.B. 1470") poses no immediate threat to GEO. Defs.' Mot. to Dismiss, Dkt. 17 ("MTD") at 7-8. First, State argues that GEO "couldn't possibly run afoul of the rules" under HB 1470 because "none have yet been adopted." *Id*. at 7. Similarly, the State argues this case is not prudentially ripe because the record is devoid of factual context and no harm can result to GEO if resolution is postponed. *Id*. at 8-9.

These arguments fail for multiple reasons. First, as noted in GEO's Reply in Support of its Motion For a Preliminary Injunction, Dkt. 22 ("GEO's Reply"), GEO faces an immediate risk of enforcement under HB 1470 regardless of how long it takes State agencies to promulgate *additional* rules. *Id*. at 10-14. HB 1470 provides unequivocal mandates imposing specific requirements and requires no speculation regarding rulemaking. *Id*. Sections 2, 3, and 4 of HB 1470 clearly provide the "[t]he office of the attorney general" immediate authority to "enforce violations of this section on its own initiative or in response to complaints or violations.". Likewise, HB 1470 § 5 creates an immediate right of action for detained persons and specifies available monetary damages, injunctive relief, and the recovery of attorneys' fees and costs. No further rulemaking is required to subject GEO to an immediate risk of enforcement, and any contrary suggestion is wholly without merit.

In fact, the *State is already undertaking efforts to enforce HB 1470*. On July 26, 2023, a representative of the Washington Department of Health ("DOH") contacted the Facility Administrator at NWIPC seeking information about NWIPC food services so DOH could conduct an "analysis pursuant to HB 1470." Scott Decl. in Supp. of Mot. for Prelim. Inj., Dkt. 23 at 1-2, ¶¶ 3, 4. Similarly, the Declaration of Wendy Yomiko "Niko" Nanto, submitted by the State (Dkt. 21), explains she is responsible for "assisting with the process for issuing penalties if non-compliance [with HB 1470] is found" and has *already solicited and received 31 complaints from NWIPC detainees* from April 2023 through the first week of June 2023. *Id*. at ¶¶ 3, 5-13. Without question,

THE GEO GROUP INC.'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS (3:23-cv-05626)- 2

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

the State is already actively engaged in enforcement efforts, and the statute empowers "[t]he office of the attorney general" to immediately "enforce violations of this section on its own initiative or in response to complaints or violations." HB 1470. The State's assertions that there is no threat of imminent enforcement is simply wrong.

Moreover, even if the State[1] chooses to delay enforcement under HB 1470, the current constitutional controversy is justiciable. "Long ago, the Supreme Court held that a person who must comply with a law or face sanctions has standing to challenge its application to him, even if the threat of prosecution is not immediate—indeed, even if the law is not yet in effect." *Hays v. City of Urbana*, *Ill*., 104 F.3d 102, 103 (7th Cir. 1997). "Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect." *Blanchette v. Conn. Gen. Ins. Corps*., 419 U.S. 102, 143 (1974); *see also Riva v. Massachusetts*, 61 F.3d 1003, 1011 (1st Cir. 1995). The mere possibility that the State may delay enforcement cannot defeat jurisdiction. *See Brandt v. Vill. of Winnetka*, *Ill*., 612 F.3d 647, 649 (7th Cir. 2010) ("Any pre-enforcement suit entails some element of chance: perhaps the plaintiff will desist before the law is applied, perhaps the law will be repealed, or perhaps the law won't be enforced as written. But pre-enforcement challenges nonetheless are within Article III.").

Standing and ripeness will be lacking only when a plaintiff's alleged future harm is "wholly contingent upon the occurrence of unforeseeable events" such that he does not confront "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1141 (9th Cir. 2000) (en banc) (quotation omitted) (internal quotation marks and citation omitted). The State cannot credibly claim that an "extended chain of highly speculative contingencies," *Nelsen v. King Cnty*, 895 F.2d 1248, 1252 (9th Cir. 1990), exists here. In fact, the State has acknowledged that it is already *soliciting* and gathering complaints regarding alleged violations of HB 1470, and the State is actively seeking

---

[1] State delays in enforcement do not lessen the risks posed by the private right of action for detainees created by HB 1470 § 5.

THE GEO GROUP INC.'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS (3:23-cv-05626)- 3

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

information about NWIPC operations to perform an "analysis pursuant to HB 1470."[2] The State's Motion to Dismiss should be denied as GEO faces danger of sustaining a direct injury as a result of HB 1470, and all facts necessary to consider whether HB 1470 violates the Supremacy Clause of the United States Constitution are before this Court.

### B.      GEO Is Likely To Succeed On The Merits On All Its Claims

#### 1.      HB 1470 Impermissibly Directly Regulates.

As detailed in Geo's Motion, Dkt. 8, HB 1470 constitutes an impermissible direct regulation of federal activities by "mandat[ing] the ways in which [GEO] renders services that the federal government hired [GEO] to perform." *See Boeing Co. v. Movassaghi*, 768 F.3d 832, 840 (9th Cir. 2014). Faced with this dispositive reality, the State deploys numerous diversions and strawman arguments that should be rejected.

First, the State incorrectly asserts that the IGI Doctrine requires a showing that HB 1470 directly regulates "*the United States itself.*"[3] MTD at 10-11, 12-13 (emphasis added). In support, the State selectively quotes from tax immunity cases. However, the State strategically omits reference to the critical context of the cited cases and strings together words from these decisions in a misleading manner. For example, the State argues "GEO must show that HB 1470 regulates 'the United States itself, or ….any agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities.'" *Id*. at 10 (citing *U.S. v. N.M.*, 455 U.S. 720, 735 (1982)). The context of this excised language reveals that it addresses a "narrow approach to governmental *tax immunity*" and the competing constitutional imperatives in that context:

> What the Court's cases leave room for, then, is the conclusion that *tax immunity* is appropriate in only one circumstance: when the levy falls on the United States itself, or on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities, at least *insofar as the activity being taxed is concerned.* This view, we believe, comports with the principal

---

[2] As detailed in GEO's Reply in Support of its Preliminary Injunction, GEO is at immediate risk of enforcement under HB 1470 § 4, Dkt. 22 at 7-8, and since the PBNDS are Congressionally mandated in every ICE detention contract, the inconsistencies and conflicts between the PBNDS and HB 1470 § 4 are inevitable in any future contracts.

