EXHIBIT A

**Nos. 21-36024, 21-36025**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

UGOCHUKWU GOODLUCK NWAUZOR, FERNANDO AGUIRRE-URBINA,
individually and on behalf of those similarly situated, Plaintiffs-Appellees,

and

STATE OF WASHINGTON, Plaintiff-Appellee,

v.

THE GEO GROUP, INC., Defendant-Appellant.

———————————

On Appeal from the United States District Court
for the Western District of Washington

———————————

## BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
## IN SUPPORT OF APPELLANT

———————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

TESSA M. GORMAN
  *United States Attorney*

MARK B. STERN
BRAD HINSHELWOOD
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-7823*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND INTEREST OF THE UNITED STATES ..........................1

STATEMENT OF THE ISSUE ..............................................................................3

BACKGROUND.....................................................................................................3

    A.    Federal Immigration Detention Operations and the Voluntary Work Program .....................................................................................3

    B.    Washington's Minimum Wage Act ...............................................7

    C.    Prior Proceedings...........................................................................8

        1.    District Court Ruling ...........................................................8

        2.    Proceedings on Appeal.......................................................10

The Supremacy Clause Precludes Application Of The Washington Minimum Wage Statute To Work Programs For Federal Immigration Detainees............. 11

I.    Application Of the State Minimum Wage Law To Federal Immigration Detainees In The Voluntary Work Program Is Preempted ............................... 12

II.   Application Of State Minimum Wage Law To Federal Immigration Detainees Is Likewise Impermissible Under The Intergovernmental Immunity Doctrine................................................................................... 20

CONCLUSION ................................................................................................ 29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                                                    **Page(s)**

*Adkisson v. Jacobs Eng'g Grp., Inc.,*
  790 F.3d 641 (6th Cir. 2015) ........................................................................28

*Alvarado-Guevara v. INS,*
  902 F.2d 394 (5th Cir. 1990) .........................................................................13

*Arizona v. United States,*
  567 U.S. 387 (2012) .......................................................................................12

*Boeing Co. v. Movassaghi,*
  768 F.3d 832 (9th Cir. 2014) .........................................................................22

*Boyle v. United Techs. Corp.,*
  487 U.S. 500 (1988) .......................................................................................28

*Bruns v. Municipality of Anchorage,*
  182 F.3d 924 (9th Cir. 1999) .........................................................................13

*Cabalce v. Thomas E. Blanchard & Assocs., Inc.,*
  797 F.3d 720 (9th Cir. 2015) .........................................................................28

*Clark v. Martinez,*
  543 U.S. 371 (2005) .........................................................................................4

*Crosby v. National Foreign Trade Council,*
  530 U.S. 363 (2000) .......................................................................................16

*Dawson v. Steager,*
  139 S. Ct. 698 (2019) .....................................................................................27

*Gartrell Constr. Inc. v. Aubry,*
  940 F.2d 437 (9th Cir. 1991) .............................................................18, 19, 22

*Geier v. American Honda Motor Co.,*
  529 U.S. 861 (2000) .......................................................................................17

*GEO Grp., Inc. v. Newsom,*
  50 F.4th 745 (9th Cir. 2022) .......................................... 3, 4, 11, 12, 19, 21, 22, 23, 24, 26

*Hancock v. Train,*
  426 U.S. 167 (1976) ........................................................................................ 19

*Hanford Nuclear Reservation Litig., In re,*
  534 F.3d 986 (9th Cir. 2008) ........................................................................ 28

*Hines v. Davidowitz,*
  312 U.S. 52 (1941) .......................................................................................... 17

*Hughes v. Talen Energy Mktg., LLC,*
  578 U.S. 150 (2016) ........................................................................................ 16

*Leslie Miller, Inc. v. Arkansas,*
  352 U.S. 187 (1956) ........................................................................................ 23

*Ndambi v. CoreCivic, Inc.,*
  990 F.3d 369 (4th Cir. 2021) ........................................................................ 13

*North Dakota v. United States,*
  495 U.S. 423 (1990) ............................................................................ 9, 22-23, 24

*Nwauzor v. GEO Grp., Inc.,*
  62 F.4th 509 (9th Cir. 2023) ........................................................................ 10

*Nwauzor v. GEO Grp., Inc.,*
  540 P.3d 93 (Wash. 2023) ...................................................................... 11, 26

*Public Utils. Comm'n of Cal. v. United States,*
  355 U.S. 534 (1958) ........................................................................................ 23

*Reno v. Flores,*
  507 U.S. 292 (1993) ........................................................................................ 12

*Taylor v. United States,*
  821 F.2d 1428 (9th Cir. 1987) ...................................................................... 22

*Taylor Energy Co. v. Luttrell,*
  3 F.4th 172 (5th Cir. 2021) .......................................................................... 28

*United States v. California*,
   921 F.3d 865 (9th Cir. 2019) ...................................................................11-12

*United States v. Fresno County*,
   429 U.S. 452 (1977) ........................................................................................24

*United States v. New Mexico*,
   455 U.S. 720 (1982) ........................................................................................24

*United States v. Town of Windsor*,
   765 F.2d 16 (2d Cir. 1985) .............................................................................22

*United States v. Washington*,
   596 U.S. 832 (2022) ................................................................................. 12, 25

*Washington v. United States*,
   460 U.S. 536 (1983) ........................................................................................25

*World Trade Ctr. Disaster Site Litig., In re*,
   521 F.3d 169 (2d Cir. 2008) ...........................................................................28

*Wyeth v. Levine*,
   555 U.S. 555 (2009) ........................................................................................19

*Yearsley v. W.A. Ross Constr. Co.*,
   309 U.S. 18 (1940) .................................................................................. 27, 28

