1

2

3

4

5

6

7

8

9

10

11

12

13

14

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

THE GEO GROUP, INC.,

                    Plaintiff,

        v.

JAY R. INSLEE, in his official capacity
as the Governor of the State of
Washington; and ROBERT W.
FERGUSON, in his official capacity as
Attorney General of the State of
Washington.

                    Defendants.

CASE NO. C23-5626 BHS

ORDER

15

16

17

18

19

20

21

22

        This matter is before the Court on the GEO Group, Inc.'s motion for a preliminary

injunction, Dkt. 8, and the State of Washington's[1] motion to dismiss under Federal Rules

of Civil Procedure 12(b)(1) and 12(b)(6), Dkt. 17.

        In 2023, the Washington legislature enacted House Bill (HB) 1470, which imposes

numerous requirements on private detention facilities within the State. Although HB

---

[1] The defendants in this matter are Washington's Governor, Jay Inslee, and its Attorney
General, Bob Ferguson. Each is sued in his official capacity. Dkt. 1, ¶ 1. For simplicity, the
Court refers to these defendants collectively as "the State."

1470 defines "private detention facility" broadly, its history and text make clear that it

applies to only the Northwest ICE[2] Processing Center (NWIPC)—the sole immigration

detention facility in Washington. GEO, which contracts with ICE to operate the NWIPC,

claims that HB 1470 violates the Supremacy Clause and Contract Clause of the United

States Constitution.

The primary issue in this case is whether HB 1470 violates the Supremacy Clause

by imposing additional burdens exclusively on GEO as the operator of an immigration

detention facility. The Supremacy Clause prohibits such discriminatory regulation, and

instead requires state laws that regulate federal contractors to be applied equally on

similarly situated constituents of the State.

Most of GEO's arguments are directed at HB 1470 § 4, which imposes numerous

requirements on the conditions of confinement at private detention facilities. This section

prohibits the use of solitary confinement; requires an immediate response to sexual

violence and harassment grievances by "culturally competent professionals"; mandates

that mental health evaluations occur weekly; requires that each sleeping room have

access to windows, natural light, and natural air circulation; and mandates, at no cost to

detainees, access to televisions, telecommunications services, handheld radios,

computers, and internet.

HB 1470 § 4 does not apply to private detention facilities that operate pursuant to

a contract that was in effect prior to January 1, 2023. GEO and ICE last modified their

---

[2] Immigration and Customs Enforcement.

1    contract before that date; they agreed in January 2021 for their contract to run through

2    September 2025. Therefore, HB 1470 § 4 does not currently apply to the NWIPC. And it

3    may never. GEO fails to establish that ICE *will* extend its contract for GEO to operate the

4    NWIPC beyond September 2025. GEO also fails to establish what the terms of any such

5    hypothetical contract would be. The Court is therefore unable to discern whether HB

6    1470 § 4 will ever be enforced against GEO as the operator of the NWIPC. GEO's

7    challenges to HB 1470 § 4 are, in turn, not constitutionally ripe and the Court lacks

8    subject-matter jurisdiction to consider them.

9         The Court does, however, have subject-matter jurisdiction to consider GEO's

10   constitutional challenges to Sections 2, 3, 5, and 6 of HB 1470. These sections impose

11   various burdens on the NWIPC that do not apply to any similarly situated facility in the

12   State. For instance, HB 1470 § 2 requires the Washington Department of Health (DOH)

13   to adopt various rules to ensure that private detention facilities comply with measurable

14   standards providing, sanitary, hygienic, and safe conditions to detained persons. It also

15   authorizes the Washington attorney general to enforce violations of these rules.

16        The State claims that HB 1470 § 2 does not impermissibly discriminate against

17   GEO in violation of the Supremacy Clause because it simply replicates standards that

18   already apply to residential treatment facilities. The Court disagrees. The Supremacy

19   Clause requires federal contractors to be treated the same as similarly situated

20   constituents of the State. Because residential treatment facilities are not sufficiently

21   similar to private immigration detention facilities like the NWIPC, HB 1470 § 2

22   impermissibly discriminates against GEO in violation of the Supremacy Clause.

HB 1470 § 3 requires DOH and the Department of Labor & Industries (L&I) to conduct routine, unannounced inspections of private detention facilities. It also requires DOH to adopt rules to ensure that private detention facilities allow for regular inspections and comply with standards providing for sanitary, hygienic, and safe conditions of confinement. It finally authorizes the Washington attorney general to enforce violations of the rules adopted by DOH. Because the State fails to identify any other state law that imposes burdens of this sort on similarly situated facilities, HB 1470 § 3 also impermissibly discriminates against GEO in violation of the Supremacy Clause.

Finally, HB 1470 §§ 5, 6 subject the NWIPC to substantial economic burdens for failing to comply with HB 1470's mandates. Section 5 creates a private right of action for detained persons aggrieved by violations of HB 1470, authorizing them to recover at least $1,000 per violation against any person who negligently violates this law, and at least $10,000 per violation against any person who intentionally or recklessly violates this law. It also authorizes detained persons to recover reasonable attorney fees and costs and to obtain other appropriate relief, including injunctive relief. Section 6 authorizes DOH to impose civil penalties on the operators of private detention facilities who fail to comply with HB 1470 in the amount of $1,000 per violation per day. It also authorizes the Washington attorney general to bring an action to recover any civil penalties that are not paid to DOH within 15 days of receipt of notice of the penalty.

The State again fails to identify any other state laws that impose burdens of this sort on facilities that are similarly situated to the NWIPC. Accordingly, HB 1470 §§ 5, 6 also impermissibly discriminate against GEO in violation of the Supremacy Clause.

Because GEO sufficiently establishes that Sections 2, 3, 5, and 6 of HB 1470 impermissibly discriminate against it in violation of the Supremacy Clause, GEO is entitled to an order preliminarily enjoining the enforcement of these sections against it as the operator of the NWIPC. To the extent GEO claims that any of these sections violate the Constitution in any other manner, those claims are not plausible and they are dismissed with prejudice.

## I.   BACKGROUND

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States* (*Arizona II*), 567 U.S. 387, 394 (2012); *see also* U.S. CONST. art I, § 8, cl. 4 (granting Congress the power to "establish an uniform Rule of Naturalization"). "Congress exercises its authority to regulate the entry, presence, and removal of noncitizens through the Immigration and Nationality Act (INA) and other related laws, and 'has specified which aliens may be removed from the United States and the procedures for doing so.'" *United States v. California*, 921 F.3d 865, 973 (9th Cir. 2019) (quoting *Arizona II*, 567 U.S. at 396).

To this end, "[t]he Attorney General shall arrange for appropriate places for detention for aliens detained pending removal or a decision on removal," which includes the "purchase or lease of [an] existing prison, jail, detention center, or other comparable facility suitable for such use." 8 U.S.C. § 1231(g); *see also id.* § 1103(a)(11) (permitting agreements with states and localities "for the necessary construction, physical renovation, acquisition of equipment, supplies or materials required to establish acceptable conditions of confinement and detention"). These statutes authorize the "use of both federal facilities

*and* nonfederal facilities with which the federal government contracts." *California*, 921 F.3d at 882 n.7 (citing 8 U.S.C. §§ 1231(g), 1103(a)(11)).

The Department of Homeland Security (DHS), through ICE, contracted with GEO to operate the NWIPC—a privately-operated immigration detention facility in Tacoma, Washington. ICE and GEO executed the contract "on September 24, 2015, effective September 28, 2015, for a base period of one year." Dkt. 1, ¶ 50. "To extend beyond that period, the contract originally had nine options of one year each and one half-year option." *Id.* ICE and GEO exercised those options several times. *Id.* ¶ 51. On January 29, 2021, ICE and GEO modified the contract by "removing remaining unexercised option years, and establishing instead a five-year performance period running from September 28, 2020, through September 27, 2025." *Id.*

This is not the first time Washington has sought to regulate the use of private immigration facilities in the State, and it is not the first time GEO has sued to enjoin such efforts. In 2021, the Washington legislature passed Engrossed House Bill (EHB) 1090 (codified as RCW 70.395.030), which generally provides that "no person, business, or state or local governmental entity shall operate a private detention facility within the state or utilize a contract with a private detention facility within the state." RCW 70.395.030(1). There are exceptions to this prohibition, *see* RCW 70.395.030(3)(a)–(h), but none apply to private immigration detention facilities like the NWIPC.

GEO sued the State in this Court, claiming that EHB 1090, as applied to GEO as the operator of the NWIPC, violated the Supremacy Clause and Contract Clause of the United States Constitution. *See* Dkt. 1, ¶¶ 63–89 in *GEO Group Inc. v. Inslee, et al.*, No.

1    3:21-cv-05313-BHS. The parties stipulated to stay that proceeding until after the Ninth

2    Circuit resolved a similar case involving a similar California statute, *Geo Group, Inc. v.*

3    *Newsom*, 50 F.4th 745 (9th Cir. 2022) (en banc). In *Newsom*, GEO and the United States

4    sought to enjoin the enforcement of Assembly Bill (AB) 32, which provides that "a

5    person shall not operate a private detention facility within [California]." Cal. Penal Code

6    § 9501. The Ninth Circuit held that AB 32 is unconstitutional as applied to privately-

7    operated immigration detention facilities: "Whether analyzed under intergovernmental

8    immunity or preemption, California cannot exert this level of control over the federal

9    government's detention operations. AB 32 therefore violates the Supremacy Clause."

10   *Newsom*, 50 F.4th at 751.

11       After the Ninth Circuit decided *Newsom*, the State conceded, in the prior case

12   before this Court, that EHB 1090 is unconstitutional as applied to GEO as the operator of

13   the NWIPC. *See GEO Group, Inc. v. Inslee*, __ F. Supp. 3d __, No. 21-cv-05313-BHS,

14   2023 WL 7919947 (W.D. Wash. Nov. 16, 2023).

15       In 2023, and in response to *Newsom*, the Washington legislature enacted HB 1470,

16   which amended chapter 70.395 RCW to impose numerous requirements on "private

17   detention facilities."[3]

18       HB 1470 § 2 (codified as RCW 70.395.040) requires DOH to adopt various rules

19   "to ensure private detention facilities comply with measurable standards providing

20

---

21       [3] Chapter 70.395 RCW defines "private detention facility" as "a detention facility that is operated by a private, nongovernmental for-profit entity and operating pursuant to a contract or agreement with a federal, state, or local governmental entity." RCW 70.395.020(7).

22

sanitary, hygienic, and safe conditions for detained persons." RCW 70.395.040(1).

Section 2 also mandates that DOH impose by rule numerous standards on private

detention facilities. These standards provide, among other things, that private detention

facilities must:

- Allow the use of personal belongings to the extent possible;
- Clean and sanitize living areas regularly;
- Provide laundry facilities and certain laundry services;
- Provide basic personal hygiene items regularly at no cost;
- Provide a nutritious and balanced diet accounting for dietary needs;
- Maintain safe indoor air quality;
- Install heating and air conditioning equipment that can be adjusted by room or area; and
- Implement and maintain a program to prevent the transmission of infections and communicable diseases.

RCW 70.395.040(1)(a)–(h).

Section 2 finally authorizes the Washington attorney general to enforce violations

of this section. RCW 70.395.040(2).

HB 1470 § 3 (codified as RCW 70.395.050) requires DOH and L&I to conduct

routine, unannounced inspections of private detention facilities. RCW 70.395.050(1), (4).

It also requires DOH to "adopt rules as may be necessary to effectuate the intent and

purposes of this section in order to ensure private detention facilities allow regular

inspections and comply with measurable standards providing sanitary, hygienic, and safe

conditions for detained persons." RCW 70.395.050(3). It finally authorizes the

Washington attorney general to enforce violations of this section. RCW 70.395.050(5).

HB 1470 § 4 (codified as RCW 70.395.060) imposes various requirements on

private detention facilities. This section "does not apply to private detention facilities

operating pursuant to a valid contract that was in effect prior to January 1, 2023, for the

duration of that contract, not to include any extensions or modifications made to, or

authorized by, that contract." RCW 70.395.060(1). The standards enumerated under

Section 4 provide, among other things, that private detention facilities must:

- Prohibit the use of solitary confinement
- Respond to sexual violence and harassment grievances immediately with "culturally competent professionals";
- Conduct weekly mental health evaluations;
- Provide requested medical care without delay;
- Allow for daily in-person visitation;
- Allow detained persons to invite persons to the facility to provide legal education;
- Ensure that a law library is available and accessible;
- Issue certain clothing and footwear to detained persons upon their admission;
- Provide, at no cost to detainees, access to televisions, telecommunications services, handheld radios, computers, and internet;
- Ensure that food items are available at a reasonable cost;
- Ensure that each room used for sleeping has access to a window, natural light, and natural air circulation; and
- Ensure that the facility is equipped to respond to natural and human-made emergencies, including earthquakes, lahar threats, tsunami, and industrial accidents.

RCW 70.395.060(2)(a)–(p).

Section 4 also authorizes the Washington attorney general to enforce violations of

this section. RCW 70.395.060(3).