[3] As noted in GEO's Reply, ICE directly provides all medical care to detainees at the NWIPC, and HB 1470 purports to directly regulate those functions. Dkt. 22 at 11, n. 4.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

purpose of the immunity doctrine, that of forestalling "clashing sovereignty[]" by preventing the States from laying demands directly on the Federal Government. […] At the same time, a *narrow approach to governmental tax immunity* accords with *competing constitutional imperatives, by giving full range to each sovereign's taxing authority.*

*Id.* at 735-36 (emphasis added) (citations omitted).[4] In *Boeing*, California made the same argument that the State offers here, relying on intergovernmental tax immunity cases to distinguish between the regulation of a contractor and the regulation of the United States. 768 F.3d at 839. Importantly, the Ninth Circuit specifically rejected that argument:

The cases that California cites to are inapposite as they discuss generally applicable state tax laws, which resulted in merely an increased economic burden on federal contractors as well as others. *These tax laws did not regulate what the federal contractors had to do or how they did it pursuant to their contracts.*

*Id.* (emphasis added). Accordingly, the State's arguments regarding these tax immunity cases are unavailing.

The State also selectively quotes these tax cases and asserts IGI cannot apply to contractors anytime engaged in "commercial activities for profit." MTD at 10 (citing *U.S. v. Boyd*, 378 U.S. 39, 44 (1964)). Again, the context reveals that the quoted language does not support the State's position. *Boyd* involved the application of a state's generally applicable "contractor use tax" on the value of personal property used by contractors during construction. *Id.* at 43. The *Boyd* Court observed:

Nor is it forbidden for a State to tax the beneficial use by a federal contractor of property owned by the United States, even though the tax is measured by the value of the Government's property, and even though his contract is for goods or services for the United States. The use by the contractor *for his own private ends—in connection with commercial activities carried on for profit—is a separate and distinct taxable activity.*

*Id.* at 44 (citations omitted). Accordingly, the *Boyd* Court simply observed that a contractor's *use* of federal property "in connection with commercial activities" was "*a separate and distinct taxable activity*" and that a tax imposed on such use was not a direct tax on the federal government. *Id.* The *Boyd* Court never held—as the State claims—that IGI cannot apply to contractors anytime

---

[4] The *New Mexico* Court further held that "It remains true, of course, that state taxes on contractors are constitutionally invalid if they discriminate against the Federal Government, or substantially interfere with its activities." *Id.* at 735 n. 11.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

they are engaged in "commercial activities for profit." Even a cursory review of the tax immunity cases cited by the State reveals that they offer no support for the State's arguments.

Next, the State ironically argues the Ninth Circuit's decision in *GEO Group, Inc. v. Newsom*, 50 F.4th 745 (2022) (en banc) supports its claim that HB 1470 represents a permissible "generally applicable health and safety law." MTD at 10-11. As noted in GEO's Motion (Dkt. 8 at 20-23) and detailed in section II.B.2 below, there is nothing "generally applicable" about HB 1470 which was designed to discriminatorily apply to *only* the NWIPC. Second, the State cites a portion of *Newsom* discussing the tax immunity cases noted above but failed to read further in *Newsom* where the Ninth Circuit notes that "even when evaluating *state regulations of federal contractors*, courts distinguish regulations that merely increase the federal government's costs *from those that would control its operations*." *Id.* at 755 (emphasis added). Indeed, the *Newsom* court cited approvingly its decision in *Boeing* and distinguished nondiscriminatory state tax laws from laws that "*regulate what the federal contractors had to do or how they did it pursuant to their contracts*":

> Later cases have drawn this very distinction between 'nondiscriminatory state taxes on activities of contractors,' which 'at most ... increase the costs of the operation,' and state laws that 'place[ ] a prohibition on the Federal Government.' [*Pub. Utils. Comm'n of Calif. v. U.S.*, 355 U.S. 534, at 543-44 (1958)]; *see, e.g., Boeing Co. v. Movassaghi*, [768 F.3d at 839] (distinguishing 'generally applicable state tax laws, which resulted in merely an increased economic burden,' from state laws that 'regulate what the federal contractors had to do or how they did it pursuant to their contracts.')

*Id.* at 756 (some alterations in original). When state regulation of a contractor would control federal operations, "[e]nforcement of the substance of [the regulation] against the contractors would have the same effect as direct enforcement against the Government." *Id.* at 760 (quoting *U.S. v. Town of Windsor*, 765 F.2d 16, 19 (2d Cir. 1985)). As a result, *Newsom* actually confirms the controlling nature of *Boeing* in the present case.

The Ninth Circuit's decision in *Boeing* compels a finding that HB 1470 constitutes an impermissible direct regulation of federal activities. In *Boeing* the court reviewed a California statute imposing remediation standards on a site that had been contaminated by the federal

THE GEO GROUP INC.'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS (3:23-cv-05626)- 6

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

government and its contractor. 768 F.3d at 837-38. Because the contamination was resulting from federal activity, the federal government had taken responsibility for the remediation even though most of the impacted property was owned by Boeing. *Id.* at 835, 839. The federal government also established standards for the cleanup and contracted with Boeing to remediate the site consistent with the federal government's standards. *Id.* at 836. The Ninth Circuit struck down the state statute as an impermissible direct regulation because it attempted to replace the cleanup standards established by the federal government and incorporated into Boeing's contract:

> SB 990 directly interferes with the functions of the federal government. *It mandates the ways in which Boeing renders services that the federal government hired Boeing to perform. The state law replaces the federal cleanup standards that Boeing has to meet to discharge its contractual obligations to* [*Department of Ecology*] *with the standards chosen by the state.* It overrides federal decisions as to necessary decontamination measures. Unlike the tax cases, SB 990 *regulates not only the federal contractor but the effective terms of federal contract itself.*

*Id.* at 840 (emphasis added). The Ninth Circuit concluded "that SB 990 regulates the federal government directly in violation of the Supremacy Clause." *Id.* at 842.