**Statutes:**

Departments of State, Justice, and Commerce, the Judiciary, and Related Agencies
   Appropriation Act, 1979, Pub. L. No. 95-431, 92 Stat. 1021, 1027 (1978) ........4-5, 14

6 U.S.C. § 112(b)(2) ...........................................................................................12

6 U.S.C. § 557 .......................................................................................................4

8 U.S.C. § 1225(b) .................................................................................................3

8 U.S.C. § 1226 .....................................................................................................3

8 U.S.C. § 1231(a) .................................................................................................3

8 U.S.C. § 1231(g) ...........................................................................................3

8 U.S.C. § 1231(g)(1) ................................................................................. 3, 12

8 U.S.C. § 1555(d) ............................................................ 1, 4, 12-13, 13, 20

29 U.S.C. § 218(a) ........................................................................................13

Wash. Rev. Code § 49.46.010(3)(k) ................................................. 7, 11, 15, 25

Wash. Rev. Code § 49.46.020 .........................................................................7

Wash. Rev. Code § 49.46.020(2)(b) .................................................................7

Wash. Rev. Code § 70.395.030(1) ...................................................................8

Wash. Rev. Code § 72.09.100 .........................................................................7

Wash. Rev. Code § 72.68.110 .......................................................................27

Wash. Rev. Code § 72.68.110(1) .....................................................................8

**Legislative Materials:**

*Hearing on H.R. 4645 and S. 2864 Before Subcomm. No. 2 of the H. Comm. on the Judiciary,*
81st Cong. (1950) .................................................................................4, 13, 20

H.R. Rep. No. 98-478 (1983) (Conf. Rep.).....................................................20

S. Rep. No. 81-1258 (1950) .......................................................................4, 13

**Other Authorities:**

*Applicability of Employer Sanctions to Alien Detainees Performing Work in INS Detention
Facilities,*
Genco Op. No. 92-8 (INS), 1992 WL 1369347 (Feb. 26, 1992) .................................20

U.S. Immig. & Customs Enf't, DHS, *Performance-Based National Detention Standards*
(2008), https://perma.cc/7WDF-TY4U .............................................................5-6, 18

U.S. Immig. & Naturalization Serv., *National Detention Standards: Voluntary Work Program* § III(K) (2000), https://perma.cc/W6P6-PD5V .......................................... 6, 18

Wash. State Dep't of Corr., Policy No. 700.100, *Class III Work Programs*, https://perma.cc/88RM-DUJW ....................................................................... 7-8, 15, 26

Wash. State Dep't of Labor & Indus., *History of Washington State's Minimum Wage*, https://perma.cc/Y7AC-EQFB.............................................................................7

**INTRODUCTION AND INTEREST OF THE UNITED STATES**

In enforcing the immigration laws, the United States detains noncitizens pending their removal or a decision on removal. The United States generally does not build and operate its own facilities to detain noncitizens, and instead arranges for detention by contract with other entities—here, appellant GEO Group, Inc., which carries out federal immigration detention operations at a facility in Tacoma, Washington, under contract with the Department of Homeland Security.

Pursuant to Congressional authorization, the federal government generally requires contractors to operate a Voluntary Work Program for detainees with the aim of reducing the "negative impact of confinement . . . through decreased idleness, improved morale and fewer disciplinary incidents," while also allowing detainees to earn money. 3-ER-516. The Program was instituted to provide for detainees to perform work for the operation of the facility in which they are housed, such as cooking, laundry, and cleaning, and the record reflects that detainees participating in the Program in this case performed such tasks.

For decades, Congress has authorized the use of appropriations for allowances for detainees in such voluntary programs. *See* 8 U.S.C. § 1555(d). Congress last prescribed the rate for such allowances in 1979 at $1/day, and has not raised the allowance in the ensuing decades. Under the present rules governing the program, contractors are not prohibited from providing additional allowances, but any such

allowances cannot be reimbursed by the federal government. Accordingly, GEO has generally given work program participants the $1/day allowance.

In giving contractors the discretion to set the Voluntary Work Program allowance at more than the reimbursable $1/day, but capping reimbursements at $1/day under Congressional direction, the federal government did not allow states to impose minimum wage provisions generally applicable to their residents, and imposing such provisions would call into question the continuing viability of the program under current law, including by imposing significant costs on contractors that Congress has opted not to reimburse.

Application of the state minimum wage is thus precluded by principles of preemption, and it also runs afoul of principles of intergovernmental immunity. Washington recognizes that it could not treat federal detainees as "employees" subject to its statute if they were housed in facilities operated by the federal government. It is no more permissible to treat the same federal detainees as employees if they are housed in a facility owned and operated by a federal contractor. Application of the Washington law also independently contravenes intergovernmental immunity because it would make federal detainees subject to provisions that do not apply, and never have applied, to persons in state custody, singling out a contractor with the federal government for obligations Washington does not itself bear. Thus, as the United States explained in district court, application of the Washington minimum wage statute to federal immigration detainees is impermissible. Our submission is limited

2

to circumstances of the kind presented here, in which detainees perform work for the operation of the facility in which they are housed.  It does not address other circumstances, such as a detainee working for an employer outside the facility.

## STATEMENT OF THE ISSUE

Whether application of Washington's Minimum Wage Act to labor performed by federal immigration detainees held in a facility operated by a private contractor under a contract with the federal government contravenes principles of preemption and intergovernmental immunity.