HB 1470 § 5 (codified as RCW 70.395.070) creates a right of action for detained

persons aggrieved by a violation of chapter 70.395 RCW. For each violation, detained

persons may recover "[a]gainst any person who negligently violates a provision of this

chapter, $1,000, or actual damages, whichever is greater"; "[a]gainst any person who

1    intentionally or recklessly violates a provision of this chapter, $10,000, or actual

2    damages, whichever is greater"; reasonable attorney fees and costs; and other appropriate

3    relief, including injunctive relief. RCW 70.395.070(1)(a)–(d).

4         HB 1470 § 6 (codified as RCW 70.395.080) authorizes DOH to impose civil

5    penalties on the operator of a private detention facility who fails to comply with chapter

6    70.395 RCW "in an amount of not more than $1,000 per violation per day." RCW

7    70.395.080(1). Section 6 also authorizes the Washington attorney general to bring an

8    action to recover any civil penalties that are not paid to DOH within 15 days of receipt of

9    notice of the penalty. RCW 70.395.080(4).

10        Finally, HB 1470 § 10 (codified as RCW 70.395.100) excludes various facilities

11   from HB 1470's requirements. These facilities include those that:

12   - Provide rehabilitative, counseling, treatment, mental health, education, or medical services to juveniles;
13   - Provide evaluation and treatment or forensic services to a person who has been civilly detained or is subject to an order of commitment by a court;
14   
15   - Are used for the quarantine or isolation of persons for public health reasons;
16   - Are used for work release;
17   - Are used for extraordinary medical placement;
18   - Are used for residential substance use disorder treatment; or
19   - Are owned and operated by federally recognized tribes and contracting with a government.

RCW 70.395.100(1)–(7).

20        After Governor Inslee signed HB 1470 into law, GEO sued, asserting that, as

21   applied to GEO as the operator of the NWIPC, HB 1470 violates the Supremacy Clause

22   and the Contract Clause of the United States Constitution. Dkt. 1 at 27–28. GEO alleges

1    that its contract with ICE already requires it to comply with ICE's 2011 Performance

2    Based National Detention Standards (PBNDS). *Id.* ¶ 53. GEO claims that the "PBNDS

3    were implemented at the direction of Congress," "are approximately 500 pages in

4    length," and "include detailed standards governing" the operation of immigration

5    detention facilities. *Id.* ¶¶ 54, 56. GEO claims that "[n]umerous operating requirements

6    contained within HB 1470 are inconsistent with or directly conflict with explicit

7    contractual requirements for the operation of the NWIPC in accordance with the

8    requirements of ICE's PBNDS." *Id.* ¶ 62.

9         GEO's complaint broadly asserts that HB 1470 is unconstitutional under the

10   Supremacy Clause for four reasons: (1) it regulates the federal government directly,

11   violating the intergovernmental immunity doctrine, *id.* ¶¶ 67–73; (2) it discriminates

12   against GEO as a contractor of the federal government, violating the intergovernmental

13   immunity doctrine, *id.* ¶¶ 74–83; (3) it is field preempted, *id.* ¶¶ 84–95; and (4) it is

14   conflict preempted, *id.* ¶¶ 96–99. GEO also claims that HB 1470 violates the Contract

15   Clause. *Id.* ¶¶ 100–107.

16        GEO promptly moved to preliminarily enjoin the enforcement of HB 1470 in its

17   entirety against it as the operator of the NWIPC. Dkt. 8. The State opposes an injunction,

18   Dkt. 18, and moves to dismiss GEO's claims for lack of subject-matter jurisdiction and

19   for failure to state a plausible claim. Dkt. 17. GEO opposes the motion to dismiss, Dkt.

20   25-1, and maintains that the Court should preliminarily enjoin the enforcement of HB

21   1470. Dkt. 22.

22

## II.   DISCUSSION

**A.     The Court lacks subject-matter jurisdiction over GEO's challenges to HB 1470 § 4.**

GEO primarily argues HB 1470 § 4 violates the Supremacy Clause and Contract Clause as applied to the NWIPC. The Court therefore begins by addressing these claims.

HB 1470 § 4 imposes numerous requirements on private detention facilities regarding a broad range of subjects:

(2) A private detention facility operating pursuant to a contract or agreement with a federal, state, or local government shall comply with the following:

(a) A detained person, upon admission to a private detention facility, must be issued new clothing and new footwear for both indoor and outdoor use and for protection against cold and heat. Clothing issued must be regularly laundered and replaced at no cost once no longer hygienic or serviceable;

(b) Any food items in the commissary must be available at reasonable prices taking into account the income and financial circumstances of detained persons;

(c) Telecommunications services must be provided free of charge to detained persons and any communication, whether initiated or received through such a service, must be free of charge to the detained person initiating or receiving the communication. Each detained person must be eligible to use these telecommunications services for at least 60 minutes on each day of the person's detainment. Private detention facilities must not use the provision of telecommunications services or any other communication service to supplant in-person contact visits any detained person may be eligible to receive;

(d) In-person visitation must be available daily. Visitation rooms must allow for the presence of children and personal contact between visiting persons and detained persons may not be restricted. A detained person may receive reading and writing materials during visitation;

(e) Solitary confinement is prohibited;

(f) Televisions must be available and accessible to a detained person at no cost. The private detention facility shall make every effort to make television programming available in the language of the detained person;

(g) Handheld radios must be provided to a detained person at no cost;

1   (h) A detained person may invite persons to the private detention facility to provide legal education, know your rights presentations, and other similar programming;

2   (i) Computer and internet access must be available and accessible to a detained person at no cost;

3   (j) A law library must be available and accessible;

4   (k) Communication from the private detention facility to a detained person, either in writing or verbally, must be delivered in the primary language of the detained person;

5   (l) Sexual violence and harassment grievances must be responded to immediately by culturally competent professionals on-site and reported to local law enforcement in the county where the private detention facility is located;

6   (m) Mental health evaluations should occur at intake and periodically, at least once a week. Culturally competent mental health therapy must be available and free;

7   (n) Requested medical care and attention must be provided without delay, including the provision of requested medical accommodations;

8   (o) Rooms used by a detained person for sleeping must have access to windows, natural light, and natural air circulation. Subject to safety limitations, sleeping rooms must include adjustable curtains, shades, blinds, or the equivalent installed at the windows for visual privacy and that are shatterproof, screened, or of the security type as determined by the private detention facility needs; and

9   (p) A private detention facility must be equipped to respond to natural and human-made emergencies, including earthquakes, lahar threats, tsunami, and industrial accidents. A private detention facility must be earthquake resistant. A private detention facility shall develop emergency operation and continuity of operations plans and provide those plans to the local emergency management department. A private detention facility must stock all necessary personal protective equipment in case of disease outbreaks consistent with large numbers of people detained in close contact to one another.

RCW 70.395.060(2)(a)–(p).

Section 4 also provides that "[t]he office of the attorney general may enforce violations of this section on its own initiative or in response to complaints or violations." RCW 70.395.060(3).

1        Notably, however, Section 4 "does not apply to private detention facilities

2    operating pursuant to a valid contract that was in effect prior to January 1, 2023, for the

3    duration of that contract, not to include any extensions of modifications made to, or

4    authorized by, that contract." RCW 70.395.060(1).

5        GEO asserts that HB 1470 § 4 violates the Supremacy Clause in four ways: (1) it

6    improperly regulates the federal government directly by purporting to replace the

7    standards imposed by the PBNDS, Dkt. 25-1 at 14–15; (2) it impermissibly discriminates

8    against GEO as the operator of the NWIPC because no other similarly situated facility is

9    subject to Section 4's requirements, *id.* at 17–20; it is field preempted because the

10   PBNDS governs the operation of private immigration detention facilities, *id.* at 20–24;

11   and (4) it is conflict preempted because Section 4 conflicts with the PBNDS. *Id.* at 24–27.

12   GEO also contends that Section 4 violates the Contract Clause because it would require

13   GEO to breach its preexisting contract with ICE and is not drawn in an appropriate and

14   reasonable way to advance a significant and legitimate public purpose. *Id.* at 27–29.

15       The State moves to dismiss these claims for lack of subject-matter jurisdiction.

16   Dkt. 17 at 15–16. It argues that HB 1470 § 4 does not apply to the NWIPC because GEO

17   and ICE last modified their contract before January 1, 2023, to run through September

18   2025. *Id.* at 15. The State contends that GEO is therefore unable to establish, "based on a

19   future contract that does not yet exist," constitutional standing to challenge HB 1470 § 4

20   or that any such challenge is constitutionally ripe. *Id.* at 15–16.

21       GEO responds that, because the PBNDS is "Congressionally mandated in every

22   ICE detention contract, the inconsistencies and conflicts between the PBNDS and HB

1    1470 § 4 are inevitable in any future contracts." Dkt. 25-1 at 11 n.2. GEO also argues that

2    ICE could unilaterally modify the contract before it expires in September 2025. Dkt. 22 at

3    13. GEO asserts that "the federal government can make unilateral modifications at any

4    time to initiate administrative changes, issue change orders, and make changes authorized

5    by other contract clauses." *Id.* at 12 (citing 48 C.F.R. § 43.103). GEO also contends that

6    "various routing or annual 'modifications made to, or authorized by' a contract may be

7    necessary to comply with applicable federal statutes and regulations." Dkt. 22 at 12

8    (citing 48 C.F.R. §§ 52.222-43, 52.204-12, 52.222-41).

9         The State's reply does not address whether a potential modification to the current

10   contract could subject the NWIPC to enforcement under HB 1470 § 4. The State instead

11   asserts that "GEO makes no argument (nor can it) that any hypothetical injuries

12   concerning a future contract are 'certainly impending.'" Dkt. 26 at 6 (quoting *Clapper v.*

13   *Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)). The State also stresses that, at this

14   juncture, the Court cannot determine whether HB 1470 § 4 conflicts with "a hypothetical

15   future contract." *Id.* at 7.

16        A claim must be dismissed under Rule 12(b)(1) if it does not present a "case or

17   controversy" within the meaning of Article III of the Constitution. "Whether the question

18   is viewed as one of standing or ripeness, the Constitution mandates that prior to our

19   exercise of jurisdiction there exist a constitutional 'case or controversy,' that the issues

20   presented are 'definite and concrete, not hypothetical or abstract.'" *Thomas v. Anchorage*

21   *Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc) (quoting *Railway*

22   *Mail Ass'n v. Corsi*, 326 U.S. 88, 93 (1945)). "Concrete legal issues require more than

1    mere 'hypothetical threat[s]' and where we can 'only speculate' as to the specific

2    activities in which a party seeks to engage, we must dismiss a claim as nonjusticiable."

3    *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 838–39 (9th Cir. 2014). To this

4    end, "[t]he ripeness doctrine seeks to identify those matters that are premature for judicial

5    review because the injury at issue is speculative, or may never occur." *Id.* at 838.

6    Constitutional ripeness "overlaps with, and is often indistinguishable from, the 'injury in

7    fact prong' of our standing analysis." *Id.* (quoting *Thomas*, 220 F.3d at 1138).

8         Courts consider three factors to determine whether a pre-enforcement challenge to

9    a law is justiciable: (1) "whether the plaintiff [has] articulated a 'concrete plan' to violate

10   the law in question"; (2) "whether the prosecuting authorities have communicated a

11   specific warning or threat to initiate proceedings"; and (3) "the history of past

12   prosecution or enforcement under the challenged [law]." *Thomas*, 220 F.3d at 1139.

13        Weighing these factors, the Court concludes that GEO's challenges to HB 1470 §

14   4 are not ripe. Most importantly, because Section 4 does not—and may never—apply to

15   the NWIPC, GEO has not articulated a concrete plan to violate it. Under its own terms,

16   Section 4 "does not apply to private detention facilities operating pursuant to a valid

17   contract that was in effect prior to January 1, 2023, for the duration of that contract, not to

18   include any extensions or modifications made to, or authorized by, that contract." RCW

19   70.395.060(1). GEO and ICE last modified their contract nearly two years before that

20   date on January 29, 2021, "establishing . . . a five-year performance period running from

21   September 28, 2020, through September 27, 2025." Dkt. 1, ¶ 51. GEO does not plausibly

22   allege that ICE *will* extend the current contract beyond that date or enter into a new

1    contract effective upon the current contract's expiration. GEO in fact fails to address this

2    question at all.

3        GEO instead argues that ICE *could* modify the contract before September 27,

4    2025. Dkt. 22 at 13. But whether ICE *will* do so is merely speculative. So is any claim

5    that a hypothetical modification would subject the NWIPC to enforcement under HB

6    1470 § 4. GEO assumes that any modification whatsoever to its existing contract with

7    ICE would subject the *entire* contract to enforcement under Section 4. But Section 4

8    makes clear that only the extensions or modifications themselves could be subject to

9    enforcement under this section. *See* RCW 70.395.060(1) ("This section does not apply to

10   private detention facilities operating pursuant to a valid contract that was in effect prior to

11   January 1, 2023, for the duration of that contract, *not to include any extensions or*

12   *modifications made to, or authorized by, that contract*." (Emphasis added)). GEO does

13   not plausibly allege that ICE will modify the existing contract in a manner that will

14   subject the NWIPC to enforcement under Section 4. Because GEO does not plausibly

15   "establish a plan" to violate this section "that is more than hypothetical," its challenges to

16   HB 1470 § 4 are not constitutionally ripe. *Protectmarriage.com*, 752 F.3d at 839 (internal

17   quotation marks omitted).