In the same way, HB 1470 directly interferes with the functions of the federal government by mandating the way in which GEO renders services to ICE. HB 1470 purports to replace the congressionally mandated PBNDS in GEO's federal contract with standards developed by the State. It attempts to override federal decisions regarding the appropriate standards applicable to federal immigration detention and regulates not only GEO but the terms of the federal contract itself. As a result, HB 1470's direct regulation of federal functions exclusively vested in a federal agency by Congress constitutes a clear violation of the Supremacy Clause.

The State attempts to distinguish *Boeing* noting that the federal government was "responsible" for the contamination. MTD at 11. Apparently, the State believes the federal government is not "responsible" for the care and custody of immigration detainees. This is simply not the case. Congress has required the detention of aliens under several different statutes (*see, e.g., Jennings v. Rodriguez*, 138 S. Ct. 830, 836-38 (2018)), and directed the Secretary of Homeland Security "shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1); *see also* 6 U.S.C. § 112(b)(2); 28 U.S.C.

THE GEO GROUP INC.'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS (3:23-cv-05626)- 7

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

§ 530C(a)(4). Congress has also enacted a statute stating: "Notwithstanding any other provision of law, . . . the [Secretary] hereafter may enter into contracts and other agreements, of any reasonable duration, for detention or incarceration space or facilities, including related services, on any reasonable basis." 18 U.S.C. § 4013, Pub. L. 106-553, § 1(a)(2) "Contracts & Agreements for Detention & Incarceration Space or Facilities" (emphasis added).

The care and custody of immigration detainees is the "responsibility" and within the exclusive authority of ICE. As authorized by Congress, ICE contracts to meet that responsibility, and those contracts incorporate, *as explicitly directed by Congress,[5]* the PBNDS. The only distinguishing fact in the present case is that the federal standards and contractual requirements HB 1470 attempts to displace were *specifically mandated by Congress* while in *Boeing* the standards were not. If anything, the facts in the present case more clearly compel a finding that HB 1470 impermissibly attempts to directly regulate federal activities in violation of the Supremacy Clause.

### 2.    HB 1470 Impermissibly Discriminates.

HB 1470 violates the Intergovernmental Immunity Doctrine because it impermissibly discriminates against the federal government and its contractors. Dkt. 8 at 20-23. The legislative history and the express language of HB 1470 plainly demonstrate that it was crafted and specifically amended to impose unique burdens on a single facility—the federal NWIPC—while expressly exempting any similarly situated Washington State facilities or those of state contractors.

In its Motion to Dismiss, the State responds with dubious arguments. First, the State argues that this Court must ignore the clear discriminatory intent reflected in the legislative history and focus solely on the "wording" of the statutory language. MTD at 13. In essence the State argues that even if the legislative history reveals that HB 1470 was intentionally designed to only apply to the federal NWIPC while expressly exempting state facilities, if the legislature was clever enough to use "broad[]" language in the *actual statute* it cannot be deemed discriminatory. *Id.* In support of this argument, the State again relies on cases that address the doctrine of

---

[5] *See* 163 Cong. Rec. H3812 (2017); H.R. Rep. No. 114-668, at 35 (2016); Section II.B.3 *infra*.

intergovernmental *tax* immunity.[6]

In *Dawson v. Steager*, 139 S.Ct. 698 (2019), the Court considered whether a West Virginia statute that exempted from state taxation the pension benefits of state and local law enforcement officers but not the federal pension benefits of retired federal marshals violated 4 U.S.C. § 111.[7] *Id*. at 702-03. The state defended the statute by arguing that it wasn't intended to harm federal retirees but instead to help certain state retirees. *Id*. at 704. The *Dawson* Court found that under 4 U.S.C. § 111, a *laudable intent* did not save a discriminatory tax statute:

> We can safely assume that discriminatory laws like West Virginia's are almost always enacted with the purpose of benefiting state employees rather than harming their federal counterparts. Yet that wasn't enough to save the state statutes in Davis, Barker, or Phillips, and it can't be enough here. Under § 111 what matters isn't the intent lurking behind the law but whether the letter of the law 'treat[s] those who deal with' the federal government 'as well as it treats those with whom [the State] deals itself.'

*Id*. at 704 (citations omitted). In other words, *Dawson* only holds that a facially discriminatory statue cannot be "cleansed" of its discriminatory impact by looking at self-serving non-discriminatory statements in the legislative history. *Dawson* plainly does *not*, as the State suggests, stand for the inverse proposition that this Court should ignore a legislative history replete with discriminatory intention when evaluating whether a resulting statute violates the IGI. *See U.S. v. Hynes*, 759 F. Supp. 1303, 1306-07 (1991) ("look[ing] solely at the apparent neutrality on the face of the amendment would be to elevate form over substance, which must be avoided" and noting legislative history reveals discriminatory intent), *rev'd in part on other grounds*, 20 F.3d 1437 (7th Cir. 1994). In short, when a statute discriminates against the federal government, the state cannot shield itself from the self-incriminating discriminatory statements contained in its legislative history by asking the Court not to "look behind the curtain."

Similarly, the State's citation to *U.S. v. Nye Cnty, Nev.*, 178 F.3d 1080 (9th Cir. 1999) does not support its position. That case merely noted that "the wording of a tax measure is significant

---

[6] As noted *supra*, tax immunity cases use a "narrow" approach to intergovernmental immunity applicable only to those cases.