## BACKGROUND

### A.    Federal Immigration Detention Operations and the Voluntary Work Program

**1.**  As part of its operations administering the immigration system, the Department of Homeland Security (DHS) detains certain noncitizens pending the completion of removal proceedings or while awaiting removal.  *See* 8 U.S.C. §§ 1225(b), 1226, 1231(a).  Congress authorized DHS to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," *id.* § 1231(g)(1), and has directed that DHS "should favor the use of existing facilities for immigration detention, whether through purchase or lease," *GEO Grp., Inc. v. Newsom*, 50 F.4th 745, 751 (9th Cir. 2022) (en banc); *see* 8 U.S.C. § 1231(g).[1]  And because the

---

[1] The statutory language refers to the "Attorney General," but many references in the Immigration and Nationality Act to the "Attorney General" are now read to

*Continued on next page.*

number and location of detained individuals change over time, it is necessary for DHS to "maintain flexibility" in detention operations. *GEO Grp.*, 50 F.4th at 751. As a result, DHS generally does not build or operate detention facilities; instead, the former Immigration and Naturalization Service (and now DHS) has contracted with private entities (beginning in the 1980s) or with local, state, or other federal agencies for detention space or facilities, including related services. *Id.*

Since shortly after World War Two, Congress has authorized the use of appropriations for payment of "allowances (at such rate as may be specified from time to time in the appropriation Act involved) to aliens, while held in custody under the immigration laws, for work performed." 8 U.S.C. § 1555(d). Congress reasoned that allowing noncitizens to perform "work around the detention center or camp" improved the operation of detention facilities by occupying detainees' time and providing compensation. *Hearing on H.R. 4645 and S. 2864 Before Subcomm. No. 2 of the H. Comm. on the Judiciary*, 81st Cong. 21-22 (1950) (statement of George M. Miller, Assistant Chief of the Accounts Branch, U.S. Dep't of Justice); *see* S. Rep. No. 81-1258, at 2 (1950) (describing need for authorization). Congress last set the rate for work programs in immigration detention centers in 1979, providing that appropriated funds could be used for payment of allowances at a rate of no more than $1 per detainee per day. *See* Departments of State, Justice, and Commerce, the Judiciary, and

---

refer to the Secretary of Homeland Security. *See* 6 U.S.C. § 557; *Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

Related Agencies Appropriation Act, 1979, Pub. L. No. 95-431, 92 Stat. 1021, 1027 (1978) (appropriating funds for "payment of allowances (at a rate not in excess of $1 per day) to aliens, while held in custody under the immigration laws, for work performed"). Congress has not raised the rate since that time, and DHS accordingly cannot expend appropriations in excess of that amount to reimburse contractors for operating the Program.

DHS implements this statutory authorization through the Voluntary Work Program for detainees. The Immigration and Naturalization Service originally administered work programs, and the Voluntary Work Program is now administered on the federal government's behalf when contractors provide immigration detention services. The Program is governed by DHS's Performance-Based National Detention Standards (PBNDS or Standards), which are incorporated into detention services contracts and require contractors to make the Program available to detainees. 3-ER-516. The Standards explain that the Program is designed to address issues that may arise for individuals in detention and detention facilities by providing opportunities to work. *See id.* For detainees, participation in the Program is voluntary, and the record here reflects that those who participate engage in tasks around the detention facility to support facility operations, like cleaning laundry or preparing food.

The Standards also address the allowance under the Voluntary Work Program. Until 2011, the PBNDS specified that "the compensation is $1.00 per day." U.S. Immig. & Customs Enf't, DHS, *Performance-Based National Detention Standards*

5

§ 5.33(V)(K) (2008), https://perma.cc/7WDF-TY4U; *accord* U.S. Immig. &

Naturalization Serv., *National Detention Standards: Voluntary Work Program* § III(K)

(2000), https://perma.cc/W6P6-PD5V.  The Standards currently in effect—originally

issued in 2011—state that detainees must be provided an allowance of "at least $1.00

(USD) per day."  3-ER-518.  The $1/day figure thus now operates as a cap on

reimbursement of the contractor by DHS (because of the statutory restriction) and

the minimum allowance the contractor may provide (under the terms of the

Standards), but contractors now have discretion to provide a higher rate.

**2.**  DHS contracts with GEO to operate a detention facility for federal

immigration detainees in Tacoma, Washington, known as Northwest ICE Processing

Center.  The contract requires GEO to provide the Voluntary Work Program for

detainees.  3-ER-505.  The Program "may include work or program assignments for

industrial, maintenance, custodial, service, or other jobs," and "shall not conflict with

any other requirements of the contract and must comply with all applicable laws and

regulations."  *Id.*  In operating the Program, GEO has generally given participants an

allowance of $1/day, although it has occasionally exceeded that amount.  2-ER-250-

252; 2-ER-229 (testimony from GEO employee describing an allowance of $5/day).

The contract between DHS and GEO has separate provisions related to

GEO's employees.  The contract requires that all persons employed by GEO must be

U.S. citizens or lawful permanent residents with work authorization who have resided

in the United States for the past five years, *see* 2-SERWA-386, and that noncitizens

6

who are unlawfully present "will not be employed by the Contractor," 2-SERWA-394.
The contract provides that GEO is required to "perform in accordance" with
"[a]pplicable federal, state and local labor laws and codes," 2-SERWA-367, and
specifies that in the event of conflicts between applicable standards, "the most
stringent shall apply," 2-SERWA-375.

### B.      Washington's Minimum Wage Act

Washington's Minimum Wage Act generally prescribes a minimum wage that
must be paid to all "employees" in the State.  Wash. Rev. Code § 49.46.020.  The
minimum wage is currently $16.28 per hour.  *See id.* § 49.46.020(2)(b); Wash. State
Dep't of Labor & Indus., *History of Washington State's Minimum Wage*,
https://perma.cc/Y7AC-EQFB.