18       GEO similarly fails to show that the State "has communicated a specific warning

19   or threat to initiate proceedings under" HB 1470 § 4. *Protectmarriage.com*, 752 F.3d at

20   839 (internal quotation marks omitted). To the contrary, the State concedes that Section 4

21   "may never apply" to the NWIPC and that Section 4 "only will if DHS chooses to enter

22   into a new contract with GEO once the current contract ends." Dkt. 17 at 14. Any threat

1    of enforcement of Section 4 is therefore merely speculative and contingent upon future

2    events that may never occur.

3         Finally, because the State has never enforced HB 1470 § 4 against the NWIPC, the

4    history and past prosecution of Section 4 weighs against finding that GEO's challenges

5    are justiciable.

6         For these reasons, GEO's challenges to HB 1470 § 4 are not constitutionally ripe,

7    and the Court lacks subject-matter jurisdiction over them.[4] The State's 12(b)(1) motion to

8    dismiss these claims is accordingly **GRANTED**. Because GEO does not explain how it

9    could cure this deficiency through further amendment, its claims asserting that HB 1470

10   § 4 violates the Supremacy Clause and Contract Clause are **DISMISSED without**

11   **prejudice** but **without leave to amend**.

12   **B.    HB 1470 § 2.**

13        HB 1470 § 2 requires DOH to adopt certain rules addressing sanitation, hygiene,

14   and safety at private detention facilities: "The department of health shall adopt rules as

15   may be necessary to effectuate the intent and purposes of this section in order to ensure

16   private detention facilities comply with measurable standards providing sanitary,

17   hygienic, and safe conditions for detained persons." RCW 70.395.040(1).

18        These rules must include:

19             (a) A detained person should have a safe, clean, and comfortable
               environment that allows a detained person to use the person's personal
20             belongings to the extent possible;

21   _____

22   [4] Because GEO's challenges to HB 1470 § 4 are not constitutionally ripe, the Court does
     not address whether they are prudentially ripe.

(b) Living areas, including areas used for sleeping, recreation, dining, telecommunications, visitation, and bathrooms, must be cleaned and sanitized regularly;

(c) A private detention facility must provide laundry facilities, equipment, handling, and processes for linen and laundered items that are clean and in good repair, adequate to meet the needs of detained persons, and maintained according to the manufacturer's instructions. Laundry and linen must be handled, cleaned, and stored according to acceptable methods of infection control including preventing contamination from other sources. Separate areas for handling clean laundry and soiled laundry must be provided and laundry rooms and areas must be ventilated to the exterior;

(d) Basic personal hygiene items must be provided to a detained person regularly at no cost;

(e) A private detention facility shall provide a nutritious and balanced diet, including fresh fruits and vegetables, and shall recognize a detained person's need for a special diet. A private detention facility must follow proper food handling and hygiene practices. A private detention facility must provide at least three meals per day, at no cost, and at reasonable hours;

(f) Safe indoor air quality must be maintained;

(g) The private detention facility must have both heating and air conditioning equipment that can be adjusted by room or area. Rooms used by a detained person must be able to maintain interior temperatures between 65 degrees Fahrenheit and 78 degrees Fahrenheit year-round. Excessive odors and moisture must be prevented in the building; and

(h) A private detention facility must implement and maintain an infection control program that prevents the transmission of infections and communicable disease among detained persons, staff, and visitors.

RCW 70.395.040(1)(a)–(h).

Section 2 finally authorizes the Washington attorney general to enforce violations of this section. RCW 70.395.040(2).

GEO contends that HB 1470 § 2 violates the Supremacy Clause in four ways: (1) it discriminates against it in violation of the intergovernmental immunity doctrine because it applies solely to GEO as the operator of the NWIPC and the State does not identify any other statute that subjects similarly situated facilities to the burdens imposed

by this section, Dkt. 25-1 at 15, 19–20; (2) it regulates the federal government directly in violation of the intergovernmental immunity doctrine by purporting to replace standards that GEO is already subject to under the PBNDS, *id.* at 11–14; (3) it is field preempted because the PBNDS already addresses the manner in which GEO must operate the NWIPC, *id.* at 21–22; and (4) it is conflict preempted because it conflicts with the PBNDS and presents an obstacle to Congress's objective of imposing a uniform set of standards on immigration detention facilities. *Id.* at 24. GEO also asserts that Section 2 violates the Contract Clause because its preexisting contract requires GEO to strictly adhere to the PBNDS and Section 2 conflicts with the PBNDS. *Id.* at 27–28.

The State asserts that these claims are not constitutionally or prudentially ripe because DOH has not yet promulgated any rules pursuant to HB 1470 § 2. Dkt. 17 at 15–16. The State also contends Section 2's text applies broadly to private detention facilities and does not discriminate against GEO as the operator of a private immigration detention facility. Dkt. 17 at 21. The State also claims that Section 2 does not impermissibly discriminate against GEO because the standards enumerated under this section are the same as the standards that apply to residential treatment facilities. *Id.* at 23. The State next argues that Section 2 does not regulate the federal government directly because GEO is a private company, not the federal government, and is therefore subject to state health and safety laws. *Id.* at 20–21. The State further contends that GEO's preemption claims fail because the PBNDS is not a federal law. *Id.* at 25, 29. The State finally asserts that GEO's Contract Clause claim fails because no provision of HB 1470, including Section 2, substantially impairs GEO's contractual relationship with ICE and the law is

1  appropriately and reasonably tailored to advance a significant and legitimate public

2  purpose. *Id.* at 29–30, 31–32.

3      The issues are addressed in turn.

4  **1.    GEO's challenges to HB 1470 § 2 are constitutionally ripe.**

5      The State moves under Rule 12(b)(1) to dismiss GEO's challenges to HB 1470 § 2

6  for lack of subject-matter jurisdiction. Dkt. 17 at 15. The State contends that these claims

7  are not constitutionally ripe because "DOH has just begun the rulemaking process, but

8  has not yet proposed rules or received comments and testimony from the public and

9  various interest groups, including GEO, on the substance of those rules." Dkt. 17 at 15.

10  The State claims that "GEO couldn't possibly run afoul of the rules under Section 2

11  where none have yet been adopted." *Id.* Therefore, the State asserts, "GEO cannot meet

12  its burden of establishing standing because it cannot show that harm is 'certainly

13  impending.'" *Id.* at 15–16 (quoting *Clapper*, 568 U.S. at 410).

14      GEO responds that it faces an immediate risk of enforcement under HB 1470 § 2

15  "regardless of how long it takes State agencies to promulgate *additional* rules." Dkt. 25-1

16  at 9. It also asserts that Section 2 "provides unequivocal mandates imposing specific

17  requirements and requires no speculation regarding rulemaking." *Id.* GEO further argues

18  that Section 2 "clearly provide[s] '[t]he office of the attorney general' immediate

19  authority to 'enforce violations of this section on its own initiative or in response to

20  complaints or violations.'" *Id.* (quoting RCW 70.395.040(2)). GEO finally contends that

21  HB 1470 § 5 (RCW 70.395.070) "creates an immediate right of action for detained

22  persons" to enforce violations of HB 1470 § 2 "and specifies available money damages,

1  injunctive relief, and the recovery of attorneys' fees and costs." *Id.* For these reasons,

2  GEO asserts, "[n]o further rulemaking is required to subject GEO to an immediate risk of

3  enforcement, and any contrary suggestion is wholly without merit." *Id.*

4       GEO appears to assume that either the Washington attorney general or detained

5  persons may seek to enforce HB 1470 § 2 *before* DOH adopts any rules pursuant to this

6  section. The Court disagrees. The plain language of Section 2 imposes requirements on

7  only *DOH*, not private detention facilities. *See Lenander v. Dep't of Ret. Sys.*, 186 Wn.2d

8  393, 405 (2016) ("If the meaning of the statute is plain on its face, then we must give

9  effect to that meaning as an expression of legislative intent."). Section 2 provides that

10 "[t]he *department of health* shall adopt rules as may be necessary . . . to ensure private

11 detention facilities comply with measurable standards providing sanitary, hygienic, and

12 safe conditions for detained persons" and "[*t*]he *department of health rules* shall include"

13 the standards set forth under subsection (1)(a)–(h). RCW 70.395.040(1) (emphasis

14 added). Thus, HB 1470 § 2 does not impose any requirements directly on private

15 detention facilities. It instead requires DOH to adopt certain rules applicable to private

16 detention facilities. The attorney general cannot enforce violations of Section 2 before

17 DOH adopts any such rules.

18      Nevertheless, "[w]here the inevitability of the operation of a statute against certain

19 individuals is patent, it is irrelevant to the existence of a justiciable controversy that there

20 will be a time delay before the disputed provisions will come into effect." *Blanchette v.*

21 *Conn. Gen. Ons. Corps.*, 419 U.S. 102, 143 (1974). Put differently, "[o]ne does not have

22 to await the consummation of threatened injury to obtain preventive relief. If the injury is

1    certainly impending, that is enough." *Id.* (internal quotation marks omitted) (quoting

2    *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923)). Because DOH is statutorily

3    required to adopt rules imposing on private detention facilities the standards set forth

4    under HB 1470 § 2, GEO's challenges those specific standards are constitutionally ripe.[5]

5           For these reasons, the State's Rule 12(b)(1) motion to dismiss GEO's challenges

6    to HB 1470 § 2 is **DENIED**.

7           **2.      GEO's challenges to HB 1470 § 2 are prudentially ripe.**

8           The State further asserts that GEO's challenges to HB 1470 § 2 are not

9    prudentially ripe. Dkt. 17 at 16–17. It argues that "[t]here is ample time for GEO to

10   provide comment to forthcoming proposed rules, and any final rules adopted will narrow

11   the legal issues involved in this dispute." *Id.* at 17. It also claims that GEO will not "be

12   harmed if judicial resolution is postponed" because "GEO has not shown a credible threat

13   of enforcement to justify pre-enforcement judicial review." *Id.* GEO argues that these

14   claims are prudentially ripe for the same reasons that they are constitutionally ripe. Dkt.

15   25-1 at 9–11.

16          Even when a court has subject-matter jurisdiction over a claim, it should decline to

17   exercise that jurisdiction if the claim is not prudentially ripe. *See Thomas*, 220 F.3d at

18

19          [5] Neither party addresses whether the first sentence of RCW 70.395.040(1) authorizes
     DOH to promulgate rules beyond those specifically listed under subsection (1)(a)–(h), or
20   whether DOH's authority to promulgate any rules under this statute is contingent upon its ability
     to promulgate rules imposing the standards specifically required under subsection (1)(a)–(h). The
21   Court therefore expresses no opinion as to whether the first sentence of RCW 70.395.040(1)
     authorizes DOH to promulgate rules beyond those specifically required under subsection (1)(a)–
22   (h).

1141. "In evaluating the prudential aspects of ripeness, [the court's] analysis is guided by

two overarching considerations: 'the fitness of the issues for judicial decision and the

hardship to the parties of withholding court consideration.'" *Id.* (quoting *Abbott Labs. v.*

*Gardner*, 387 U.S. 136, 149 (1967)). "'[R]ipeness will prevent review if the systemic

interest in postponing adjudication due to lack of fitness outweighs the hardship on the

parties created by postponement.'" *Municipality of Anchorage v. United States*, 980 F.2d

1320, 1323 (9th Cir. 1992) (quoting *Chavez v. Director, OWCP*, 961 F.2d 1409, 1414

(9th Cir. 1992)). When a plaintiff's claims are fit for review, courts need not consider the

hardship to the parties in delaying review. *Skyline Wesleyan Church v. California Dep't*

*of Managed Health Care*, 968 F.3d 738, 753 (9th Cir. 2020) (citing *Oklevueha Native*

*Am. Church of Hawaii, Inc. v. Holder*, 676 F.3d 829, 838 (9th Cir. 2012)).

GEO's challenges to HB 1470 § 2 satisfy the concerns of prudential ripeness.

They are fit for decision because they are primarily legal. As explained, Section 2

requires DOH to adopt by rule various standards that, once adopted, will apply to the

NWIPC.[6] These standards are sufficiently clear and definite to determine whether they

violate either the Supremacy Clause or the Contract Clause without any further factual

development or rulemaking on DOH's part. *See Whitman v. American Trucking Ass'ns*,

531 U.S. 457, 479 (2001) (concluding that an issue was fit for decision when it was

---

[6] To the extent GEO seeks to challenge DOH's authority—if any such authority exists—
to adopt rules in addition to those specifically required under RCW 70.395.040(1)(a)–(h), further
factual development is needed before any such challenge would be prudentially ripe. For this
reason, too, the Court declines to consider any challenge to the first sentence of RCW
70.395.040(1).