[7] Once again the State provides an incomplete and misleading quote from this case which conceals the fact that it involved the application of 4 U.S.C. § 111. MTD at 13.

THE GEO GROUP INC.'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS (3:23-cv-05626)- 9

....." when trying to distinguish between the taxing of *property* and the taxing of the *beneficial use* of property. *Id.* at 1084 ("when a statute says it taxes property, it probably does. And when it says it doesn't, it probably doesn't.") (quoting *U.S. v. Nye Cnty., Nev.*, 938 F.2d 1040, 1042 (1991)). This holding has no import in the current circumstances. As detailed in GEO's Motion, the legislative history *and* the plain language of HB 1470 unmistakably demonstrate the impermissible discriminatory nature of HB 1470.

Next, the State argues that the Ninth Circuit's decision in *U.S. v. California*, 921 F.3d 865 (9th Cir 2019) supports a finding that HB 1470 does not violate the IGI Doctrine. To the contrary, an examination of the Ninth Circuit's decision in *California* only further confirms and definitively guides this Court with respect to determining the impermissible nature of HB 1470. In *California*, the court considered, *inter alia*, the constitutionality of a California statute ("AB 103") "which requires the California Attorney General to conduct 'reviews of county, local, or private locked detention facilities in which noncitizens are being housed or detained for purposes of civil immigration proceedings in California.'" *Id.* at 875 (citation omitted). In its briefing, California noted the limited nature of the mandated "reviews" or "inspections" under AB 103 and pointed out that "*AB 103 does not impose standards on the conditions of facilities, nor does it mandate any policies and procedures.*" *U.S. v. California*, 2018 WL 3350892 (E.D. Cal. May 4, 2018) (Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction (Dkt. #74, at 29-30) (emphasis added). Additionally, and perhaps most tellingly, California highlighted that AB 103 includes "*no enforcement mechanism.*" *Id.* (emphasis added). As a result, California argued that "*there is no conflict with the national detention standards promulgated by ICE*" and that there is no evidence that AB 103 intrudes on the operations of facilities. *Id.* (emphasis added). In reaching its decision the *California* court correspondingly noted that AB 103 did not regulate confinement or impose mandates on ICE contractors but merely required access for inspections and the production of data. *California* 921 F.3d at 885.

In stark contrast, HB 1470 purports to effectively override and replace the Congressionally mandated PBNDS with a new detailed regime of state-mandated standards, policies and

THE GEO GROUP INC.'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS (3:23-cv-05626)- 10

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

procedures that regulate virtually every aspect of the operation of the federal NWIPC. In addition, unlike AB 103, HB 1470 imposes a regime for assessing civil penalties for non-compliance with these state-imposed standards, and also purports to create a private right of action for detainees to enforce the state-imposed standards. Simply stated, the detailed set of operational requirements, enforcement mechanisms, and state-developed standards imposed by HB 1470 bear *no resemblance whatsoever* to the basic "review" or "inspection" requirement in AB 103 that survived Ninth Circuit review in *California.*

The State further argues the requirements contained in HB 1470 are not discriminatory because they "largely replicate[]" and include "standards akin" to those imposed by the State on "other facilities." MTD at 13, 15-16. In fact, the State asserts that HB 1470 merely "applies requirements already imposed on other facilities." *Id.* at 15. This is simply not true.

At the outset, the State's claims are belied by the Legislature's conspicuous efforts to ensure that no State agencies or facilities would be subject to *the actual requirements of HB 1470*. Section 5 of HB 1470, which creates a right of action for detained persons and specifies available monetary damages, injunctive relief, and the recovery of attorneys' fees and costs, specifically exempts Washington State and any of its agencies from those burdens, risks and potential liability. Similarly, § 6 of HB 1470, which creates an additional regime of civil penalties for violations, exempts Washington State and any of its agencies from those burdens, risks and potential liability. Additionally, HB 1470 § 10 exempts various facilities from the key requirements of the statute, and the Washington Multiple Agency Fiscal Note Summary accompanying HB 1470 explains that "[w]hile prior versions of the bill could have impacted private detention *facilities that DSHS might wish to contract with in the future, the new language in Section 10 of this bill exempts those types of facilities* from the new requirements." https://fnspublic.ofm.wa.gov/FNSPublicSearch/GetPDF?packageID=68477 at 15 (emphasis added) (last visited Aug. 28, 2023). This extraordinary legislative effort to exempt from the reach of HB 1470 state agencies and facilities the State "may wish to contract with in the future" flatly

THE GEO GROUP INC.'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS (3:23-cv-05626)- 11

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

belies the State's current claim that HB 1470 merely includes "requirements imposed on other facilities." MTD at 15-16.

Equally unpersuasive is the State's attempt to identify specific "standards akin" to those imposed by HB 1470. In this section of its motion, the State cites a number of statutes, regulations and policies that apply to a variety of different (and in many instances very dissimilar)[8] types of facilities. In most instances, the examples cited by the State are statutes, regulations or policies that address the same *broad topics* as certain sections of HB 1470 *but do not include the same requirements*. The fact that other facilities are subject to statutory, regulatory or policy requirements that address the *same general topics* like "infection control," "laundry" and "visitations" does not change the fact that HB 1470 discriminatorily imposes unique and more burdensome requirements solely on one single federal facility—NWIPC.