Certain classes of individuals are excluded from the statutory definition of
"employee" and thus are not required to be paid minimum wage.  As relevant here,
Washington excludes from the definition of "employee" "[a]ny resident, inmate, or
patient of a state, county, or municipal correctional, detention, treatment or
rehabilitative institution."  Wash. Rev. Code § 49.46.010(3)(k).  Thus, when
Washington operates labor programs within its own correctional or other detention
facilities, participants are generally paid only a "gratuity" that is substantially below the
state's minimum wage.  *See id.* § 72.09.100 (providing for various "classes" of labor by
detained or incarcerated individuals); Wash. State Dep't of Corr., Policy No. 700.100,
*Class III Work Programs*, https://perma.cc/88RM-DUJW (providing that

7

compensation for "Class III" labor, which includes "facility support positions that are vital to facility operations," "will not exceed $40 per week"). Guidance from Washington's Department of Labor and Industries also makes clear that if persons detained under state authority are "assigned by prison officials to work on prison premises for a private corporation at rates established and paid for by the state," those individuals "are not employees of the private corporation and would not be subject to the [Minimum Wage Act]." 3-ER-502.

Washington law also provides that the State is generally prohibited from entering into contracts with private detention providers for the incarceration of state prisoners within the State. Wash. Rev. Code § 72.68.110(1); *see id.* § 70.395.030(1). The State has represented that it "has no private contractors running state prisons or detention centers." State Br. 11.

## C. Prior Proceedings

### 1. District Court Ruling

In 2017, the State of Washington and a group of private plaintiffs filed separate suits against GEO. In both cases, the plaintiffs contended that GEO was required to pay federal immigration detainees the state minimum wage for work performed in the Voluntary Work Program.

As relevant to the points addressed in this amicus brief, the district court held that application of Washington's minimum wage law to a work program for federal immigration detainees was neither preempted nor barred by the doctrine of

8

intergovernmental immunity. The court held that GEO "has failed to show that paying the detainees minimum wage stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," and that application of the Washington law was therefore not preempted. 1-ER-158 (quotation marks omitted). On the basis of similar reasoning, the district court also concluded that application of Washington's minimum wage law did not run afoul of principles of intergovernmental immunity because it did not "regulate[] the United States directly" or "discriminate[] against the Federal Government or those with whom it deals." *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality op.). The district court declared that "[a]pplication of the [Minimum Wage Act] does not mandate the way in which GEO runs the [Voluntary Work Program]" or "replace or add to the contractual requirements . . . GEO [must] fulfill in running the [P]rogram," and thus would not directly regulate the federal government. 1-ER-122.

The district court also concluded that application of the state minimum wage law did not discriminate against the federal government, stating that this case involves "a neutral law of general application" that "is being imposed on GEO on a 'basis unrelated to [GEO's] status as a Government contractor.'" 1-ER-79 (alteration in original) (quoting *North Dakota*, 495 U.S. at 438 (plurality op.)). The district court entered judgments in the two cases amounting to over $30 million in damages and interest. 1-ER-13; 1-ER-35; 1-ER-38. The district court also enjoined GEO "from continuing operation of the Voluntary Work Program as it has been operating without

9

paying detainee workers the minimum wage." 1-ER-35. In light of the injunction, GEO requested that ICE suspend the Program at Northwest ICE Processing Center during the pendency of these appeals, and ICE agreed. 2-ER-217. As a result, detainees at that facility are currently unable to work or receive an allowance during their detention.

### 2. Proceedings on Appeal

GEO appealed from the judgments in these cases, and this Court consolidated the appeals. After briefing and oral argument, this Court certified three questions to the Washington Supreme Court: whether "the detained workers" qualify as "employees within the meaning" of Washington's Minimum Wage Act; whether the Minimum Wage Act applies "to work performed in comparable circumstances by civil detainees confined in a private detention facility operating under a contract with the State"; and whether an award of damages foreclosed an unjust enrichment remedy. *Nwauzor v. GEO Grp., Inc.*, 62 F.4th 509, 516-17 (9th Cir. 2023). The Court simultaneously issued an order inviting the United States to submit an amicus brief "setting forth its current views on the constitutional defenses asserted by Defendant GEO Group, Inc.—intergovernmental immunity, derivative sovereign immunity, and preemption." Order 1-2 (Mar. 7, 2023).

In answering the certified questions, the Washington Supreme Court held that federal immigration detainees are "employees" for purposes of the Washington Minimum Wage Act. *Nwauzor v. GEO Grp., Inc.*, 540 P.3d 93, 99 (Wash. 2023). The

court concluded that detainees are "employees" of GEO under the state statute, *id.* at 102, and rejected the application of the exception for "[a]ny resident, inmate, or patient of a state, county, or municipal correctional, detention, treatment or rehabilitative institution," Wash. Rev. Code § 49.46.010(3)(k), because that exception is limited to detention by "government divisions within the state" in "public institutions," *Nwauzor*, 540 P.3d at 99. The court further held that the exception would "not apply to a detainee held in a private institution that is owned and operated by a private entity even where that entity operates the facility pursuant to a contract with the State." *Id.* The court explained that it interpreted the exception "narrowly" to apply "only to workers detained in a government institution." *Id.*

The United States now responds to this Court's invitation with this amicus brief in support of appellant and reversal.

## ARGUMENT

### THE SUPREMACY CLAUSE PRECLUDES APPLICATION OF THE WASHINGTON MINIMUM WAGE STATUTE TO WORK PROGRAMS FOR FEDERAL IMMIGRATION DETAINEES

"Modern Supremacy Clause cases discuss two separate doctrines: intergovernmental immunity and preemption." *GEO Grp., Inc. v. Newsom*, 50 F.4th 745, 758 (9th Cir. 2022) (en banc). "Under the doctrine of obstacle preemption . . . a state law is preempted if it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *United States v. California*, 921 F.3d 865, 879 (9th Cir. 2019)). "Intergovernmental immunity

11

'prohibit[s] state laws that *either* regulate the United States directly *or* discriminate against the Federal Government or those with whom it deals (*e.g.*, contractors)."' *Id.* (quoting *United States v. Washington*, 596 U.S. 832, 838 (2022)).  In this context, application of the two doctrines does not admit of "a rigid distinction," and, as in *GEO Group*, "either doctrine would lead to the same result." *Id.*

I. **Application Of the State Minimum Wage Law To Federal Immigration Detainees In The Voluntary Work Program Is Preempted**

**A. 1.**  Noncitizens held in immigration detention are in the custody of the federal government pursuant to its broad authority over immigration. *See, e.g.*, *Reno v. Flores*, 507 U.S. 292, 305-06 (1993).  That authority is uniquely federal in nature: "Immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws." *Arizona v. United States*, 567 U.S. 387, 395 (2012).  Federal law thus authorizes DHS to "arrange for appropriate places for detention," 8 U.S.C. § 1231(g)(1), which includes the authority to contract for detention on the Secretary's behalf, 6 U.S.C. § 112(b)(2); *GEO Grp.*, 50 F.4th at 751, 757 n.6.