1   "purely one of statutory interpretation that would not 'benefit from further factual

2   development of the issues presented'" (quoting *Ohio Forestry Assn., Inc. v. Sierra Club*,

3   523 U.S. 726, 733 (1998)). For this reason alone, GEO's challenges to HB 1470 § 2 are

4   prudentially ripe.

5       There is also no benefit to either party in delaying review of GEO's challenges to

6   HB 1470 § 2. The Court's consideration of these claims will resolve any dispute

7   regarding the constitutionality of these standards *before* DOH expends resources to

8   undertake and complete a rulemaking process.

9       The harm resulting to GEO from withholding review is also sufficiently definite

10  and impending to render GEO's claims prudentially ripe. GEO alleges that compliance

11  with rules imposing the standards enumerated under HB 1470 § 2 "would necessitate

12  significant physical modifications to the NWIPC, including the wholesale redesign of the

13  HVAC[7] system and extensive physical modifications to the building structure currently

14  estimated to cost GEO in excess of $3,000,000." Dkt. 1, ¶ 65. Once such rules are

15  adopted, the Washington attorney general may seek to enforce violations of those rules,

16  *see* RCW 70.395.040(2), DOH may impose civil penalties on GEO in the amount of

17  $1,000 per violation per day, *see* RCW 70.395.080, and detained persons aggrieved by a

18  violation may obtain monetary damages for the violation, including attorney fees and

19  costs, and other appropriate relief, including injunctive relief. *See* RCW 70.395.070.

20

21

22      [7] Heating, ventilation, and air conditioning.

1    Because there is no reason to delay review of GEO's challenges to HB 1470 § 2,

2    the State's motion to dismiss these claims for lack of prudential ripeness is **DENIED**.

3    **3.    HB 1470 § 2 discriminates against GEO in violation of the**
     **intergovernmental immunity doctrine.**

4    Having determined that GEO's challenges to HB 1470 § 2 are constitutionally and

5    prudentially ripe, the Court considers whether GEO plausibly claims that this section

6    discriminates against it in violation of the intergovernmental immunity doctrine.

7        **a.    Federal Rule of Civil Procedure 12(b)(6) Standard.**

8    Dismissal under Federal Rule of Civil Procedure 12(b)(6) may be based on either

9    the lack of a cognizable legal theory or the absence of sufficient facts alleged under a

10   cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.

11   1988). A plaintiff's complaint must allege facts to state a claim for relief that is plausible

12   on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim has "facial plausibility"

13   when the party seeking relief "pleads factual content that allows the court to draw the

14   reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Although

15   courts must accept as true the complaint's well-pleaded facts, conclusory allegations of

16   law and unwarranted inferences will not defeat an otherwise proper Rule 12(b)(6) motion

17   to dismiss. *Vasquez v. Los Angeles Cnty.*, 487 F.3d 1246, 1249 (9th Cir. 2007); *Sprewell*

18   *v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "[A] plaintiff's obligation to

19   provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and

20   conclusions, and a formulaic recitation of the elements of a cause of action will not do.

21   Factual allegations must be enough to raise a right to relief above the speculative level."

22

1    *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). This requires a

2    plaintiff to plead "more than an unadorned, the-defendant-unlawfully-harmed-me

3    accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

4         When granting a Rule 12(b)(6) motion to dismiss, "a district court should grant

5    leave to amend even if no request to amend the pleading was made, unless it determines

6    that the pleading could not possibly be cured by the allegation of other facts." *Cook,*

7    *Perkiss & Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990). However,

8    when the facts are not in dispute and the sole issue is whether there is liability as a matter

9    of substantive law, courts may deny leave to amend. *Albrecht v. Lund*, 845 F.2d 193,

10   195–96 (9th Cir. 1988).

11        **b.     The Intergovernmental Immunity Doctrine.**

12        The Supremacy Clause provides: "This Constitution, and the Laws of the United

13   States which shall be made in Pursuance thereof . . . shall be the supreme Law of the

14   Land." U.S. CONST., art. VI. "The doctrine of intergovernmental immunity is derived

15   from the Supremacy Clause, . . . which mandates that 'the activities of the Federal

16   Government are free from regulation by any state.'" *California*, 921 F.3d at 878 (quoting

17   *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014)). This doctrine arises from

18   the well-settled principle that "'the states have no power, by taxation or otherwise, to

19   retard, impede, burden, or in any manner control, the operations of the constitutional laws

20   enacted by congress to carry into execution the powers vested in the general

21   government.'" *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010) (quoting

22   *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436, 4 L. Ed. 579 (1819)); *accord North*

1  *Dakota v. United States*, 495 U.S. 423, 437–38 (1990) (plurality opinion) ("The

2  nondiscrimination rule finds its reason in the principle that the States may not directly

3  obstruct the activities of the Federal Government.").

4       Under this doctrine, "'state laws are invalid if they "regulate[] the United States

5  directly or discriminate[] against the Federal Government or those with whom it deals."'"

6  *California*, 921 F.3d at 878 (quoting *Boeing*, 768 F.3d at 839). "When the state law is

7  discriminatory, a private entity with which the federal government deals can assert

8  immunity." *Boeing*, 768 F.3d at 842. "Since the advent of the doctrine, intergovernmental

9  immunity has attached where a state's discrimination negatively affected federal

10  activities in some way. It is not implicated when a state merely references or even singles

11  out federal activities in an otherwise innocuous enactment." *California*, 921 F.3d at 881.

12  Accordingly, "intergovernmental immunity attaches . . . to state laws that discriminate

13  against the federal government and burden it in some way." *Id.* at 880.

14       A state law "'does not discriminate against the Federal Government and those with

15  whom it deals unless it treats someone else better than it treats them.'" *California*, 921

16  F.3d at 881 (quoting *Washington v. United States*, 460 U.S. 536, 544–45 (1983)).

17  Therefore, to avoid violating the intergovernmental immunity doctrine, the state law must

18  "be imposed equally on other *similarly situated* constituents of the State." *North Dakota*,

19  495 U.S. at 438 (plurality opinion) (emphasis added).

20       The Ninth Circuit has declined to "recognize a de minimis exception to the

21  doctrine of intergovernmental immunity." *California*, 921 F.3d at 883. It instead stresses:

22  "*Any* economic burden that is discriminatorily imposed on the federal government is

1   unlawful." *Id.* at 883–84. Therefore, those provisions of a state law that impose an

2   additional economic burden exclusively on the federal government—however slight—

3   violate the Supremacy Clause. *Id.* at 884.

4        **c.**    **HB 1470 applies exclusively to private immigration detention facilities.**

5       The State argues that HB 1470 in its entirety applies broadly to "private detention

6   facilities" and, therefore, none of its provisions impermissibly discriminate against GEO

7   as the operator of a private *immigration* detention facility. Although the State does not

8   dispute that the NWIPC is, as a practical matter, the only private detention facility that is

9   actually subject to HB 1470, it asserts that "intergovernmental immunity does not turn on

10  the happenstance of whether another private detention facility presently exists, but on the

11  statutory language itself." Dkt. 17 at 21. According to the State, "HB 1470 is written

12  broadly" and, by its own terms, applies to "'private, nongovernmental for-profit

13  entit[ies]' that 'operat[e] pursuant to a contract or agreement with a federal, state, or local

14  governmental entity.'" *Id.* (quoting RCW 70.395.020(7)). The State argues that, when

15  assessing whether a state law impermissibly discriminates against the federal activities,

16  the letter of the law is determinative. Dkt. 17 at 21. Therefore, the State contends, HB

17  1470 applies broadly to private detention facilities and does not discriminate against GEO

18  as the operator of a private immigration detention facility.

19      GEO responds that "the legislative history and express language of HB 1470

20  plainly demonstrate that it was crafted and specifically amended to impose unique

21  burdens on a single facility—the federal NWIPC—while expressly exempting any

22

1    similarly situated Washington State facilities or those of state contractors." Dkt. 25-1 at

2    15. Therefore, GEO asserts, HB 1470 applies solely to the NWIPC. *Id.* at 17.

3         There is no doubt that the wording of a state law is significant when determining

4    whether it impermissibly discriminates against federal activities. But it is not always

5    determinative. When determining whether a state law discriminates in violation of the

6    Supremacy Clause, "look[ing] solely at the apparent neutrality on the face of the [statute]

7    would . . . elevate form over substance, which must be avoided." *United States v. Hynes*,

8    759 F. Supp. 1303, 1306 (N.D. Ill. 1991), *rev'd in part on other grounds*, 20 F.3d 1437

9    (7th Cir. 1994) (citing *Washington*, 460 U.S. at 544). In other words, "[t]he important

10   consideration . . . is not whether the State differentiates in determining what entity shall

11   bear the legal incidence of the [state law], but whether the [state law] is discriminatory

12   *with regard to the . . . burdens that result*." *Washington*, 460 U.S. at 544 (emphasis

13   added).

14        The language and history of HB 1470 demonstrate that it was enacted to apply

15   solely to private immigration detention facilities. The Washington legislature enacted HB

16   1470 *after* the Ninth Circuit decided *Newsom*, 50 F.4th 745. That decision, which held

17   that a California law prohibiting the use of private detention facilities in that state, made

18   clear that Washington's similar prohibition of private detention facilities under EHB

19   1090 was unconstitutional as applied to private immigration detention facilities. *See GEO*

20   *Group*, ___ F. Supp. 3d ___, No. 21-cv-05313-BHS, 2023 WL 7919947.

21        The legislature expressly stated its intent for the requirements imposed by HB

22   1470 to conform with the Supremacy Clause in light of *Newsom*:

1
2
3
4

> States have broad authority to enforce generally applicable health and safety laws against contractors operating private detention facilities within the state. The ninth circuit reinforced this authority in *Geo Group, Inc. v. Newsom*, 50 F.4th 745, 750 (9th Cir. 2022), stating "[p]rivate contractors do not stand on the same footing as the federal government, so states can impose many laws on federal contractors that they could not apply to the federal government itself."

5 HB 1470 § 8 (codified as RCW 70.395.010(1)).

6       The legislature's express reference to *Newsom* strongly indicates that the purpose

7 of this bill is to impose conditions specifically on the NWIPC as the sole private

8 immigration detention facility in the State. Further support for this conclusion is found in

9 HB 1470 § 10, which expressly excludes various facilities from HB 1470's ambit:

10
> RCW 70.395.040 through 70.395.080 do not apply to a facility that is:

11
12
> (1) Providing rehabilitative, counseling, treatment, mental health, educational, or medical services to juveniles who are subject to Title 13 RCW, or similarly applicable federal law;

13
14
> (2) Providing evaluation and treatment or forensic services to a person who has been civilly detained or is subject to an order of commitment by a court pursuant to chapter 10.77, 71.05, 71.09, or 71.34 RCW, or similarly applicable federal law, including facilities regulated under chapters 70.41, 71.12, and 71.24 RCW;

15
> (3) Used for the quarantine or isolation of persons for public health reasons pursuant to RCW 43.20.050, or similarly applicable federal law;

16
> (4) Used for work release under chapter 72.65 RCW, or similarly applicable federal law;

17
> (5) Used for extraordinary medical placement;
> (6) Used for residential substance use disorder treatment; or

18
> (7) Owned and operated by federally recognized tribes and contracting with a government.

19 RCW 70.395.100.

20
21
22

1   The exclusion of these facilities from HB 1470's requirements begs the question:

2   What facilities aside from private immigration detention facilities are subject to HB

3   1470? The State provides no answer.

4   The State instead asserts that HB 1470 does not discriminate against private

5   immigration detention facilities because EHB 1090—which is unconstitutional as applied

6   to those facilities—"already subjects state and local governments to a more stringent

7   standard than the federal government by prohibiting them from hiring private detention

8   facilities altogether." Dkt. 17 at 22. The State essentially argues that, following *Newsom*,

9   it can impose any burdens it wants on private immigration detention facilities short of

10  prohibiting them altogether because EHB 1090 already prohibits some other kinds of

11  detention facilities.[8] The Court rejects this argument. The Supremacy Clause requires

12  state laws imposed on federal contractors to "be imposed equally on other similarly

13  situated constituents of the State." *North Dakota*, 495 U.S. at 438 (plurality opinion).

14  Private immigration detention facilities are similarly situated to state prisons and local

15  jails, *see California*, 921 F.3d at 884, which EHB 1090 plainly does *not* prohibit. EHB

16  1090's prohibition of certain other kinds of detention facilities does not authorize the

17

18

19   [8] EHB 1090 does not prohibit *all* facilities that may fall under chapter 70.395 RCW's
20   definition of "private detention facility." In addition to being unconstitutional as applied to
     private immigration detention facilities, EHB 1090 expressly excludes from its ambit the same
21   facilities that HB 1470 excludes from its requirements. *Compare* RCW 70.395.030 *with* RCW
     70.395.100. EHB 1090 also expressly excludes any "facility used to house persons pursuant to
22   18 U.S.C. Sec. 4013," which authorizes appropriations for federal detention by the United States
     Marshals Service. RCW 70.395.030(3)(g).