Notably, the State does not and cannot identify any State statutes, regulations, or policies that subject other similarly situated facilities to numerous requirements in HB 1470 including but not limited to: (1) a prohibition on segregation ("solitary confinement") (HB 1470 § 4(2)(e)), *compare* Washington Administrative Code ("WAC") 246-337-110 which permits the use of "restraints and seclusion" a/k/a "involuntary confinement" in residential treatment centers; (2) a special statutory cause of action for residents that specifies available monetary damages, injunctive relief, and the recovery of attorneys' fees and costs (HB 1470 § 5); (3) a specific statutory regime of civil penalties applicable to the facilities for violations of standards enforceable by the attorney general (HB 1470 § 6); (4) a requirement that all rooms have HVAC *adjustable by room* (HB 1470 § 2(1)(g)), *compare* WAC 246-337-135 which, contrary to the State's representations (MTD at 15), only requires "Rooms used by residents are able to maintain interior temperatures between sixty-five degrees Fahrenheit and seventy-eight degrees Fahrenheit year-round;" (5) a requirement to provide fresh fruits and vegetables and a prohibition on any processed, canned, frozen, or

---

[8] The State cites statutes and regulations applicable to 24-hour private, county or municipal residential treatment facilities ("RTF") that provide healthcare services to persons with mental or substance abuse disorders(WAC 246-337-001 *et seq*.), or statutes governing adult family homes that provide long-term care (RCW 70.129.005 *et seq*.). As the court in *California* recognized, it is more appropriate to compare the burdens imposed on ICE detention facilities with burdens applied to state "prisons and detainment facilities." *See California* 921 F.3d at 882-83.

THE GEO GROUP INC.'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS (3:23-cv-05626)- 12

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

dehydrated fruits or vegetables (HB 1470 § 2(1)(e)), *compare* WAC 246-337-111 which includes no requirements to provide *any* fruits or vegetables; (6) a requirement that in-person visitation must be available daily and allow personal contact (HB 1470 § 4(2)(d)), *compare* Washington Department of Corrections ("DOC") Policy No. 450.300 which provides that visits may be considered but are not guaranteed, allows for denial, suspension, or termination of visit privileges, and limits contact visits based on custody level; (7) a requirement that telecommunications services must be provided free of charge for at least 60 minutes each day (HB 1470 § 4(2)(c)), *compare* DOC Policy No. 450.200 which provides individuals will have "access to reasonably priced telephone services" with all calls limited to 20 minutes, subject to limitations and restrictions necessary for security.

If anything, a comparison of the actual requirements in HB 1470 to those applicable to a variety of other state-regulated facilities demonstrates that HB 1470 imposes more restrictive, and more burdensome requirements on the single federal facility it was intended to regulate—NWIPC. This is unsurprising in light of HB 1470's stated legislative goal of "prohibit[ing] the use of private, for-profit prisons and detention facilities in the state." HB 1470 § 8. This comparison, like the legislative history and the express language of HB 1470, plainly demonstrates that HB 1470 violates the Intergovernmental Immunity Doctrine because it impermissibly discriminates against the federal government and its contractors.

### 3. HB 1470 Is Field Preempted.

The State provides a two-pronged response to GEO's claim of field preemption. First, the State argues that the decision of the Ninth Circuit in *California* compels a presumption against preemption and forecloses a finding that HB 1470 is field preempted. MTD at 16-17. Second, the State argues there is no indication that Congress intended to occupy the field of alien detention pending removal. *Id.* at 17-18. The State is wrong on both counts.

As explained in section II.B above, the State's broad interpretation of *California* is erroneous. The surviving portions of AB 103 merely subjected detention facilities located in California to "inspections" or a "review" by the state attorney general. The Ninth Circuit

THE GEO GROUP INC.'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS (3:23-cv-05626)- 13

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

specifically noted that AB 103 did not regulate confinement or impose mandates on ICE contractors but merely required the permission of inspections and the production of data. *Id*. at 885. For that reason, the Ninth Circuit found that the mere "review" allowed by AB 103 did not "constitute[] an obstacle to the federal government's enforcement of its immigration laws or detention scheme." *Id*. at 886.

In *GEO v. Newsom*, *supra,* the Ninth Circuit explicitly noted the circumscribed nature of AB 103 and the limited scope of its corresponding holding in *California*:

> We applied the presumption [against preemption] to a state law requiring state inspections of immigration detention facilities, and we held that the law was not preempted. [] *But we specifically recognized that the requirement did not "regulate whether or where an immigration detainee may be confined" or cause "active frustration of the federal government's ability to discharge its operations*." […] The Supreme Court has indicated that the presumption *does not apply when a state law would interfere with inherently federal relationships*. […] Here, the same is true of the *contractual relationship between a federal agency and its contractor. See* [*Boyle v. United Tech. Corp.*, 487 U.S. 500, 504 (1988)] (explaining that the "*obligations to and rights of the United States under its contracts are governed exclusively by federal law*").

50 F.4th at 761-62 (emphasis added)

Here, HB 1470 would require a wholesale rewriting of ICE's federal contract and the replacement of the congressionally mandated PBNDS with the often inconsistent and conflicting State requirements that would govern virtually every aspect of GEO's contract performance, as well as the medical care provided to detainees directly by ICE. As the Ninth Circuit noted in *Newsom*, such interference with and frustration of the United States' contractual relationship (and ICE's direct provision of healthcare services) is outside the circumstances addressed in *California* and not entitled to any presumption against preemption.[9]

Equally unconvincing are the State's arguments that Congress has not expressed the

---

[9] The "presumption against preemption" does not apply when a state regulates in an area with a "history of significant federal presence," *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 496 (9th Cir. 2005), and when the federal interest "has been manifest since the beginning of our Republic," *U.S. v. Locke*, 529 U.S. 89, 99 (2000). The detention of removable aliens has always been an area dominated by the federal government.