For over 70 years Congress has authorized provision of "allowances (at such rate as may be specified from time to time in the appropriation Act involved) to aliens, while held in custody under the immigration laws, for work performed." 8 U.S.C. § 1555(d).  Congress reasoned from the outset that the purpose of a work

12

program for immigration detainees—including the provision of modest allowances—is to promote good order and improved morale in detention settings. *See Hearing on H.R. 4645 and S. 2864 Before Subcomm. No. 2 of the H. Comm. on the Judiciary*, *supra*, at 21-22 (statement of George M. Miller, Assistant Chief of the Accounts Branch, U.S. Dep't of Justice); S. Rep. No. 81-1258, at 2 (1950). DHS now implements this special statutory authorization by requiring operators of facilities to provide the Voluntary Work Program, and DHS has explained that the Voluntary Work Program is designed to achieve those same goals. *See* 3-ER-516.

Congress has expressly capped the amount DHS may reimburse for work performed under the Program. Additionally, Congress has chosen not to incorporate the federal minimum wage standards established under the Fair Labor Standards Act, instead reserving to itself authority to set the allowance rate through appropriations. 8 U.S.C. § 1555(d); *see Alvarado-Guevara v. INS*, 902 F.2d 394, 395-97 (5th Cir. 1990) (per curiam) (FLSA wage standard not applicable to immigration detainees working within facility); *Ndambi v. CoreCivic, Inc.*, 990 F.3d 369, 371-75 (4th Cir. 2021) (same).[2] Congress last set that rate at $1/day in 1979 and has not raised it since. Pub. L. No.

---

[2] As this Court has correctly recognized, the Fair Labor Standards Act generally "does not excuse noncompliance with more generous state or local laws," and "simply acts as a floor that states and municipalities may exceed through their own legislation." *Bruns v. Municipality of Anchorage*, 182 F.3d 924 (9th Cir. 1999) (unpublished table op.); *see* 29 U.S.C. § 218(a). Preemption here does not arise from the FLSA, but from the impact application of state law would have on the operation of the Program to perform work within the facility in support of facility operations, as established by statute and the implementing Standards and contracts.

95-431, 92 Stat. 1021, 1027 (1978). That remains the case for Voluntary Work Programs administered by private contractors in facilities operated on behalf of DHS. DHS standards accordingly provide that the allowance for participants in the Program will be "at least $1.00 (USD) per day," 3-ER-518, and DHS provides facilities with the $1/day prescribed by Congress while allowing contractors discretion to incur unreimbursed costs.

 **2.** Application of Washington's minimum wage laws in these circumstances is at odds with the Program that Congress has created, which caps reimbursement at $1 per day, as well as the federal government's control over federal immigration detention. Until Congress raises the permitted reimbursement rate or authorizes state regulation in this area, a state law mandating payment in excess of what Congress permitted to be reimbursed will undermine the Program Congress has established. The statutory provisions concerning immigration detention and the Program contemplate that DHS may implement such a Program and provide allowances— including through contractors—subject to the limitations Congress imposes. That statutory structure does not contemplate a role for states or state law in governing the Program.

 Moreover, as discussed, Congress's purpose in authorizing the Program was to foster good order in immigration detention facilities. At the same time, positions in the Program are not guaranteed and may not be available to all detainees. *See* 3-ER-516 (noting that "[d]etainees may have opportunities to work and earn money while

14

confined, subject to the number of work opportunities available and within the constraints of the safety, security and good order of the facility"). It is for Congress to determine whether a wage floor usually applicable to private employment in non-custodial settings is warranted given the Program's objectives of supporting facility morale and good order, particularly given that application of that standard would result in a system under which some detainees may earn substantial pay while others earn nothing. In considering a similar issue, Washington has decided not to apply its state minimum wage to state prisoners who engage in tasks akin to the federal immigration detainees, instead compensating them at a rate that "will not exceed $40 per week." Wash. Dep't of Corr. Policy 700.100; *see* Wash. Rev. Code § 49.46.010(3)(k).

Congress's control over this matter is also inconsistent with the introduction by States of wide disparities across immigration detention facilities nationwide absent approval by Congress. State minimum wage laws may differ substantially both in coverage and prescribed amounts. Some states have no state-law minimum wage at all, while Washington requires payment of $16.28 an hour. And while Washington seeks to apply its law to federal immigration detainees held in private facilities, other states may not. By establishing a reimbursable floor and giving *contractors* discretion to go above that, Congress did not leave room for States to impose different minimum requirements. The district court's holding would create dramatic distinctions in the allowances applicable to detainees based on the happenstance of the location of their

15

detention and the operator of their detention facility, absent authorization by Congress.