State to impose additional burdens on private immigration detention facilities that are not imposed on other similarly situated facilities.

In sum, the statutory language of HB 1470 and its history indicate that it was designed to apply to only the NWIPC and any other private immigration detention facility that may eventually exist in Washington. The Court accordingly rejects the State's argument that HB 1470 does not discriminate against GEO as the operator of the NWIPC simply because chapter 70.395 RCW defines the term "private detention facility" broadly.

### d.    HB 1470 § 2 impermissibly discriminates against GEO.

The State asserts that HB 1470 § 2 does not impermissibly discriminate against GEO because the standards listed under this section are "drawn directly from Title 246 of the Washington Administrative Code, which sets minimum health and safety standards for 'twenty-four hour private, county or municipal residential treatment facilities.'" Dkt. 17 at 23 (quoting WAC 246-337-001). The State also contends that "[o]ther provisions replicate existing regulatory requirements for [Department of Corrections] facilities, including the provision of basic personal hygiene items." *Id.* (citing WAC 137-55-030).

GEO responds that "the State does not and cannot identify any State [laws] that subject other similarly situated facilities to" the standards that DOH is required to adopt by rule under HB 1470 § 2. Dkt. 25-1 at 19. GEO contends that residential treatment facilities are not similarly situated to immigration detention facilities and that "it is more appropriate to compare the burdens imposed on ICE detention facilities with burdens

1   applied to state 'prisons and detainment facilities.'" Dkt. 25-1 at 19 n.8 (quoting

2   *California*, 921 F.3d at 882).

3        The Court is not convinced that HB 1470 § 2 treats private immigration detention

4   facilities in the same manner that chapter 246-337 WAC treats residential treatment

5   facilities. That regulatory chapter "implements chapter 71.12 RCW and sets the minimum

6   health and safety standards for licensure and operations of twenty-four hour private,

7   county or municipal residential treatment facilities . . . providing health care services to

8   persons with mental disorders or substance use disorders." WAC 246-337-001(1). HB

9   1470 expressly excludes from its ambit any facility "regulated under chapter[] . . . 71.12

10  . . . RCW." RCW 70.395.100(2). It also does not apply to any facility "[u]sed for

11  residential substance use disorder treatment." RCW 70.395.100(6). Therefore, the State's

12  suggestion HB 1470 § 2 treats private immigration detention facilities the same as

13  residential treatment facilities is simply wrong.

14       In any event, because residential treatment facilities are not similarly situated to

15  immigration detention facilities, HB 1470 § 2 plainly discriminates against GEO in

16  violation of the intergovernmental immunity doctrine. A state law "'does not discriminate

17  against the Federal Government and those with whom it deals" in violation of the

18  intergovernmental immunity doctrine "unless it treats someone else better than it treats

19  them.'" *California*, 921 F.3d at 881 (*Washington*, 460 U.S. at 544–45). To avoid such

20  unlawful discrimination, the state law must "be imposed equally on other *similarly*

21  *situated* constituents of the State." *North Dakota*, 495 U.S. at 438 (plurality opinion)

22  (emphasis added). In *California*, the Ninth Circuit held that those provisions of a state

1   law that applied to immigration detention facilities and "duplicate[d] preexisting

2   inspection demands imposed on *state and local detention facilities*" likely did not

3   discriminate against immigration detention facilities. *California*, 921 F.3d at 884

4   (emphasis added). In so doing, the court implicitly reasoned that immigration detention

5   facilities are similarly situated to state and local detention facilities, such as prisons and

6   jails.

7          This makes sense. Congress expressly acknowledged the similarities between

8   immigration detention facilities and state and local detention facilities when it directed

9   the Commissioner of Immigration and Naturalization to "consider the availability for

10   purchase or lease of any existing *prison, jail, detention center, or other comparable*

11   *facility suitable for such use*" "[p]rior to initiating any project for the construction of any

12   new detention facility for the [Immigration and Naturalization] Service." 8 U.S.C. §

13   1231(g)(1) (emphasis added). This congressional mandate is consistent with the plain and

14   ordinary meaning of "detention center," which applies equally to immigration detention

15   facilities like the NWIPC and other detention facilities like prisons or jails. *See* BLACK'S

16   LAW DICTIONARY (11th ed. 2019) (defining "detention center" as "[a] place where

17   people are temporarily kept and prevented from escaping, esp[ecially] people who have

18   entered the country illegally or are thought to have committed crimes").

19          The State does not even attempt to explain how immigration detention facilities

20   like the NWIPC are similarly situated to residential treatment facilities. Nor can it.

21   Immigration detention facilities and residential treatment facilities serve entirely different

22   purposes. Whereas immigration detention facilities function to temporarily keep and

1   prevent people suspected of illegally entering into or residing in the country from

2   escaping, *see* 8 U.S.C. § 1226; *see also* BLACK'S, *supra*, residential treatment facilities

3   serve to provide "twenty-four hour on-site care" "for the evaluation, stabilization, or

4   treatment of residents for substances use, mental health, co-occurring disorders, or for

5   drug exposed infants." RCW 71.12.455(7). There is no requirement that a person be

6   suspected of having engaged in illegal activity to reside at a residential treatment facility.

7       And unlike immigration detention facilities, residential treatment facilities are

8   generally voluntary, meaning that they require a resident's consent to house that resident.

9   *See* WAC 246-337-095(9)(c) (stating that the licensee of a residential treatment facility

10  *must* "[i]nclude . . . in each health care record . . . [a] [r]esident's consent for health care

11  provided by the [residential treatment facility], unless the resident is admitted under an

12  involuntary court order"); *see also* RCW 11.130.330(7) ("[N]o care setting which

13  provides nursing or other care may detain a person within such facility against their will"

14  except as provided by a court "order issued in accordance with the involuntary treatment

15  provisions of chapter 10.77, 71.05, and 72.23 RCW"). Immigration detention facilities do

16  not require a court order to initially detain aliens. *See* 8 U.S.C. § 1226(a) ("On a warrant

17  issued by the *Attorney General*, an alien may be arrested and detained pending a decision

18  on whether the alien is to be removed from the United States." (Emphasis added)).

19      Also, the types of facilities that are used as immigration detention facilities differ

20  significantly from those that are used for residential treatment facilities. Again, an

21  immigration detention facility may operate out of an "existing prison, jail, detention

22  center, or other comparable facility suitable for such use." 8 U.S.C. § 1231(g)(1). By

1   contrast, a residential treatment facility is defined as "an *establishment* in which twenty-

2   four hour on-site care is provided for the evaluation, stabilization, or treatment of

3   residents for substance use, mental health, co-occurring disorders, or for drug exposed

4   infants." RCW 71.12.455(7). "Establishment," in turn, is defined as "[e]very private or

5   county or municipal hospital, including public hospital districts, sanatoriums, homes,

6   psychiatric hospitals, residential treatment facilities, or other places receiving or caring

7   for any person with mental illness, mentally incompetent person, or chemically

8   dependent person" and, "[b]eginning January 1, 2019, facilities providing pediatric

9   transitional care services." RCW 71.12.455(3)(a), (b). None of these facilities are similar

10  to prisons, detention centers, or jails.

11      In short, private immigration detention facilities and residential treatment facilities

12  serve fundamentally different purposes, are authorized to exercise vastly different

13  degrees of control over those who fall under their purview, and operate out of

14  categorically different types of facilities. The State fails to demonstrate why these

15  materially different facilities should be regarded as similarly situated for purposes of

16  applying the intergovernmental immunity doctrine. Accordingly, to the extent that any of

17  the standards listed under HB 1470 § 2 replicate those that apply to residential treatment

18  facilities, HB 1470 § 2 impermissibly discriminates against GEO as the operator of the

19  NWIPC.

20      The Court also rejects the State's argument that "[o]ther provisions" of HB 1470 §

21  2 "replicate existing regulatory requirements for [Department of Corrections] facilities,

22  including the provision of basic personal hygiene items." Dkt. 17 at 23. In support of this

1  assertion, the State cites to only one regulation, WAC 137-55-030. *See* Dkt. 17 at 23.

2  This regulation generally provides "[a]ll offenders incarcerated within the department of

3  corrections facilities shall be responsible for the acquisition and replenishment of

4  personal hygiene items after the initial issuance of those items at the reception center."

5  WAC 137-55-030(1). It further provides that the Department of Corrections shall *initially*

6  provide every offender with several personal hygiene items upon that offender's arrival at

7  a detention center:

8          (2) Initial issuance of personal hygiene items shall include the
       department's issuance of the following items to individual offenders:

9          (a) Bath soap;
           (b) Toothbrush;

10         (c) Toothpaste;
           (d) Razor - One each;

11         (e) Comb or hair pick - One each;
           (f) Shampoo - Thirty-day supply (optional issuance for offenders in

12      the reception center only);
           (g) Deodorant - Thirty-day supply (optional issuance for offenders in

13      the reception center only); and
           (h) State issued sanitary napkins will be made available to female

14      offenders on an as needed basis without charge.

15  WAC 137-55-030(2).

16          No standard enumerated under HB 1470 § 2 requires detainees to be responsible

17  for the acquisition and replenishment of personal hygiene items after the initial issuance

18  of those items. This section instead provides that "[b]asic personal hygiene items must be

19  provided to a detained person *regularly* at no cost." RCW 70.395.040(1)(d) (emphasis

20  added)). This standard is stricter than the standards imposed on the Department of

21  Corrections under WAC 137-55-030. It accordingly discriminates against GEO as the

22  operator of the NWIPC in violation of the intergovernmental immunity doctrine.

GEO therefore states a plausible claim that HB 1470 § 2 violates the Supremacy

Clause by discriminating against it in violation of the intergovernmental immunity

doctrine. The State's 12(b)(6) motion to dismiss this claim is **DENIED**.

**4.      HB 1470 § 2 does not regulate the federal government directly in violation of the intergovernmental immunity doctrine.**

The State asserts that GEO fails to state a plausible claim that HB 1470 § 2

impermissibly regulates the federal government directly. Dkt. 17 at 17–21. The State

contends that "the constitutional prohibition on direct regulation of the federal

government is limited to just that—direct regulation of the federal government." *Id.* at 20.

The State asserts that, "[b]ecause GEO is a private company and HB 1470 is a generally

applicable health and safety law that regulates private entities, *not* the federal

government, GEO's direct regulation claim should be dismissed." *Id.* at 20–21.

GEO responds that "[t]he Ninth Circuit's decision in *Boeing* compels a finding

that HB 1470 constitutes an impermissible direct regulation of federal activities." Dkt.

25-1 at 13 (citing *Boeing*, 768 F.3d 832). This is so, GEO contends, because it

"'mandat[es] the ways in which [GEO] renders services that the federal government hired

[GEO] to perform.'" Dkt. 25-1 at 11 (quoting *Boeing*, 768 F.3d at 840). GEO specifically

asserts that "HB 1470 purports to replace the congressionally mandated PBNDS in

GEO's federal contract with standards developed by the State." *Id.* at 14. GEO therefore

claims that HB 1470 § 2 directly regulates federal activities by "attempt[ing] to override

federal decisions regarding the appropriate standards applicable to federal immigration

detention and regulates not only GEO but the terms of the federal contract itself." *Id.*

1     A state law regulates the activities of the federal government directly in violation

2 of the intergovernmental immunity doctrine if it "falls on the United States itself, or on an

3 agency or instrumentality so closely connected to the Government that the two cannot

4 realistically be viewed as separate entities, at least insofar as the activity being [regulated]

5 is concerned." *United States v. New Mexico*, 455 U.S. 720, 721 (1982). "'[T]he activities

6 of federal installations are shielded by the Supremacy Clause from direct state regulation

7 unless Congress provides "clear and unambiguous" authorization for such regulation.'"

8 *Boeing*, 768 F.3d at 840 (quoting *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180

9 (1988)).

10     In *Boeing*, the Ninth Circuit addressed whether a California law, Senate Bill (SB)

11 990, directly regulated the activities of the federal government in violation of the

12 Supremacy Clause. 768 F.3d at 839–42. SB 990 imposed standards on the cleanup of

13 radioactive contamination caused by the activities of the federal Department of Energy

14 (DOE), the National Aeronautics and Space Association (NASA), and Boeing, which, as

15 a DOE and NASA contractor, contributed to the contamination. *Id.* at 836.

16     Through the Atomic Energy Act, Congress established that DOE was "responsible

17 for establishing a comprehensive health, safety, and environmental program for managing

18 DOE's nuclear facilities nationwide." *Boeing*, 768 F.3d at 836 (citing 42 U.S.C. §§

19 2121(a)(3), 2201). DOE "implemented that authority by issuing orders that set health and

20 safety limits for radioactive releases and cleanup and site-closure procedures." *Id.* DOE

21 then hired Boeing to clean up the radioactive contamination. *Boeing*, 768 F.3d at 836. SB

22

1    990 imposed cleanup standards that were stricter than and conflicted with the standards

2    adopted by DOE. *Id.* at 836–38.