THE GEO GROUP INC.'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS (3:23-cv-05626)- 14

intention to occupy the entire field of alien detention pending removal.[10] The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens. *See Toll v. Moreno*, 458 U.S. 1, 10 (1982). This authority rests, in part, on the federal government's constitutional power to "establish a uniform Rule of Naturalization," U.S. CONST. art. I, § 8, cl. 4, and its inherent power as sovereign to control and conduct relations with foreign nations. *See Toll,* 458 U.S. at 10 (*citing U.S. v. Curtiss–Wright Exp. Corp.*, 299 U.S. 304, 318 (1936)). It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate states. *See Chy Lung v. Freeman*, 92 U.S. 275, 279-280 (1876). The U.S. Supreme Court has reaffirmed that "[o]ne of the most important and delicate of all international relationships ... has to do with the protection of the just rights of a country's own nationals when those nationals are in another country." *Hines v. Davidowitz*, 312 U.S. 52, 64 (1941).

As detailed in GEO's Motion, various federal statutes place responsibility for the detention of aliens pending removal with the Department of Homeland Security ("DHS"). *See also* 8 U.S.C. § 1231(g)(1); 6 U.S.C. § 112(b)(2); 28 U.S.C. § 530C(a)(4). Consistent with this delegation, Congress also granted the Secretary of DHS broad authority and discretion to "enter into contracts and other agreements, of any reasonable duration, for detention or incarceration space or facilities, *including related services, on any reasonable basis.*" 18 U.S.C. § 4013, Pub. L. 106-553, § 1(a)(2) (emphasis added). In 2017, Congress reached its own conclusion regarding how to best ensure the health and safety of federal detainees when it *explicitly directed* that contracts or agreements for immigration detention pending removal should incorporate and comply with the PBNDS. The Joint Explanatory Statement, which accompanied the Fiscal Year 2017 Department of Homeland Security Appropriations Act (P.L. 115-31) directed: "Within 45 days after the enactment of this

---

[10] The State cites *Gill v. United States Department of Justice*, 913 F.3d 1179 (9th Cir. 2019), for the proposition that "the Supremacy Clause is only triggered by the Laws of the United States, and the PBNDS did not have the force of law." MTD at 17. *Gill* is an APA challenge of an agency action related to Suspicious Activity Reports that has absolutely nothing to do with the PBNDS or the Supremacy Clause.

THE GEO GROUP INC.'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS (3:23-cv-05626)- 15

Act, ICE shall report on its progress in implementing the 2011 Performance Based National Detention Standards, including the 2016 revisions….” 163 Cong. Rec. H3812 (2017). House Report 114-668 similarly states: “Within 45 days after the date of enactment of this Act, ICE shall report on its progress in implementing the 2011 PBNDS and requirements related to PREA, including a list of facilities that are not yet in compliance; a schedule for bringing facilities into compliance; and current year and estimated future year costs associated with compliance.” H.R. Rep. No. 114-668, at 35 (2016).[11]

In every preemption case, the intent of Congress is the “ultimate touchstone” of preemption analysis. *Medtronic, Inc., v. Lohr*, 518 U.S. 470, 485 (1996) (internal quotation marks and citation omitted). It is widely accepted that Committee Reports are an “authoritative source for finding the Legislature’s intent.” *See Garcia v. U.S.*, 469 U.S. 70, 76 (1984); *see also Samantar v. Yousuf*, 560 U.S. 305, 316 n.9, 323 (2010) (considering the House Committee Report in interpreting the Foreign Sovereign Immunities Act). In discerning this intent, courts also look to the “structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court’s reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law.” *See Medtronic*, 518 U.S. at 486 (internal quotation marks and citations omitted); *see also Ariz. v. U.S.*, 567 U.S. 387, 405-06 (2012) (reviewing legislative background of IRCA when evaluating preemption).

The FY 2017 Joint Explanatory Statement and Committee Report cited above expresses Congressional intent that the PBNDS should uniformly govern the health and welfare of detainees in ICE custody pending removal.[12] That expression, combined with the federal statutes noted above, provides a comprehensive and unified system for the detention of aliens pending removal

---

[11] Building on this mandate, in 2019 Congress created the DHS Immigration Detention Ombudsman and mandated the Ombudsman, *inter alia*, investigate complaints and conduct inspections, reviews and audits of detention contractor performance to ensure compliance with “detention standards.” 6 U.S.C. § 205(a) & (b). This action unmistakably confirms Congressional intent that the PBNDS governs federal immigration detention.

[12] The decision in *Owino v. CoreCivic, Inc.*, No. 17-CV-1112 JLS (NLS), 2018 WL 2193644 (S.D. Cal. May 14, 2018) does little to support the State’s arguments as there is no indication that the parties or the district court were aware of, much less considered, the FY 2017 Joint Explanatory Statement and Committee Report or 6 U.S.C. § 205. The district court’s musings in a footnote that the PBNDS “cannot provide congressional intent” should be disregarded as inconsistent with 163 Cong. Rec. H3812 (2017), H.R. Rep. No. 114-668, at 35 (2016), and 6 U.S.C. § 205. *Id.* at *18 n.10

THE GEO GROUP INC.’S OPPOSITION TO DEFENDANTS’
MOTION TO DISMISS (3:23-cv-05626)- 16

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

1   which reflects a congressional decision to foreclose any state regulation in the area. *See Silkwood*

2   *v. Kerr–McGee Corp*., 464 U.S. 238, 249 (1984). To find otherwise would disregard Congress's

3   express direction and undermine the uniform detention system commanded by Congress and

4   implemented by DHS.

5         **4.**      **HB 1470 Is Obstacle And Conflict Preempted.**

6         In response to GEO's argument regarding obstacle and conflict preemption, the State offers

7   a confusing reply that misstates the holding in *California* and the requirements of the PBNDS.

8   First, the State argues that *California* is "dispositive" because the "Ninth Circuit has already

9   rejected GEO's argument that state health and safety laws stand as an obstacle to the federal

10  government's detention scheme." MTD at 19. Apparently, the State reads the decision in *California*

11  as permitting the imposition of *any state law concerning "health and safety"* on any federal

12  immigration detention facility. As detailed in Section C above, the relevant portion of the

13  *California* decision was limited to the consideration of the provisions in AB 103 that allowed only

14  a "review" or "inspection." As the Ninth Circuit subsequently explained in *Newsom*, the

15  "inspections" involved in *California* did not "regulate" confinement or impact "operations."