Absent further action from Congress, the district court's holding would imperil the Program's ongoing viability.  Application of the minimum wage rates would replace the $1/day floor prescribed by Congressional appropriations and DHS standards with a floor of $16.28/hour ($130.24 for an 8-hour day).  Congress has never funded the Program in contemplation of those costs and has instead capped reimbursement at $1/day.  Contractors are unlikely to agree to operate the Program on terms that would inevitably lead to considerable unreimbursed costs.  As noted, the Program has been suspended at the Northwest ICE Processing Center since entry of the district court's injunction.  The application of the State's minimum wage laws would threaten a similar consequence on a permanent basis.  The result would be that detainees at some facilities would have no opportunity to participate in the Program, despite the benefits Congress and DHS have determined flow from that Program.

In sum, application of the state minimum wage statute to persons in federal immigration detention would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016) (quoting *Crosby v. National Foreign Trade Council,* 530 U.S. 363, 373 (2000)).

**B**.  Plaintiffs and the district court have emphasized that the current $1/day standard operates as a floor on the federal government's reimbursement of

contractors, allowing contractors discretion to pay greater allowances; from this they infer that there is no conflict between state and federal standards that gives rise to preemption. State Br. 46-51; Class Br. 44-49. That reasoning mistakes the relevant preemption analysis. A state law may be preempted when it is "'impossible' for private parties to comply with both state and federal law." *Geier v. American Honda Motor Co.*, 529 U.S. 861, 873 (2000). This kind of "impossibility preemption" is not at issue here. But under principles of "obstacle preemption," a state law may be preempted even if it is technically possible to comply with both federal and state law. In applying principles of obstacle preemption, a court determines whether the state statute at issue "'under the circumstances of th[e] particular case . . . stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress'—whether that 'obstacle' goes by the name of 'conflicting; contrary to; . . . repugnance; difference; irreconcilability; inconsistency; violation; curtailment; . . . interference,' or the like." *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

A state law requiring contractors to pay rates that exceed the amounts they may be reimbursed by the federal government stands as an obstacle to the congressionally established Program. That DHS has given the contractor discretion to provide an allowance of greater than $1/day does not alter the obstacle preemption analysis. As noted, until 2011 the applicable detention standards established $1/day as the allowance rate for Program participants, with no discretion to exceed that amount. *Performance-Based National Detention Standards*, *supra*, § 5.33(V)(K); *National Detention*

17

*Standards: Voluntary Work Program, supra*, § III(K). Giving contractors discretion to increase allowances based on their evaluation of particular circumstances did not transform the nature of the Program and subject contractors to payment obligations under state law many times the amount of the $1/day reimbursement cap.

Plaintiffs are equally mistaken in stressing that the contract between DHS and GEO requires GEO to follow "applicable" state law generally and with respect to the Program, a clause which, in their view, requires the contractor to pay detainees in accordance with the state minimum wage law. *E.g.*, State Br. 7, 52-53; Class Br. 49. Neither party understood the contract to impose this obligation, and the federal government has never understood any contract for operation of the Voluntary Work Program to require payments under a State's minimum wage laws.

Imposing that reading of the contract would be particularly anomalous because, as this Court has explained, such contract provisions cannot render applicable a state-law requirement that impermissibly interferes with federal operations. *See Gartrell Constr. Inc. v. Aubry*, 940 F.2d 437, 440-41 (9th Cir. 1991) (holding that contract provision requiring contractor to obtain "necessary" licenses and to comply with "applicable" state laws did not incorporate otherwise preempted state law). Insofar as the agreement addresses the minimum allowances to be paid under the Program, it does so by incorporating the floor for allowances specified in the Standards, not by incorporating state-law requirements. And the contract should likewise be interpreted with reference to all of its provisions, including the contract's requirement that GEO

18

verify the employment status of its employees and otherwise to comply with the employment restrictions of the immigration laws.

Plaintiffs' invocation of the "presumption against preemption" is similarly misplaced. State Br. 43-46; Class Br. 45, 48. As this Court has explained, "the presumption does not apply when a state law would interfere with inherently federal relationships." *GEO Grp.*, 50 F.4th at 761. Thus, for example, in *Gartrell Construction*, this Court held that a generally applicable statute that required contractors to be licensed under state law was preempted as applied to a contractor with the federal government. The Court instead applied the opposite presumption, emphasizing the lack of a "'clear Congressional mandate' and 'specific Congressional action' that unambiguously authorize state regulation of a federal activity." 940 F.2d at 440-41 (quoting *Hancock v. Train*, 426 U.S. 167, 178-79 (1976)); *see GEO Grp.*, 50 F.4th at 762. The same principles apply here, where application of the state's minimum wage law would dictate the terms on which federal immigration detainees perform work authorized by Congress and displace the contractual floor established between the federal government and its contractor. And in any event, the presumption could apply only in an area of traditional state regulation. *See, e.g.*, *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). Regulation of federal immigration detention—including the allowance and other terms of any work programs Congress and DHS may authorize for those federal detainees—is not an area in which states have historically exercised their police powers.

19

Finally, plaintiffs incorrectly suggest (State Br. 49; Class Br. 46) that the $1/day rate limiting DHS's use of appropriated funds for allowances no longer applies. 8 U.S.C. § 1555(d) is an authorization to use appropriated funds "hereafter provided" for the purpose of paying allowances "at such rate as may be specified from time to time in the appropriation Act involved." Congress may alter the rate at any time, but the last rate—like the authorization itself—remains in effect until Congress specifies otherwise. *See, e.g.*, *Hearing on H.R. 4645 and S. 2864 Before Subcomm. No. 2 of the H. Comm. on the Judiciary*, *supra*, at 21 (statement of George M. Miller, Assistant Chief of the Accounts Branch, U.S. Dep't of Justice); H.R. Rep. No. 98-478, at 23 (1983) (Conf. Rep.) (noting Congress's decision not to raise the rate in 1984 appropriation); *Applicability of Employer Sanctions to Alien Detainees Performing Work in INS Detention Facilities*, Genco Op. No. 92-8 (INS), 1992 WL 1369347, at *1 (Feb. 26, 1992). Plaintiffs offer nothing supporting their assertion that Congress's decision not to address rates in subsequent years means that Congress has removed any cap on DHS's expenditure of appropriated funds on allowances.