3            The Ninth Circuit held that "SB 990 regulates the federal government directly in

4    violation of the Supremacy Clause." *Boeing*, 768 F.3d at 842. It explained that SB 990

5    "regulates [DOE]'s cleanup activities directly" because it "authorizes California's

6    Department of Toxic Substances Control . . . 'to compel a responsible party or parties to

7    take or pay for appropriate removal or remedial action.'" *Id.* (quoting Cal. Health &

8    Safety Code § 25359.20(a)). Under SB 990, "DOE is a 'responsible party' with respect to

9    radioactive contamination" because "[a]ll of the contamination [at issue] is the result of

10   federal activity or is indistinguishable from contamination caused by federal activity."

11   *Boeing*, 768 F.3d at 839. The court further reasoned that "SB 990 affects nearly all of

12   DOE's decisions with respect to the cleanup" and, in turn, "directly interferes with the

13   functions of the federal government." *Id.* at 839–40. The court explained that SB 990

14   "replaces the federal cleanup standards that Boeing has to meet to discharge its

15   contractual obligations to DOE with the standards chosen by the state" and "overrides

16   federal decisions as to necessary decontamination measures." *Id.* at 840. For all these

17   reasons, SB 990 regulated the federal government directly in violation of the

18   intergovernmental immunity doctrine.

19           HB 1470 § 2 does nothing of the sort. Whereas the federal cleanup standards in

20   *Boeing* were adopted by DOE pursuant to an act of Congress, the PBNDS is *not*

21   congressionally mandated. *See Owino v. CoreCivic, Inc.*, No. 17-CV-1112 JLS (NLS),

22   2018 WL 2193644, at *18 n.10 (S.D. Cal. May 14, 2018) ("The ICE PBNDS is a federal

1    agency publication and cannot provide congressional intent."). In support of its assertion

2    that the PBNDS is "congressionally mandated," GEO cites to a joint explanatory

3    statement and a house report which direct ICE to report on its progress in implementing

4    the PBNDS. *See* Dkt. 25-1 at 23 (citing 163 Cong. Rec. H3812 (2017); H.R. Rep. No.

5    114-668, at 35 (2016)). Neither of these documents establish the intent of Congress. *See*

6    *American Civil Liberties Union v. F.C.C.*, 823 F.2d 1554, 1569 (D.C. Cir. 1987) ("Even

7    if the pertinent passage from the House Report is seen as speaking with complete clarity,

8    the fact remains that committee reports, even authoritative committee reports, are not

9    law." (Footnote omitted)). Therefore, HB 1470 § 2 does not directly regulate federal

10   activities in violation of the Supremacy Clause. *See City of Arcata*, 629 F.3d at 991

11   (under the intergovernmental immunity doctrine, "the states have no power . . . to retard,

12   impede, burden, or in any manner control, the operations of *the constitutional laws*

13   *enacted by congress*" (emphasis added) (internal quotation marks omitted)).

14          In any event, neither the joint explanatory statement nor the house report state that

15   immigration detention facilities must strictly adhere to the PBNDS. The joint explanatory

16   statement provides: "Within 45 days after the enactment of [the Department of Homeland

17   Security Appropriations Act, 2017], ICE shall report on its progress in implementing the

18   2011 [PBNDS], including the 2016 revisions." 163 Cong. Rec. H3812 (2017). The house

19   report similarly states: "Within 45 days after the date of enactment of this Act, ICE shall

20   report on its progress in implementing the 2011 [PBNDS] . . . , including a list of

21   facilities that are not yet in compliance; [and] a schedule for bringing facilities into

22   compliance." H.R. Rep. No. 114-668, at 35 (2016). At most, these documents indicate a

1  desire for immigration detention facilities to be "in compliance" with the PBNDS. They

2  do not state that immigration detention facilities must strictly adhere to the PBNDS when

3  a state law imposes more rigorous requirements.

4      Nor does the contract between ICE and GEO require GEO to operate the NWIPC

5  in strict adherence with the PBNDS. Under a section entitled "Performance Work

6  Statement," the contract provides that "[t]he Contractor shall perform all services in

7  accordance with," among other things, the "ICE 2011 Performance-Based National

8  Detention Standards (PBNDS)."[9] Dkt. 10-1 at 46. However, the contract also provides

9  that "[a]ll services must comply with the Performance Work Statement (PWS) and all

10  applicable federal, state, and local laws and standards. *Should a conflict exist between any*

11  *of these standards, the most stringent shall apply.*"[10] *Id.* at 53 (emphasis added). GEO is

12

13      [9] The contract between GEO and ICE is incorporated into the complaint by reference. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

14      [10] GEO argues that the emphasized sentence in the following paragraph from the Performance Work Statement means that it must adhere to the PBNDS whenever a state law conflicts with the PBNDS:

15
16      The Contractor shall perform all services in accordance with ICE 2011 Performance-Based National Detention Standards (PBNDS) . . . optimals and enhanced recreation, Prison Rape Elimination Act (PREA), American Correctional Associate [sic] (ACA), Standards for Adult Local Detention Facilities (ALDF), and Standards Supplement, Standards for Health Services in Jails, latest edition, National Commission on Correctional Health Care (NCCHC), and state and local laws on firearms at all times. Some ACA standards are augmented by ICE policy and/or procedure. *In cases where other standards conflict with DHS/ICE Policy or Standards, DHS/ICE Policy and Standards prevail*. ICE and third party inspectors will conduct periodic and unscheduled audits and inspections of the facility to ensure compliance with the aforementioned standards.

17
18
19
20

21  Dkt. 10-1 at 46 (emphasis added). Read in context, the emphasized sentence provides merely

22  that, when the standards specifically listed in this paragraph conflict with DHS/ICE policy or

1    therefore not required to adhere to the PDNDS when an "applicable"[11] state law imposes

2    more stringent standards than the PBNDS.

3        GEO accordingly fails to state a plausible claim that HB 1470 § 2 directly

4    regulates against federal activities in violation of the intergovernmental immunity

5    doctrine. The State's motion to dismiss is this claim is **GRANTED** and, because GEO

6    cannot cure the deficiencies with this claim through further amendment, this claim is

7    **DISMISSED with prejudice**.

8        **5.    HB 1470 § 2 is not field preempted.**

9        The State asserts that, because "the federal law that permits contracts for

10   immigration detention purposes do not demonstrate *any* intent to supersede a state's

11   general authority to ensure the health and welfare of inmates and detainees" and HB 1470

12   § 2 "does not actively frustrate the federal government's ability to discharge its

13   operations, GEO's field preemption claim should be dismissed." Dkt. 17 at 25. The State

14   also contends that the PBNDS cannot serve as the basis for a field preemption claim

15   because "the Supremacy Clause is only triggered by 'the Laws' of the United States, and

16   [the] PBNDS does not have 'the force of law.'" *Id.*

17

18

19   procedures, the DHS/ICE policy or procedures prevail. It does not mean that the PBNDS
     controls whenever a state law conflicts with it.

20        [11] When examining similar language in a different federal contract, the Ninth Circuit held
     that a state law is not "applicable" if it violates the Constitution. *Gartrell Const. Inc. v. Aubry*,

21   940 F.2d 437, 440 (9th Cir. 1991) (citing *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 (1956)).
     Accordingly, this contract language does not foreclose GEO's claims that HB 1470 § 2 violates

22   the Constitution in some other manner.

1        GEO responds that HB 1470 § 2 is field preempted because it "would require a

2   wholesale rewriting of ICE's federal contract and the replacement of the congressionally

3   mandated PBNDS with the often inconsistent and conflicting State requirements that

4   would govern virtually every aspect of GEO's contract performance." Dkt. 25-1 at 21.

5   GEO also asserts that "Congress reached its own conclusion regarding how to best ensure

6   the health and safety of federal detainees when it *explicitly directed* that contracts or

7   agreements for immigration detention pending removal should incorporate and comply

8   with the PBNDS." *Id.* at 22 (citing 163 Cong. Rec. H3812 (2017); H.R. Rep. No. 114-

9   668, at 35 (2016)).

10        "Field preemption occurs when *federal law* occupies a 'field' of regulation 'so

11   comprehensively that it has left no room for supplementary state legislation.'" *Murphy v.*

12   *Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 479 (2018) (emphasis added) (quoting *R.J.*

13   *Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 140 (1986)). "In other words,

14   courts will infer that Congress intended 'to displace state law altogether' when Congress

15   enacts 'a framework of regulation so pervasive that Congress left no room for the States

16   to supplement it or whether there is a federal interest so dominant that the federal system

17   will be assumed to preclude enforcement of state laws on the same subject.'" *Knox v.*

18   *Brnovich*, 907 F.3d 1167, 1174 (9th Cir. 2018) (quoting *Arizona II*, 567 U.S. at 399).

19        As explained, the PBNDS is merely an agency publication and does not indicate

20   the intent of Congress. Therefore, the PBNDS is not a federal law and, for this reason

21   alone, it cannot serve as the basis for a field preemption claim. *See Murphy*, 584 U.S. at

22   479; *Knox*, 907 F.3d at 1174.

1    GEO therefore fails to state a plausible claim that HB 1470 § 2 is field preempted.

2    The State's motion to dismiss this claim is **GRANTED** and, because GEO cannot cure

3    the deficiencies with this claim through further amendment, the claim is **DISMISSED**

4    **with prejudice**.

5        **6.    HB 1470 § 2 is not conflict preempted.**

6        The State asserts that HB 1470 § 2 is not conflict preempted because "[t]he

7    PBNDS does not have the force of law and cannot preempt state law" and, even if it did,

8    the standards that DOH is required to adopt by rule under HB 1470 § 2 do "not make

9    compliance with the PBNDS impossible." Dkt. 17 at 29.

10       GEO responds that the standards enumerated under HB 1470 § 2 "are preempted

11   because they create conflicts with GEO's contractual obligations to ICE under the

12   Congressionally mandated PBNDS and present an obstacle to the Congressional

13   objective of implementing a uniform set of requirements for federal immigration

14   detention." Dkt. 25-1 at 24.

15       "Under the doctrine of conflict preemption, 'state laws are preempted when they

16   conflict with federal law. This includes cases where compliance with both federal and

17   state regulations is a physical impossibility, and those instances where the challenged

18   state law stands as an obstacle to the accomplishment and execution of the full purposes

19   and objectives of Congress.'" *California*, 921 F.3d at 878–79 (some internal quotation

20   marks omitted) (quoting *Arizona II*, 567 U.S. at 399). "In the absence of irreconcilability,

21   there is no conflict preemption." *California*, 921 F.3d at 882. "The latter instances

22   constitute so-called 'obstacle preemption,'" which "attaches to any state law, regardless

of whether it specifically targets the federal government, but only if it imposes an obstructive, not-insignificant burden on federal activities." *California*, 921 F.3d at 879–80.

Because the PBNDS is not a federal law, any conflict between it and HB 1470 § 2 does not support a conflict preemption claim. *See California*, 921 F.3d at 878–79. Separately, GEO does not explain how HB 1470 § 2 imposes an obstructive, not-insignificant burden on federal activities. *See id.* at 879–80. Although GEO alleges that compliance with Section 2 would require physical modifications to the NWIPC costing "in excess of $3,000,000," Dkt. 1, ¶ 65, GEO does not plausibly allege that any such modifications would obstruct federal activities.

Accordingly, GEO fails to state a plausible claim that HB 1470 § 2 is conflict preempted. The State's motion to dismiss this claim is **GRANTED** and, because GEO cannot cure the deficiencies with this claim through further amendment, the claim is **DISMISSED with prejudice**.

### 7. HB 1470 § 2 does not violate the Contract Clause.

The State contends that no provision of HB 1470 violates the Contract Clause because the law does not substantially impair GEO's contractual relationship with ICE and, even if it did, the law is appropriately and reasonably tailored to advance a significant and legitimate public purpose. Dkt. 17 at 29–30, 31–32.

GEO responds that its preexisting contract with ICE requires GEO to strictly adhere to the PBDNS and HB 1470 § 2 conflicts with the PBNDS. Dkt. 25-1 at 19, 27–

1   28. GEO also contends that HB 1470 in its entirety is not drawn in an appropriate and

2   reasonable way to advance a significant and legitimate public purpose. *Id.* at 28–29.

3       The Contract Clause provides: "No state shall . . . pass any . . . Law impairing the

4   Obligation of Contracts." U.S. CONST., art. I, § 10, cl. 1. "[N]ot all laws affecting pre-

5   existing contracts violate the Clause" and, "[t]o determine when such a law crosses the

6   constitutional line, [courts] . . . appl[y] a two-step test." *Sveen v. Melin*, 584 U.S. 811,

7   819 (2018). "The threshold issue is whether the state law has 'operated as a substantial

8   impairment of a contractual relationship.'" *Id.* (quoting *Allied Structural Steel Co. v.*

9   *Spannaus*, 438 U.S. 234, 244 (1978)). "In answering that question, [courts] . . . consider[]

10  the extent to which the law undermines the contractual bargain, interferes with a party's

11  reasonable expectations, and prevents the party from safeguarding or reinstating his

12  rights." *Sveen*, 584 U.S. at 819. "If such factors show a substantial impairment, the

13  inquiry turns to . . . whether the state law is drawn in an 'appropriate' and 'reasonable'

14  way to advance 'a significant and legitimate public purpose.'" *Id.* (quoting *Energy*

15  *Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411–412 (1983)).