16  *Newsom*, 50 F.4th at 761-62. Moreover, the *Newsom* court indicated the result would be different

17  if, as is the case with HB 1470, the state law were to "interfere with inherently federal

18  relationships," including the contractual relationship between a federal agency and its contractor.

19  *Id*. at 761. Both *California* and *Newsom* clearly support a finding that HB 1470's requirements are

20  preempted because they create conflicts with GEO's contractual obligations to ICE under the

21  Congressionally mandated PBNDS and present an obstacle to the Congressional objective of

22  implementing a uniform set of requirements for federal immigration detention.

23        Next, the State argues it is irrelevant whether HB 1470 conflicts with the PBNDS because

25  "[t]he PBNDS does not have the force of law and cannot preempt state law." MTD at 21. However,

26  the State ignores the breadth of the conflict created by HB 1470 and the extent to which it interferes

27  with federal operations and Congressional objectives. Both the Ninth Circuit and the Supreme

28  Court have found conflict preemption when "the federal legislation at issue involved a uniquely

THE GEO GROUP INC.'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS (3:23-cv-05626)- 17

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

federal area[] of regulation" and state law "directly interfered with the operation of the federal program." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 959 F.3d 1201, 1212 (9th Cir. 2020) (quoting *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 604 (2011)). Immigration detention is unquestionably a "uniquely federal area of regulation." The Federal Government has "plenary or near plenary power over immigration issues," *Steinle v. City & Cnty. of San Francisco*, 919 F.3d 1154, 1165 (9th Cir. 2019), and detention of removable aliens is part and parcel of that power, *see Wing v. U.S.*, 163 U.S. 228, 235 (1896). HB 1470 impermissibly overrides the substantial authority and discretion Congress granted DHS to contract with private detention facilities *on any reasonable basis. See* 8 U.S.C. § 1231(g)(1); 18 U.S.C. § 4013. HB 1470's attempt to dictate detailed operational requirements of GEO's contract with ICE interferes with the discretion afforded DHS to contract for detention services, directly interferes with the operation of the federal program for the detention of removable aliens, and violates the settled principle that "normally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted" to a federal official. *Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1192 (9th Cir. 2018) (quoting *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 33 (1996)). As a result, the conflict and obstacle presented by HB 1470 is not limited to its numerous direct conflicts with the Congressionally mandated PBNDS but includes a direct conflict with the statutory grant of authority and discretion to DHS to contract for immigration detention services on any reasonable basis.

Moreover, as noted above, the intent of Congress is the "ultimate touchstone" of preemption analysis. *Medtronic*, 518 U.S. at 494. The Congressional mandate that ICE implement and use the PBNDS removes any doubt that HB 1470 stands as a direct obstacle to the accomplishment and execution of the full purposes and *objectives of Congress*. See Section II.B.3. *supra*. Congress explicitly directed the incorporation of the PBNDS into all ICE detention contracts. Like a statutory directive to promulgate implementing regulations, this direction manifests the intent of Congress and preempts the State's attempts to replace the PBNDS in whole or part with HB 1470. *See Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153

THE GEO GROUP INC.'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS (3:23-cv-05626)- 18

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

(1982). Any finding to the contrary would undercut the statutory grant of authority and discretion to DHS to contract for immigration detention services on any reasonable basis, as well as *Congress's own explicit direction* to ICE to utilize the PBNDS when exercising that authority and discretion.

The State further argues the requirements of HB 1470 do not conflict with the PBNDS. MTD at 19-20. This argument is replete with misstatements regarding the requirements of the PBNDS and HB 1470. For example, the State contends that there is no conflict between HB 1470 Section 4(e) which prohibits "solitary confinement" and the PBNDS because the "PBNDS does not require detainees held in special management units to be confined 'alone.'" *Id*. at 20. This is incorrect, and there are numerous circumstances where the PBNDS requires that detainees be held alone in segregation, *e.g.,* segregation "from all other detainees" Dkt. 10-2 (Ex. B) at 210 (emphasis omitted); "segregation from general population," *id*. at 282; "medical isolation," *id*. at 275; use of "special isolation room," *id*. at 315; "Isolation until Medically Evaluated," *id*. at 60 (emphasis omitted). In fact, the very definition of "Segregation" notes that it involves "[c]onfinement in an individual cell isolated from the general population; for administrative, disciplinary, or protective reasons." *Id*. at 454. The State's other attempts to read HB 1470 as consistent with the PBNDS are equally misguided.

As detailed in GEO's Motion, HB 1470 is inconsistent with and in direct conflict with various portions of the PBNDS and the NWIPC contract. These inconsistencies and conflicts include but are not limited to: (1) HB 1470 § 4(2)(c) requiring free telecommunications services for each detainee for at least 60 minutes daily while the NWIPC contract requires "the ICE designated Detainee Telephone Services (DTS) vendor will be the exclusive provider of detainee telephones for this facility" and § 5.6 of the PBNDS which provides that "detainees or the persons they call shall be responsible for the costs of telephone calls" and telephone service rates shall "be based on rates and surcharges comparable to those charged to the general public;" Ex. B. at 376; (2) HB 1470 § 4(d) requires daily in-person visitation with unrestricted personal contact while the PBNDS § 5.7 allows visitation only to the extent practicable and limits physical contact; (3) HB

THE GEO GROUP INC.'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS (3:23-cv-05626)- 19