## II. Application Of State Minimum Wage Law To Federal Immigration Detainees Is Likewise Impermissible Under The Intergovernmental Immunity Doctrine

"Intergovernmental immunity 'prohibit[s] state laws that either regulate the United States directly or discriminate against the Federal Government or those with whom it deals (*e.g.*, contractors).'" *GEO Grp.*, 50 F.4th at 758 (emphases omitted).

20

Each of these independent inquiries establishes that application of Washington minimum wage law to individuals in federal immigration detention is impermissible.

**A. 1.** There can be no dispute that if the federal government operated the detention facility and implemented the Voluntary Work Program directly, principles of intergovernmental immunity would bar application of state minimum wage laws to detainees. Indeed, Washington has acknowledged that it could not dictate allowances paid in that circumstance. State Br. 35; Response to Summary Judgment Motion at 4 n.2, *Washington v. GEO Grp., Inc.*, No. 3:17-cv-05806 (W.D. Wash. Nov. 26, 2018), Dkt. No. 155. Plaintiffs urge, however, that these principles do not apply to payment of the same federal detainees if the federal government chooses to exercise its custodial detention authority in a privately owned and operated facility.

But the impermissible interference with government operations, is essentially the same in both settings. Federal immigration detainees are in the custody of the United States. GEO and other contractors are permitted to house individuals in immigration detention—and to permit them to work under the Program in the facility—only because the United States has granted GEO that authority. That the detainees participate in the Program in a facility operated by a contractor does not alter the analysis. Application of the state minimum wage law (or other state-imposed conditions of participation that deviate from those Congress established) to the persons in federal detention is equally inimical to the structure created by Congress whether or not the federal government operates the program directly.

21

A state acquires no greater authority to regulate the terms on which federal detainees may participate in the Program simply because the federal government structures its implementation of the immigration laws to include detention of persons in DHS custody in contractor-operated facilities. As this Court reaffirmed in *GEO Group*, even a generally applicable state law applied to contractors is impermissible where it "would control federal operations" because "[e]nforcement of the substance of [the regulation] against the contractors would have the same effect as direct enforcement against the Government." 50 F.4th at 760 (quoting *United States v. Town of Windsor*, 765 F.2d 16, 19 (2d Cir. 1985)); *see also id.* (collecting cases); *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014) ("The federal government's decision to hire [a contractor] to perform its cleanup work does not affect the legal analysis" of direct regulation); *Gartrell Constr.*, 940 F.2d at 438-39 (holding that California's licensing requirements for construction contractors were preempted to the extent that they applied to federal contractors); *Taylor v. United States*, 821 F.2d 1428, 1431-32 (9th Cir. 1987) (noting that California could not require an army hospital or its health care providers to be licensed under state law).

**2.** The district court found it significant that this case involved "a neutral law of general application" that "is being imposed on GEO on a 'basis unrelated to [GEO's] status as a Government contractor.'" 1-ER-79 (quoting *North Dakota v. United States*, 495 U.S. 423, 438 (1990) (plurality op.)). But as discussed, the Supreme Court and this Court have long held that state laws of general application can trigger

intergovernmental immunity.  *See, e.g., Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 188-90 (1956); *GEO Grp.*, 50 F.4th at 760 (explaining that in *Leslie Miller* and *Public Utilities Commission of California v. United States*, 355 U.S. 534 (1958), "the Supreme Court held that neutral state laws imposed on the private conduct of federal contractors violated the Supremacy Clause").  The mere fact that Washington's minimum wage law is generally applicable does not dictate the result.  Similarly, the State's suggestion (Br. 42-43) that a state law cannot constitute direct regulation of the federal government because the law applies to a private contractor that carries on activities for profit fails.  Virtually all federal contractors carry on their activities for profit, but this Court and the Supreme Court have recognized that even generally applicable laws that regulate their conduct may implicate intergovernmental immunity.

Plaintiffs are no closer to the mark in analogizing to tax cases in which a generally applicable state tax indirectly increases costs to the federal government by raising contractors' costs or prices.  Class Br. 37-38; State Br. 41-42; *see GEO Grp.*, 50 F.4th at 760 & n.10 (noting that "states may impose some regulations on federal contractors that they would not be able to impose on the federal government itself," such as generally applicable taxes that "merely increase the federal government's costs" indirectly).  The class plaintiffs, for example, rely on a plurality opinion in *North Dakota*, which concerned the application of state liquor taxes to liquor sold to a federal military installation.  Plaintiffs cite that decision for the proposition that "where a state law 'operate[s] against' private companies, rather than the government

23

itself, 'concerns about direct interference with the Federal Government . . . are not implicated.'" Class Br. 37 (quoting *North Dakota*, 495 U.S. at 437 (plurality op.)).

But as this Court recently explained in rejecting a similar argument, *North Dakota* "dealt only with regulations that increased the cost of liquor rather than regulations that would have negated the federal government's control over its own operations." *GEO Grp.*, 50 F.4th at 760. Thus, in other cases involving generally applicable taxes, the Supreme Court has taken pains to emphasize the absence of any direct effect on government operations. *See, e.g.*, *United States v. New Mexico*, 455 U.S. 720, 731-32 (1982) (upholding tax "'where no direct burden is laid upon the governmental instrumentality, and there is only a remote, if any, influence upon the exercise of the functions of government'"); *United States v. Fresno County*, 429 U.S. 452, 464 (1977) (upholding tax "imposed solely on private citizens who work for the Federal Government," that "threaten[ed] to interfere with federal [functions]" only insofar as it might cause the government "to reimburse its employees for the taxes legally owed by them," emphasizing that "[t]here is no other respect in which the tax involved in this case threatens to obstruct or burden a federal function").