16      HB 1470 § 2 does not substantially impair the contractual relationship between

17  GEO and ICE. As explained, the contract does not require GEO to strictly adhere to the

18  PBNDS. For this reason alone, Section 2 does not impair GEO's contractual relationship

19  with ICE. And although GEO alleges that compliance with Section 2 would require it to

20  incur more than $3,000,000 in costs to physically modify the NWIPC, *see* Dkt. 1, ¶ 65,

21  GEO does not plausibly allege that such costs would substantially impair its contractual

22  relationship with ICE.

GEO accordingly fails to state a plausible claim that HB 1470 § 2 violates the Contract Clause. The State's motion to dismiss this claim is **GRANTED** and, because GEO cannot cure the deficiencies with this claim through further amendment, the claim is **DISMISSED with prejudice**.

**C.     HB 1470 § 3.**

HB 1470 § 3 generally requires DOH to conduct routine, unannounced inspections of private detention facilities:

> (1) The department of health shall:
> (a) Conduct routine, unannounced inspections of private detention facilities including, but not limited to, inspection of food service and food handling, sanitation and hygiene, and nutrition as provided in (c) of this subsection;
> (b) Conduct investigations of complaints received relating to any private detention facility located within the state;
> (c) Regularly review the list of food items provided to detained persons to ensure the specific nutrition and calorie needs of each detained person are met, including any needs related to medical requirements, food allergies, or religious dietary restrictions;
> (d) Test water used for drinking and bathing and air quality every six months at private detention facilities both inside and outside of the facility; and
> (e) Post inspection results on its website and in a conspicuous place viewable by detained persons and visitors to private detention facilities. Results should be posted in English and in languages spoken by detainees, to the extent practicable.
> (2) The department of health may delegate food safety inspections to the local health jurisdiction, where the local health jurisdiction is in the county where the private detention facility is located, to conduct inspections pursuant to regulations.

RCW 70.395.050(1)–(2).

Section 3 also mandates that DOH impose certain rules on private detention facilities: "The department of health shall adopt rules as may be necessary to effectuate

1  the intent and purposes of this section in order to ensure private detention facilities allow

2  regular inspections and comply with measurable standards providing sanitary, hygienic,

3  and safe conditions for detained persons." RCW 70.395.050(3).

4       Section 3 further requires L&I to "conduct routine, unannounced inspections of

5  workplace conditions at private detention facilities, including work undertaken by

6  detained persons." RCW 70.395.050(4).

7       Section 3 finally authorizes the Washington attorney general to enforce violations

8  this section: "The office of the attorney general may enforce violations of this section on

9  its own initiative or in response to complaints or violations." RCW 70.395.050(5).

10      Although GEO's complaint broadly alleges that HB 1470 in its entirety violates

11  the Constitution in numerous ways, it does not clearly allege how HB 1470 § 3 itself

12  violates the Constitution. The State assumes that GEO challenges Section 3 under the

13  discrimination prong of the intergovernmental immunity doctrine. *See* Dkt. 17 at 24. In

14  response, GEO does not clearly address how Section 3 alone impermissibly discriminates

15  against it, but instead broadly asserts that the State fails to identify any other law that

16  subjects similarly situated facilities to HB 1470's numerous requirements. Dkt. 25-1 at

17  19. Because GEO does not articulate any other theory as to how HB 1470 § 3 itself

18  violates the Constitution, the Court, like the State, assumes that GEO asserts that this

19  section is unconstitutional because it impermissibly discriminates against it.

20      The State asserts that GEO's challenge to HB 1470 § 3 is not constitutionally or

21  prudentially ripe because GEO has not alleged a specific threat of enforcement of this

22

1    section. Dkt. 17 at 16. GEO responds its challenge to this section is ripe because DOH

2    has already attempted to inspect the NWIPC. Dkt. 15-1 at 9–11.

3        The State also contends that HB 1470 § 3 does not impermissibly discriminate

4    against GEO because it merely authorizes DOH and L&I to conduct inspections related

5    to food and worker safety, and other statutes already authorize these agencies to conduct

6    inspections of this sort at state and local detention facilities. Dkt. 17 at 24. GEO asserts

7    that no statute exists that subjects similarly situated facilities to the requirements that HB

8    1470 imposes on the NWIPC. Dkt. 25-1 at 19.

9        The issues are addressed in turn.

10   **1.    GEO's claim that HB 1470 § 3 impermissibly discriminates against it is constitutionally and prudentially ripe.**

11

12       The State moves under Rule 12(b)(1) to dismiss GEO's challenge to HB 1470 § 3

13   for lack of subject-matter jurisdiction. Dkt. 17 at 16. The State argues that GEO's

14   challenge to HB 1470 § 3 is not constitutionally ripe because GEO has not alleged a

15   specific threat of enforcement of this section. *Id.* The State also asserts that this claim is

16   not prudentially ripe for the same reason. *Id.* at 17.

17       GEO responds that this claim is both constitutionally and prudentially ripe because

18   DOH has already undertaken efforts to conduct inspections of the NWIPC. Dkt. 25-1 at

19   9–11.

20       "Ripeness 'is drawn both from Article III limitations on judicial power and from

21   prudential reasons for refusing to exercise jurisdiction.'" *Twitter, Inc. v. Paxton*, 56 F.4th

22   1170, 1173 (9th Cir. 2022) (quoting *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d

1088, 1094 n.2 (9th Cir. 2003)). Regardless of whether a claim is examined for

constitutional ripeness or prudential ripeness, "[t]he 'basic rationale' of the ripeness

requirement is 'to prevent the courts, through avoidance of *premature* adjudication, from

entangling themselves in abstract disagreements.'" *Portman v. Cnty. of Santa Clara*, 995

F.2d 898, 902 (9th Cir. 1993) (emphasis added) (quoting *Abbott Labs.*, 387 U.S. at 149).

Both DOH and L&I have already attempted to conduct inspections pursuant to HB

1470 § 3 (codified as RCW 70.395.050). *See* Dkt. 1-1 in *State of Washington Dep't of

*Health v. The GEO Group Inc.*, No. 3:24-cv-05029-BHS (complaint filed by DOH in

Thurston County Superior Court seeking an injunction preventing GEO from refusing

DOH access to the NWIPC to conduct inspections under chapter 70.395 RCW); Dkt. 1-3

in *Dep't of Labor and Indus. of the State of Washington v. Geo Secure Services, LLC, et

al.*, No. 3:24-cv-05095-BHS (complaint filed by L&I in Pierce County Superior Court

seeking to enforce a warrant to conduct inspections of the NWIPC under chapter 70.395

RCW).[12] Considering these enforcement efforts by DOH and L&I, GEO's challenge to

HB 1470 § 3 is ripe.

Accordingly, the State's 12(b)(1) motion to dismiss GEO's challenge to HB 1470

§ 3 is **DENIED**.

**2.    HB 1470 § 3 discriminates against GEO in violation of the
intergovernmental immunity doctrine.**

The State asserts that HB 1470 § 3 does not violate the intergovernmental

immunity doctrine because it merely "authorizes DOH and L&I to conduct unannounced

---

[12] The Court takes judicial notice of these documents. *See* Fed. R. Civ. P. 201(b)–(c).

inspections related to food and worker safety" and "[b]oth DOH and L&I already conduct inspections of state and local correctional and detention facilities and other workplaces." Dkt. 17 at 24 (citing RCW 43.70.170; RCW 49.17.070; WAC 296-900-12005).

Although GEO does not clearly explain how HB 1470 § 3 itself discriminates against it, GEO asserts that "the State does not and cannot identify any State statutes, regulations, or policies that subject other similarly situated facilities to [the] numerous requirements in HB 1470." Dkt. 25-1 at 19. GEO also contends that the laws cited by the state "address the same *broad topics* as certain sections of HB 1470 *but do not include the same requirements*." *Id.*

There a several flaws with the State's argument that HB 1470 § 3 simply authorizes DOH and L&I to conduct inspections that these agencies already conduct at other facilities. First, HB 1470 § 3 does not simply "authorize" DOH and L&I to conduct certain inspections. It instead *mandates* that both DOH and L&I conduct *routine*, unannounced inspections of private detention facilities. *See* RCW 70.395.050(1)(a) ("The department of health *shall*: (a) Conduct *routine*, unannounced inspections of private detention facilities." (Emphasis added)); RCW 70.395.050(4) ("The department of labor and industries *shall* conduct *routine*, unannounced inspections of workplace conditions at private detention facilities." (Emphasis added)).

The State does not identify any other statute that subjects any other facility—let alone a similarly situated facility—to mandatory, routine, and unannounced inspections. The statutes cited by the State merely *authorize* DOH and L&I to conduct certain inspections; they do not *require* these agencies to conduct inspections and they do not

1  mandate that these inspections occur *regularly*.[13] *See* RCW 43.70.170 ("The secretary [of

2  health] . . . *may* investigate, examine, sample or inspect any article or condition

3  constituting a threat to the public health." (Emphasis added)); RCW 49.17.070 ("[T]he

4  director [of the department of labor and industries] . . . is *authorized* . . . [t]o inspect,

5  survey, and investigate . . . any such workplace." (Emphasis added)).[14] For this reason

6  alone, HB 1470 § 3 imposes stricter requirements on GEO as the operator of the NWIPC

7  than either of these statutes impose on other facilities.

8       Second, unlike HB 1470 § 3, RCW 49.17.070 requires L&I to obtain consent

9  before it may enter a worksite to conduct investigations, unless an exception to the

10  warrant requirements of the federal and state constitutions applies. *See* RCW

11  49.17.070(3) (stating that L&I "*shall obtain consent* from the owner, manager, operator,

12  or his or her on-site person in charge of the worksite when entering any worksite located

13  on private property to carry out his or her duties under this chapter" (Emphasis added));

14  *see also* RCW 49.17.070(4) ("This section does not prohibit" L&I "from taking action

15  consistent with a recognized exception to the warrant requirements of the federal and

16

17

---

18  [13] The regulation cited by the State simply lists the types of "unprogrammed" inspections that L&I conducts under the Washington Industrial Safety and Health Act. *See* WAC 296-900-12005(2). This regulation is of no consequence to GEO's claim that HB 1470 § 3 discriminates

19  against it in violation of the intergovernmental immunity doctrine.

20  [14] Whether RCW 43.70.170 and RCW 49.17.070 themselves apply to GEO as the operator of the NWIPC is subject to dispute in two other cases pending before this Court: *State of Washington Dep't of Health v. The GEO Group Inc.*, No. 3:24-cv-05029-BHS and *Dep't of*

21  *Labor and Indus. of the State of Washington v. Geo Secure Services, LLC, et al.*, No. 3:24-cv-05095-BHS. The Court expresses no opinion in this order as to whether those statutes are

22  constitutional as applied to GEO as the operator of the NWIPC.

1   state Constitutions"). Because HB 1470 § 3 does not contain any such requirement, it

2   impermissibly discriminates against GEO.

3     Third, the State wrongly asserts that HB 1470 § 3 provides for only *inspections*

4   related to food and worker safety. *See* Dkt. 17 at 13, 24. In addition to requiring

5   inspections, Section 3 states that "the department of health *shall adopt rules* as may be

6   necessary to effectuate the intent and purposes of this section in order to ensure private

7   detention facilities allow regular inspections and comply with measurable standards

8   providing sanitary, hygienic, and safe conditions for detained persons." RCW

9   70.395.050(3) (emphasis added). Section 3 further states that "[t]he office of the attorney

10  general may enforce violations of this section on its own initiative or in response to

11  complaints or violations." RCW 70.395.050(5).

12    The State does not identify any other statute that *requires* DOH to adopt rules that

13  apply solely to a similarly situated facility. The statute cited by the State authorizing

14  DOH to investigate threats to the public health does not require DOH to adopt any rules.

15  *See* RCW 43.70.170. Moreover, the statute that grants DOH its general authority to

16  promulgate rules—RCW 43.70.040—provides that this authority is discretionary, not

17  mandatory. *See* RCW 43.70.040(1) ("In addition to any other powers granted the

18  secretary [of health], the secretary *may* . . . adopt . . . rules." (Emphasis added)). The State

19  also fails to identify any other statute that authorizes the Washington attorney general to

20  enforce violations by a similarly situated facility of any rules adopted by DOH. In these

21  respects, GEO plausibly alleges that HB 1470 § 3 places burdens on the NWIPC that are

22  not placed on any other similarly situated facility. For these reasons, too, GEO plausibly

1   claims that HB 1470 § 3 discriminates against it in violation of the intergovernmental

2   immunity doctrine.