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

1470 § 4(e) prohibits "solitary confinement" while "segregation" is permitted and mandated by various sections of PBNDS (Ex. B at 60, 210, 275, 282, 315, 367 454); (4) HB 1470 § 2(1)(g) requires both heating and air conditioning equipment that can be adjusted by room while the NWIPC split HVAC system is compliant with the NWIPC contract and ICE unique physical and operational requirements applicable to immigrant detention pending removal, including 2005 Health Services Design Standards, 2006 Executive Office for Immigration Review ("EOIR") Standards, and the 2000 International Building code; (5) HB 1470 § 2(1)(e) requires that detainees must be provided fresh fruits and vegetables "not including any processed, canned, frozen, or dehydrated fruits or vegetables" while PBNDS § 4.1 specifically allows "canned fruit;" (6) HB 1470 § 2(1)(a) requires that a detained person be allowed to possess and use personal belongings while PBNDS § 2.5 limits personal property and prohibits possession of various categories of personal property, and; (7) HB 1470 § 4(2)(b) requires that commissary items be available at reasonable prices taking into account the income and financial circumstances of each detained person while the NWIPC contract requires commissary items and pricing as approved by ICE. PWS § XII.E. p.84. As state agencies promulgate additional rules and requirements pursuant to HB 1470, this list of conflicting requirements will certainly expand.

### 5.  HB 1470 Violates The Contract Clause.

As outlined in GEO's Motion, compliance with HB 1470 would require GEO to breach multiple explicit contractual requirements that could lead to a complete termination of GEO's contract. Dkt. 10 (Martin Decl.) ¶ 17. Moreover, even if compliance with both HB 1470 and GEO's contract were possible, it would significantly increase the costs associated with the performance of GEO's current contract, defeating the expectations of the parties and dramatically altering the financial bargain. Dkt. 9 (Shakir Decl.) ¶ 8. As a result, HB 1470 is unconstitutional because it violates the Contracts Clause of the U.S. Constitution.

In response, the State first argues that GEO's breaches of the NWIPC contract and the PBNDS would not impair that contract because those breaches would be excused by clauses in the contract that require GEO to comply with "applicable state laws." MTD at 22. Setting aside

THE GEO GROUP INC.'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS (3:23-cv-05626)- 20

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

whether HB 1470 can be considered "applicable," the section of the NWIPC contract cited by the State sets out a listing of 25 separate "constraints [that] comprise the statutory, regulatory, policy and operational *considerations that will impact* the contractor." Dkt. 10-1 (Ex. A) at 44-45 (emphasis added). One listed "constraint" is "applicable state facility codes," and another is "The ICE/OHS Performance Based Detention Standards." *Id*. This clause concludes by noting that *"[i]n cases where other standards conflict with DHS/ICE policy or standards, OHS/ICE policy and standards prevail*." *Id*. at 45 (emphasis added). The very next paragraph in the contract is titled "Performance" and states "[t]he Contractor *shall perform all services in accordance with ICE 2011 Performance-Based National Detention Standards (PBNDS)*." *Id*. at 46. (emphasis added). The State's argument that general references to "applicable state laws" in the NWIPC contract would excuse a breach of the PBNDS is plainly erroneous.

The State next argues that even if HB 1470 required GEO to breach its contractual obligations with ICE, GEO would still be guaranteed a minimum payment. MTD at 22. This argument defies common sense and basic contract law. The NWIPC contract incorporates the standard Federal Acquisition Regulation ("FAR") clause at 48 C.F.R. ¶ 52.249-8. This clause provides that if GEO breaches its contractual obligations in order to comply with HB 1470, ICE has the absolute right to terminate the contract and GEO has no continuing entitlement to any minimum payments thereunder. *Id*. Moreover, this clause subjects GEO to possible liability for any excess costs incurred by the government to procure the services required by the terminated portion of the contract. 48 C.F.R. ¶ 52.249-8(b). As explained in GEO's Motion, compliance with HB 1470 would require GEO to breach multiple explicit contractual requirements that could lead to a complete termination of GEO's contract. *See* Marin Decl. ¶ 17.

Finally, the State argues that even if HB 1470 substantially impairs GEO's contractual rights, no violation of the Contracts Clause is possible because HB 1470 was motivated by a noble public purpose. MTD at 23. However sincere the concerns and noble the intentions of the legislature, to the extent the public purpose is aimed at controlling the operation of federal immigration detention facilities it is not a *legitimate* public purpose. *See, e.g*., *Hancock v. Train*,

THE GEO GROUP INC.'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS (3:23-cv-05626)- 21

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150

426 U.S. 167, 174 n.23, 180 (1976). Moreover, even if the State's purpose were legitimate, that purpose must be pursued in an appropriate and reasonable way. State control over federal contracts is an inappropriate means for achieving State purposes. *See Boyle v. United Technologies Corp.*, 487 U.S. 500, 505 (1988). HB 1470 pursues the illegitimate public purpose of regulating federal immigration detention and it pursues that purpose by the inappropriate means of controlling federal contracts. The Contracts Clause precludes this pursuit, however well-intentioned.

### III.   CONCLUSION

For the foregoing reasons, the State's motion to dismiss should be denied.

DATED this 28th day of August, 2023.

I certify that this memorandum contains **8,349** words, in compliance with the Local Civil Rules.

Davis Wright Tremaine LLP
*Attorneys for Plaintiff*

By */s/ John G. Hodges-Howell*
    Harry J. F. Korrell, WSBA No. 23173
    John G. Hodges-Howell, WSBA No. 42151
    920 Fifth Avenue, Suite 3300
    Seattle, WA 98104-1610
    Phone:  206.622.3150
    Email:  harrykorrell@dwt.com
    Email:  jhodgeshowell@dwt.com

    Scott Allyn Schipma, (Admitted *pro hac vice*)
    Joseph Negron, Jr., (Admitted *pro hac vice*)
    4955 Technology Way
    Boca Raton, FL 99431
    Phone:  561.999.7615
    Email:  scott.schipma@geogroup.com
    Email:  jnegron@geogroup.com

THE GEO GROUP INC.'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS (3:23-cv-05626)- 22

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150