Here, as discussed, the impact on the federal government cannot properly be described as incidental. Under the statutory scheme enacted by Congress, the detainees are the responsibility of the federal government, not the states, and the application of the minimum wage laws directly affects the terms of that custodianship, including by replacing the minimum allowance standard imposed by the relevant

24

federal Standards with the state law minimum. Application of Washington law would thus be impermissible even if—as the district court concluded—there would be "no economic impact on the federal government" because GEO would incur all increased costs on an unreimbursed basis. 1-ER-80. Application of the state minimum wage law would alter the Program and threaten its continuing viability under current law, regardless of who ultimately bears the costs of these particular judgments.

**B. 1.** Application of the Washington statute would independently contravene principles of intergovernmental immunity by discriminating against the federal government's detention operations. "[A] state law discriminates against the Federal Government or its contractors if it 'single[s them] out' for less favorable 'treatment.'" *Washington*, 596 U.S. at 839 (second alteration in original) (quoting *Washington v. United States*, 460 U.S. 536, 546 (1983)). Here, as discussed, Washington has exempted its own detention operations from the state minimum wage laws, excluding from the definition of "employee" "[a]ny resident, inmate, or patient of a state, county, or municipal correctional, detention, treatment or rehabilitative institution." Wash. Rev. Code § 49.46.010(3)(k). Thus, when Washington operates labor programs within its own correctional or other detention facilities, participants are generally paid substantially less than the minimum wage. State detainees who perform "Class III" labor, which includes labor within the facility comparable to the tasks performed in the Voluntary Work Program, are paid at a rate that "will not exceed $40 per week." Wash. State Dep't of Corr., Policy 700.100, *supra*. Similarly, under the Washington

25

Supreme Court's interpretation of the Minimum Wage Act, if DHS contracted with the state or a locality to house immigration detainees in a state prison or county jail, the state or locality would have no obligation to pay state minimum wage to detainees when operating the Voluntary Work Program. *See Nwauzor v. GEO Grp., Inc.*, 540 P.3d 93, 99 (Wash. 2023); *see also GEO Grp.*, 50 F.4th at 751 (noting that DHS also "contracts out its detention responsibilities to . . . local, state, or other federal agencies").

The only detainees in the state that must be paid minimum wage are thus federal detainees—and only if those detainees are housed in facilities owned and operated by a private contractor pursuant to the federal government's authority to contract. *See GEO Grp.*, 50 F.4th at 751 (describing authority to contract for immigration detention).

**2.** The State has nevertheless urged that its law is nondiscriminatory on the ground that if it were to contract with GEO or a similar private detention facility, state law would require payment of the minimum wage for any work program for state detainees run by that private contractor. State Br. 39-40; *see Nwauzor*, 540 P.3d at 99.

That reasoning misapprehends the relevant analysis. Washington has stated that it "has no private contractors running state prisons or detention centers," State Br. 11, and the state has chosen to bar itself from entering into contracts with private detention facilities at all, Wash. Rev. Code § 72.68.110. The State is of course free to

26

structure its own detention operations as it sees fit. But the State may not use its own judgments to force the federal government to make the same choices about whether to contract out its detention operations. The relevant point is that the State has chosen to exempt all of its own detainees from the Minimum Wage Act while refusing to extend that same exemption to federal detainees. *See Dawson v. Steager*, 139 S. Ct. 698, 705 (2019) (explaining that the analysis examines "how the State has defined the favored class"). It is uncontroverted that application of the minimum wage laws to federal immigration detainees has no counterpart to any past, present, or future application of the minimum wage statute to state detainees, and thus that the law has application to the federal government that the State has determined would be incompatible with its own treatment of all detainees in its custody.

**C.** This Court also invited the United States to address GEO's "derivative sovereign immunity" argument. Order 2 (Mar. 7, 2023). As discussed above, this Court should reverse on preemption or intergovernmental immunity grounds, and thus need not reach any other argument advanced by GEO. In any event, application of a defense under *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940), would turn in significant part on questions already addressed above. The *Yearsley* defense recognizes that where a contractor is exercising authority "validly conferred" by the government, it cannot be held liable for its proper exercise of that authority. *Id.* at 20-21. Evaluation of that argument would involve many of the same questions about the

27

degree of discretion conferred on GEO and the meaning of contractual requirements already discussed above.  *See supra* pp. 12-20.

If the Court addresses the issue, however, it should not embrace its prior statement that the *Yearsley* defense is "limited to cases in which a contractor 'had no discretion in the design process and completely followed government specifications.'" *Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 732 (9th Cir. 2015).  That statement relied on a case applying the distinct government contractor defense, *see In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1001 (9th Cir. 2008); *see also Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988), not the application of *Yearsley*.  As other circuits have explained, the *Yearsley* defense may apply even where a contractor exercises some discretion in carrying out its responsibilities.  *See In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 193 (2d Cir. 2008); *Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 645 (6th Cir. 2015); *Taylor Energy Co. v. Luttrell*, 3 F.4th 172, 176-77 (5th Cir. 2021).  If the *Yearsley* defense were as limited as *Cabalce* suggests, it would have little value to contractors that exercise discretion in the performance of their delegated functions, while acting at the government's direction.

28

# CONCLUSION

For the foregoing reasons, the judgments of the district court should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

TESSA M. GORMAN
*United States Attorney*

MARK B. STERN

*s/ Brad Hinshelwood*
BRAD HINSHELWOOD
*Attorneys, Appellate Staff*
*Civil Division, Room 7256*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-7823*
*bradley.a.hinshelwood@usdoj.gov*

February 2024

29

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) and Ninth Circuit Rule 32-1(a) because it contains 6,994 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Brad Hinshelwood*
Brad Hinshelwood

## CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.


*s/ Brad Hinshelwood*
Brad Hinshelwood