3          Finally, HB 1470 § 3 grants DOH broader authority to inspect than does RCW

4   43.70.170. To be sure, the investigation of "food service and food handling" and

5   "sanitation and hygiene" under HB 1470 § 3 might, under certain circumstances, also be

6   authorized under RCW 43.70.170 as an investigation of an "article or condition

7   constituting a threat to the public health." However, the Court is not convinced that

8   inspections "to ensure the specific nutrition and calorie needs of each detained person are

9   met, including any needs related to medical requirements, food allergies, or religious

10  dietary restrictions," RCW 70.395.050, would also be authorized under RCW 43.70.170

11  as inspections of conditions constituting "a threat to the *public* health." (Emphasis

12  added). In this respect, GEO plausibly alleges that the types of inspections required under

13  HB 1470 § 3 place additional burdens on the NWIPC that do not apply to any similarly

14  situated facility.[15]

15         For all these reasons, GEO plausibly claims that HB 1470 § 3 discriminates

16  against it in violation of the intergovernmental immunity doctrine. The State's motion to

17  dismiss this claim is **DENIED**.

18  _____

19         [15] The Court notes that HB 1470 § 3 also requires DOH to post inspection results "in a
    conspicuous place viewable by detained persons and visitors to private detention facilities."
20  RCW 70.395.050(1)(e). The State does not identify any statute that imposes a similar
    requirement on any similarly situated facility. However, the record is unclear as to how this
21  particular requirement would burden GEO as the operator of the NWIPC. In any event, DOH's
    authority to post inspection results under HB 1470 § 3 is clearly contingent upon its authority to
22  conduct inspections under this section, which GEO plausibly alleges to violate the Supremacy
    Clause.

**D.    HB 1470 §§ 5, 6 violate the intergovernmental immunity doctrine.**

HB 1470 §§ 5, 6 subject private immigration detention facilities to severe financial

burdens for violating HB 1470's requirements. HB 1470 § 5 creates a right of action for

detained persons aggrieved by violations of chapter 70.395 RCW:

> (1) A detained person aggrieved by a violation of this chapter has a
> right of action in superior court and may recover for each violation as
> follows:
> (a) Against any person who negligently violates a provision of this
> chapter, $1,000, or actual damages, whichever is greater, for each violation;
> (b) Against any person who intentionally or recklessly violates a
> provision of this chapter, $10,000, or actual damages, whichever is greater,
> for each violation;
> (c) Reasonable attorneys' fees and costs if the detained person is the
> prevailing party; and
> (d) Other relief, including an injunction, as the court may deem
> appropriate. Injunctive relief may be issued without bond in the discretion
> of the court, notwithstanding any other requirement imposed by statute.
> (2) Any action under this chapter is barred unless the action is
> commenced within three years after the cause of action accrues.
> (3) For the purposes of this section, "person" means an owner,
> operator, contractor, subcontractor, or employee of a private detention
> facility.

RCW 70.395.070(1)–(3).

Section 5 also provides that "[t]he state and its agencies are not liable for a

violation of this chapter." RCW 70.395.070(4).

HB 1470 § 6 similarly authorizes DOH to impose substantial civil penalties on

operators of private detention facilities that fail to comply with chapter 70.395 RCW:

> (1) Any person who fails to comply with this chapter may be subject
> to a civil penalty in an amount of not more than $1,000 per violation per
> day.
> (2) Subject to the availability of amounts appropriated for this
> specific purpose, the secretary of the department of health may adopt by

rule a penalty matrix that establishes procedures for civil penalties assessed under this chapter.

(3) Each violation is a separate and distinct offense. The department of health shall impose the civil penalty in accordance with chapter 34.05 RCW. Moneys collected under this section must be deposited into the state general fund.

RCW 70.395.080(1)–(3).

Section 6 also authorizes the Washington attorney general to sue to recover penalties that are not paid within 15 days of receipt of notice of the penalty. RCW 70.395.080(4).

Finally, Section 6, like Section 5, provides that "[t]he state and its agencies are not liable for a violation of this chapter." RCW 70.395.080(6).

The parties' analysis of HB 1470 §§ 5, 6 addresses only whether these sections discriminate against GEO in violation of the intergovernmental immunity doctrine. The Court accordingly limits its review of these sections to that issue.

GEO argues that HB 1470 §§ 5, 6 discriminate against it in violation of the intergovernmental immunity doctrine by subjecting it to severe economic burdens that are not imposed on any similarly situated facility. Dkt. 8 at 22–23; Dkt. 25-1 at 18. GEO asserts that the discriminatory effect of Sections 5 and 6 is apparent from the express exclusion of the State and its agencies from their ambit. Dkt. 8 at 22–23; Dkt. 25-1 at 18.

The State acknowledges that state and local state facilities, including state and local detention facilities, are not subject to HB 1470 §§ 5, 6. Dkt. 26 at 11. It nevertheless asserts that "[t]he discrimination prong" of the intergovernmental immunity doctrine "only prohibits states from treating federal contractors 'unfavorably on some basis related

to their governmental "status"'" *Id.* (quoting *United States v. Washington*, 596 U.S. 832, 839 (2022)). The State also asserts that the Supremacy Clause "does not require states to treat federal contractors the same as the state itself." Dkt. 26 at 11.

The State misses the point. When the Supreme Court says that the Supremacy Clause requires a state law "be one that is imposed on some basis unrelated to the object's status as a Government contractor," it means "*that it be imposed equally on other similarly situated constituents of the State.*" *North Dakota*, 495 U.S. at 438 (plurality opinion) (emphasis added). HB 1470 §§ 5, 6 exclude state and local detention facilities from their ambit. The State also fails to identify any other statute that subjects similarly situated facilities to the burdens imposed by these sections.

For these reasons alone, GEO plausibly alleges that HB 1470 §§ 5, 6 violate the intergovernmental immunity doctrine. *See California*, 921 F.3d at 881; *North Dakota*, 495 U.S. at 438 (plurality opinion). The State's motion to dismiss these claims is **DENIED**.

**E.    The State is preliminarily enjoined from enforcing Sections 2, 3, 5, and 6 of HB 1470.**

GEO moves to preliminarily enjoin the State from enforcing HB 1470 in its entirety against it as the operator of the NWIPC. Dkt. 8 at 31. GEO asserts that it is likely to succeed on the merits of all of its claims, *id.* at 17–29, that it is likely to suffer irreparable harm absent an injunction in the form of a constitutional violation and damages, *id.* at 29–30, and that the balance of the equities and the public interest favor

1    GEO because there is no legitimate interest in allowing the State to violate the

2    Constitution. *Id.* at 31.

3        The State responds that GEO is unlikely to succeed on any of its claims for the

4    same reasons articulated in its motion to dismiss. Dkt. 18 at 17–19. It contends that GEO

5    fails to establish irreparable harm because it cannot show that compliance with any of HB

6    1470's requirements will likely result in economic harm. *Id.* at 19–21. It also asserts that

7    the balance of the equities and the public interest favor the State because of the State's

8    interest in ensuring the health, safety, and security of detainees. *Id.* at 21–33.

9        To obtain preliminary injunctive relief, a plaintiff must establish (1) a likelihood

10   of success on the merits, (2) a likelihood of irreparable harm in the absence of such relief,

11   (3) that the balance of equities favors the plaintiff, and (4) that an injunction is in the

12   public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Where,

13   as here, the government opposes a preliminary injunction, the third and fourth factors

14   merge into one inquiry." *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021).

15       To the extent that GEO moves to preliminarily enjoin the enforcement of HB 1470

16   § 4, the Court lacks subject-matter jurisdiction over GEO's challenges to that section and

17   the motion is accordingly **DENIED**.

18       To the extent GEO moves to preliminarily enjoin the enforcement of HB 1470 §§

19   2, 3, 5, 6, GEO is entitled to relief. For the same reasons that GEO states plausible claims

20   that these sections discriminate against it in violation of the intergovernmental immunity

21   doctrine, GEO establishes a likelihood of success on the merits. And because these

22   statutes violate the constitution, GEO establishes a likelihood of irreparable harm in the

absence of a preliminary injunction. *See United States v. Arizona* (*Arizona I*), 641 F.3d 339, 366 (9th Cir. 2011), *rev'd in part on other grounds*, 567 U.S. 387 (2012) ("'[A]n alleged constitutional infringement will often alone constitute irreparable harm.'" (quoting *Assoc. Gen. Contractors v. Coal. For Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991)). GEO has also sufficiently demonstrated that compliance with RCW 70.395.040(1)(g), which provides that heating and air conditioning must be adjustable by room, would alone require GEO to expend more than $3,000,000 in modifications to the HVAC system and building structure. Dkt. 9, ¶ 8.

Because GEO establishes that HB 1470 §§ 2, 3, 5, 6 violate the Supremacy Clause, the balance of the equities favors GEO and an injunction is in the public interest. *See Ariz. Dream Act Coal., v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014) ("[B]y establishing a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction."); *Arizona I*, 641 F.3d at 366, *aff'd in part, rev'd on other grounds*, 567 U.S. 387 ("'[I]t is *clear that it would not be equitable or in the public's interest to allow the state* . . . to violate the requirements of federal law, especially when there are no adequate remedies available . . . . In such circumstances, the interest of preserving the Supremacy Clause is paramount.'" (quoting *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852–53 (9th Cir. 2009)).

The Court will not permit the State to enforce unconstitutional laws so that it can seek to address the public policy concerns that gave rise to those laws. There is no dispute that Washington "has an interest in administering its police power to 'protect the

1   public health and the public safety.'" *Montana Med. Ass'n v. Knudsen*, 591 F. Supp. 3d

2   905, 917 (D. Mont. 2022) (quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905)).

3   However, it is beyond dispute that "'[t]he mode or manner in which those results are to

4   be accomplished is . . . subject . . . to the condition that no rule prescribed by a state . . .

5   shall contravene the Constitution of the United States." *Montana Med. Ass'n*, 591 F.

6   Supp. 3d at 917 (quoting *Jacobson*, 197 U.S. at 25).

7        For these reasons, GEO's motion to preliminarily enjoin the enforcement of

8   Sections 2, 3, 5, and 6 of HB 1470 (RCW 70.395.040, .050, .070, and .080, respectively)

9   against GEO as the operator of the NWIPC is **GRANTED**. To the extent that GEO seeks

10  to preliminarily enjoin the enforcement of Section 4 of HB 1470 (RCW 70.395.060), the

11  Court lacks subject-matter jurisdiction over GEO's challenges to that section and the

12  motion is accordingly **DENIED**.

13                              ***

14       GEO briefly asserts at the end of its motion for a preliminary injunction that,

15  "because the legal questions in this case require no further factual development,

16  permanent injunctive relief is likewise appropriate." Dkt. 8 at 31. Because GEO has not

17  properly moved for a permanent injunction, the Court declines to enter a permanent

18  injunction at this time. The Court encourages the parties to consult and agree on a

19  resolution to this case in light of this order.

20  //

21  //

22  //

1

### III.  ORDER

2      For the reasons set forth above, the State's motion to dismiss, Dkt. 17, is

3  **GRANTED in part** and **DENIED in part** as follows:

4   • The motion is **GRANTED** insofar as it seeks to dismiss, under Federal Rule of

5      Civil Procedure 12(b)(1), GEO's claims challenging Section 4 of HB 1470 (RCW

6      70.395.060). Because the Court lacks subject-matter jurisdiction over those

7      claims, they are **DISMISSED without prejudice** but **without leave to amend**.

8   • The motion is **GRANTED** insofar as it seeks to dismiss, under Federal Rule of

9      Civil Procedure 12(b)(6), GEO's claims that Section 2 of HB 1470 (RCW

10     70.395.040) regulates federal activities directly in violation of the

11     intergovernmental immunity doctrine, is field preempted, is conflict preempted,

12     and violates the Contract Clause. Because those claims are not plausible and

13     cannot be cured through further amendment, they are **DISMISSED with**

14     **prejudice**.

15  • The motion is **DENIED** insofar as it seeks to dismiss GEO's claims that Sections

16     2, 3, 5, and 6 of HB 1470 (RCW 70.395.040, .050, .070, and .080, respectively)

17     discriminate against GEO in violation of the intergovernmental immunity doctrine.

18     These claims are *not* dismissed.

19     GEO's motion for a preliminary injunction, Dkt. 8, is **GRANTED in part** and

20  **DENIED in part** as follows:

21  • The motion is **GRANTED** insofar as it seeks to enjoin the enforcement of

22     Sections 2, 3, 5, and 6 of HB 1470 (codified as RCW 70.395.040, .050, .070, and

.080) against GEO as the operator of the NWIPC. The State and its agencies are preliminarily enjoined from enforcing these sections against GEO as the operator of the NWIPC.

- The motion is **DENIED** insofar as it seeks to enjoin the enforcement of Section 4 of HB 1470 (codified as RCW 70.395.060) against GEO as the operator of the NWIPC.

**IT IS SO ORDERED**.

Dated this 8th day of March, 2024.

_____
BENJAMIN H. SETTLE
United States District Judge