The Honorable Benjamin H. Settle

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA**

THE GEO GROUP, INC.,

               Plaintiff,

    v.

ROBERT W. FERGUSON, in his official capacity as Governor of the State of Washington; NICHOLAS W. BROWN, in his official capacity as Attorney General of the State of Washington,

               Defendants.

No. 3:23-cv-05626-BHS

**DECLARATION OF
HARRY J. F. KORRELL**

DECLARATION OF HARRY J. F. KORRELL
(3:23-cv-05626-BHS)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

**<u>DECLARATION OF HARRY J. F. KORRELL</u>**

I, Harry J. F. Korrell, declare as follows:

1.      I am over the age of 18 and otherwise competent to testify in this matter.  I execute this declaration in support of the Opposition to Defendants' Motion for Preliminary Injunction filed by The GEO Group, Inc. ("GEO").

2.      I am a partner at the law firm Davis Wright Tremaine LLP and counsel for GEO in this matter.

3.      Attached as **Exhibit A** is a true and correct copy of a May 12, 2026, post on social media platform X by Assistant Attorney General Brett Shumate, which included images of a two-page letter from the Department of Justice to the State of Washington. Attorneys working under me preserved the post from URL https://www.x.com/AAGShumate/status/2054574750026834327/photo/2.

4.      Attached as **Exhibit B** is a true and correct copy of an August 31, 2023, email produced by the Washington State Department of Health in *Washington Department of Health v. The GEO Group, Inc.*, No. 3:24-cv-05639-BHS. The email states "I wanted to share with you the general trend in complaints we have received thus far from La Resistencia. We have not had a complaint come into DOH directly as this point."

5.      Attached as **Exhibit C** is a true and correct copy of the Washington State Department of Health Private Detention Facilities Complaint Form, available at survey123.arcgis.com/share/dc1451d521be4a6586ca3b104e84e5f0.

6.      Attached as **Exhibit D** is a true and correct copy of Multiple Agency Fiscal Note Summary, Engrossed Second Substitute HB 1232, dated 2017, which is available at https://fnspublic.ofm.wa.gov/FNSPublicSearch/GetPDF?packageID=74955.

7.      Attached as **Exhibit E** is a true and correct copy of WSR 25-19-069, Preproposal Statement of Inquiry, Department of Health (filed September 15, 2025), available at https://lawfilesext.leg.wa.gov/law/wsr/2025/19/25-19-069.htm.

DECLARATION OF HARRY J. F. KORRELL - 1
(3:23-cv-05626-BHS)

8.    Attached as **Exhibit F** is a true and correct copy of the Performance Work Statement of the March 27, 2026 contract between ICE and GEO (Contract 70CDCR26D00000026), available on the ICE FOIA Reading Room at: https://www.ice.gov/doclib/foia/detFacContracts/70CDCR26D00000026_NorthwestIPC_TacomaWA_Att1PWS.pdf.

9.    Attached as **Exhibit G** is a true and correct copy of the Declaration of ICE Assistant Field Office Director Matthew Cantrell signed February 12, 2026, filed as Docket Number 33–1 in *Washington Department of Health v. The GEO Group, Inc.*, No. 3:24-cv-05639-BHS.

10.    Attached as **Exhibit H** is a true and correct copy of the Statement of Interest of the United States filed in *State of Washington v. The GEO Group, Inc.*, 3:17-cv-05806-RJB, Dkt. 290.

11.    Attached as **Exhibit I** is a true and correct copy of the Declaration of ICE Assistant Field Office Director Matthew Cantrell signed May 14, 2026.

12.    Below is a true and correct copy of a May 11, 2026, Facebook post made by Defendant Governor Ferguson. An attorney working under my supervision preserved the Facebook post on May 11, 2026, at URL https://www.facebook.com/100044146853837/posts/pfbid0CKaAT98EdC3jErftiFw1oezUDw6dawsVfTe2L6j93XZdJps3XF6HtmE74adH8EBTl/. In the post, Governor Ferguson pretends to quote "ICE" as saying Washington's claims regarding NWIPC have no merit and responded to himself, "If that's true, let our health inspectors in.…" After GEO cited Governor Ferguson's Facebook post as supporting evidence in its Opposition to Defendants' Motion for Leave to File Amended Answer and Counterclaim, Dkt. 71 at 6, the Governor deleted the Facebook post or otherwise caused it to become unavailable to the public as of May 18, 2026. The Governor deleted at least one other Facebook post about ICE from May 11, 2026, as well.

DECLARATION OF HARRY J. F. KORRELL - 2
(3:23-cv-05626-BHS)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax



I declare under penalty of perjury of the laws of the State of Washington that the foregoing statements are true and correct.

Executed this 19th day of May, 2026, at Seattle, Washington.

/s/ Harry J. F. Korrell
Harry J. F. Korrell

DECLARATION OF HARRY J. F. KORRELL - 3
(3:23-cv-05626-BHS)

# EXHIBIT A

𝕏

Home

Explore

Notifications

Follow

Chat

Grok

Bookmarks

Creator Studio

Premium  **50% off**

Profile

More

**Post**

← **Post**

**Brett Shumate** ✔ ◉
@AAGShumate

Some states are refusing to issue license plates to federal law enforcement.  It's dangerous, shameful, and unconstitutional.  It needs to stop now.  Under @DAGToddBlanche, this @TheJusticeDept stands with our brave law enforcement officers.

2:49 PM · May 13, 2026 · **264.7K** Views

💬 169          ⟲ 857          ♡ 2.5K          🔖 64          ↥

Relevant ⌄                              View quotes ›

J    Post your reply                    Reply

**Brett Shumate** ✔ ◉ @AAGShumate · May 13

J    **DaWrTrem**
     @JJB_14753                         ···

**Relevant people**

Brett Shumate ✔ ◉          Follow
@AAGShumate
Assistant Attorney General for @DOJCivil under @DAGToddBlanche & @POTUS Trump 🇺🇸 DOJ Privacy Policy: justice.gov/doj/privacy-po…

**What's happening**

Only on X · Trending
#MondayMood                    ···

Trending in United States
Javier                         ···

Sports · Trending
Jamahl Mosley                  ···
Trending with Pelicans, Knicks in 5

Politics · Trending
RINO Cornyn                    ···

Show more

Terms of Service    Privacy Policy    Cookie Policy
Accessibility    Ads info    More ···    © 2026 X Corp.





**U.S. Department of Justice**
Civil Division

_Office of the Assistant Attorney General_                    _Washington, DC 20044_

May 12, 2026

Attorney General Nick Brown
1125 Washington St. SE
Olympia, WA 98504-0100

Dear Attorney General Brown,

It has come to my attention that Washington State Department of Licensing is refusing to issue undercover license plates to all Department of Homeland Security components, while continuing to issue such plates to state and local law enforcement agencies. This discriminatory policy is not only deeply dangerous as a matter of public safety but also blatantly unlawful as a matter of constitutional law. It should be immediately withdrawn; otherwise, the United States intends to seek judicial relief.

Washington State Department of Licensing's policies undermine ongoing investigations and put federal law enforcement officers at risk of harm. Federal law enforcement officers conduct investigations into myriad serious crimes, including drug trafficking, weapons trafficking, human trafficking, terrorism, and fraud. The investigation into such crimes and the criminal enterprises involved often require covert surveillance and undercover activities. Federal law enforcement officers' duties also include locating missing children, apprehending fugitives, safeguarding people under federal protection, and transporting dignitaries. If federal law enforcement vehicles are readily identifiable, either by a government plate or through a state plate and registration that is subject to public exposure through an information request, then officers, their families, and people under their protection will all be at risk. Officers could be identified and tracked to their homes. Suspects could be alerted to officer presence and flee, destroy evidence, or take countermeasures to avoid arrest, making arrests more dangerous for all involved. Persons under officers' protection could be endangered. Such threats are particularly troubling in the current environment, in which federal officers have been the target of threats, doxing, and harassment.[1]

---

[1] Press Release, ICE Officers Face an 8,000% Increase in Death Threats Against Them and Their Families (Jan. 26, 2026), https://www.dhs.gov/news/2026/01/26/ice-officers-face-8000-increase-death-threats-against-them-and-their-families; Press Release, Bounties Originating From Mexico Offered to Shoot ICE and CBP Officers in Chicago (Oct. 14, 2025), https://www.dhs.gov/news/2025/10/14/bounties-originating-mexico-offered-shoot-ice-and-cbp-officers-chicago; ICE, California man accused of doxxing ICE employee now in custody (Sep. 26, 2025), https://perma.cc/F9YE-EU73; Associated Press, _Federal_

 

**Brett Shumate** ✓ ⓞ                                    ⌀ ···
@AAGShumate

Some states are refusing to issue license plates to federal law enforcement. It's dangerous, shameful, and unconstitutional. It needs to stop now. Under @DAGToddBlanche, this @TheJusticeDept stands with our brave law enforcement officers.

2:49 PM · May 13, 2026 · **264.7K** Views

💬 169    🔁 857    ♡ 2.5K    🔖 64    ⬆️

Relevant⌄                              View quotes ›

J    Post your reply            Reply

**Brett ...** ✓ ⓞ @A... · May 13 ···

💬 6    🔁 50    ♡ 200    📊 7.9K    ⬆️

**Brett ...** ✓ ⓞ @A... · May 13 ···
💬 19    🔁 109    ♡ 385    📊 17K    ⬆️

**Brett ...** ✓ ⓞ @A... · May 13 ···
💬 2    🔁 31    ♡ 139    📊 5.9K    ⬆️

**Monetiz...** ✓ @m... · May 13 ···
Have they withdrawn from the union? If not, federal supremacy reigns supreme.
💬    🔁 1    ♡ 5    📊 346    ⬆️

**Nobody** @AA2ANJ · May 13    ···
Tell me again how we are not headed toward another civil war
💬 1    🔁    ♡ 1    📊 59    ⬆️

**Skyl...** ✓ @skylar... · May 13 ···
Don't give these States a heads up with a letter and cite federal law (unless there is a legal requirement to do so). Slap them with a lawsuit and be done with it. They can't ignore the law because they lost an election. This is beyond ridiculous.
💬 3    🔁 7    ♡ 112    📊 1.1K    ⬆️

**Alex** ✓ @AToggs · May 13    ···
You'll see that in some states the commies have taken over. Oregon, WA, CA etc..

They call themselves Democrats, but they are communists! They will keep acting like children until

The State's discriminatory policy is also plainly unconstitutional under well-established precedent. The Supremacy Clause of the United States Constitution mandates that "[t]his Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. As the Supreme Court has long held, the Supremacy Clause incorporates principles of intergovernmental immunity; accordingly, a state law or policy is invalid if it "regulat[es] the United States directly or discriminat[es] against the Federal Government or those with whom it deals," *United States v. Washington*, 596 U.S. 832, 838 (2022) (citation omitted). By refusing to issue undercover plates to Department of Homeland Security components, while continuing to issue undercover plates to similarly-situated state and local law enforcement agencies without restriction, the Washington State Department of Licensing has directly run afoul of the Supremacy Clause by discriminating against the federal government.

As a former United States Attorney, you should appreciate the dangers posed by this change in policy by the Washington State Department of Licensing. The policy is manifestly unconstitutional and puts our officers at risk. I therefore ask that you require that the Washington State Department of Licensing rescind this policy immediately and return to issuing undercover plates to all federal law enforcement agencies (including but not limited to Homeland Security Investigations, Immigration and Customs Enforcement, and Customs and Border Protection), on equal terms with every other state and local law enforcement agency, without delay and without further restrictions.

Please provide me with written assurance that this policy has in fact been rescinded and *all* federal law enforcement are again able to obtain undercover plates in your state on equal terms by no later than **May 22, 2026**. Absent such an assurance, the United States reserves all rights.

Sincerely yours,

BRETT SHUMATE

Digitally signed by BRETT SHUMATE
Date: 2026.05.12 14:24:13 -04'00'

Brett A. Shumate
Assistant Attorney General
Civil Division

---

*prosecutors charge 3 activists with 'doxing' of ICE agent in Los Angeles*, PBS (Sep. 29, 2025 14:15 ET), https://perma.cc/55RN-PP5H; https://www.dhs.gov/news/2025/12/09/dhs-arrests-new-jersey-twins-who-threaten-shoot-ice-officers-sight-and-hang.

2

# EXHIBIT B

| | |
|---|---|
| **From:** | Nanto, Miko (DOH)[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=CBFC8C6090E14E51AFB53972C 2608C4D-NANTO, WEND] |
| **Sent:** | Thur 8/31/2023 3:41:25 PM (UTC-07:00) |
| **To:** | Laxson, Joe D (DOH)[Joe.Laxson@doh.wa.gov] |
| **Cc:** | Jenks, Lauren  (DOH)[Lauren.Jenks@DOH.WA.GOV]; Muniz, Soleil (DOH)[amanda.muniz@doh.wa.gov]; Eckmann, Kaye (DOH)[Kaye.Eckmann@doh.wa.gov] |
| **Subject:** | Private detention facility complaints |
| **Attachment:** | Private Detention Facility Complaints April to August 2023.docx |

Hi all,

I wanted to share with you the general trend in complaints we have received thus far from La Resistencia.  We have not had a complaint come into DOH directly at this point. If you have any questions feel free to reach out.

Thank you!

**Miko Nanto, MPA, CDE**  pronounce
Gender Pronouns: she/her
Public Engagement Manager
Environmental Public Health Division
Washington State Department of Health
miko.nanto@doh.wa.gov
360-339-0299 | www.doh.wa.gov


# EXHIBIT C

## Private Detention Facilities Complaint Form



People detained at private detention facilities in Washington State have the right to report concerns about their detention. In 2023, the Washington State Legislature established Chapter 70.395 RCW, giving the Washington State Department of Health access to private detention facilities to ensure they comply with measurable standards providing sanitary, hygienic and safe conditions for detained persons. This applies to both current and future private detention facilities operating in Washington state.

Examples of these measurable standards can include safe, clean, and comfortable living areas, a nutritious and balanced diet, and access to laundered clothing and bedding. It can also include safe indoor air quality, and infection control programs that prevents the transmission of infections and communicable disease.

Information in this form is subject to public disclosure. If you wish to remain anonymous, **do not** provide your contact information with your complaint. Please be aware if you do not provide contact information, we may not be able to fully investigate or proceed with enforcement action.

If you need additional support or accommodations to complete this form, please contact us at eph.cru@doh.wa.gov or toll free at 1-833-770-7500.
You can also reach out to us by mail at:

Attn: Complaint Response Unit
Environmental Public Health
Office of the Assistant Secretary
PO Box 47820
Olympia, WA 98504

### Are you reporting for yourself or someone else?*
Please select one

| Yourself ▼ |
| --- |

### Does this pertain to a Private Detention Facility in Washington State?*

| Yes ▼ |
| --- |

### What is the name of the private detention facility you are submitting a concern?*

| |
| --- |

This is a required question

## Complaint Information ⌄

### Complaint ⌄

#### Primary Language
Please select the language you primarily communicate in to improve our communication with you.

| -Please select- ▼ |
| --- |

#### Country of Origin



English  Reset  Saved

-Please select- ▼

## Country of Origin

-Please select- ▼

## Date and Time Incident Happened

📅 MM/DD/YYYY    ⌄        🕐 -- : -- --    ⌄

### Describe your concern*

Include any evidence to support your concern, witness names if applicable, and any other important details.

[                                                    ]
8000

This is a required question

### What is your suggested resolution and/or remedy?

[                                                    ]
8000

## Privacy Notice

Information in this form is subject to public disclosure. **If you wish to remain anonymous, do not provide your contact information with your complaint.** Please be aware if you do not provide contact information, we may not be able to fully investigate or proceed with enforcement action.

## First Name:

Name of person impacted at the facility.

[                                                    ]

## Last Name:

Name of person impacted at the facility.

[                                                    ]

## Unit

[                                                    ]

## Number of People in your Unit

Please enter a whole number.

English  Reset  Saved

**What is your suggested resolution and/or remedy?**

```
                                                    8000
```

## Privacy Notice

Information in this form is subject to public disclosure. **If you wish to remain anonymous, do not provide your contact information with your complaint.** Please be aware if you do not provide contact information, we may not be able to fully investigate or proceed with enforcement action.

**First Name:**

Name of person impacted at the facility.

**Last Name:**

Name of person impacted at the facility.

**Unit**

**Number of People in your Unit**

Please enter a whole number.

**Email Address**

Please provide email in the vaild format. Example: johndoe@emaildomain.com.

**Phone Number**

Phone number must be 10 digits. For example 999-999-9999.

Submit

Document title: Private Detention Facilities Complaint Form
Capture URL: https://survey123.arcgis.com/share/dc1451d521be4a6586ca3b104e84e5f0
Capture timestamp (UTC): Mon, 18 May 2026 20:47:01 GMT

# EXHIBIT D

# Multiple Agency Fiscal Note Summary

| Bill Number: | 1232 E 2S HB AMS CHF S2843.1 | Title: | Private detention facilities |
|---|---|---|---|

## Estimated Cash Receipts

NONE

| Agency Name | 2025-27 | | 2027-29 | | 2029-31 | |
|---|---|---|---|---|---|---|
| | GF- State | Total | GF- State | Total | GF- State | Total |
| Local Gov. Courts | Fiscal note not available | | | | | |
| Loc School dist-SPI | | | | | | |
| Local Gov. Other | | | | | | |
| Local Gov. Total | | | | | | |

## Estimated Operating Expenditures

| Agency Name | 2025-27 | | | | 2027-29 | | | | 2029-31 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FTEs | GF-State | NGF-Outlook | Total | FTEs | GF-State | NGF-Outlook | Total | FTEs | GF-State | NGF-Outlook | Total |
| Administrative Office of the Courts | Fiscal note not available | | | | | | | | | | | |
| Office of State Treasurer | Fiscal note not available | | | | | | | | | | | |
| Office of Attorney General | .0 | 0 | 0 | 0 | .0 | 0 | 0 | 0 | .0 | 0 | 0 | 0 |
| Department of Labor and Industries | .0 | 0 | 0 | 0 | .0 | 0 | 0 | 0 | .0 | 0 | 0 | 0 |
| Department of Social and Health Services | .0 | 0 | 0 | 0 | .0 | 0 | 0 | 0 | .0 | 0 | 0 | 0 |
| Department of Health | 1.5 | 542,000 | 542,000 | 542,000 | 4.2 | 1,294,000 | 1,294,000 | 1,294,000 | 4.2 | 1,294,000 | 1,294,000 | 1,294,000 |
| Department of Children, Youth, and Families | .0 | 0 | 0 | 0 | .0 | 0 | 0 | 0 | .0 | 0 | 0 | 0 |
| Department of Corrections | .0 | 0 | 0 | 0 | .0 | 0 | 0 | 0 | .0 | 0 | 0 | 0 |
| Total $ | 1.5 | 542,000 | 542,000 | 542,000 | 4.2 | 1,294,000 | 1,294,000 | 1,294,000 | 4.2 | 1,294,000 | 1,294,000 | 1,294,000 |

| Agency Name | 2025-27 | | | 2027-29 | | | 2029-31 | | |
|---|---|---|---|---|---|---|---|---|---|
| | FTEs | GF-State | Total | FTEs | GF-State | Total | FTEs | GF-State | Total |
| Local Gov. Courts | Fiscal note not available | | | | | | | | |
| Loc School dist-SPI | | | | | | | | | |
| Local Gov. Other | Non-zero but indeterminate cost and/or savings. Please see discussion. | | | | | | | | |
| Local Gov. Total | | | | | | | | | |

## Estimated Capital Budget Expenditures

FNPID 74955

FNS029 Multi Agency rollup

1

| Agency Name | 2025-27 | | | 2027-29 | | | 2029-31 | | |
|---|---|---|---|---|---|---|---|---|---|
| | FTEs | Bonds | Total | FTEs | Bonds | Total | FTEs | Bonds | Total |
| Administrative Office of the Courts | Fiscal note not available | | | | | | | | |
| Office of State Treasurer | Fiscal note not available | | | | | | | | |
| Office of Attorney General | .0 | 0 | 0 | .0 | 0 | 0 | .0 | 0 | 0 |
| Department of Labor and Industries | .0 | 0 | 0 | .0 | 0 | 0 | .0 | 0 | 0 |
| Department of Social and Health Services | .0 | 0 | 0 | .0 | 0 | 0 | .0 | 0 | 0 |
| Department of Health | .0 | 0 | 0 | .0 | 0 | 0 | .0 | 0 | 0 |
| Department of Children, Youth, and Families | .0 | 0 | 0 | .0 | 0 | 0 | .0 | 0 | 0 |
| Department of Corrections | .0 | 0 | 0 | .0 | 0 | 0 | .0 | 0 | 0 |
| Total $ | 0.0 | 0 | 0 | 0.0 | 0 | 0 | 0.0 | 0 | 0 |

| Agency Name | 2025-27 | | | 2027-29 | | | 2029-31 | | |
|---|---|---|---|---|---|---|---|---|---|
| | FTEs | GF-State | Total | FTEs | GF-State | Total | FTEs | GF-State | Total |
| Local Gov. Courts | Fiscal note not available | | | | | | | | |
| Loc School dist-SPI | | | | | | | | | |
| Local Gov. Other | Non-zero but indeterminate cost and/or savings. Please see discussion. | | | | | | | | |
| Local Gov. Total | | | | | | | | | |

## Estimated Capital Budget Breakout

| This is a preliminary fiscal note package and may not reflect the total estimated impact. |
|---|

| Prepared by: Amy Hatfield, OFM | Phone: (360) 280-7584 | Date Published: Preliminary 4/25/2025 |
|---|---|---|

# Individual State Agency Fiscal Note

| Bill Number: | 1232 E 2S HB AMS CHRI S2843.1 | Title: | Private detention facilities | Agency: | 100-Office of Attorney General |
|---|---|---|---|---|---|

## Part I: Estimates

☒   **No Fiscal Impact**

**Estimated Cash Receipts to:**

   NONE

**Estimated Operating Expenditures from:**
   NONE

**Estimated Capital Budget Impact:**

   NONE

*The cash receipts and expenditure estimates on this page represent the most likely fiscal impact.  Factors impacting the precision of these estimates, and alternate ranges (if appropriate), are explained in Part II.*

Check applicable boxes and follow corresponding instructions:

☐   If fiscal impact is greater than $50,000 per fiscal year in the current biennium or in subsequent biennia, complete entire fiscal note form Parts I-V.

☐   If fiscal impact is less than $50,000 per fiscal year in the current biennium or in subsequent biennia, complete this page only (Part I).

☐   Capital budget impact, complete Part IV.

☐   Requires new rule making, complete Part V.

| Legislative Contact: | Monica Fontaine | Phone: 3607867341 | Date:  04/17/2025 |
|---|---|---|---|
| Agency Preparation: | Dave Merchant | Phone: 360-753-1620 | Date:  04/22/2025 |
| Agency Approval: | Thomas Deaton | Phone: 3607096473 | Date:  04/22/2025 |
| OFM Review: | Val Terre | Phone: (360) 280-3073 | Date:  04/22/2025 |

Form FN (Rev 1/00)  206,827.00                                                            Request #   490-1
FNS063 Individual State Agency Fiscal Note                 1                    Bill # 1232 E 2S HB AMS CHRI S2843.1

# Part II: Narrative Explanation

**II. A - Brief Description Of What The Measure Does That Has Fiscal Impact**

*Significant provisions of the bill and any related workload or policy assumptions that have revenue or expenditure impact on the responding agency by section number.*

1. The Attorney General's Office (AGO) Agriculture & Health Division (AHD) has reviewed this bill and determined it will not significantly increase or decrease the division's workload in representing the Department of Health (DOH). New legal services including advice on the adoption of updated rules setting, private detention facility standards, and representation of DOH in taking actions under new enforcement authority are nominal, and costs are not included in this request.

The AGO AHD Division has reviewed this bill and determined it will not increase or decrease the division's workload in representing the Department of Commerce (Commerce). Therefore, no costs are included in this request.

2. The AGO Corrections Division (COR) has reviewed this bill and determined it will not increase or decrease the division's workload. Therefore, no costs are included in this request.

3. The AGO Children, Youth and Families Division (CYF) has reviewed this bill and determined it will not increase or decrease the division's workload. The enactment of this bill will not impact the provision of legal services to the Department of Children, Youth, and Families (DCYF). DCYF does not have a role in implementing this bill, and this bill does not impact DCYF's facilities. Therefore, no costs are included in this request.

4. The AGO Labor and Industries Division (LNI) has reviewed this bill and determined it will not significantly increase or decrease the division's workload in representing the Department of Labor & Industries (L&I). This bill modifies an existing statute with a focus on the conditions of confinement. Those are not areas where L&I is responsible for enforcing or otherwise engaging with. One minor change that would affect L&I is the removal of "for profit" from the current statute. That would slightly expand the universe of employers who could be inspected under the law. However, the change is it would not meaningfully alter LNI's legal workload. L&I's underlying duties under the existing statute otherwise remain effectively unchanged. New legal services are nominal, and costs are not included in this request.

5. The AGO Revenue Division (REV) has reviewed this bill and determined it will not increase or decrease the division's workload in representing the Office of the State Treasurer (OST). Therefore, no costs are included in this request.

6. AGO Social & Health Services Division (SHO) has reviewed this bill and determined it will not significantly increase or decrease the division's workload in representing the Department of Social & Health Services (DSHS). DSHS facilities do not meet the definition of a "private" facility under the existing statute and under this bill. New legal services, including client advice about how the amendments apply to their facilities are nominal, and costs are not included in this request.

**II. B - Cash receipts Impact**

*Cash receipts impact of the legislation on the responding agency with the cash receipts provisions identified by section number and when appropriate, the detail of the revenue sources. Description of the factual basis of the assumptions and the method by which the cash receipts impact is derived. Explanation of how workload assumptions translate into estimates. Distinguished between one time and ongoing functions.*

**II. C - Expenditures**

*Agency expenditures necessary to implement this legislation (or savings resulting from this legislation), with the provisions of the legislation that result in the expenditures (or savings) identified by section number. Description of the factual basis of the assumptions and the method by which the expenditure impact is derived. Explanation of how workload assumptions translate into cost estimates. Distinguished between one time and ongoing functions.*

# Part III: Expenditure Detail

**III. A - Operating Budget Expenditures**
   NONE

Private detention facilities                                                                                 100-Office of Attorney General
Form FN (Rev 1/00)  206,827.00                                                                        Request #   490-1
FNS063 Individual State Agency Fiscal Note                2            Bill # 1232 E 2S HB AMS CHRI S2843.1

4

**III. B - Expenditures by Object Or Purpose**

    NONE

**III. C - Operating FTE Detail:** *FTEs listed by classification and corresponding annual compensation. Totals agree with total FTEs in Part I and Part IIIA.*

  NONE

**III. D - Expenditures By Program (optional)**

 NONE

# Part IV: Capital Budget Impact

**IV. A - Capital Budget Expenditures**

    NONE

**IV. B - Expenditures by Object Or Purpose**

    NONE

**IV. C - Capital Budget Breakout**

*Acquisition and construction costs not reflected elsewhere on the fiscal note and description of potential financing methods.*

    NONE

**IV. D - Capital FTE Detail:** *FTEs listed by classification and corresponding annual compensation. Totals agree with total FTEs in Part IVB.*

    NONE

# Part V: New Rule Making Required

*Provisions of the bill that require the agency to adopt new administrative rules or repeal/revise existing rules.*

| | |
|---|---|
| Private detention facilities | 100-Office of Attorney General |
| Form FN (Rev 1/00)  206,827.00 | Request #   490-1 |
| FNS063 Individual State Agency Fiscal Note                3 | Bill # 1232 E 2S HB AMS CHRI S2843.1 |

# Individual State Agency Fiscal Note

| Bill Number: | 1232 E 2S HB AMS CHRI S2843.1 | Title: | Private detention facilities | Agency: | 235-Department of Labor and Industries |
|---|---|---|---|---|---|

## Part I: Estimates

☒ **No Fiscal Impact**

**Estimated Cash Receipts to:**

NONE

**Estimated Operating Expenditures from:**
NONE

**Estimated Capital Budget Impact:**

NONE

*The cash receipts and expenditure estimates on this page represent the most likely fiscal impact. Factors impacting the precision of these estimates, and alternate ranges (if appropriate), are explained in Part II.*

Check applicable boxes and follow corresponding instructions:

☐ If fiscal impact is greater than $50,000 per fiscal year in the current biennium or in subsequent biennia, complete entire fiscal note form Parts I-V.

☐ If fiscal impact is less than $50,000 per fiscal year in the current biennium or in subsequent biennia, complete this page only (Part I).

☐ Capital budget impact, complete Part IV.

☐ Requires new rule making, complete Part V.

| Legislative Contact: | Monica Fontaine | Phone: 3607867341 | Date: 04/17/2025 |
|---|---|---|---|
| Agency Preparation: | Crystal Van Boven | Phone: 000-000-0000 | Date: 04/22/2025 |
| Agency Approval: | Trent Howard | Phone: 360-902-6698 | Date: 04/22/2025 |
| OFM Review: | Anna Minor | Phone: (360) 790-2951 | Date: 04/22/2025 |

Form FN (Rev 1/00)  206,731.00                                              Request #  167-DOSH-1
FNS063 Individual State Agency Fiscal Note          1          Bill # 1232 E 2S HB AMS CHRI S2843.1

6

## Part II: Narrative Explanation

### II. A - Brief Description Of What The Measure Does That Has Fiscal Impact

*Significant provisions of the bill and any related workload or policy assumptions that have revenue or expenditure impact on the responding agency by section number.*

This bill amends RCW 70.395.020, 70.395.040, 70.395.050, 70.395.060, and 70.395.100; adding new sections to chapter 70.395 RCW; creating a new section; and declaring an emergency.

E2SHB 1232 AMS CHRI S2843.1 is different from E2SHB 1232 in that it:
• Section 4(b), "The department of labor and industries shall post the inspection results on its website and in a conspicuous place viewable by detained persons and visitors to private detention facilities. Results should be posted in English and in languages spoken by detainees, to the extent practicable." Has been added
• Section 5, "As resources allow, the" has been replaced with "The".
• Section 5, "in accordance with the requirements of RCW 70.395.050 and section 4 of this act" has been added.
These changes do not affect the impact for the Department of Labor and Industries (L&I).

The proposed bill does not have fiscal impact for the Department of Labor and Industries (L&I). There is no change to inspection requirements for L&I Division of Occupational Safety and Health (DOSH).

### II. B - Cash receipts Impact

*Cash receipts impact of the legislation on the responding agency with the cash receipts provisions identified by section number and when appropriate, the detail of the revenue sources. Description of the factual basis of the assumptions and the method by which the cash receipts impact is derived. Explanation of how workload assumptions translate into estimates. Distinguished between one time and ongoing functions.*

None.

### II. C - Expenditures

*Agency expenditures necessary to implement this legislation (or savings resulting from this legislation), with the provisions of the legislation that result in the expenditures (or savings) identified by section number. Description of the factual basis of the assumptions and the method by which the expenditure impact is derived. Explanation of how workload assumptions translate into cost estimates. Distinguished between one time and ongoing functions.*

None.

## Part III: Expenditure Detail

### III. A - Operating Budget Expenditures
NONE

### III. B - Expenditures by Object Or Purpose
NONE

### III. C - Operating FTE Detail: *FTEs listed by classification and corresponding annual compensation. Totals agree with total FTEs in Part I and Part IIIA.*
NONE

### III. D - Expenditures By Program (optional)
NONE

## Part IV: Capital Budget Impact

### IV. A - Capital Budget Expenditures
NONE

| | |
|---|---|
| Private detention facilities | 235-Department of Labor and Industries |
| Form FN (Rev 1/00)  206,731.00 | Request #   167-DOSH-1 |
| FNS063 Individual State Agency Fiscal Note | Bill # 1232 E 2S HB AMS CHRI S2843.1 |

**IV. B - Expenditures by Object Or Purpose**

    NONE

**IV. C - Capital Budget Breakout**

*Acquisition and construction costs not reflected elsewhere on the fiscal note and description of potential financing methods.*

    NONE

**IV. D - Capital FTE Detail:**  *FTEs listed by classification and corresponding annual compensation. Totals agree with total FTEs in Part IVB.*

    NONE

None.

# Part V: New Rule Making Required

*Provisions of the bill that require the agency to adopt new administrative rules or repeal/revise existing rules.*

Private detention facilities                                              235-Department of Labor and Industries
Form FN (Rev 1/00)  206,731.00                                     Request #   167-DOSH-1
FNS063 Individual State Agency Fiscal Note        3            Bill # 1232 E 2S HB AMS CHRI S2843.1

8

# Individual State Agency Fiscal Note

| Bill Number: | 1232 E 2S HB AMS CHRI S2843.1 | Title: | Private detention facilities | Agency: | 300-Department of Social and Health Services |
|---|---|---|---|---|---|

## Part I: Estimates

☒ **No Fiscal Impact**

**Estimated Cash Receipts to:**

NONE

**Estimated Operating Expenditures from:**
NONE

**Estimated Capital Budget Impact:**

NONE

*The cash receipts and expenditure estimates on this page represent the most likely fiscal impact. Factors impacting the precision of these estimates, and alternate ranges (if appropriate), are explained in Part II.*

Check applicable boxes and follow corresponding instructions:

☐ If fiscal impact is greater than $50,000 per fiscal year in the current biennium or in subsequent biennia, complete entire fiscal note form Parts I-V.

☐ If fiscal impact is less than $50,000 per fiscal year in the current biennium or in subsequent biennia, complete this page only (Part I).

☐ Capital budget impact, complete Part IV.

☐ Requires new rule making, complete Part V.

| Legislative Contact: | Monica Fontaine | Phone: 3607867341 | Date: 04/17/2025 |
|---|---|---|---|
| Agency Preparation: | Sara Corbin | Phone: 360-902-8194 | Date: 04/17/2025 |
| Agency Approval: | Dan Winkley | Phone: 360-902-8236 | Date: 04/17/2025 |
| OFM Review: | Arnel Blancas | Phone: (360) 000-0000 | Date: 04/18/2025 |

Form FN (Rev 1/00)  206,722.00                                                      Request #   1232E2SHBA-1
FNS063 Individual State Agency Fiscal Note                     1                     Bill # 1232 E 2S HB AMS CHRI S2843.1

## Part II: Narrative Explanation

### II. A - Brief Description Of What The Measure Does That Has Fiscal Impact

*Significant provisions of the bill and any related workload or policy assumptions that have revenue or expenditure impact on the responding agency by section number.*

E2SHB 1232 AMS CHRI S2843.1 relates to private detention facilities amending RCW 70.395.020, 70.395.040, 70.395.050, 70.395.060, and 70.395.100; adding new sections to chapter 70.395 RCW.

The Department of Social and Health Services (DSHS) does not operate any private detention facilities, therefore enacting this bill into law will result in no fiscal impact to DSHS.

### II. B - Cash receipts Impact

*Cash receipts impact of the legislation on the responding agency with the cash receipts provisions identified by section number and when appropriate, the detail of the revenue sources. Description of the factual basis of the assumptions and the method by which the cash receipts impact is derived. Explanation of how workload assumptions translate into estimates. Distinguished between one time and ongoing functions.*

None

### II. C - Expenditures

*Agency expenditures necessary to implement this legislation (or savings resulting from this legislation), with the provisions of the legislation that result in the expenditures (or savings) identified by section number. Description of the factual basis of the assumptions and the method by which the expenditure impact is derived. Explanation of how workload assumptions translate into cost estimates. Distinguished between one time and ongoing functions.*

None

## Part III: Expenditure Detail

### III. A - Operating Budget Expenditures
NONE

### III. B - Expenditures by Object Or Purpose
NONE

### III. C - Operating FTE Detail:  *FTEs listed by classification and corresponding annual compensation. Totals agree with total FTEs in Part I and Part IIIA.*
NONE

### III. D - Expenditures By Program (optional)
NONE

## Part IV: Capital Budget Impact

### IV. A - Capital Budget Expenditures
NONE

### IV. B - Expenditures by Object Or Purpose
NONE

### IV. C - Capital Budget Breakout

*Acquisition and construction costs not reflected elsewhere on the fiscal note and description of potential financing methods.*
NONE

Private detention facilities                                                                300-Department of Social and Health Services
Form FN (Rev 1/00)  206,722.00                                                      Request #   1232E2SHBA-1
FNS063 Individual State Agency Fiscal Note              2                    Bill # 1232 E 2S HB AMS CHRI S2843.1

10

**IV. D - Capital FTE Detail:**  *FTEs listed by classification and corresponding annual compensation. Totals agree with total FTEs in Part IVB.*

    NONE

None

# Part V: New Rule Making Required

*Provisions of the bill that require the agency to adopt new administrative rules or repeal/revise existing rules.*

Private detention facilities                                        300-Department of Social and Health Services
Form FN (Rev 1/00)  206,722.00                                      Request #   1232E2SHBA-1
FNS063 Individual State Agency Fiscal Note           3              Bill # 1232 E 2S HB AMS CHRI S2843.1

11

# Individual State Agency Fiscal Note

| Bill Number: | 1232 E 2S HB AMS CHRI S2843.1 | Title: | Private detention facilities | Agency: 303-Department of Health |
|---|---|---|---|---|

## Part I: Estimates

☐ **No Fiscal Impact**

**Estimated Cash Receipts to:**

NONE

**Estimated Operating Expenditures from:**

| | FY 2026 | FY 2027 | 2025-27 | 2027-29 | 2029-31 |
|---|---|---|---|---|---|
| FTE Staff Years | 1.5 | 1.5 | 1.5 | 4.2 | 4.2 |
| **Account** | | | | | |
| General Fund-State        001-1 | 273,000 | 269,000 | 542,000 | 1,294,000 | 1,294,000 |
| **Total $** | 273,000 | 269,000 | 542,000 | 1,294,000 | 1,294,000 |

**Estimated Capital Budget Impact:**

NONE

*The cash receipts and expenditure estimates on this page represent the most likely fiscal impact. Factors impacting the precision of these estimates, and alternate ranges (if appropriate), are explained in Part II.*

Check applicable boxes and follow corresponding instructions:

☒ If fiscal impact is greater than $50,000 per fiscal year in the current biennium or in subsequent biennia, complete entire fiscal note form Parts I-V.

☐ If fiscal impact is less than $50,000 per fiscal year in the current biennium or in subsequent biennia, complete this page only (Part I).

☐ Capital budget impact, complete Part IV.

☒ Requires new rule making, complete Part V.

| Legislative Contact: | Monica Fontaine | Phone: 3607867341 | Date: 04/17/2025 |
|---|---|---|---|
| Agency Preparation: | Katie Osete | Phone: 3602363000 | Date: 04/21/2025 |
| Agency Approval: | Kristin Bettridge | Phone: 3607911657 | Date: 04/21/2025 |
| OFM Review: | Amy Hatfield | Phone: (360) 280-7584 | Date: 04/22/2025 |

Form FN (Rev 1/00)  206,726.00
FNS063 Individual State Agency Fiscal Note          1          Bill # 1232 E 2S HB AMS CHRI S2843.1
Request #   FN25-265-1

12

# Part II: Narrative Explanation

**II. A - Brief Description Of What The Measure Does That Has Fiscal Impact**

*Significant provisions of the bill and any related workload or policy assumptions that have revenue or expenditure impact on the responding agency by section number.*

The fiscal impact to the Department of Health (DOH) has not changed from the previous fiscal note on 1232 E2S HB AMS CHRI S2843.1.

Summary of changes from substitute bill 1232 E2S HB AMS CHRI S2843.1:

This version adds language that: Requires inspection results from the Department of Labor and Industries to be posted on its website and in a conspicuous place viewable by detained persons and visitors.

Previous versions amended statutes that were established as part of Second Substitute House Bill (2SHB) 1470 (chapter 419, Laws of 2023), parts of which are subject to ongoing litigation involving DOH, amends RCW 70.395.060 to set standards for nutrition, food safety and services, communications and visitation, rights for detained individuals, staffing and staff training, and infection control and amends RCW 70.395.040 to modify the standards for which DOH must establish rules.

Section 4: of the bill provides DOH with additional enforcement tools and fining authority in instances of repeat violations, deficiencies, or non-compliance. DOH is required to adopt in rule specific fine amounts in relation to the severity of non-compliance. As resources allow, DOH will make plans of correction and enforcement actions available to the public.

Section 6: further defines operating compliance standards.

Section 7: removes the exemption for facilities that provide counseling, treatment, mental health, educational, or medical services to juveniles who are subject to Title 13 RCW, or similarly applicable federal law.

New Section 8: This act is necessary for the immediate preservation of the public peace, health, or safety, or support of the state government and its existing public institutions and takes effect immediately.

New Section 9: If any provision of this act or its application to any person or circumstance is held invalid, the remainder of the act or the application of the provision to other persons or circumstances is not affected.

New Section 10. This act shall be construed liberally to effectuate its purposes.

New Section 11: adds language to null and void the bill is funding is not provided by June 30, 2025.

**II. B - Cash receipts Impact**

*Cash receipts impact of the legislation on the responding agency with the cash receipts provisions identified by section number and when appropriate, the detail of the revenue sources. Description of the factual basis of the assumptions and the method by which the cash receipts impact is derived. Explanation of how workload assumptions translate into estimates. Distinguished between one time and ongoing functions.*

N/A

**II. C - Expenditures**

*Agency expenditures necessary to implement this legislation (or savings resulting from this legislation), with the provisions of the legislation that result in the expenditures (or savings) identified by section number. Description of the factual basis of the assumptions and the method by which the expenditure impact is derived. Explanation of how workload assumptions translate into cost estimates. Distinguished between one time and ongoing functions.*

Section 2:
DOH is required to develop and adopt measurable standards providing sanitary, hygienic, and safe conditions for individuals

Private detention facilities                                                            303-Department of Health
Form FN (Rev 1/00)  206,726.00                                            Request #   FN25-265-1
FNS063 Individual State Agency Fiscal Note          2          Bill # 1232 E 2S HB AMS CHRI S2843.1

13

detained in private detention facilities. DOH anticipates utilizing a significant rulemaking process in accordance with the Administrative Procedures Act. The rules must address safe and clean environments, access and equipment for people with physical and mental disabilities, adequate lighting, water quality, cleaning services, maintenance, sewage and waste disposal, and civil penalties. Based on DOH's experience, DOH anticipates this rulemaking to be complex and controversial. This rulemaking is subject to a cost-benefit analysis and environmental justice assessment, and potentially a small business economic impact statement. DOH must conduct extensive engagement with interested and impacted parties and community members to develop the draft rules and will include at least twelve listening sessions and rules workshops. DOH will engage with individuals who are detained or have experience previously being detained, their family members, Tribes, community members, immigration advocates, private detention facilities, and federal and state government agencies. In addition to the extensive engagement, DOH will also hold a formal rule hearing. DOH anticipates providing English and Spanish interpretation services for all listening sessions, rules workshops, and the rules hearing. All written materials will be translated into at least Spanish to ensure an equitable rulemaking process. DOH anticipates this rulemaking will take approximately 24 months to complete.

Beginning in FY 2026 through 2027, DOH will require:

• 0.3 FTE, Environmental Planner 4, which would manage the rulemaking process, responsible for facilitating the listening session, rules workshops, drafting the rule language, preparing analyses, and ensuring compliance with the Administrative Procedures Act.
• 0.10 FTE, WMS2 Program Manager will oversee the rulemaking and engagement activities, and review rulemaking documents and materials.
• 0.2 FTE, Health Services Consultant 4, will provide subject matter expertise and technical input through the rule process, coordinate and lead community engagement activities, and review rulemaking documents and materials.
• 0.5 FTE Epidemiologist 3, this position located in the Office of Health Sciences, Communicable Disease EPI would be supporting EPH assisting with rule making and engagement activities and review documents and materials.
• Costs for interpretive and translation services are estimated at $20,000.
• Costs for Office of Attorney General support in the amount of $25,000.

Total Cost to implement section 2:
FY26: $273,000, 1.5 FTE
FY27: $269,000, 1.5 FTE

Section 3:
DOH is required to conduct inspections for juvenile private detention facilities related to food service and handling, basic sanitation and hygiene, nutrition, and complaints. These costs will depend on inspection frequency and number of facilities. Section 3 (d) requires private detention facilities both inside and outside of the facility every six months therefore DOH assumes at least two inspections per year per facility. Routine inspections will begin once rulemaking is completed.

Beginning in FY 2028 and ongoing, DOH will require:
• 0.5 FTE Public Health Advisor 3 to conduct inspections for the new private detention facilities required to comply with this chapter.
• 0.5 FTE WMS2 Program Manager to manage the expanded inspection program and supervise the inspection staff.
• 0.5 FTE Epidemiologist 3, this position located in the Office of Health Sciences, Communicable Diseases EPI would be assisting EPH with complaints of communicable diseases. If DOH becomes responsible for investigations and complaints of communicable diseases at private detention facility located within the state, then this position will support disease control and response activities. They will support with conducting investigations of complaints received relating to any private detention facility located within the state.
• Costs for translation and interpretive services for inspections in the amount of $10,000.
• Attorney General time to review and advise on enforcement penalties will be estimated at $22,000 in FY 2028 and ongoing.
• Travel will be needed for these staff to inspect facilities. DOH assumes one facility in Tacoma and one in Medical Lake,

WA. The estimated travel would be $4,000 per FY.

Total Cost to implement section 3:
FY28 and Ongoing: $334,000, 2.1 FTE

Section 4:
These costs will depend on the number of complaints received, investigations, and enforcement actions DOH must take. DOH assumes it will receive at least 500 complaints per year, per facility. Assumptions have been made from the current work being done in Tacoma and scaled back due to the smaller number of people housed in the new facility. Enforcement actions will begin once rulemaking is completed.

Beginning in FY 2028 and ongoing, DOH will require:

• 1.0 FTE Health Services Consultant 4: This position will serve as the program subject matter expert, receive and triage complaints, coordinate investigations with the inspectors, generate enforcement action notices and reports, respond to public record requests and media inquiries, collaborate with local health jurisdictions, external government, Tribes, and community advocates, and post inspection statements of deficiencies, plans of correction, notice of plans of correction, enforcement actions and notices of resolution to DOH's public facing website.
• 0.5 FTE WMS2 Program Manager: to manage the expanded investigations and enforcement program, supervise staff, oversee rule making, program development, and enforcement actions, serve as the point of contact with facility leaders, federal government, state agencies, Tribes, and advocacy groups, and respond to Legislative Inquiries.
• Costs for translation and onsite and/or virtual interpretive services for investigations and enforcement in the amount of $10,000 per FY.
• Attorney General time to review and advise on enforcement penalties will be estimated at $22,000 in FY 2028 and ongoing.

Total Cost to implement section 4:
FY28 and Ongoing: $313,000, 2.1 FTE

Section 5: DOH is directed to make all facility inspection statements of deficiencies, plans of correction, notice of plans of correction, enforcement actions and notices of resolution publicly available on the Internet. DOH will complete this work using existing funding to publish this data.

Section 7:
By expanding the private detention centers to include juveniles in rehabilitation, counseling, treatment, mental health, educational, or medical services who are involved with the criminal justice system, this section increases the scope of work for DOH to then implement the other sections of this bill.
• The costs associated with this rulemaking would be completed in tandem with sections 2 and section 4 above.
• The costs associated with inspections would be completed in tandem with section 3.
• The costs associated with investigations and enforcement would be completed in tandem with section 4.
• The costs associated with making all facility inspection statements of deficiencies, plans of correction, notice of plans of correction, enforcement actions and notices of resolution publicly available on the Internet would be completed in tandem with section 5.

Total Cost to implement this bill:
FY 2026: $273,000 and 1.5 FTE
FY 2027: $269,000 and 1.5 FTE
FY 2028 and ongoing: $647,000 and 4.2 FTE

Private detention facilities                                                                                    303-Department of Health
Form FN (Rev 1/00)  206,726.00                                                              Request #   FN25-265-1
FNS063 Individual State Agency Fiscal Note                 4                 Bill # 1232 E 2S HB AMS CHRI S2843.1

15

## Part III: Expenditure Detail

**III. A - Operating Budget Expenditures**

| Account | Account Title | Type | FY 2026 | FY 2027 | 2025-27 | 2027-29 | 2029-31 |
|---------|---------------|------|---------|---------|---------|---------|---------|
| 001-1 | General Fund | State | 273,000 | 269,000 | 542,000 | 1,294,000 | 1,294,000 |
| | | Total $ | 273,000 | 269,000 | 542,000 | 1,294,000 | 1,294,000 |

**III. B - Expenditures by Object Or Purpose**

| | FY 2026 | FY 2027 | 2025-27 | 2027-29 | 2029-31 |
|---|---------|---------|---------|---------|---------|
| FTE Staff Years | 1.5 | 1.5 | 1.5 | 4.2 | 4.2 |
| A-Salaries and Wages | 138,000 | 138,000 | 276,000 | 746,000 | 746,000 |
| B-Employee Benefits | 50,000 | 50,000 | 100,000 | 272,000 | 272,000 |
| E-Goods and Other Services | 69,000 | 69,000 | 138,000 | 210,000 | 210,000 |
| G-Travel | 1,000 | 1,000 | 2,000 | 10,000 | 10,000 |
| J-Capital Outlays | 4,000 | | 4,000 | | |
| T-Intra-Agency Reimbursements | 11,000 | 11,000 | 22,000 | 56,000 | 56,000 |
| Total $ | 273,000 | 269,000 | 542,000 | 1,294,000 | 1,294,000 |

**III. C - Operating FTE Detail:**  *List FTEs by classification and corresponding annual compensation.  Totals need to agree with total FTEs in Part I and Part IIIA*

| Job Classification | Salary | FY 2026 | FY 2027 | 2025-27 | 2027-29 | 2029-31 |
|--------------------|--------|---------|---------|---------|---------|---------|
| ENVIRONMENTAL PLANNER 4 | 95,652 | 0.3 | 0.3 | 0.3 | | |
| EPIDEMIOLOGIST 3 (NON-MEDICAL) | 116,556 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| Fiscal Analyst 2 | 53,000 | 0.3 | 0.3 | 0.3 | 0.8 | 0.8 |
| HEALTH SERVICES CONSULTANT 4 | 88,800 | 0.2 | 0.2 | 0.2 | 1.0 | 1.0 |
| Health Svcs Conslt 1 | 53,000 | 0.1 | 0.1 | 0.1 | 0.4 | 0.4 |
| PUBLIC HEALTH ADVISOR 3 | 80,460 | | | | 0.5 | 0.5 |
| WMS02 | 122,496 | 0.1 | 0.1 | 0.1 | 1.0 | 1.0 |
| Total FTEs | | 1.5 | 1.5 | 1.5 | 4.2 | 4.2 |

**III. D - Expenditures By Program (optional)**

| Program | FY 2026 | FY 2027 | 2025-27 | 2027-29 | 2029-31 |
|---------|---------|---------|---------|---------|---------|
| Office of Health & Science (010) | 93,000 | 93,000 | 186,000 | 182,000 | 182,000 |
| Division of Environmental Public Health (020) | 146,000 | 142,000 | 288,000 | 950,000 | 950,000 |
| Administration (090) | 34,000 | 34,000 | 68,000 | 162,000 | 162,000 |
| Total $ | 273,000 | 269,000 | 542,000 | 1,294,000 | 1,294,000 |

## Part IV: Capital Budget Impact

**IV. A - Capital Budget Expenditures**

NONE

**IV. B - Expenditures by Object Or Purpose**

NONE

**IV. C - Capital Budget Breakout**

*Acquisition and construction costs not reflected elsewhere on the fiscal note and description of potential financing methods.*

NONE

**IV. D - Capital FTE Detail:**  *FTEs listed by classification and corresponding annual compensation. Totals agree with total FTEs in Part IVB.*

NONE

Private detention facilities                                                    303-Department of Health
Form FN (Rev 1/00)  206,726.00                                          Request #   FN25-265-1
FNS063 Individual State Agency Fiscal Note                5          Bill # 1232 E 2S HB AMS CHRI S2843.1

16

N/A

## Part V: New Rule Making Required

*Provisions of the bill that require the agency to adopt new administrative rules or repeal/revise existing rules.*

Section 2: DOH will need to conduct rulemaking to RCW 70.395.040. DOH is instructed to develop and adopt measurable standards providing sanitary, hygienic, and safe conditions for individuals detained in private detention facilities.

Section 4: Directs DOH to adopt in rules specific fine amounts in RCW 43.70.095 in relation to the severity of the noncompliance.

Section 7: RCW 70.395.100 directs DOH to expand the requirements in the entire chapter to private detention facilities that provide rehabilitation, counseling, treatment, mental health, educational, or medical services to juveniles who are involved with the criminal justice system.

Private detention facilities                                                                303-Department of Health
Form FN (Rev 1/00)  206,726.00                                                    Request #   FN25-265-1
FNS063 Individual State Agency Fiscal Note                 6                Bill # 1232 E 2S HB AMS CHRI S2843.1

17

# Individual State Agency Fiscal Note

| Bill Number: | 1232 E 2S HB AMS CHRI S2843.1 | Title: | Private detention facilities | Agency: | 307-Department of Children, Youth, and Families |
|---|---|---|---|---|---|

## Part I: Estimates

[X]    **No Fiscal Impact**

**Estimated Cash Receipts to:**

NONE

**Estimated Operating Expenditures from:**
NONE

**Estimated Capital Budget Impact:**

NONE

*The cash receipts and expenditure estimates on this page represent the most likely fiscal impact.  Factors impacting the precision of these estimates, and alternate ranges (if appropriate), are explained in Part II.*

Check applicable boxes and follow corresponding instructions:

[ ]    If fiscal impact is greater than $50,000 per fiscal year in the current biennium or in subsequent biennia, complete entire fiscal note form Parts I-V.

[ ]    If fiscal impact is less than $50,000 per fiscal year in the current biennium or in subsequent biennia, complete this page only (Part I).

[ ]    Capital budget impact, complete Part IV.

[ ]    Requires new rule making, complete Part V.

| Legislative Contact: | Monica Fontaine | Phone: 3607867341 | Date:  04/17/2025 |
|---|---|---|---|
| Agency Preparation: | Joe Cushman | Phone: 3607906422 | Date:  04/21/2025 |
| Agency Approval: | Crystal Lester | Phone: 360-628-3960 | Date:  04/21/2025 |
| OFM Review: | Danya Clevenger | Phone: (360) 688-6413 | Date:  04/22/2025 |

Form FN (Rev 1/00)  206,787.00                                                         Request #   1232 E2SHB-1
FNS063 Individual State Agency Fiscal Note                    1                      Bill # 1232 E 2S HB AMS CHRI S2843.1

18

## Part II: Narrative Explanation

**II. A - Brief Description Of What The Measure Does That Has Fiscal Impact**

*Significant provisions of the bill and any related workload or policy assumptions that have revenue or expenditure impact on the responding agency by section number.*

This bill seeks to add new definition to RCW 70.395.050 in order to support inspection of private detention facilities to ensure basic humane conditions are being met for those that live and work in these facilities.

Version 1232-S2.E AMS CHRI S2843

This substitute offers no changes with fiscal impact.

_____

Previous version:

Section 4 is a new section giving the Department of Health (DOH) the authority to take corrective action when if inspects a private detention facility and finds the facility has failed or is not compliant with applicable state statutes or regulations.

Section 5 is a new section requiring DOH to, as resources allow, to make inspection results, plans of corrections, or enforcement actions available to the public on the internet.

**II. B - Cash receipts Impact**

*Cash receipts impact of the legislation on the responding agency with the cash receipts provisions identified by section number and when appropriate, the detail of the revenue sources. Description of the factual basis of the assumptions and the method by which the cash receipts impact is derived. Explanation of how workload assumptions translate into estimates. Distinguished between one time and ongoing functions.*

NONE

**II. C - Expenditures**

*Agency expenditures necessary to implement this legislation (or savings resulting from this legislation), with the provisions of the legislation that result in the expenditures (or savings) identified by section number. Description of the factual basis of the assumptions and the method by which the expenditure impact is derived. Explanation of how workload assumptions translate into cost estimates. Distinguished between one time and ongoing functions.*

No Fiscal Impact.

Department of Children, Youth, and Families (DCYF) considers this bill to have no fiscal impact as this bill relates to Private Detention Facilities which does not affect DCYF's institutions or housing.

## Part III: Expenditure Detail

**III. A - Operating Budget Expenditures**
NONE

**III. B - Expenditures by Object Or Purpose**
NONE

**III. C - Operating FTE Detail:**  *FTEs listed by classification and corresponding annual compensation. Totals agree with total FTEs in Part I and Part IIIA.*
NONE

Private detention facilities                                           307-Department of Children, Youth, and Families
Form FN (Rev 1/00)  206,787.00                                                          Request #   1232 E2SHB-1
FNS063 Individual State Agency Fiscal Note            2            Bill # 1232 E 2S HB AMS CHRI S2843.1

19

**III. D - Expenditures By Program (optional)**

NONE

# Part IV: Capital Budget Impact

### IV. A - Capital Budget Expenditures

NONE

### IV. B - Expenditures by Object Or Purpose

NONE

### IV. C - Capital Budget Breakout

*Acquisition and construction costs not reflected elsewhere on the fiscal note and description of potential financing methods.*

NONE

### IV. D - Capital FTE Detail:  *FTEs listed by classification and corresponding annual compensation. Totals agree with total FTEs in Part IVB.*

NONE

# Part V: New Rule Making Required

*Provisions of the bill that require the agency to adopt new administrative rules or repeal/revise existing rules.*

| | |
|---|---|
| Private detention facilities | 307-Department of Children, Youth, and Families |
| Form FN (Rev 1/00)  206,787.00 | Request #   1232 E2SHB-1 |
| FNS063 Individual State Agency Fiscal Note              3 | Bill # 1232 E 2S HB AMS CHRI S2843.1 |

20

# Individual State Agency Fiscal Note

| Bill Number: | 1232 E 2S HB AMS CHRI S2843.1 | Title: | Private detention facilities | Agency: | 310-Department of Corrections |
|---|---|---|---|---|---|

## Part I: Estimates

☒ **No Fiscal Impact**

**Estimated Cash Receipts to:**

NONE

**Estimated Operating Expenditures from:**
NONE

**Estimated Capital Budget Impact:**

NONE

*The cash receipts and expenditure estimates on this page represent the most likely fiscal impact.  Factors impacting the precision of these estimates, and alternate ranges (if appropriate), are explained in Part II.*

Check applicable boxes and follow corresponding instructions:

☐ If fiscal impact is greater than $50,000 per fiscal year in the current biennium or in subsequent biennia, complete entire fiscal note form Parts I-V.

☐ If fiscal impact is less than $50,000 per fiscal year in the current biennium or in subsequent biennia, complete this page only (Part I).

☐ Capital budget impact, complete Part IV.

☐ Requires new rule making, complete Part V.

| Legislative Contact: | Monica Fontaine | Phone: 3607867341 | Date:  04/17/2025 |
|---|---|---|---|
| Agency Preparation: | Matthew Friesen | Phone: 360-791-0201 | Date:  04/21/2025 |
| Agency Approval: | Wendi Gunther | Phone: 360-789-4001 | Date:  04/21/2025 |
| OFM Review: | Danya Clevenger | Phone: (360) 688-6413 | Date:  04/22/2025 |

Form FN (Rev 1/00)  206,727.00                                                                    Request #   233-1
FNS063 Individual State Agency Fiscal Note                    1                    Bill # 1232 E 2S HB AMS CHRI S2843.1

21

# Part II: Narrative Explanation

## II. A - Brief Description Of What The Measure Does That Has Fiscal Impact

*Significant provisions of the bill and any related workload or policy assumptions that have revenue or expenditure impact on the responding agency by section number.*

An act relating to private detention facilities; amending RCW 170.395.020, 70.395.040, 70.395.050, 70.395.060, and 70.395.100; adding new sections to chapter 70.395 RCW; creating a new section; and declaring an emergency.

E2SHB 1232 AMS CHRI S2843.1 does not have any changes from the latest version that affect the Department of Corrections.

The following impacts remain unchanged from the latest bill version, E2SHB 1232 AMS ORTI H1835.1:

This bill amends state law related to the operations of private detention facilities and expands the rights of the Department of Health (DOH) to conduct inspections of these facilities. The Department of Corrections (DOC) does not currently contract to use private detention facilities. Therefore, this bill has no fiscal impact to DOC.

## II. B - Cash receipts Impact

*Cash receipts impact of the legislation on the responding agency with the cash receipts provisions identified by section number and when appropriate, the detail of the revenue sources. Description of the factual basis of the assumptions and the method by which the cash receipts impact is derived. Explanation of how workload assumptions translate into estimates. Distinguished between one time and ongoing functions.*

## II. C - Expenditures

*Agency expenditures necessary to implement this legislation (or savings resulting from this legislation), with the provisions of the legislation that result in the expenditures (or savings) identified by section number. Description of the factual basis of the assumptions and the method by which the expenditure impact is derived. Explanation of how workload assumptions translate into cost estimates. Distinguished between one time and ongoing functions.*

The updated bill language from E2SHB 1232 AMS CHRI S2843.1 to E2SHB 1232 AMS ORTI H1835.1 does not change the previous fiscal impact assumptions to DOC.

The DOC assumes this bill will have no fiscal impact.

This bill affects private detention facilities and their compliance with measurable standards providing sanitary, hygienic, and safe conditions for detained persons as designated by DOH. The DOC does not currently contract to use private detention facilities. Therefore, this bill has no fiscal impact to DOC.

# Part III: Expenditure Detail

## III. A - Operating Budget Expenditures

NONE

## III. B - Expenditures by Object Or Purpose

NONE

## III. C - Operating FTE Detail:  *FTEs listed by classification and corresponding annual compensation. Totals agree with total FTEs in Part I and Part IIIA.*

NONE

## III. D - Expenditures By Program (optional)

NONE

Private detention facilities                                                      310-Department of Corrections
Form FN (Rev 1/00)  206,727.00                                                           Request #   233-1
FNS063 Individual State Agency Fiscal Note              2              Bill # 1232 E 2S HB AMS CHRI S2843.1

22

## Part IV: Capital Budget Impact

### IV. A - Capital Budget Expenditures

NONE

### IV. B - Expenditures by Object Or Purpose

NONE

### IV. C - Capital Budget Breakout

*Acquisition and construction costs not reflected elsewhere on the fiscal note and description of potential financing methods.*

NONE

### IV. D - Capital FTE Detail:  *FTEs listed by classification and corresponding annual compensation. Totals agree with total FTEs in Part IVB.*

NONE

## Part V: New Rule Making Required

*Provisions of the bill that require the agency to adopt new administrative rules or repeal/revise existing rules.*

Private detention facilities                                                                                310-Department of Corrections
Form FN (Rev 1/00)  206,727.00                                                                                Request #   233-1
FNS063 Individual State Agency Fiscal Note                    3                    Bill # 1232 E 2S HB AMS CHRI S2843.1

# LOCAL GOVERNMENT FISCAL NOTE
Department of Commerce

| Bill Number: | 1232 E 2S HB AMS CHRI S2843.1 | Title: | Private detention facilities |
|---|---|---|---|

## Part I: Jurisdiction-Location, type or status of political subdivision defines range of fiscal impacts.

**Legislation Impacts:**

☐ Cities:

☒ Counties:   Indeterminate expenditure impact as a result of private detention facility operating, inspection and violation enforcement requirements being applied to Martin Hall Juvenile Detention Facility

☐ Special Districts:

☐ Specific jurisdictions only:

☐ Variance occurs due to:

## Part II: Estimates

☐ No fiscal impacts.

☐ Expenditures represent one-time costs:

☐ Legislation provides local option:

☒ Key variables cannot be estimated with certainty at this time:   Whether Martin Hall Juvenile Detention Facility would currently meet the operating, inspection and violation enforcement requirements of the proposed legislation or whether meeting these requirements would require additional facility expenditures; whether any additional facility expenditures may be passed on to counties that contract for detention services at Martin Hall and what those costs may be

**Estimated revenue impacts to:**

   **None**

**Estimated expenditure impacts to:**

| Non-zero but indeterminate cost and/or savings.  Please see discussion. |
|---|

## Part III: Preparation and Approval

| Fiscal Note Analyst:   James Vogl | Phone:   360-480-9429 | Date:   04/24/2025 |
|---|---|---|
| Leg. Committee Contact:  Monica Fontaine | Phone:  3607867341 | Date:   04/17/2025 |
| Agency Approval:   Tammi Alexander | Phone:   360-725-5038 | Date:   04/24/2025 |
| OFM Review:   Amy Hatfield | Phone:  (360) 280-7584 | Date:   04/25/2025 |

## Part IV: Analysis

### A. SUMMARY OF BILL

*Description of the bill with an emphasis on how it impacts local government.*

This fiscal note analyzes the local government impact of E2SHB 1232 AMS CHRI S2843.1, comparing it to the impact of E2SHB 1232.

CHANGES BETWEEN THIS BILL VERSION AND PREVIOUS BILL VERSION:
The amended engrossed second substitute bill would add a requirement that the Department of Labor and Industries post the results of its inspections of workplace conditions at private detention facilities, including work undertaken by detained persons, on its website and in a conspicuous place viewable by detained persons and visitors to private detention facilities

In addition, the amended engrossed second substitute bill would require that the Department of Health make private detention facility inspection statements of deficiencies, plans of correction, notice of acceptance of plans of correction, enforcement actions, and notices of resolution available to the public on the internet in accordance with the requirements of RCW 70.395.050 and section 4 of the proposed legislation.

These changes would not affect the local government expenditure or revenue impacts below.

SUMMARY OF CURRENT BILL:
Section 1 of the proposed legislation would amend RCW 70.395.020, modifying various definitions that apply throughout chapter 70.395 RCW. The amendments in this section would remove the requirement that a facility be operated by a for-profit entity in order to fall under the definition of a private detention facility.

Section 2 would amend RCW 70.395.040, modifying the requirements for DOH rules regarding conditions in private detention facilities.

Section 3 would amend RCW 70.395.050, adding a provision specifying that DOH would be able to at any time inspect a private detention facility to determine whether it has failed or refused to comply with the requirements of chapter 70.395 RCW, standards or rules adopted under that chapter, or other applicable state or federal statutes or rules.

Section 4 would add a new section to chapter 70.395 RCW, specifying the options available to DOH if it finds during an inspection that a private detention facility has failed or refused to comply with applicable statutes or regulations.

Section 6 would amend RCW 70.395.060, modifying the operating requirements for private detention facilities that operate pursuant to a contract or agreement with a federal, state or local government.

Section 7 would amend RCW 70.395.100, removing the exemption from RCW 70.395.040 through 70.395.080 and sections 4 and 5 of the proposed legislation for facilities that provide counseling, treatment, mental health, educational, or medical services to juveniles under chapter 74.15 RCW.

Section 8 specifies that the proposed legislation would take effect immediately.

### B. SUMMARY OF EXPENDITURE IMPACTS

*Expenditure impacts of the legislation on local governments with the expenditure provisions identified by section number and when appropriate, the detail of expenditures. Delineated between city, county and special district impacts.*

The proposed legislation would have an indeterminate impact on local government expenditures.

The Martin Hall Juvenile Detention Facility in Medical Lake, Washington is a private juvenile detention facility operated by Community, Counseling, and Correctional Services, Inc. (CCCS), a Montana-based non-profit organization. Adams, Asotin, Douglas, Garfield, Grant, Lincoln, Pend Oreille, Spokane, Stevens and Whitman counties pay for juvenile detention

services at Martin Hall through contracting with CCCS. By including facilities operated by non-profit entities in the definition of private detention facility, the amended engrossed second substitute bill would make the Martin Hall Juvenile Detention Facility subject to the operating, inspection and violation enforcement provisions of the proposed legislation.

It is unknown, however, whether Martin Hall would incur any additional expenditures as a result of being subject to these requirements, what these costs may be, or whether they would be passed on to counties that contract with CCCS for juvenile detention services. Accordingly, the local government expenditure impact of the proposed legislation is indeterminate.

The Department of Health assumes that under the bill's provisions it would conduct two inspections per private detention facility per year, and that the department would require 0.5 FTE for inspectors.

## C.  SUMMARY OF REVENUE IMPACTS

*Revenue impacts of the legislation on local governments, with the revenue provisions identified by section number, and when appropriate, the detail of revenue sources. Delineated between city, county and special district impacts.*

The proposed legislation would have no impact on local government revenues.

SOURCES:
Community, Counseling, and Correctional Services, Inc., "About Us"
Local government fiscal note for 2SHB 1470, 2023
Washington Defender Association, "Juvenile Rehabilitation & Juvenile Detention Centers"
Washington State Department of Health

# EXHIBIT E

**WSR 25-19-069**
**PREPROPOSAL STATEMENT OF INQUIRY**
**DEPARTMENT OF HEALTH**
[Filed September 15, 2025, 12:29 p.m.]

Subject of Possible Rule Making: Private detention facilities for juveniles. The department of health (department) is considering establishing new rules in Title 246 WAC to establish operational, health, and safety standards for private detention facilities serving juveniles, pursuant to E2SHB 1232 (chapter 235, Laws of 2025). The department will consider either establishing rules in the same chapter as that being developed for adult private detention facilities (chapter 246-385 WAC) or as a new chapter of rule. Additionally, the department is considering creating a severity matrix for fines related to private detention facility enforcement in order to implement E2SHB 1232.

Statutes Authorizing the Agency to Adopt Rules on this Subject: E2SHB 1232 (chapter 235, Laws of 2025) and chapter 70.395 RCW.

Reasons Why Rules on this Subject may be Needed and What They Might Accomplish: RCW 70.395.040 requires the department to adopt rules for operational, health, and safety standards to ensure persons detained in private detention facilities are provided sanitary, hygienic, and safe living conditions. E2SHB 1232 amended RCW 70.395.100 to remove certain exemptions for facilities that provide services for juveniles. The department will consider whether it is best to combine both the adult and juvenile requirements in the same chapter or in separate chapters.

Section 4 of E2SHB 1232 also directs the department to adopt in rule specific fine amounts in relation to the severity of noncompliance by a private detention facility. A civil fine would be assessed if the department determines the private detention facility has previously been subject to an enforcement action for the same or similar type of violation of the same statute or rule, or has been given any previous statement of deficiency that included the same or similar type of violation of the same or similar statute or rule, or when the private detention facility failed to correct noncompliance with a statute or rule by a date established or agreed to by the department.

Other Federal and State Agencies that Regulate this Subject and the Process Coordinating the Rule with These Agencies: Washington state department of labor and industries, the office of the attorney general, and the department of children, youth, and families. Coordination with these agencies will occur as identified in E2SHB 1232. The department will convene a broad-based work group and invite state and federal agencies and interested parties to participate.

Process for Developing New Rule: The department will use a collaborative rule-making approach. The department will keep interested parties informed of the rule development through email and posting information on the department's rule making and program websites. Interested parties will have the opportunity to provide comments throughout the rule-making process, during the formal comment period, and at the public hearing.

Interested parties can participate in the decision to adopt the new rule and formulation of the proposed rule before publication by contacting Kseniya Efremova, P.O. Box 47822, Olympia, WA 98504-7822, phone 360-236-3449, TTY 711, email privatedetentionfacilities@doh.wa.gov, website https://doh.wa.gov.

Additional comments: If you would like to be added to the interested parties list and receive future communication for this rule making, please contact privatedetentionfacilities@doh.wa.gov.

September 15, 2025
Kristin Peterson, JD
Chief of Policy
for Dennis E. Worsham
Secretary of Health

# EXHIBIT F

Attachment 1- PWS                                   70CDCR26D00000026

**Performance Work Statement**

**Detention Services**

**Northwest ICE Processing Center March 2026**

Attachment 1- PWS                                          70CDCR26D00000026

**1.0    Objective**

The objective of this contract is to obtain comprehensive detention, transportation, and food services for ICE detainees located in the Seattle, WA area in support of the ICE ERO Seattle Field Office as detailed below and as described within this document. The federal facility shall be located within an appropriate proximity and access to emergency services (medical, fire protection, law enforcement, etc.) and access to airport services for transportation requirements. The Service Provider shall furnish the federal facility and services inclusive of a trained and qualified management staff, supervision, manpower, relief officers, uniforms, equipment, vehicles, and supplies (which includes firearms, ammunition, body restraints, non-lethal devices, body armor, radios, and cellular telephones) to provide support seven (7) days per week, twenty-four (24) hours per day.

**2.0    Background and Mission**

U.S. Immigration and Customs Enforcement (ICE) is responsible for the detention, health, welfare, transportation, and deportation of aliens in removal proceedings, and those subject to a final order of removal from the United States.

The mission of ICE Enforcement and Removal Operations (ERO) is to identify, arrest, and remove aliens, who present a danger to national security or are a risk to public safety, as well as those who enter the U.S. illegally or otherwise undermine the integrity of immigration laws and border control efforts.

In implementing its mission, ERO is responsible for carrying out all orders for the securing and departure activities of aliens who are designated in removal proceedings and for arranging for the detention of aliens when such becomes necessary and prescribed by law.

**3.0    Scope of Work**

A service provider-owned/service provider-operated federal detention facility to house aliens 24 hours per day, 7 days per week, 365 days per year basis. The federal detention facility shall house approximately ████ detainees ██████████████████████ of all security levels).

The federal detention facility shall provide safe and secure conditions of confinement based on the individual characteristics of a diverse population, including threat to the community, risk of flight, type and status of immigration proceeding, community ties, medical and behavioral health issues. The federal detention facility shall provide easy access to legal services; abundant natural light throughout the federal detention facility; ample indoor and

Attachment 1- PWS                                    70CDCR26D00000026

outdoor recreation shall be offered at a reasonable time of day. Weather permitting, each detainee shall have access for at least one hour per day, five days per week; or, six or more hours per week, at least four days per week that allows for vigorous aerobic exercise with extended hours of availability - a minimum of four hours per day of outdoor recreation; private showers and restrooms (where practicable); cafeteria style meal service or satellite feeding; non-institutional alien clothing; contact visitation (if applicable), including special arrangements for visiting families, with extended hours including nights and weekends; private areas for attorney-client visits, with video teleconferencing capabilities; noise control; enhanced, but controlled freedom of movement (although the manner and degree of implementation may vary based on security levels); enhanced law library and legal resources (including computers with limited web access to accommodate the ICE provided online law library via the ICE Portal); and enhanced programming, including religious services and social programs and dedicated space for religious services.

**4.0. Virtual Attorney Visitation Capability**

Virtual attorney visitation is an established federal facility protocol that allows attorneys (or legal representatives) to contact the federal facility and schedule video teleconference (VTC) visitation with their detainee client(s) at least 24 hours in advance of the desired teleconference. The federal facility plant layout and design shall accommodate a minimum of seven (7) virtual attorney visitation rooms. The utilized space/room must be private, allowing confidential attorney-client conversations, and equipped with video teleconference equipment and/or tablet(s) permitting both visual and audio communications. The room must also have a windowed door or other mechanism that allows detainee observation for safety. While the designated space and equipment can be utilized for other purposes, it is expected that virtual attorney visitation will be made available for at least six (6) hours each day.

Detention services shall be performed in accordance with the optimal level of the most current version of the National Detention Standards (NDS). The current version is NDS 2025 available at 2025 National Detention Standards | ICE. The service provider shall also abide by the March 7, 2014, Department of Homeland Security (DHS) regulation under the Prison Rape Elimination Act of 2003 (PREA; P.L. 108-79), *Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities* (DHS PREA Standards) available at https://www.gpo.gov/fdsys/pkg/FR-2014-03-07/pdf/2014-04675.pdf.

The service provider shall be responsible for obtaining and maintaining American Correctional Association (ACA) Adult Local Detention Facilities (ALDF) accreditation. Conformance with the ACA ALDF Standards is required on the first day of contract

performance and accreditation shall be obtained within 7 months from the contract award. If the federal facility is already accredited, reaccreditation shall occur as required by ACA.

The service provider shall furnish all personnel, management, equipment, supplies, training, certification, accreditation, and services necessary for the performance of all aspects of the contract. Unless explicitly stated otherwise, the service provider is responsible for all costs associated with and incurred as part of providing the services outlined in this contract. Unless explicitly stated otherwise, the service provider is responsible for all costs associated with and incurred in providing the services specified in this contract.

The service provider shall provide fully operational radios assigned to each detention officer (including relief officers). The service provider will maintain a serviceable, in stock, backup quantity of radios that are adequate for all staff and enough to cover backup staff and/or repairs and downtime.

The contractor will provide for the secure custody, care, and safekeeping of aliens in accordance with the federal laws, standards, policies, procedures for firearms requirements, or court orders applicable to the operations of the federal facility.

The service provider shall enforce disciplinary actions against any alien who is not in compliance with the rules and procedures of the federal facility in accordance with applicable NDS 2025 and applicable ICE policy.

The federal facility shall include a special management unit(s) for administrative and discipline segregation.

If any conflicts between federal, state, or local laws or rules arise, the federal rules shall be followed. Nothing in this performance work statement, is intended to, or shall be construed to be, a waiver of federal supremacy or the immunity of the Government or its support-service provider, the contractor.    Otherwise, applicable or more stringent state or local laws or regulations shall not apply to the performance under this contract when they would directly or indirectly regulate, dictate, or control the support-service provider's performance under these standards.

In the event a lawsuit is filed against the service provider, in which any claim or allegation contests the legality or propriety of the service provider's performance of its obligations under the agreement  or a lawsuit is filed as a result of an alleged administrative error, omission, or intentional act of the Federal Government, ICE, if it determines the service provider abided by the terms of this Agreement during the activity alleged in such lawsuit, will promptly request, and use its best efforts to endorse, and recommend  that the United States Department of Justice (DOJ), as appropriate, should, but is not limited to, move to either have the service provider dismissed from such suit; have ICE substituted as the proper party defendant; or to have the case removed to a court of proper jurisdiction. ICE will request, endorse, and use its best

service provider's performance under this agreement is solely at the discretion of DOJ and nothing in this agreement limits the discretion of DOJ on any litigation matters. The parties further acknowledge that nothing in this Agreement provides that the service provider or its employees acting under this Agreement are employees of the Government for wrongful acts or omissions committed by the service provider or its employees.  Consistent with federal law including statutes of limitations, the Defense of Suit as outlined in this paragraph will apply even after the contract concludes, in cases where a lawsuit is filed against the service provider for services performed under this agreement.

The COR does not have the authority to modify the stated terms of the contract or approve any action that would result in additional charges to the government beyond what is stated in the contract line-item number schedule. The Contracting Officer (CO) shall make all modifications in writing.

In the event that an alien at the federal facility is found to have a medical condition that requires medical care beyond the scope of the service provider's health care provider, the service provider shall notify ICE and request transfer of the alien from the federal facility. The service provider shall permit ICE reasonable time to make alternative arrangements for
the alien.

DHS, ICE, federal entities, and ICE-approved third-party inspectors (e.g., contracted support for conducting inspections) will conduct scheduled and unscheduled audits and inspections of performance to ensure contract compliance. Approved inspectors shall always have full access to the federal facility and in all areas of performance. The service provider shall provide full and complete cooperation for all requests related to detention oversight or investigation conducted by the government or approved third-party inspectors on behalf of the government.

Aliens are classified as High (Level 4 - Red), Medium-High (Level 3 - Orange), Medium-Low (Level 2 - Green) or Low-Risk (Level 1 - Blue). Upon discovery that an alien may be a juvenile, the service provider shall immediately notify the COR or ICE designee and follow the instructions of the COR or ICE designee.

The service provider will not house any non-ICE population at the federal facility without the express prior written approval of the CO.

ICE will review and approve all design documents and maintain approval of final inspection of the federal facility before occupancy.

Attachment 1- PWS                                    70CDCR26D00000026

## 5.0.    Facilities

### 5.1.  Detention Site Standards

The Service Provider shall ensure that detention sites conform to NDS 2025, the Architectural Barriers Act of 1968, as amended, and Section 504 of the Rehabilitation Act of 1973.

For safety, security, and sanitation purposes, an inspection of housing areas shall be conducted by a supervisor at a minimum of once per shift. The inspection shall be logged into the security logbook and available for review by the COR and/or ICE official.
All locks, windows, walls, floors, ventilators, covers, access panels, and doors shall be checked daily for operational wear and tampering. The Service Provider shall take immediate action to repair all defective equipment.

The federal facility shall be subject to periodic and random inspections by the COR, an ICE official, or other federal government officials to ensure compliance with ICE Standards.

### 5.2.  Detention Space

The federal facility shall meet, at a minimum, all ACA ALDF requirements and NDS 2025 requirements. The Service Provider shall provide for ICE processing/holding space operated in accordance with ICE policy 11087.2 Operations of ERO Holding Facilities: located at
https://icegov.sharepoint.com/sites/inSight-ero/policy/SitePages/Policy%20Statements/11087-2.aspx.
The processing/holding space shall be for in-processing and out-processing of aliens and must have a minimum capacity of ██ standing aliens.

### 5.3.  Physical Plant

The federal facility operation and maintenance shall ensure that aliens are housed in a safe, secure, and humane manner. All equipment, supplies, and services shall be Service Provider-furnished and in operating condition, except as otherwise noted.

The federal facility, whether expansion or an existing physical plant, shall be operated, and maintained in accordance with all applicable federal laws, regulations, codes, guidelines, and policies.

The federal facility shall provide housing configurations commensurate with the security needs of the population.

6

Attachment 1- PWS                                   70CDCR26D00000026

The federal facility, whether expansion or existing physical plant, shall comply with the building code under which it was permitted at the time of original construction. Any expansion or renovation of the federal facility shall be subject to the existing and applicable building codes at the time of the expansion or renovation.

The federal facility, whether expansion or existing physical plant, shall comply with the requirements in effect at the time of the original federal facility construction of the *Architectural Barriers Act of 1968* as amended and the *Rehabilitation Act of 1973* as amended. The standards for federal facility accessibility by physically handicapped persons as set forth in "Uniform Federal Accessibility Standards/Fed Std. - 795 4/01/88 Edition" (UFAS) shall apply. All areas of the buildings and site shall meet these requirements.

A safety program shall be maintained in compliance with all applicable Federal laws, statutes, regulations, and codes. The Service Provider shall comply with the requirements of the OSHA and all codes and regulations associated with 29 CFR §§ 1910 and 1926 with respect to the Service Provider's employees.

Fire alarm systems and equipment – all fire detection, communication, alarm, annunciation, suppression, and related equipment shall be operated, inspected, maintained, and tested in accordance with the edition of the applicable national electrical code and life safety codes under which the federal facility was permitted at the time of original construction. Any changes to the fire alarm systems or equipment shall be subject to the existing and applicable codes at the time of the changes.

The Service Provider will provide exterior outdoor lighting, which is enough to illuminate the entire facility federal facility and secure perimeter, subject to ICE's visual inspection and approval.

Promptly after the occurrence of any physical damage to the federal facility (including disturbances), the Service Provider will report such damage to the COR and ICE official. It shall be the responsibility of the Service Provider to repair such damage, to rebuild or restore the institution.

Government staff will be on-site to monitor contract performance and manage other government interests associated with the operation of the federal facility. Government staff will have full access to all areas of the federal facility. Service Provider access to the government required space must be pre-approved by the COR. In case of emergency the Service Provider shall notify the COR promptly.

Attachment 1- PWS                                    70CDCR26D00000026

### 5.4. Business Permits and Licenses

The Service Provider shall obtain applicable operating permits and licenses by the date of contract award.. The Service Provider must (depending on the state's requirements) be licensed as a qualified security service company in accordance with the requirements of the district, municipality, county, and state in which the federal facility is located. Throughout the term of this contract, the Service Provider shall maintain current permits/business licenses and make copies available for government inspection. The Service Provider shall comply with all applicable federal, laws and all applicable Occupational Safety and Health Administration (OSHA) standards.

ICE/IHSC will review and approve all design documents and conduct final inspections of the federal facility before occupancy. The Service Provider should also review Attachment 12 – EOIR Design Standards, and Attachment 13 – Contract Detention Federal facility Design Standards, and Structured Cable Plant Standard and comply as applicable. The Service Provider should also review ICE Health Services Design Standards for all administrative and medical space requirements.

### 5.5. ICE Administrative Space

Administrative and support space for ICE staff of approximately 60 employees. Including approximately:

a) 24 Offices – Deportation Officers (DO) (8x8)
b) 4 Offices – Supervisory Detention and Deportation Officers (SDDO) (100 sq ft)
c) 2 Offices – Assistant Field Office Director (AFOD) (100 sq ft)
d) 1 Office – MPA/COR (100 sq ft)
e) 1 Office – DSM (8x8)
f) 1 Office – IT (8x8)
g) 1 Office – Intelligence Officer (8x8)
h) 1 Office – FOD/DFOD drop office (100 sq ft)
i) 1 Office – PIV room (100 sq ft)
j) 2 Offices – Travel (8x8)
k) 1 Secure Contact Window for visitors
l) 1 Waiting Room
m) 1 File room with rolling file shelves
n) 1 Storage Room
o) 1 Supply Room
p) 2 Open areas for Copier/fax/printer/shredder and tables for working with files
q) 8 Workstations – Enforcement and Removal Assistants (ERA) (8x8)
r) 22 workstations – Case Processing Specialists and other visitors assisting ICE (8x8)
s) Employee break room with kitchenette (i.e. small food storage/preparation area including a refrigerator, microwave and sink and garbage disposal at a minimum) - within the ERO area.
t) IT computer support rooms including specialized requirements for climate-controlled IT equipment

Attachment 1- PWS                                    70CDCR26D00000026

u)  Conference room (with video teleconferencing (VTC) capability)
v)  Secure file room – with safes
w)  Male restroom with two stalls, two urinals, and lockers (not used/shared with aliens)
x)  Female restroom with three stalls and lockers (not used/shared with aliens)
y)  Training room – adjacent to or within ICE space
z)  Employee fitness center/weight room that includes male/female showers and lockers in separate rooms – for ERO employees only
aa) Employee firearms lockers that meet NDS standards
bb) Consulate affairs room
cc) Lactation room with running water, refrigerator, and comfortable furniture that is washable. The Service Provider is required to provide an ICE office and support space at or immediately adjacent to the detention federal facility.

All office, administrative, support, and multiple use space shall be complete with appropriate electrical, communication, and phone/fax/VTC connections. VTC connections will use a primary rate interface T1 connection, at a minimum.

All ICE/IHSC administrative, support, and multiple use spaces shall be clean, free from mold, climate controlled, with Heating, Ventilation, and Air Conditioning (HVAC) thermostat located outside a private office (within open space) controlling no more than 1,500 square feet. The ICE administrative space shall be separate from, but accessible to, housing units and the centralized visiting area. The ICE administrative space shall be secure and inaccessible to Service Provider staff, except when specific permission is granted by on-site ICE staff. The Service Provider shall be responsible for all maintenance, security, and janitorial costs associated with the ICE administrative space, to include painting the walls and replacing the carpeting every five years.  All other years, the carpet should be cleaned at least once per year or at the direction of the COR and touch-up painting should be done as needed. All ICE administrative and support space shall be cleaned daily (between the hours of 8 a.m. and 4 p.m.) by government cleared Service Provider janitorial staff. The Service Provider is responsible for coordinating clearance activities for their janitorial staff with the government and for costs associated with clearance. Cleaning services to be performed every day include but are not limited to dusting all surfaces within the open spaces and offices upon request, emptying all trashcans and replacing liners, vacuuming all carpeting, and sweeping and mopping all floors that are not carpeted, cleaning and disinfecting all common touch items such as door handles, countertops, sinks, toilets, and tables.
Stairwells are to be cleaned weekly to include sweeping, mopping, and cleaning the railings.

**5.6.  Additional Requirements for ICE Administrative Office Space**

All furniture and case goods will be furnished by the Service Provider, throughout the length of the contract, and be in good working order with no damage. Any systems furniture, such

9

Attachment 1- PWS                                          70CDCR26D00000026

as cubicles, shall be electrically hardwired to the building electrical support by the Service Provider, and have bottom raceways for data and telecommunications. The systems furniture must have knockouts within the bottom raceways as well as numerous grommets within the work surface. The systems furniture must have some universal requirements for a workspace to include a desk, chair, desk storage, overhead storage (with locking flipper doors) and lighting capacity under the overhead storage. All chairs are to be replaced every 2-3 years or as needed based on condition.  All other case goods should be replaced every 5-7 years or as needed. Cubicles will be standard size with a minimum of 64 usable square feet, unless otherwise authorized by the COR. The government will provide and install IT equipment for government office spaces. The Service Provider is responsible for providing phone/fax/Internet/VTC services and responsible for the costs for such services.

ICE will provide and install IT equipment in office spaces for ICE/IHSC personnel only, including CPUs, screens, printers, fax machines, and copiers.

**5.7.  Office of the Principal Legal Advisor (OPLA) Space**

Administrative and support space for approximately 30 employees.

OPLA Space Requirements – based on a ▮▮▮ bed Correctional Detention Federal facility (if OPLA shall be located or relocated elsewhere in the complex):

Refer to ICE/OPLA Design Standards for specific office and workstation sizes and specific furnishing and utility requirements for a ▮▮▮ bed Contract Detention Federal facility.  All furniture and case goods shall be furnished by the service provider, throughout the life of the contract, in accordance with ICE/OPLA Design Standards.  The standards include but are not limited to the following:

a)  1 - Office – Supervisory Attorney (100 sq ft)
b)  20 - Offices – Attorneys (8x8)
c)  8 - Workstations – Legal Technician workstations (8x8)
d)  2 - Workstations – Mail/File Clerk (8x8)
e)  1 - Conference room/Law Library
f)  1 - Break room
g)  1 - Supply room
h)  1 - Storage/Copier room
i)  1 - Support workstation for fax/scanner/network printer
j)  Separate entrance for OPLA staff is requested with access to the parking lot, which must be ADA compliant
k)  OPLA Support Space must be provided per the ICE/OPLA Design Standards
l)  OPLA space shall be contiguous

Attachment 1- PWS                                                70CDCR26D00000026

**5.8. U.S. Citizenship and Immigration Services (USCIS) Space**

Administrative and support space for approximately 8 employees including approximately 4 offices and 4 workstations. Offices must provide complete privacy (i.e. sound proofing) for asylum officers to conduct interviews.

**5.9. Executive Office for Immigration Review (EOIR) Space**

Refer to ICE/EOIR design standards for specific office and workstation sizes and specific furnishing requirements for a 1,635-bed federal facility. All furniture shall be furnished by the Service Provider in accordance with ICE/EOIR design standards. Support space includes:

a) 5 courtrooms - Each courtroom will have the capability to hold live court as well as via video teleconferencing.
b) 5 Courtroom Sub-Lobbies
c) Secure Judge's corridor
d) Public/detainee secure corridors
e) 5 Judges Chambers (hard walled office) (100 sq ft)
f) 2 Court Administrator offices (8x8)
g) 15 Offices (hard walled) (8x8)
h) 15 Workstations (8x8)
i) 1 Visitation space (pro-bono room) must be provided to meet the ACA and NDS standards
j) EOIR Support Space must be provided per the ICE/EOIR Design Standards
k) EOIR space shall be contiguous

**5.10. Note: A separate, Americans with Disabilities Act (ADA) compliant, entrance for judges and staff is required with complete security system and access to parking lot.**

For further EOIR space requirements, please see *US Department of Homeland Security, US Immigration and Customs Enforcement, Office of Enforcement and Removal Operations, Contract Detention Federal facility and Intergovernmental Service Agreement, Design Standards for Executive Office for Immigration Review, Jun 2011*

For further ICE and OPLA space requirements, please see *Contract Detention Facility (CDF) Design Standards for Immigration and Customs Enforcement (ICE), May 14, 2007; addendums: ICE Cabling Standards; Phone Specifications.*

**5.11. Parking Spaces at the Contracted Detention Federal Facility:**

11

Attachment 1- PWS                                    70CDCR26D00000026

The Contractor shall provide hard surface (concrete or asphalt) parking for all ICE/IHSC employees and visitors at no additional cost. A minimum of 150 secured surface parking spaces on-site at the federal facility exclusively for Government employees and ICE visitors' parking spaces shall be reserved for ICE, USCIS, OPLA, and EOIR. The Contractor must provide ICE/IHSC employee parking on a secure surface (concrete or asphalt) striped parking lot. The ICE/IHSC employee parking area shall be well lit, shall have privacy mesh on the fencing, and shall drain well. The ICE/IHSC employee parking spaces shall be striped and have reserved spaces, all spaces shall be painted at least once per year and as directed by the COR or designated ICE official. The ICE /IHSC employee parking lot shall have an automated entrance and exit gate, operated by the Contractor-provided building access badge system.

The Contractor shall provide an on-site hard surface (concrete or asphalt) parking lot for visitors. Street parking for ICE visitors is not acceptable.

## 6.0   Environmental Health

The Service Provider collaborates with the IHSC Health Service Administrator to implement all general housekeeping, environmental cleaning, and disinfection in areas where medical, dental, mental and behavioral health, and intake medical screening services are provided. This includes routine and terminal cleaning of medical housing and medical isolation units. The Service Provider submits the implementation plan to the ICE COR.

## 7.0   Sanitation and Hygienic Living Conditions

The Service Provider shall comply with the requirements of the OSHA and all codes and regulations associated with 29 CFR 1910 and 1926. The Service Provider shall comply with all applicable ICE, federal laws, statutes, regulations, and codes.

## 8.0   Maintain Institutional Emergency Readiness

The Service Provider shall submit an institutional emergency plan that will be operational prior to the end of the transition period, in accordance with NDS 2025, Standard 1.1 Environmental Health and Safety. The emergency plan shall include provisions for two or more disturbance control teams consisting of at least 12 people on each team. The Service Provider shall provide protective clothing and equipment for each team member and 20 percent of all additional federal facility detention officers shall be maintained in a secure location outside the perimeter of the federal facility. The plan shall receive the concurrence

Attachment 1- PWS                                      70CDCR26D00000026

of the COR prior to implementation and shall not be modified without the further written concurrence of the CO.

The Service Provider shall have written agreements with appropriate state and local authorities that will allow the Service Provider to make requests for assistance in the event of any emergency incident that would adversely affect the community.

Any decision by ICE or other federal agencies to provide and/or direct emergency assistance will be at the discretion of the government. The Service Provider shall reimburse the government for all expenses incurred in providing such assistance.

The Service Provider shall submit to the COR a proposed inventory of intervention equipment (e.g., weapons, munitions, chemical agents) intended for use during the performance of this contract. The COR, prior to the end of the transition period, shall provide a concurrence of the intervention equipment. The approved intervention equipment inventory shall not be modified without prior written concurrence of the CO.

The Service Provider shall obtain the appropriate authority from state or local law enforcement agencies to use force as necessary to maintain the security of the federal facility.

**9.0    Armed Transportation Services**

The Service Provider shall provide all such ground transportation services as may be required to transport aliens securely, in a timely manner, to locations within the Seattle Field Office (AOR) or as directed by the COR and/or designated ICE official.  This includes but is not limited to Tukwila, WA, Ferndale, WA, Yakima, WA, Wenatchee, WA, Spokane, WA, Richland, WA, Portland, OR, Eugene, OR, and Medford, OR.  The Service Provider shall also transport detainees to various appointments. Regular transportation to key sites shall be provided as necessary and additional transportation requirements as requested by the COR and/or designated ICE official. Transportation services requested by the U.S. Marshall's Service (USMS) and Customs and Border Protection (CBP) may be performed on a case-by-case basis.

Transportation will only be provided if it can be completed as part of a normal run; special runs solely for USM or BP will not be allowed. Any USMS or CBP run must also be performed within normal working hours.  When officers are not providing transportation services, the Service Provider shall assign the employees to supplement security duties within the federal facility. However, the primary function of these officers is transportation. Duties performed by these officers shall not incur any additional expenses to the Government.

Attachment 1- PWS                                70CDCR26D00000026

The Service Provider shall assign, at a minimum, t████████ teams of transportation officers whenever necessary throughout a 24-hour period, 7-days a week, including weekends and holidays. The COR shall approve the number of teams assigned to any shift or period to meet the needs of ICE transportation requirements. When transporting detainees of the opposite gender, assigned transportation staff shall call in their time of departure and odometer reading; and then do so again upon arrival, to account for their time. Except in emergency situations, a single transportation staff member may not transport a single detainee of the opposite gender. Further, if there is an expectation that a pat down will occur during transport, an assigned transportation staff member of the same gender as the detainee(s) must be present.

The COR may determine on a case-by-case basis, according to the NDS 2025 on Transportation by Land (considering the distance traveled, the status of detainees transported, number of stops, etc.) that a t████████ team is not necessary for some transportation routes. In all other cases, a minimum of t██ officers shall be assigned, as described above.

The Service Provider shall furnish suitable vehicles in good condition, approved by the Government and in-line with the NDS 2025 requirements, to safely provide the required transportation services per federal facility as listed below. The Service Provider shall comply with all federal laws regarding inspections, licensing, and registration for all vehicles used for transportation. The Service Provider will provide parking spaces for the required vehicles at the federal facility.

The Service Provider may acquire additional vehicles as deemed necessary by the Service Provider at no cost to the Government. The Service Provider shall not allow employees to use their privately-owned vehicles to transport detainees. The Service Provider shall furnish vehicles equipped with interior security features in accordance with NDS 2025. The Service Provider shall provide the interior security specification of the vehicles to ICE for review and approval prior to installation. Vehicles furnished by the Service Provider shall be equipped with interior security features such as, but not limited to door lock controls, window locks, a wire cage with acrylic panel between the driver seat and the rear passenger seats and provide physical separation of detainees from Detention Officers.

Personnel provided for transportation services shall be of the same qualifications, receive the same training, complete the same security clearances, and wear the same uniforms as those Service Provider personnel provided in the other areas of this contract. Transportation officers shall have the required state licenses for commercial drivers with the proper endorsement limited to vehicles with Automatic Transmission and meet the federal and state licensing requirements.

Attachment 1- PWS                                    70CDCR26D00000026

All transportation officers shall be armed in the performance of these duties
.
The Service Provider shall supply and maintain restraining equipment, per NDS 2025 Standard 1.2 "Transportation (by Land)." ICE personnel reserve the right to approve such restraining equipment, as well as the right to inspect such restraining equipment.

The Service Provider shall comply with ICE transportation standards related to the number of hours the Service Provider employee may operate a vehicle. Overnight lodging resulting from transportation services shall be approved in advance by the COR and designated ICE official; overnight lodging expenses shall be billed at rates not to exceed the applicable GSA per diem rates https://www.gsa.gov/travel/plan-book/per-diem-rates. Transportation shall be accomplished in the most economical manner and in accordance with the applicable GSA per diem rates.

The Service Provider shall, upon order of the COR, or upon his or her own decision in an urgent medical situation, transport a detainee to a hospital location. An officer, or officers, shall keep the detainee under constant supervision 24 hours per day until the detainee is ordered released from the hospital, or at the order of the COR. The Service Provider shall then transport the detainee to the detention site.
The COR may direct the Service Provider to transport detainees to unspecified, miscellaneous locations, within a 50-mile radius of the federal facility and other ICE designated locations.

When the COR or ICE designated official provides documents to the Service Provider concerning the detainee(s) to be transported and/or escorted, the Service Provider shall deliver these documents only to the named authorized recipients or his or her designee. The Service Provider shall ensure the material is kept confidential and not viewed by any person other than the authorized recipient.

The Service Provider shall establish a fully operational communication system that has direct and immediate contact with all transportation vehicles and post assignments. Upon demand, the COR shall be provided with the status of all vehicles and post assignment employees.
Failure of the Service Provider to comply fully with the detainee(s) departure as pre-scheduled may result in the Service Provider having deductions made for non-performance. ICE anticipates normal transportation requirements other than hospital visits and local needs. In addition to unspecified or miscellaneous locations, the contract federal facility must support transportation to and from locations as directed by the COR and ICE official. All

15

Attachment 1- PWS                                      70CDCR26D00000026

transportation reports must be submitted to the COR within two business days of trip completion.

Monthly Status Report: The report will include at a minimum the information required for each G-391 for every trip as indicated on the G-391 A breakdown of hours and personnel will also be provided and divided into Transportation Guard Hours and Stationary Guard Hours.  A breakdown of vehicles used (year, model, and capacity) will also be required if the Service Provider is using Service Provider owned vehicles. This information will be available electronically to government users and submitted in addition to the invoice each month.

## 10.0  On-call Guard Services

The Service Provider shall provide on-call guard services as requested by the COR and/or ICE designated official and shall include, but is not limited to, escorting and guarding detainees to medical or doctor appointments; hearings; ICE interviews; and any other remote location requested by the COR and designated ICE official. On-call stationary guard services are for detainees housed at the facility only, and only for locations where facility detainees are temporarily located. Service Provider shall provide sufficient staff to escort detainees within the facility for routine appointments.  Qualified guard personnel employed by the Service Provider under their policies, procedures, and practices will perform such services. The Service Provider agrees to augment such practices as may be requested by ICE to enhance specific requirements for security, detainee monitoring, visitation, and contraband control.

Upon the order of the COR and designated ICE official or in an emergency, the Service Provider shall provide an officer to safeguard the detainee(s) at a medical federal facility while undergoing medical examination or treatment as either inpatient or outpatient care. Such assignments may include but are not restricted to medical appointments of detainees. The detainee shall be kept under constant supervision. Public contact is prohibited unless authorized in advance by the COR.

The numbers and frequency of these services shall vary, but to the extent possible, the COR and ICE designated officials shall notify the Service Provider 48 hours in advance of such need and four hours of a schedule for the remote post to be manned. ▮▮  ▮▮ shall be authorized for such a post unless the COR specifies additional guards are required. For safeguarding of detainees at secured community Long Term Care and Inpatient Behavioral Health Facilities, ▮▮ ▮▮▮ ▮▮ shall be authorized for such posts unless COR specifies additional guards are required

The following notes are applicable to the above posts:

a)  All on-call posts require at least ▮▮  ▮▮ that is of the same sex as the detainee.

Attachment 1- PWS                                            70CDCR26D00000026

b) Additional officers for each post assignment may be required at the direction of the COR and ICE Supervisor when operationally necessary.

c) All necessary meals shall be provided by the Service Provider when the detainees(s) are in custody of the Service Provider.

d) COR shall follow Contract requirements for each on-call post directed.

e) The Service Provider remains responsible for providing security and preventing escapes. The itemized monthly invoice for such on-call guard services shall state the number of hours being billed, the duration of the billing (times and dates to include travel to and from location being guarded) and the names and A-numbers of the detainees who were guarded. Such services shall be denoted as a separate item on submitted invoices. ICE agrees to reimburse the Service Provider for actual on-call guard services provided at the negotiated rate.

**11.0    Notice to Proceed**

It is essential that the Service Provider is fully prepared to accept responsibility for performing the requirements of the contract. Therefore, ICE may perform required assessments to ensure contract compliance prior to issuance of the Notice to Proceed (NTP). If ICE determines that the Service Provider can accept detainees, the NTP will be issued by the Contracting Officer. The Service Provider shall be prepared to begin performance and accept detainees immediately upon issuance of the NTP. Performance may begin with staged capacity or open with full capacity, as stated in the NTP. Performance includes, but is not limited to, preliminary fitness determination and training documentation for an adequate number of federal facility staff. Preliminary fitness determinations may take up to 30 days on average to be adjudicated and depend upon the federal facility providing proper initiation documentation and individuals completing the required application and fingerprints once initiated. If proper initiation documentation and fingerprints are not completed and returned timely, the applicant will be discontinued and will have to start the process again to be considered.

The Service Provider shall submit in writing a Quality Control Plan (QCP) and all other plans, policies, and procedures, including those identified in the NDS 2025 and ACA standards to the COR for review and concurrence prior to issuance of the NTP. Once written concurrence has been granted by the COR, these plans, policies, and procedures shall not be modified without the prior written approval of the COR. The Service Provider's operational and/or corporate policies that do not impact on ICE operations (i.e. policies on employee sick days, vacation days, etc.) do not have to be reviewed or approved by ICE.

17

Attachment 1- PWS                                    70CDCR26D00000026

## 12.0   Federal Facility Security and Control

### 12.1.   Security and Control (General)

The Service Provider shall maintain a copy of federal facility post orders for employee review within the areas of assignment and shall initiate responses to any incidents as outlined in the post orders.
Service Provider employees shall write reports of incidents as outlined in the post orders.

The Service Provider will operate and control all designated points of ingress and egress on the site, such as housing units, courtrooms, medical facilities, and hold rooms. The Service Provider shall inspect all packages in accordance with ICE procedures. The Service Provider shall comply with ICE security plans.

The Service Provider shall adhere to local operating procedures within each federal facility.

The Service Provider shall provide, install, and maintain a building access control system in all ICE and/or DOJ administrative space. The Service Provider shall provide the government with administrative access and oversight role for system. The Service Provider shall comply with ICE security plans.

## 13.0   Alien Rights

The Service Provider will supervise, observe, and protect aliens from sexual abuse, discrimination, corporal punishment, personal injury, property damage, harassment, or violation of aliens' civil rights. The Service Provider shall have a zero-tolerance policy for incidents of sexual abuse or assault.

Aliens have the right to be free from discrimination for any reason, including race, religion, national origin, sex, sexual orientation, sexual presentation, expression, or perception thereof, physical ability, mental ability, or political beliefs.

## 14.0   Unauthorized Access

The Service Provider shall attempt to detect anyone attempting to gain unauthorized access to the site(s) identified in this contract, and notify both ICE and local law enforcement.

18

Attachment 1- PWS                                    70CDCR26D00000026

**15.0   Direct Supervision of Aliens**

The Service Provider will provide supervision of all aliens in all areas, including supervision in medical, housing, and activity areas, to permit detention officers to hear and respond promptly to emergencies. This shall include providing medical housing unit security officer with video surveillance unit to view all patients rooms. The Service Provider shall have direct supervision of each housing unit. This direct supervision position(s) (determined by the COR based on the size of the housing unit) is separate from the housing control post.

The Service Provider shall comply with the requirements applicable to detention facilities contained in Subpart A of the DHS PREA Standards, specifically §115.13, including the development of alien supervision guidelines that are reviewed annually, as outlined in Attachment 10, Prison Rape Elimination Act Regulations.

**16.0   Maintain a Video Surveillance Program**

The Service Provider will ensure video surveillance of hallways, exits, and common areas. Additionally, surveillance systems shall be installed and updated in accordance with the DHS PREA Standards §115.18(b). A qualified individual shall be responsible for monitoring this system inside and outside the building. Considering that the videos will be recordings of residents who may be seeking asylum or other considerations under
U.S. immigration law, the Service Provider is required to maintain the recordings and may not release them to anyone, unless approved by ICE. The Service Provider shall retain recordings for a minimum of 90 days, or for the duration of any investigation as necessary for use by local law enforcement, ICE, or the Service Provider and in accordance with applicable records retention requirements.

**17.0   Detention Management System**

The contractor shall procure, install, and maintain an information system capable of electronically tracking and securely reporting to the ICE system of record in real time:
- Facility census to include encumbered and available bed capacity,
- Detainee movements, and
- All records related to detainee management and housing including but not limited to detainee grievances and requests, detainee housing assignments, detainee classification, medical requests, appointments, segregated housing placements, use of force incidents, and other updates as requested by the COR. The design of this system and contractor policies and activities shall abide by ICE system security and records management requirements including record retention schedules.

19

Attachment 1- PWS                                70CDCR26D00000026

### 18.0    Logbooks

The Service Provider shall be responsible for completion and documentation of the following information in the logbooks, for each shift:

a) Activities that have an impact on the population (e.g., counts, shakedowns, movement, and escorts to and from court).
b) Shift activities (e.g., security checks, meals, recreation, religious services, property lockers, medical visits).
c) Entry and exit of vehicles and individuals other than aliens, ICE staff, or Service Provider staff (e.g., attorneys and other visitors).
d) Fire drills and unusual occurrences.
e) Recreation time.

### 19.0    Reports

The Service Provider shall furnish, daily, a manifest of all aliens currently detained in the federal facility. The manifest shall contain the following information for each alien: "A" File Number (system of numbering supplied by ICE); office received from; name; date of birth; sex; nationality; date of arrival; number of days the alien has been in the federal facility; and type of release, if applicable. The manifest shall be transmitted in a Microsoft Excel format, unless otherwise directed by ICE. The Service Provider shall conduct a daily reconciliation of the ICE detention manifest and the Service Provider manifest to ensure accuracy. Any discrepancies in the reports shall be the responsibility of the Service Provider to immediately rectify and bring to the attention of ICE.

The Service Provider shall provide monthly status reports to the COR and ICE officials. Such reports will include a monthly key indicator report, which indicates the key personnel positions of the federal facility (e.g., position title, name of the employee, vacancies and length of vacancies, dates of service, and additional comments). These monthly reports shall be submitted to the COR and ICE officials by the fifth of each month for the previous month's activities and staffing.

The Service Provider shall prepare required orders, instructions, and reports of accidents, security violations, fires, and bomb threats. The reports shall be maintained on file, concerning all activities in connection with duties and responsibilities for the services performed under this contract. All such records shall be kept using a system with a written policy, which allows the reports to be made available to the government for inspection.

Attachment 1- PWS                                    70CDCR26D00000026

The Service Provider shall, at the request of ICE, prepare any special or other reports, or issue further orders and instructions and may be required in support of work within the scope of this contract. The distribution, format, and time elements for these reports shall be directed by government requirements.

## 20.0    Daily Inspections

Staff will check all bars, locks, windows, walls, floors, ventilation covers, glass panels, access plates, protective screens, doors, lights, and equipment for operational wear and alien tampering. Staff shall also report slippery floor surfaces. This documentation will be made daily in a logbook. Problems discovered during these inspections shall be clearly identified in the documentation.

The Service Provider shall also notify the COR of any abnormalities or problems. The Service Provider shall immediately notify the COR and ICE officials of any physical federal facility damage. Written documentation of any problem areas shall be submitted to the COR by the end of the shift.

## 21.0    Deviation from Prescribed Schedule Assignments

The Service Provider is authorized to deviate from the scheduled assignment when unusual conditions or circumstances so demand, and if prior approval is received from the COR. All deviations shall be recorded in the daily logbook. When the COR is not available, the Service Provider shall notify the ICE official immediately or as soon as is practicably possible.

## 22.0    Suicide Prevention

The Service Provider shall develop and implement a comprehensive suicide prevention and intervention program in accordance with ICE policy and standards. This program shall include staff training and protocols for managing aliens who require placement on suicide watch. This must include security officers documented monitoring every 15 minutes or more frequently if necessary per NDS standards.  Clinical staff must perform welfare checks every 8 hours.

## 23.0    Escapes

The Service Provider shall take all appropriate measures to prevent escapes. The Service

21

Attachment 1- PWS                                    70CDCR26D00000026

Provider shall notify the COR and ICE official immediately if an escape or an attempted escape has occurred. The Service Provider shall provide the COR and ICE officials with a written report prior to the end of the shift. The Service Provider shall be held to the following standards concerning escapes:

a) The Service Provider assumes absolute liability for the escape of any alien in its control.

b) The Service Provider shall provide written policies and procedures regarding the actions to be taken in the event of an escape. This document must include reporting requirements for all contract employees, escorts, supervisors, and management personnel. These procedures will meet with the approval of the COR, be reviewed at least annually, and updated as necessary.

c) Escapes shall be grounds for removing the responsible Service Provider employee(s) from duty if the Service Provider employee(s) is/are determined by the Service Provider or the COR to be negligent, reckless, or intentionally responsible for the escape. Notice of removal shall be provided to the CO.

d) Corrective actions to prevent future escapes or attempted escapes shall be taken immediately and communicated to the COR for approval. A written report of the remedial action shall be due to the COR within 24 hours of an escape or attempted escape.

e) An escape is deemed an egregious incident and subject to the expedited processing of a contract discrepancy report resulting in a deduction or withholding for any applicable standards violations.

**24.0   Evacuation Plan**

The Service Provider shall furnish 24-hour emergency evacuation procedures.

**25.0   Injury, Illness, and Reports**

The Service Provider shall immediately assist employees, aliens, or others on the premises in need of immediate help or those who are injured or ill. Service Provider employees shall provide first aid and CPR when necessary.

Attachment 1- PWS                              70CDCR26D00000026

**26.0   Food Service**

**26.1.   Manage Food Service Program in a Safe and Sanitary Environment**

The Service Provider shall provide aliens with nutritious, adequately varied meals, prepared in a  sanitary manner while identifying, developing, and managing resources to meet the operational needs of the food service program.

The Service Provider shall provide a sack meal for aliens in custody, those who are absent during any meal, planning for departure, or for aliens on certain travel routes (upon order by the ICE COR and/or designated official). Further, the Service Provider will provide alien sack meals as requested by ICE staff. The contents of the sack meals must be approved by COR and ICE official.

At the COR's request, the Service Provider shall provide sack meals for aliens in ICE custody, but not yet on the Service Provider's premises.

**26.2.   Minimum Daily Calories**

The service provider shall follow U.S. Department of Health & Human Services Dietary Guidelines for Americans (www.dietaryguidelines.gov). The menus must be certified as exceeding minimum daily nutritional requirements, meeting or exceeding U.S. recommended daily allowances (RDAs).

**27.0   Health Services**

1      The contractor shall not be responsible for the provision of health care services for ICE detainees at the facility. Such services shall be provided by ICE Health Services Corps (IHSC).

2      The contractor understands the IHSC services as the agent and final health authority on all health-related matters including off-site medical services, and that all health expenditures must be approved and authorized by IHSC.

3      The contractor shall adhere to ICE policies and procedures regarding detainee medical requests. If a detainee requires immediate medical attention, the detention officer shall immediately notify his or her supervisor via radio or telephone. The contractor's supervisor will, in turn, notify the medical provider as well as the COR and/or ICE-designee.

Attachment 1- PWS                                    70CDCR26D00000026

4        The contractor shall develop and implement written policies and procedures that define emergency health care evacuation of detainees from within the facility.

5        The Contractor shall provide adequate space for health services, to include office and support space within the medical clinic, attached ICE health services design standards.

6        The contractor will provide security guards including rovers to cover the medical housing unit (MHU), ambulatory clinic, sick call, pill line times, suicide watch, medical, dental and behavioral appointments.

**Manage a Detainee Death**

The contractor shall comply with NDS 2025, Standard 4.6 Terminal Illness and Death, in the event of a detainee injury or death. In the event of a detainee death, the contractor shall immediately notify the COR or ICE designated official and submit a written report within 24 hours. The contractor shall fingerprint the deceased. Staff members performing the fingerprinting shall date and sign the fingerprint card to ensure that a positive identification has been made and file the card in the detainee's file. Personal property of the deceased shall be inventoried, and release coordinated with ICE to the designated family member, the nearest of kin, or the consular officer of the detainee's country of legal residence.

If death is due to violence, accident surrounded by unusual or questionable circumstances, or is sudden and the deceased has not been under immediate medical supervision, ICE shall notify the coroner of the local jurisdiction to request a review of the case, and if necessary, examination of the body.
ICE shall establish coroner notification procedures outlining such issues as performance of an autopsy, who will perform the autopsy, obtaining state-approved death certificates, and local transportation of the body.

ICE shall ensure the body is turned over to the designated family member, the nearest of kin, or the consular officer of the detainee's country of legal residence.

## 28.0    Employee Health

Employee health files for all Service Providers' employees must be maintained on-site. Health files are maintained in accordance with DHS and ICE Privacy Policies and the Privacy Act of 1974 and contain the following documents:

a)   Initial and annual TB infection screening results.
b)   Vaccination records including results, titers, and Immunization Declination Form(s).
c)   OSHA 301 Incident forms.
d)   Blood borne pathogen exposure documentation.
e)   Respirator medical clearance.
f)   Respirator fit test results; and
g)   Other employee health documents.
The Service Provider may initiate employment of an individual who has initiated the

Attachment 1- PWS                                    70CDCR26D00000026

required vaccines schedule, and the individual hired may begin work on the contract if they meet all subsequent vaccine schedule requirements until fully vaccinated.

All Service Provider personnel must provide documentation regarding the following:
a) History of testing for TB within the last 12 months:
    i. Chest x-ray if employee has a history of latent TB infection (LTBI), treatment history for LTBI or TB disease, if applicable; and
    ii. Additionally, on an annual basis and at own expense, the Service Provider shall provide a current TST or IGRA test result if the employee previously tested negative for LTBI, evaluation for TB symptoms if the employee previously tested positive for LTBI and followed up as appropriate in accordance with CDC guidelines.

b) Recommended Immunizations
   Individuals employed by the Service Provider in a custody or detention environment are at significant risk for acquiring or transmitting Hepatitis B, measles, mumps, rubella, varicella, seasonal influenza, and COVID-19. These diseases are vaccine preventable. Therefore, the following vaccinations are highly recommended for the Service Provider's personnel. If staff decline or refuse any of these recommended vaccines, an Immunization Declination Form is required, and the COR must be notified of the refusal. ICE reserves the right to refuse Service Provider employees that refuse vaccines.

    i. Hepatitis A.
    ii. Hepatitis B; (Note: The U.S. OSHA Bloodborne Pathogens (BBP) Standard requires employers to provide employees at risk of occupational exposure to blood and other potentially infectious material (OPIM) with the Hepatitis B vaccination series. Refer to OSHA regulations  https://www.osha.gov/sites/default/files/publications/bbfact05.pdf
    iii. Varicella.
    iv. Measles, Mumps, Rubella (MMR).
    v. Diphtheria, tetanus, a-cellular pertussis (DTAP); and
    vi. Annual seasonal influenza.
    vii. COVID-19

The Service Provider's personnel will provide immunization documentation or titer results to the Health Services Administrator or the employer's designee for placement in the employee health file. It is recommended that the CDCs Immunization of Health Care Workers: Recommendations of the Advisory Committee on Immunization Practices (ACIP) and the Hospital Infection Control Practices Advisory Committee (HICPAC) be used as a reference for employee health immunization issues.
https://www.osha.gov/law-regs.html
OSHA Publications By Search | Occupational Safety and Health Administration

Attachment 1- PWS                                       70CDCR26D00000026

- eHR Compliance Terms and Conditions

- **Accessibility Requirements (Section 508):** Section 508 of the Rehabilitation Act, as amended by the Workforce Investment Act of 1998 (P.L. 105-220) requires that when Federal agencies develop, procure, maintain, or use electronic and information technology (EIT), they must ensure that it is accessible to people with disabilities. Federal employees and members of the public who have disabilities must have equal access to and use of information and data that is comparable to that enjoyed by non-disabled Federal employees and members of the public.
  All EIT deliverables within this work statement shall comply with the applicable technical and functional performance criteria of Section 508 unless exempt. Specifically, the following applicable EIT accessibility standards have been identified.
  Section 508 Applicable EIT Accessibility Standards:

- 36 CFR 1194.21 Software Applications and Operating Systems applies
  to all EIT software applications and operating systems procured or developed under this work statement including but not limited to government off-the-shelf (GOTS) and COTS software. In addition, this standard is to be applied to Web-based applications when needed to fulfill the functional performance criteria. This standard also applies to some Web based applications as described within 36 CFR 1194.22.

- 36 CFR 1194.22 Web-based Intranet and Internet Information and Applications, applies to all Web-based deliverables, including documentation and reports procured or developed under this work statement. When any Web application uses a dynamic (non-static) interface, embeds custom user control(s), embeds video or multimedia, uses proprietary or technical approaches such as, but not limited to, Flash or Asynchronous JavaScript and XML (AJAX) then 1194.21 Software standards also apply to fulfill functional performance criteria.

- 36 CFR 1194.26 Desktop and Portable Computers, applies to all desktop and portable computers, including but not limited to laptops and personal data assistants (PDA) that are procured or developed under this work statement.

- 36 CFR 1194.31 Functional Performance Criteria applies to all EIT deliverables regardless of delivery method. All EIT deliverable shall use technical standards, regardless of technology, to fulfill the functional performance criteria.

- 36 CFR 1194.41 Information Documentation and Support applies to all documents, reports, as well as help and support services. To ensure that documents and reports fulfill the required 1194.31 Functional Performance Criteria, they shall comply with the technical standard associated with Web-based Intranet and Internet Information and Applications at a minimum. In addition, any help or support provided in this work statement that offers

Attachment 1- PWS                                           70CDCR26D00000026

telephone support, such as, but not limited to, a help desk, shall have the ability to transmit and receive messages using TTY.

**Section 508 Applicable Exceptions:** Exceptions for this statement of work have been determined by DHS and only the exceptions described herein may be applied. Any request for additional exceptions shall be sent to the COR and determination will be made in accordance with DHS MD 4010.2. DHS has identified the following exceptions that may apply: 36 CFR 1194.3(b) Incidental to Contract, all EIT that is exclusively owned and used by the Service Provider to fulfill this work statement does not require compliance with Section 508. This exception does not apply to any EIT deliverable, service or item that will be used by any Federal employee(s) or member(s) of the public. This exception only applies to those Service Providers assigned to fulfill the obligations of this work statement and for the purposes of this requirement, they are not considered members of the public.

**Section 508 Compliance Requirements:** 36 CFR 1194.2(b) (COTS/GOTS products), When procuring a product, each agency shall procure products which comply with the provisions in this part when such products are available in the commercial marketplace or when such products are developed in response to a Government solicitation. Agencies cannot claim a product is not commercially available because no product in the marketplace meets all the standards. If products are commercially available that meet some but not all standards, the agency must procure the product that best meets the standards. When applying this standard, all procurements of EIT shall have documentation of market research that identify a list of products or services that first meet the agency's business needs, and from that list of products or services, an analysis that the selected product met more of the accessibility requirements than the non-selected products as required by FAR 39.2. Any selection of a product or service that meets less accessibility standards due to significant difficulty or expense shall only be permitted under an undue burden claim and requires authorization from the DHS Office of Accessible Systems and Technology (OAST) in accordance with DHS MD 4010.2.

### 29.0.     General Cyber Security Contract Requirements.

#### 29.1.   In accordance with ITAR 4.5.3.1 – Compliance with DHS Security Policy Terms and Conditions.

**Compliance with DHS Security Policy Terms and Conditions:**

All hardware, software, and services provided under this task order must be compliant with *DHS 4300A DHS Sensitive System Program 4300A version 13.3 Feb. 13, 2023, and attachments*.

#### 29.2.   In accordance with ITAR 4.5.3.4 and ITAR 4.5.4.4 – Security Review

**Security Review Terms and Conditions**

Attachment 1- PWS                                    70CDCR26D00000026

The Government may elect to conduct periodic reviews to ensure that the security requirements contained in this contract are being implemented and enforced. The Contractor shall afford ICE, including the organization of ICE Office of the Chief Information Officer, the Office of the Inspector General, authorized Contracting Officer Representative (COR), and other government oversight organizations, access to the Contractor's facilities, installations, operations, documentation, databases and personnel used in the performance of this contract. The Contractor will contact ICE Chief Information Security Officer to coordinate and participate in the review and inspection activity of government oversight organizations external to ICE. Access shall be provided to the extent necessary for the government to carry out a program of inspection, investigation, and audit to safeguard against threats and hazards to the integrity, availability, and confidentiality of ICE data or the function of computer system operated on behalf of ICE, and to preserve evidence of computer crime.

### A.2 In accordance with ITAR 4.5.3.7 – Supply Chain Risk Management

### 29.3.   Supply Chain Risk Management Terms and Conditions

The Contractors supplying the Government hardware and software shall provide the manufacturer's name, address, state and/or domain of registration, and the Data Universal Numbering System (DUNS) number for all components comprising the hardware and software. If subcontractors or subcomponents are used, the name, address, state, and/or domain of registration and DUNs number of those suppliers must also be provided.

Subcontractors are subject to the same general requirements and standards as prime contractors. Contractors employing subcontractors shall perform due diligence to ensure that these standards are met.

The Government shall be notified when a new contractor/subcontractor/service provider is introduced to the supply chain, or when suppliers of parts or subcomponents are changed.

Contractors shall provide, implement, and maintain a Supply Chain Risk Management Plan that addresses internal and external practices and controls employed to minimize the risk posed by counterfeits and vulnerabilities in systems, components, and software.

The Plan shall describe the processes and procedures that will be followed to ensure appropriate supply chain protection of information system resources developed, processed, or used under this contract.

The Supply Chain Risk Management Plan shall address the following elements:
1) How risks from the supply chain will be identified;
2) What processes and security measures will be adopted to manage these risks to the system or system components; and

Attachment 1- PWS                                          70CDCR26D00000026

3) How the risks and associated security measures will be updated and monitored.

The Supply Chain Risk Management Plan shall remain current through the life of the contract or period of performance. The Supply Chain Risk Management Plan shall be provided to the Contracting Officer Representative (COR/CO) 30 days post award.

The Contractor acknowledges the Government's requirement to assess the Contractors Supply Chain Risk posture. The Contractor understands and agrees that the Government retains the right to cancel or terminate the contract, if the Government determines that continuing the contract presents a risk to national security.

The Contractor shall disclose, and the Government will consider, relevant industry standard certifications, recognitions and awards, and acknowledgments.

The Contractor shall provide only new equipment unless otherwise expressly approved, in writing, by the CO. Contractors shall provide only Original Equipment Manufacturer (OEM) parts to the Government. In the event that a shipped OEM part fails, all replacement parts must be OEM parts.

The Contractor shall be excused from using new OEM (i.e. "grey market, "previously used) components only with formal Government approval. Such components shall be procured from their original source and have them shipped only from manufacturers authorized shipment points.

For software products, the contractor shall provide all OEM software updates to correct defects for the life of the product (i.e., until the "end of life"). Software updates and patches must be made available to the government for all products procured under this contract.

Contractors shall employ formal and accountable transit, storage, and delivery procedures (i.e., the possession of the component is documented at all times from initial shipping point to final destination, and every transfer of the component from one custodian to another is fully documented and accountable) for all shipments to fulfill contract obligations with the Government.

All records pertaining to the transit, storage, and delivery will be maintained and available for inspection for the lessor of the term of the contract, the period of performance, or one calendar year from the date the activity occurred.

These records must be readily available for inspection by any agent designated by the U.S. Government as having the authority to examine them.

This transit process shall minimize the number of times en route components undergo a change of custody and make use of tamper-proof or tamper-evident packaging for all shipments. The supplier, at the Government's request, shall be able to provide shipping status

29

Attachment 1- PWS                                    70CDCR26D00000026

at any time during transit.

The Contractor is fully liable for all damage, deterioration, or losses incurred during shipping and handling, unless the damage, deterioration, or loss is due to the Government. The Contractor shall provide a packing slip which shall accompany each container or package with the information identifying the contract number, the order number, a description of the hardware/software enclosed (Manufacturer name, model number, serial number), and the customer point of contact. The contractor shall send a shipping notification to the intended government recipient or contracting officer. This shipping notification shall be sent electronically and will state the contract number, the order number, a description of the hardware/software being ship (manufacturer name, model number, serial number), initial shipper, shipping date and identifying (tracking) number.

**30.0.    In accordance with HSAR Class Deviation 15-01, REV 1, SAFEGUARDING OF CONTROLLED UNCLASSIFIED INFORMATION (JULY 2023) and ALTERNATE 1 (JULY 2023)**

**\*Alternate I of 3052.204-72 SAFEGUARDING OF CONTROLLED UNCLASSIFIED INFORMATION (JULY 2023)**
**3052.204-72   SAFEGUARDING   OF   CONTROLLED   UNCLASSIFIED INFORMATION (JULY 2023)**

(a) *Definitions*. As used in this clause—

*Adequate Security* means security protections commensurate with the risk resulting from the unauthorized access, use, disclosure, disruption, modification, or destruction of information. This includes ensuring that information hosted on behalf of an agency and information systems and applications used by the agency operate effectively and provide appropriate confidentiality, integrity, and availability protections through the application of cost-effective security controls.

*Controlled Unclassified Information (CUI)* is any information the Government creates or possesses, or an entity creates or possesses for or on behalf of the Government (other than classified information) that a law, regulation, or Governmentwide policy requires or permits an agency to handle using safeguarding or dissemination controls.
This definition includes the following CUI categories and subcategories of information:

(1) Chemical-terrorism Vulnerability Information (CVI) as defined in 6 CFR part 27, "Chemical Federal facility Anti-Terrorism Standards," and as further described in supplementary guidance issued by an authorized official of the Department of Homeland

30

Attachment 1- PWS                                    70CDCR26D00000026

Security (including the Revised Procedural Manual "Safeguarding Information Designated as Chemical-Terrorism Vulnerability Information" dated September 2008);

(2) Protected Critical Infrastructure Information (PCII) as set out in the Critical Infrastructure Information Act of 2002 (title XXII, subtitle B of the Homeland Security Act of 2002 as amended through Pub. L. 116–283), PCII's implementing regulations (6 CFR part 29), the PCII Program Procedures Manual, and any supplementary guidance officially communicated by an authorized official of the Department of Homeland Security, the PCII Program Manager, or a PCII Program Manager Designee;

(3) Sensitive Security Information (SSI) as defined in 49 CFR part 1520, "Protection of Sensitive Security Information," as amended, and any supplementary guidance officially communicated by an authorized official of the Department of Homeland Security (including the Assistant Secretary for the Transportation Security Administration or designee), including Department of Homeland Security MD 11056.1, "Sensitive Security Information (SSI)" and, within the Transportation Security Administration, TSA MD 2810.1, "SSI Program";

(4) Homeland Security Agreement Information means information the Department of Homeland Security receives pursuant to an agreement with State, local, Tribal, territorial, or private sector partners that is required to be protected by that agreement. The Department receives this information in furtherance of the missions of the Department, including, but not limited to, support of the Fusion Center Initiative and activities for cyber information sharing consistent with the Cybersecurity Information Sharing Act of 2015;

(5) Homeland Security Enforcement Information means unclassified information of a sensitive nature lawfully created, possessed, or transmitted by the Department of Homeland Security in furtherance of its immigration, customs, and other civil and criminal enforcement missions, the unauthorized disclosure of which could adversely impact the mission of the Department;

(6) International Agreement Information means information the Department of Homeland Security receives that is required to be protected by an information sharing agreement or arrangement with a foreign government, an international organization of governments or any element thereof, an international or foreign public or judicial body, or an international or foreign private or non-governmental organization;

(7) Information Systems Vulnerability Information (ISVI) means:
  i.   Department of Homeland Security information technology (IT) systems data

31

Attachment 1- PWS                                       70CDCR26D00000026

revealing infrastructure used for servers, desktops, and networks; applications name, version, and release; switching, router, and gateway information; interconnections and access methods; and mission or business use/need. Examples of ISVI are systems inventories and enterprise architecture models. Information pertaining to national security systems and eligible for classification under Executive Order 13526 will be classified as appropriate; and/or

ii.   Information regarding developing or current technology, the release of which could hinder the objectives of the Department, compromise a technological advantage or countermeasure, cause a denial of service, or provide an adversary with sufficient information to clone, counterfeit, or circumvent a process or system;

(8)  Operations Security Information means Department of Homeland Security information that could be collected, analyzed, and exploited by a foreign adversary to identify intentions, capabilities, operations, and vulnerabilities that threaten operational security for the missions of the Department;

(9)  Personnel Security Information means information that could result in physical risk to Department of Homeland Security personnel or other individuals whom the Department is responsible for protecting;

(10) Physical Security Information means reviews or reports illustrating or disclosing federal facility infrastructure or security vulnerabilities related to the protection of Federal buildings, grounds, or property. For example, threat assessments, system security plans, contingency plans, risk management plans, business impact analysis studies, and certification and accreditation documentation;

(11) Privacy Information includes both Personally Identifiable Information (PII) and Sensitive Personally Identifiable Information (SPII). PII refers to information that can be used to distinguish or trace an individual's identity, either alone, or when combined with other information that is linked or linkable to a specific individual; and SPII is a subset of PII that if lost, compromised, or disclosed without authorization could result in substantial harm, embarrassment, inconvenience, or unfairness to an individual. To determine whether information is PII, the DHS will perform an assessment of the specific risk that an individual can be identified using the information with other information that is linked or linkable to the individual. In performing this assessment, it is important to
recognize that information that is not PII can become PII whenever additional information becomes available, in any medium or from any source, that would make it possible to identify an individual. Certain data elements are particularly sensitive and may alone present an

Attachment 1- PWS                                    70CDCR26D00000026

increased risk of harm to the individual.

(i)   Examples of stand-alone PII that are particularly sensitive include: Social Security numbers (SSNs), driver's license or State identification numbers, Alien Registration Numbers (A-numbers), financial account numbers, and biometric identifiers.

(ii)   Multiple pieces of information may present an increased risk of harm to the individual when combined, posing an increased risk of harm to the individual. SPII may also consist of any grouping of information that contains an individual's name or other unique identifier plus one or more of the following elements:

(A) Truncated SSN (such as last 4 digits);
(B) Date of birth (month, day, and year);
(C) Citizenship or immigration status;
(D) Ethnic or religious affiliation;
(E) Sexual orientation;
(F) Criminal history;
(G) Medical information; and
(H) System authentication information, such as mother's birth name, account passwords, or personal identification numbers (PINs).

(iii) Other PII that may present an increased risk of harm to the individual depending on its context, such as a list of employees and their performance ratings or an unlisted home address or phone number. The context includes the purpose for which the PII was collected, maintained, and used. This assessment is critical because the same information in different contexts can reveal additional information about the impacted individual.

*Federal information* means information created, collected, processed, maintained, disseminated,
disclosed, or disposed of by or for the Federal Government, in any medium or form.
*Federal information system* means an information system used or operated by an agency or by a
Contractor of an agency or by another organization on behalf of an agency.
*Handling* means any use of controlled unclassified information, including but not limited to marking,
safeguarding, transporting, disseminating, re-using, storing, capturing, and disposing of the information.

*Incident* means an occurrence that—

(1) Actually or imminently jeopardizes, without lawful authority, the integrity, confidentiality, or availability of information or an information system; or

33

(2)  Constitutes a violation or imminent threat of violation of law, security policies, security procedures, or acceptable use policies.

*Information Resources* means information and related resources, such as personnel, equipment, funds,
and information technology.

*Information Security* means protecting information and information systems from unauthorized access,
use, disclosure, disruption, modification, or destruction in order to provide—

(1)  Integrity, which means guarding against improper information modification or destruction, and includes ensuring information nonrepudiation and authenticity;

(2)  Confidentiality, which means preserving authorized restrictions on access and disclosure, including means for protecting personal privacy and proprietary information; and

(3)  Availability, which means ensuring timely and reliable access to and use of information.

(4)  Information System means a discrete set of information resources organized for the collection, processing, maintenance, use, sharing, dissemination, or disposition of information.

(b) *Handling of Controlled Unclassified Information.*

(1)  Contractors and subcontractors must provide adequate security to protect CUI from unauthorized access and disclosure. Adequate security includes compliance with DHS policies and procedures in effect at the time of contract award. These policies and procedures are accessible at *https://www.dhs.gov/dhs-security-and-training-requirements-contractors*.

(2)  The Contractor shall not use or redistribute any CUI handled, collected, processed, stored, or transmitted by the Contractor except as specified in the contract.

(3)  The Contractor shall not maintain SPII in its invoicing, billing, and other recordkeeping systems maintained to support financial or other administrative functions. It is acceptable to maintain in these systems the names, titles, and contact information for the Contracting Officer's Representative (COR) or other government personnel associated with the administration of the contract, as needed.

(4) Any government data provided, developed, or obtained under the contract, or otherwise under the control of the Contractor, shall not become part of the bankruptcy estate in the event a Contractor and/or subcontractor enters bankruptcy proceedings.

(c) *Incident Reporting Requirements.*

(1) Contractors and subcontractors shall report all known or suspected incidents to the Component Security Operations Center (SOC) in accordance with Attachment F, *Incident Response*, to DHS Policy Directive 4300A *Information Technology System Security Program, Sensitive Systems*. If the Component SOC is not available, the Contractor shall report to the DHS Enterprise SOC. Contact information for the DHS Enterprise SOC is accessible at
https://www.dhs.gov/dhs-security-and-training-requirements-contractors. Subcontractors are required to notify the prime Contractor that it has reported a known or suspected incident to the Department. Lower tier subcontractors are required to likewise notify their higher tier subcontractor, until the prime contractor is reached. The Contractor shall also notify the Contracting Officer and COR using the contact information identified in the contract. If the report is made by phone, or the email address for the Contracting Officer or COR is not immediately available, the Contractor shall contact the Contracting Officer and COR immediately after reporting to the Component or DHS Enterprise SOC.

(2) All known or suspected incidents involving PII or SPII shall be reported within 1 hour of discovery. All other incidents shall be reported within 8 hours of discovery.

(3) CUI transmitted via email shall be protected by encryption or transmitted within secure communications systems. CUI shall be transmitted using a *FIPS 140-2/140-3 Security Requirements for Cryptographic Modules* validated cryptographic module identified on https://csrc.nist.gov/projects/cryptographic-module-validation-program/validated-modules. When this is impractical or unavailable, for Federal information systems only, CUI may be transmitted over regular email channels. When using regular email channels, Contractors and subcontractors shall not include any CUI in the subject or body of any email. The CUI shall be included as a password-protected attachment with the password provided under separate cover, including as a separate email. Recipients of CUI information will comply with any email restrictions imposed by the originator.

(4) An incident shall not, by itself, be interpreted as evidence that the Contractor or Subcontractor has failed to provide adequate information security safeguards for CUI or has otherwise failed to meet the requirements of the contract.

(5) If an incident involves PII or SPII, in addition to the incident reporting guidelines in Attachment F, *Incident Response*, to DHS Policy Directive 4300A *Information Technology*

Attachment 1- PWS                                           70CDCR26D00000026

*System Security Program, Sensitive Systems*, Contractors shall also provide as many of the following data elements that are available at the time the incident is reported, with any remaining data elements provided within 24 hours of submission of the initial incident report:

(i) Unique Entity Identifier (UEI);

(ii) Contract numbers affected unless all contracts by the company are affected;

(iii) Federal facility CAGE code if the location of the event is different than the prime Contractor location;

(iv) Point of contact (POC) if different than the POC recorded in the System for Award Management (address, position, telephone, and email);

(v) Contracting Officer POC (address, telephone, and email);

(vi) Contract clearance level;

(vii) Name of subcontractor and CAGE code if this was an incident on a subcontractor network;

(viii) Government programs, platforms, or systems involved;

(ix) Location(s) of incident;

(x) Date and time the incident was discovered;

(xi) Server names where CUI resided at the time of the incident, both at the Contractor and subcontractor level;

(xii) Description of the government PII or SPII contained within the system; and

(xiii) Any additional information relevant to the incident.

(d) *Incident Response Requirements.*

(1) All determinations by the Department related to incidents, including response activities, will be made in writing by the Contracting Officer.

(2) The Contractor shall provide full access and cooperation for all activities determined by the Government to be required to ensure an effective incident response, including providing all requested images, log files, and event information to facilitate rapid resolution of incidents.

(3) Incident response activities determined to be required by the Government may include, but are not limited to, the following:

(i) Inspections;

(ii) Investigations;

(iii) Forensic reviews;

(iv) Data analyses and processing; and

(v) Revocation of the Authority to Operate (ATO), if applicable.

Attachment 1- PWS　　　　　　　　　　　　　　　70CDCR26D00000026

(4)  The Contractor shall immediately preserve and protect images of known affected information systems and all available monitoring/packet capture data. The monitoring/packet capture data shall be retained for at least 180 days from submission of the incident report to allow DHS to request the media or decline interest.

(5)  The Government, at its sole discretion, may obtain assistance from other Federal agencies and/or third-party firms to aid in incident response activities.

(e)  *Certificate of Sanitization of Government and Government-Activity-Related Files and Information.* Upon the conclusion of the contract by expiration, termination, cancellation, or as otherwise indicated in the contract, the Contractor shall return all CUI to DHS and/or destroy it physically and/or logically as identified in the contract unless the contract states that return and/or destruction of CUI is not required. Destruction shall conform to the guidelines for media sanitization contained in NIST SP 800–88, *Guidelines for Media Sanitization*. The Contractor shall certify and confirm the sanitization of all government and government-activity related files and information. The Contractor shall submit the certification to the COR and Contracting Officer following the template provided in NIST SP 800–88, *Guidelines for Media Sanitization*, Appendix G.

(f)  *Other Reporting Requirements.* Incident reporting required by this clause in no way rescinds the Contractor's responsibility for other incident reporting pertaining to its unclassified information systems under other clauses that may apply to its contract(s), or as a result of other applicable statutory or regulatory requirements, or other U.S. Government requirements.

(g)  　　　*Subcontracts.* The Contractor shall insert this clause in all subcontracts and require subcontractors to

include this clause in all lower tier subcontracts when subcontractor employees will have access to CUI; CUI will be collected or maintained on behalf of the agency by a subcontractor; or a subcontractor information system(s) will be used to process, store, or transmit CUI.

**ALTERNATE I (JULY 2023)**

(h)  　　　*Authority to Operate.* The Contractor shall not collect, process, store, or transmit CUI within a Federal information system until an ATO has been granted by the Component or Headquarters CIO, or designee. Once the ATO has been granted by the Government, the Contracting Officer shall incorporate the ATO into the contract as a

37

Attachment 1- PWS                                    70CDCR26D00000026

compliance document. Unless otherwise specified in the ATO letter, the ATO is valid for 3 years. An ATO is granted at the sole discretion of the Government and can be revoked at any time. Contractor receipt of an ATO does not create any contractual right of access or entitlement. The Government's grant of an ATO does not alleviate the Contractor's responsibility to ensure the information system controls are implemented and operating effectively.

(1)            *Complete the Security Authorization process.* The Security Authorization (SA) process shall proceed according to DHS Policy Directive 4300A *Information Technology System Security Program, Sensitive Systems* (Version 13.3, February 13, 2023), or any successor publication; and the *Security Authorization Process Guide*, including templates. These policies and templates are accessible at *https://www.dhs.gov/dhs-security-and-training-requirements-contractors*.

(i)            *Security Authorization Package.* The SA package shall be developed using the government-provided Security Requirements Traceability Matrix and SA templates. The SA package consists of the following: Security Plan, Contingency Plan, Contingency Plan Test Results, Configuration Management Plan, Security Assessment Plan, Security Assessment Report, and Authorization to Operate Letter. Additional documents that may be required include a Plan(s) of Action and Milestones and Interconnection Security Agreement(s). The Contractor shall submit a signed copy of the SA package, validated by an independent third party, to the COR for review and approval by the Component or Headquarters CIO, or designee, at least 30 days prior to the date of operation of the information system. The Government is the final authority on the compliance of the SA package and may limit the number of resubmissions of modified documents.

(ii)            *Independent Assessment.* Contractors shall have an independent third party validate the security and privacy controls in place for the information system(s). The independent third party shall review and analyze the SA package, and report on technical, operational, and management level deficiencies as outlined in NIST SP 800–53, *Security and Privacy Controls for Information Systems and Organizations*, or successor publication, accessible at *https://csrc.nist.gov/publications/sp*. The Contractor shall address all deficiencies before submitting the SA package to the COR for review.

(2)            *Renewal of ATO.* Unless otherwise specified in the ATO letter, the Contractor shall renew the ATO every 3 years. The Contractor is required to update its SA package as part of the ATO renewal process for review and verification of security controls. Review and verification of security controls is independent of the system production date and may include onsite visits that involve physical or logical inspection of the Contractor

38

Attachment 1- PWS                                70CDCR26D00000026

environment to ensure controls are in place. The updated SA package shall be submitted for review and approval by the Component or Headquarters CIO, or designee, at least 90 days before the ATO expiration date. The Contractor shall update its SA package by one of the following methods:

(i)                          Updating the SA package in the DHS Information Assurance Compliance System; or

(ii) Submitting the updated SA package directly to the COR.

(3)                          *Security Review.* The Government may elect to conduct periodic reviews to ensure that the security requirements contained in the contract are being implemented and enforced. The Government, at its sole discretion, may obtain assistance from other Federal agencies and/or third-party firms to aid in security review activities. The Contractor shall afford DHS, the Office of the Inspector General, other government organizations, and Contractors working in support of the Government access to the Contractor's facilities, installations, operations, documentation, databases, networks, systems, and personnel used in the performance of this contract. The Contractor shall, through the Contracting Officer and COR, contact the Component or Headquarters CIO, or designee, to coordinate and participate in review and inspection activity by government organizations external to DHS. Access shall be provided, to the extent necessary as determined by the Government (including providing all requested images), for the Government to carry out a program of inspection, investigation, and audit to safeguard against threats and hazards to the integrity, availability, and confidentiality of government data or the function of computer systems used in performance of this contract and to preserve evidence of computer crime.

(4)                          *Federal Reporting and Continuous Monitoring Requirements.* Contractors operating information systems on behalf of the Government shall comply with Federal reporting and information system continuous monitoring requirements. Reporting requirements are determined by the Government and are defined in the Fiscal Year 2023 DHS Information Security Performance Plan, or successor publication, accessible at *https://www.dhs.gov/dhs-security-and-training-requirements-contractors*.    The  plan  is updated on an annual basis. Annual, quarterly, and monthly data collection will be coordinated by the Government. The Contractor shall provide the Government with all information to fully satisfy Federal reporting requirements for information systems. The Contractor shall provide the COR with requested information within 3 business days of receipt of the request. Unless otherwise specified in the contract, monthly continuous monitoring data shall be stored at the Contractor's location for a period not less than 1 year from the date the data are created. The Government may elect to perform information system continuous monitoring and IT security scanning of information systems from government

Attachment 1- PWS                                    70CDCR26D00000026

tools and infrastructure.

Authority to Operate - Compliance

The service provider shall obtain full authority to operate (ATO) in accordance with DHS Policy Directive 4300A, current revision and in *accordance with 3052.204-72 Safeguarding of Controlled Unclassified Information* of this document. If unable to meet the requirements, the service provider shall provide, within thirty (30) days of award, a Cybersecurity Compliance Plan (CCP) to obtain ATO within six (6) months of the contract effective date, which includes incremental delivery of deliverables and supporting artifacts, as requested. The CCP shall include a completed Authorization Readiness Report to provide overview of the system's cybersecurity posture and current readiness of each deliverable. The service provider shall notify the Contracting Officer (CO) immediately, or as soon as reasonably possible, should the service provider encounter any delay that would necessitate the need to revise the compliance plan. Cybersecurity deliverables and the Authorization Readiness Report are provided in Attachment: "Cybersecurity Deliverables Sensitive Information Systems_HIGH_MOD 05.08.24."


(End of clause)


**31.0.   3052.204-73 NOTIFICATION AND CREDIT MONITORING REQUIREMENTS FOR PERSONALLY IDENTIFIABLE INFORMATION INCIDENTS (JULY 2023)**

(a)        *Definitions.* Privacy Information includes both Personally Identifiable Information (PII) and Sensitive Personally Identifiable Information (SPII). PII refers to information that can be used to distinguish or trace an individual's identity, either alone, or when combined with other information that is linked or linkable to a specific individual; and SPII is a subset of PII that if lost, compromised, or disclosed without authorization could result in substantial harm, embarrassment, inconvenience, or unfairness to an individual. To determine whether information is PII, the DHS will perform an assessment of the specific risk that an individual can be identified using the information with other information that is linked or linkable to the individual. In performing this assessment, it is important to recognize that information that is not PII can become PII whenever additional information becomes available, in any medium or from any source, that would make it possible to identify an individual. Certain data elements are particularly sensitive and may alone present an increased risk of harm to the individual.

(1)                Examples of stand-alone PII that are particularly sensitive include: Social Security numbers (SSNs), driver's license or State identification numbers, Alien

Attachment 1- PWS                                    70CDCR26D00000026

Registration Numbers (A-numbers), financial account numbers, and biometric identifiers.

(2)            Multiple pieces of information may present an increased risk of harm to the individual when combined, posing an increased risk of harm to the individual. SPII may also consist of any grouping of information that contains an individual's name or other unique identifier plus one or more of the following elements:

   (i) Truncated SSN (such as last 4 digits);
  (ii) Date of birth (month, day, and year);
 (iii) Citizenship or immigration status;
 (iv) Ethnic or religious affiliation;
  (v) Sexual orientation;
 (vi) Criminal history;
(vii) Medical information; and
(viii) System authentication information, such as mother's birth name, account passwords, or personal identification numbers (PINs).

(3)            Other PII that may present an increased risk of harm to the individual depending on its context, such as a list of employees and their performance ratings or an unlisted home address or phone number. The context includes the purpose for which the PII was collected, maintained, and used. This assessment is critical because the same information in different contexts can reveal additional information about the impacted individual.

(b) *PII and SPII Notification Requirements.*

(1)            No later than 5 business days after being directed by the Contracting Officer, or as otherwise required by applicable law, the Contractor shall notify any individual whose PII or SPII was either under the control of the Contractor or resided in an information system under control of the Contractor at the time the incident occurred. The method and content of any notification by the Contractor shall be coordinated with, and subject to prior written approval by, the Contracting Officer. The Contractor shall not proceed with notification unless directed in writing by the Contracting Officer.

(2)            All determinations by the Department related to notifications to affected individuals and/or Federal agencies and related services (e.g., credit monitoring) will be made in writing by the Contracting Officer.

(3)            Subject to government analysis of the incident and direction to the Contractor regarding any resulting notification, the notification method may consist of letters to affected individuals sent by first-class mail, electronic means, or general public notice, as approved by the Government. Notification may require the Contractor's use of address

41

Attachment 1- PWS                                    70CDCR26D00000026

verification and/or address location services. At a minimum, the notification shall include:

(i) A brief description of the incident;

(ii) A description of the types of PII or SPII involved;

(iii) A statement as to whether the PII or SPII was encrypted or protected by other means;

(iv) Steps individuals may take to protect themselves;

(v) What the Contractor and/or the Government are doing to investigate the incident, mitigate the incident, and protect against any future incidents; and

(vi) Information identifying who individuals may contact for additional information.

(c) *Credit Monitoring Requirements.* The Contracting Officer may direct the Contractor to:

(1) Provide notification to affected individuals as described in paragraph (b).

(2) Provide credit monitoring services to individuals whose PII or SPII was under the control of the Contractor or resided in the information system at the time of the incident for a period beginning the date of the incident and extending not less than 18 months from the date the individual is notified. Credit monitoring services shall be provided from a company with which the Contractor has no affiliation. At a minimum, credit monitoring services shall include:

(i) Triple credit bureau monitoring;

(ii) Daily customer service;

(iii) Alerts provided to the individual for changes and fraud; and

(iv) Assistance to the individual with enrollment in the services and the use of fraud alerts.

(3) Establish a dedicated call center. Call center services shall include:

(i) A dedicated telephone number to contact customer service within a fixed period;

(ii) Information necessary for registrants/enrollees to access credit reports and credit scores;

(iii) Weekly reports on call center volume, issue escalation (i.e., those calls that cannot be handled by call center staff and must be resolved by call center management or DHS, as appropriate), and other key metrics;

(iv) Escalation of calls that cannot be handled by call center staff to call center management or DHS, as appropriate;

Attachment 1- PWS                               70CDCR26D00000026

(v)                    Customized Frequently Asked Questions, approved in writing by the Contracting Officer in coordination with the Component or Headquarters Privacy Officer; and

(vi)                    Information for registrants to contact customer service representatives and fraud resolution representatives for credit monitoring assistance.

(End of clause).

**CONTRACTOR EMPLOYEE ACCESS (JULY 2023)**

(a)        *Controlled Unclassified Information (CUI)* is any information the Government creates or possesses, or an entity creates or possesses for or on behalf of the Government (other than classified information) that a law, regulation, or Governmentwide policy requires or permits an agency to handle using safeguarding or dissemination controls. This definition includes the following CUI categories and subcategories of information:

(1)        Chemical-terrorism Vulnerability Information (CVI) as defined in 6 CFR part 27, "Chemical Facility Anti-Terrorism Standards," and as further described in supplementary guidance issued by an authorized official of the Department of Homeland Security (including the Revised Procedural Manual "Safeguarding Information Designated as Chemical-Terrorism Vulnerability Information" dated September 2008);

(2)        Protected Critical Infrastructure Information (PCII) as set out in the Critical Infrastructure Information Act of 2002 (title XXII, subtitle B of the Homeland Security Act of 2002 as amended through Pub. L. 116–283), PCII's implementing regulations (6 CFR part 29), the PCII Program Procedures Manual, and any supplementary guidance officially communicated by an authorized official of the Department of Homeland Security, the PCII Program Manager, or a PCII Program Manager Designee;

(3)        Sensitive Security Information (SSI) as defined in 49 CFR part 1520, "Protection of Sensitive Security Information," as amended, and any supplementary guidance officially communicated by an authorized official of the Department of Homeland Security (including the Assistant Secretary for the Transportation Security Administration or designee), including Department of Homeland Security MD 11056.1, "Sensitive Security Information (SSI)" and, within the Transportation Security Administration, TSA MD 2810.1, "SSI Program";

(4)        Homeland Security Agreement Information means information the Department of Homeland Security receives pursuant to an agreement with State, local, Tribal, territorial, or private sector partners that is required to be protected by that agreement.

Attachment 1- PWS                                              70CDCR26D00000026

The Department receives this information in furtherance of the missions of the Department, including, but not limited to, support of the Fusion Center Initiative and activities for cyber information sharing consistent with the Cybersecurity Information Sharing Act of 2015;

(5)         Homeland Security Enforcement Information means unclassified information of a sensitive nature lawfully created, possessed, or transmitted by the Department of Homeland Security in furtherance of its immigration, customs, and other civil and criminal enforcement missions, the unauthorized disclosure of which could adversely impact the mission of the Department;

(6)         International Agreement Information means information the Department of Homeland Security receives that is required to be protected by an information sharing agreement or arrangement with a foreign government, an international organization of governments or any element thereof, an international or foreign public or judicial body, or an international or foreign private or non-governmental organization;

(7) Information Systems Vulnerability Information (ISVI) means:

(i)         Department of Homeland Security information technology (IT) systems data revealing infrastructure used for servers, desktops, and networks; applications name, version, and release; switching, router, and gateway information; interconnections and access methods; and mission or business use/need. Examples of ISVI are systems inventories and enterprise architecture models. Information pertaining to national security systems and eligible for classification under Executive Order 13526 will be classified as appropriate; and/or

(ii)        Information regarding developing or current technology, the release of which could hinder the objectives of the Department, compromise a technological advantage or countermeasure, cause a denial of service, or provide an adversary with sufficient information to clone, counterfeit, or circumvent a process or system;

(8)         Operations Security Information means Department of Homeland Security information that could be collected, analyzed, and exploited by a foreign adversary to identify intentions, capabilities, operations, and vulnerabilities that threaten operational security for the missions of the Department;

(9)         Personnel Security Information means information that could result in physical risk to Department of Homeland Security personnel or other individuals whom the Department is responsible for protecting;

(10)        Physical Security Information means reviews or reports illustrating or

44

Attachment 1- PWS                                  70CDCR26D00000026

disclosing federal facility infrastructure or security vulnerabilities related to the protection of Federal

buildings, grounds, or property. For example, threat assessments, system security plans, contingency plans, risk management plans, business impact analysis studies, and certification and accreditation documentation;

(11)        Privacy Information includes both Personally Identifiable Information (PII) and Sensitive Personally Identifiable Information (SPII). PII refers to information that can be used to distinguish or trace an individual's identity, either alone, or when combined with other information that is linked or linkable to a specific individual; and SPII is a subset of PII that if lost, compromised, or disclosed without authorization could result in substantial harm, embarrassment, inconvenience, or unfairness to an individual. To determine whether information is PII, DHS will perform an assessment of the specific risk that an individual can be identified using the information with other information that is linked or linkable to the individual. In performing this assessment, it is important to recognize that information that is not PII can become PII whenever additional information becomes available, in any medium or from any source, that would make it possible to identify an individual. Certain data elements are particularly sensitive and may alone present an increased risk of harm to the individual.

(i)        Examples of stand-alone PII that are particularly sensitive include: Social Security numbers (SSNs), driver's license or State identification numbers, Alien Registration Numbers (A-numbers), financial account numbers, and biometric identifiers.

(ii)        Multiple pieces of information may present an increased risk of harm to the individual when combined, posing an increased risk of harm to the individual. SPII may also consist of any grouping of information that contains an individual's name or other unique identifier plus one or more of the following elements:

(A) Truncated SSN (such as last 4 digits);
(B) Date of birth (month, day, and year);
(C) Citizenship or immigration status;
(D) Ethnic or religious affiliation;
(E) Sexual orientation;
(F) Criminal history;
(G) Medical information; and
(H)        System authentication information, such as mother's birth name, account passwords, or personal identification numbers (PINs).
(iii)        Other PII that may present an increased risk of harm to the

45

Attachment 1- PWS                                    70CDCR26D00000026

individual depending on its context, such as a list of employees and their performance ratings or an unlisted home address or phone number. The context includes the purpose for which the PII was collected, maintained, and used. This assessment is critical because the same information in different contexts can reveal additional information about the impacted individual.

(b)        *Information Resources* means information and related resources, such as personnel, equipment, funds, and information technology.

(c)        Contractor employees working on this contract must complete such forms as may be necessary for security or other reasons, including the conduct of background investigations to determine suitability. Completed forms shall be submitted as directed by the Contracting Officer. Upon the Contracting Officer's request, the Contractor's employees shall be fingerprinted or subject to other investigations as required. All Contractor employees requiring recurring access to government facilities or access to CUI or information resources are required to have a favorably adjudicated background investigation prior to commencing work on this contract unless this requirement is waived under Departmental procedures.

(d)        The Contracting Officer may require the Contractor to prohibit individuals from working on the contract if the Government deems their initial or continued employment contrary to the public interest for any reason, including, but not limited to, carelessness, insubordination, incompetence, or security concerns.

(e)        Work under this contract may involve access to CUI. The Contractor shall access and use CUI only for the purpose of furnishing advice or assistance directly to the Government in support of the Government's activities, and shall not disclose, orally or in writing, CUI for any other purpose to any person unless authorized in writing by the Contracting Officer. For those Contractor employees authorized to access CUI, the Contractor shall ensure that these persons receive initial and refresher training concerning the protection and disclosure of CUI. Initial training shall be completed within 60 days of contract award and refresher training shall be completed every 2 years thereafter.

(f)        The Contractor shall include this clause in all subcontracts at any tier where the subcontractor may have access to government facilities, CUI, or information resources.

(End of clause)

46

Attachment 1- PWS                                      70CDCR26D00000026

**ALTERNATE I (JULY 2023)**

(g)        Before receiving access to information resources under this contract, the individual must complete a security briefing; additional training for specific categories of CUI, if identified in the contract; and any nondisclosure agreement furnished by DHS. The Contracting Officer's Representative (COR) will arrange the security briefing and any additional training required for specific categories of CUI.

(h)        The Contractor shall have access only to those areas of DHS information resources explicitly stated in this contract or approved by the COR in writing as necessary for performance of the work under this contract. Any attempts by Contractor personnel to gain access to any information resources not expressly authorized by the terms and conditions in this contract, or as approved in writing by the COR, are strictly prohibited. In the event of violation of this provision, DHS will take appropriate actions with regard to the contract and the individual(s) involved.

(i)        Contractor access to DHS networks from a remote location is a temporary privilege for mutual convenience while the Contractor performs business for DHS. It is not a right, a guarantee of access, a condition of the contract, or government-furnished equipment (GFE).

(j)        Contractor access will be terminated for unauthorized use. The Contractor agrees to hold and save DHS harmless from any unauthorized use and agrees not to request additional time or money under the contract for any delays resulting from unauthorized use or access.

(k)        Non-U.S. citizens shall not be authorized to access or assist in the development, operation, management, or maintenance of Department IT systems under the contract, unless a waiver has been granted by the Head of the Component or designee, with the concurrence of both the Department's Chief Security Officer (CSO) and the Chief Information Officer (CIO) or their designees. Within DHS Headquarters, the waiver may be granted only with the approval of both the CSO and the CIO or their designees. In order for a waiver to be granted:

(1)        There must be a compelling reason for using this individual as opposed to a U.S. citizen; and

(2) The waiver must be in the best interest of the Government.

(3)        Contractors shall identify in their proposals the names and citizenship of all non-U.S. citizens proposed to work under the contract. Any additions or deletions of non-

47

Attachment 1- PWS                                    70CDCR26D00000026

U.S. citizens after contract award shall also be reported to the Contracting Officer.
(End of clause)

**32.0.    A.9    DHS FAR Class Deviation 17-03 – Revision 1**

**52.224-3 Privacy Training – Alternate I (DEVIATION)**

(a)        *Definition.* As used in this clause, personally identifiable information means information that can be
used to distinguish or trace an individual's identity, either alone or when combined with other information that is linked or linkable to a specific individual. (See Office of Management and Budget
(OMB) Circular A–130, Managing Federal Information as a Strategic Resource).

(b)        The Contractor shall ensure that initial privacy training, and annual privacy training, thereafter, is
completed by contractor employees who—

(1) Have access to a system of records;

(2)                        Create, collect, use, process, store, maintain, disseminate, disclose, dispose, or otherwise handle personally identifiable information on behalf of an agency; or

(3)                        Design, develop, maintain, or operate a system of records (see also FAR subpart 24.1 and 39.105).

(c)        The contracting agency will provide initial privacy training, and annual privacy training thereafter, to Contractor employees for the duration of this contract. Contractor employees shall satisfy this requirement by completing *Privacy at DHS: Protecting Personal Information* accessible at *http://www.dhs.gov/dhs-security-and-training-requirements-contractors*. Training shall be completed within 30 days of contract award and be completed on an annual basis thereafter not later than October 31st of each year.

(d)        The Contractor shall maintain and, upon request, provide documentation of completion of privacy
training to the Contracting Officer.

(e)        The Contractor shall not allow any employee access to a system of records, or permit any employee to create, collect, use, process, store, maintain, disseminate,

48

Attachment 1- PWS                                        70CDCR26D00000026

disclose, dispose or otherwise handle personally identifiable information, or to design, develop, maintain, or operate a system of records unless the employee has completed privacy training, as required by this clause.

(f)       The substance of this clause, including this paragraph (f), shall be included in all subcontracts under this contract, when subcontractor employees will—

(1) Have access to a system of records;

(2)  Create, collect, use, process, store, maintain, disseminate, disclose, dispose, or otherwise handle personally identifiable information; or

(3) Design, develop, maintain, or operate a system of records.

**33.0.       Cloud Services Contract Requirements**

**B.1  In accordance with ITAR 4.5.3.2 – Encryption Compliance**

**Encryption Compliance Terms and Conditions**

If encryption is required, the following methods are acceptable for encrypting sensitive information:

A) FIPS 197 (Advanced Encryption Standard (AES)) 256 algorithm and cryptographic modules that have been validated under FIPS 140-2.
B) National Security Agency (NSA) Type 2 or Type 1 encryption.
C) Public Key Infrastructure (PKI) (see paragraph 5.5.2.1 of the *Department of Homeland Security (DHS) IT Security Program Handbook (DHS Management Directive (MD) 4300A) for Sensitive Systems*).

**B.2  In accordance with ITAR 4.5.3.5 and ITAR 4.5.4.5 – Interconnection Security Agreement (ISA)**

**ISA Terms and Conditions**
Interconnections between DHS/ICE and non-DHS/ICE IT systems shall be established only through controlled interfaces and via approved service providers. The controlled interfaces shall be authorized at the highest security level of information on the network. Connections with other Federal agencies shall be documented based on interagency agreements; memoranda of understanding, service level agreements or interconnection security agreements.

Attachment 1- PWS                              70CDCR26D00000026

**B.3  In accordance with ITAR 4.5.3.6 and ITAR 4.5.4.6 – Required Protections for DHS/ICE Systems Hosted in Non-DHS/ICE Data Centers**

**1)  Security Authorization Terms and Conditions**

A Security Authorization of any infrastructure directly in support of DHS/ICE information system shall be performed as a general support system (GSS) prior to DHS/ICE occupancy to characterize the network, identify threats, identify vulnerabilities, analyze existing and planned security controls, determine likelihood of threat, analyze impact, determine risk, recommend controls, perform remediation on identified deficiencies, and document the results. The Security Authorization (SA) shall be performed in accordance with DHS/ICE Security Policy and the controls provided by the hosting provider shall be equal to or stronger than the FIPS 199 security categorization of DHS/ICE information system.

At the beginning of the contract, and upon request thereafter (generally at the deployment of a new system or renewal of a System Authority to Operate), the contractor/Cloud Service Provider (CSP) shall provide the results of an independent assessment and verification of security controls. The independent assessment and verification shall apply the same standards that DHS/ICE applies in the SA process of its information systems. Any deficiencies noted during this assessment shall be provided to the COR for entry into DHS/ICE POA&M Management Process. ICE shall use DHS' POA&M process to document planned remedial actions to address any deficiencies in information security policies, procedures, and practices, and the completion of those activities. Security deficiencies shall be corrected within the timeframes dictated by DHS/ICE POA&M Management Process. CSP procedures shall be subject to periodic, unannounced assessments by DHS/ICE officials. The documented physical aspects associated with CSP activities shall also be subject to such assessments. Inspections of CSP physical facilities will be scheduled in advance and coordinated with the provider in accordance with their federal facility procedures. On a periodic basis, DHS and its Components, including DHS Office of Inspector General, may choose to evaluate any or all of the security controls implemented by the contractor under these clauses. Evaluation could include, but is not limited to vulnerability scanning. The DHS and its Components reserve the right to conduct audits at their discretion. With ten working days' notice, at the request of the Government, the CSP and reseller shall fully cooperate and facilitate in a Government-sponsored security control assessment at each location wherein DHS/ICE information is processed or stored, or information systems are developed, operated, maintained, or used on behalf of DHS/ICE, including those initiated by the Office of the Inspector General.

The government may conduct a security control assessment on shorter notice (to include unannounced assessments) determined by DHS/ICE in the event of a security incident.

**2)  Enterprise Security Architecture Terms and Conditions**

The CSP shall utilize and adhere to DHS/ICE Enterprise Security Architecture in accordance

Attachment 1- PWS                                    70CDCR26D00000026

with applicable laws and DHS/ICE policies to the satisfaction of DHS/ICE COR.

3) **Continuous Monitoring Terms and Conditions**
   The CSP shall participate in the DHS/ICE Continuous Monitoring methodologies and, shall provide a Continuous Monitoring capability over their resources as required by FedRAMP. The DHS Chief Information Security Officer (CISO) issues annual updates to its Continuous Monitoring requirements via the Annual Information Security Performance Plan. At a minimum, the CSP shall adhere to all ITAR and FedRAMP continuous monitoring requirements and ensure that DHS/ICE can implement and integrate the following processes:

   A) Asset Management
   B) Vulnerability Management
   C) Configuration Management
   D) Malware Management
   E) Log Integration
   F) Security Information Event Management (SIEM) Integration
   G) Patch Management
   H) Providing near-real-time security status information to DHS/ICE SOC Specific Protections Terms and Conditions
   i) Specific protections that shall be provided by the CSP include, but are not limited to the following:
   Specific Operations Terms and Conditions
   The Contractor shall operate a SOC to provide security for the below mentioned services. The CSP shall support regular reviews with DHS/ICE Information Security Office to coordinate and synchronize the security posture of the CSP hosting federal facility with that of DHS Data Centers. The SOC personnel shall provide 24x7x365 staff to monitor the network and all of its devices. The CSP staff shall also analyze the information generated by the devices for security events, respond to real-time events, correlate security device events, and perform continuous monitoring. It is recommended that the CSP staff shall also maintain a trouble ticket system in which incidents and outages are recorded. In the event of an incident, the CSP federal facility SOC shall adhere to the incident response plan.

4) **Computer Incident Response Services Terms and Conditions**
   The CSP shall provide Computer Incident Response Team (CIRT) services. The CSP shall adhere to the standard Incident Reporting process as determined by the Component and is defined by a DHS/ICE-specific incident response plan that adheres to DHS/ICE policy and procedure for reporting incidents. The CSP shall conduct Incident Response Exercises to ensure all personnel are familiar with the plan. The CSP shall notify DHS/ICE SOC of any incident in accordance with the Incident Response Plan and work with DHS/ICE throughout the incident duration.

Attachment 1- PWS                                   70CDCR26D00000026

5) **Network Intrusion Detection Systems (NIDS) and Monitoring Terms and Conditions**
The Contractor shall provide the design, configuration, implementation, and maintenance of the sensors and hardware that are required to support the NIDS solution. The contractor is responsible for creating and maintaining the NIDS rule sets for their federal facility(s). The NIDS solution should provide real-time alerts. These alerts and other relevant information shall be located in a central repository. The NIDS shall operate 24x7x365. A summary of alerts shall be made available to DHS/ICE upon request. If an abnormality or anomaly is identified, the contractor shall notify the appropriate DHS/ICE point of contact in accordance with the incident response plan.

6) **Physical and Information Security and Monitoring Terms and Conditions**
The CSP shall provide a federal facility using appropriate protective measures to provide for physical security. All facilities will be located within the United States. The CSP shall maintain a process to control physical access to all DHS/ICE IT assets. DHS/ICE IT Assets shall be monitored 24x7x365. A summary of unauthorized access attempts shall be reported to the appropriate DHS/ICE security office upon request.

7) **Vulnerability Assessments Terms and Conditions**
The CSP and reseller shall provide all information from any managed device to DHS/ICE, as requested, and shall assist, as needed, to perform periodic vulnerability assessments of the network, operating systems, and applications to identify vulnerabilities and propose mitigations. Vulnerability assessments shall be included as part of compliance with the continuous monitoring of the system.

8) **Anti-malware (e.g., virus, spam) Terms and Conditions**
The CSP shall design, implement, monitor, and manage to provide comprehensive anti-malware service. The CSP shall provide all maintenance for the system providing the anti-malware capabilities to include configuration, definition updates, when changes are required. A summary of alerts shall be reported to DHS/ICE SOC in weekly status report. If an abnormality or anomaly is identified, the CSP shall notify the appropriate DHS/ICE point of contact in accordance with the incident response plan.

9) **Log Retention Terms and Conditions**
Log files for all infrastructure devices, physical access, and anti-malware should be retained online for 180 days and offline for three years.

Attachment 1- PWS                                   70CDCR26D00000026

**B.4  In accordance with ITAR 4.5.3.8 – Personal Identification Verification (PIV) Credential Compliance Personal Identification Verification (PIV) Credential Compliance Terms and Conditions**

A) Procurements for products, systems, services, hardware, or software involving controlled federal facility or information system shall be PIV-enabled by accepting HSPD-12 PIV credentials as a method of identity verification and authentication.

B) Procurements for software products or software developments shall be compliant by accepting PIV credentials as the common means of authentication for access for federal employees and contractors.

C) PIV-enabled information systems must demonstrate that they can correctly work with PIV credentials by responding to the cryptographic challenge in the authentication protocol before granting access.

D) If a system is identified to be non-compliant with HSPD-12 for PIV credential enablement, a remediation plan for achieving HSPD-12 compliance shall be required for review, evaluation, and approval by the CISO.

**B.5  In accordance with FedRAMP**

*Note: The following requirements/clauses apply to both **CUI and CLASSIFIED REQUESTS**.*

### 1)  FedRAMP IT Systems Security Requirements

A) The Federal agency will determine the security category for the cloud system in accordance with Federal Information Processing Standard 199; then, the contractor/Cloud Service Provider (CSP) shall apply the appropriate set of impact baseline controls as required in the FedRAMP Cloud Computing Security Requirements Baseline document to ensure compliance to security standards. The FedRAMP baseline controls are based on the National Institute of Standards and Technology (NIST) Special Publication (SP) 800-53, Revision 5.1.1, Security and Privacy Controls for Federal Information Systems and Organizations (as amended) and also includes a set of additional controls for use within systems providing cloud services to the federal government.

B) The CSP shall maintain a security management continuous monitoring environment that meets or exceeds the requirements outlined in the latest edition of FedRAMP Cloud Computing Security Requirements Baseline and FedRAMP Continuous Monitoring Requirements.

Attachment 1- PWS                                    70CDCR26D00000026

## 2) FedRAMP Privacy Requirements

Contractor shall be responsible for the following privacy and security safeguards:

A) To the extent required to carry out the FedRAMP assessment and authorization process and FedRAMP continuous monitoring, to safeguard against threats and hazards to the security, integrity, and confidentiality of any non-public Government data collected and stored by the Contractor, the Contractor shall afford the Government access to the Contractor's facilities, installations, technical capabilities, operations, documentation, records, and databases.

B) If new or unanticipated threats or hazards are discovered by either the Government or the Contractor, or if existing safeguards have ceased to function, the discoverer shall immediately bring the situation to the attention of the other party.

C) The contractor shall also comply with any additional FedRAMP privacy requirements.

D) The Government has the right to perform manual or automated audits, scans, reviews, or other inspections of the vendor's IT environment being used to provide or facilitate services for the Government. In accordance with the Federal Acquisitions Regulations (FAR) clause 52.239-1, contractor shall be responsible for the following privacy and security safeguards:

- The Contractor shall not publish or disclose in any manner, without the CO's written consent, the details of any safeguards either designed or developed by the Contractor under this contract or otherwise provided by the Government. Exception—Disclosure to a Consumer Agency for purposes of C&A verification.

- To the extent required to carry out a program of inspection to safeguard against threats and hazards to the security, integrity, and confidentiality of Government data, the Contractor shall afford the Government access to the Contractor's facilities, installations, technical capabilities, operations, documentation, records, and databases within 72 hours. The program of inspection shall include, but is not limited to: Authenticated and unauthenticated operating system/network vulnerability scans Authenticated and unauthenticated we b application vulnerability scans Authenticated and unauthenticated database application vulnerability scans Automated scans can be performed by Government personnel, or agents acting on behalf of the Government, using Government operated equipment, and Government specified tools.

- If new or unanticipated threats or hazards are discovered by either the Government or the Contractor, or if existing safeguards have ceased to function, the discoverer shall immediately bring the situation to the attention of the other party.

- If the vendor chooses to run its own automated scans or audits, results from these scans may, at the Government's discretion, be accepted in lieu of Government performed vulnerability scans. In these cases, scanning tools and their configuration shall be approved by the Government. In addition, the results of vendor-conducted scans shall be provided, in full, to the Government.

Attachment 1- PWS                                        70CDCR26D00000026

### 3)  Sensitive Information Storage

Sensitive But Unclassified (CUI) information, data, and/or equipment will only be disclosed to authorize personnel on a need-to-know basis. The contractor shall ensure that appropriate administrative, technical, and physical safeguards are established to ensure the security and confidentiality of this information, data, and/or equipment is properly protected. When no longer required, this information, data, and/or equipment will be returned to Government control, destroyed, or held until otherwise directed. Destruction of items shall be accomplished by following NIST SP 800-88, Guidelines for Media Sanitization.

The disposition of all data will be at the written direction of the COR, this may include documents returned to Government control; destroyed; or held as specified until otherwise directed. Items returned to the Government shall be hand carried or sent by certified mail to the COR.

### 4)  Protection of Information

The contractor shall be responsible for properly protecting all information used, gathered, or developed because of work under this contract. The contractor shall also protect all Government data, equipment, etc. by treating the information as sensitive. All information about the systems gathered or created under this contract should be considered as CUI information. It is anticipated that this information will be gathered, created, and stored within the primary work location. If contractor personnel must remove any information from the primary work area they should protect it to the same extent they would their proprietary data and/or company trade secrets. The use of any information that is subject to the Privacy Act will be utilized in full accordance with all rules of conduct as applicable to Privacy Act Information.

The government will retain unrestricted rights to government data. The government retains ownership of any user created/loaded data and applications hosted on vendor's infrastructure, as well as maintains the right to request full copies of these at any time.

The data that is processed and stored by the various applications within the network infrastructure contains financial data as well as personally identifiable information (PII). This data and PII shall be protected against unauthorized access, disclosure or

modification, theft, or destruction. The contractor shall ensure that the facilities that house the network infrastructure are physically secure.

The government-owned data must be available to the Government upon request within one business day or within the timeframe specified otherwise and shall not be used for any other purpose other than that specified herein. The contractor shall provide requested data at no additional cost to the government.

No data shall be released by the Contractor without the consent of the Government in writing.

Attachment 1- PWS                                    70CDCR26D00000026

All requests for release must be submitted in writing to the COR/CO.

### 5)  Security Classification

The preparation of the deliverables in this contract will be completed at a Sensitive but Unclassified level unless a higher level is specified.

### 6)  Confidentiality and Nondisclosure

The preliminary and final deliverables and all associated working papers and other material deemed relevant by the agency that have been generated by the contractor in the performance of this contract, are the property of the U.S. Government, and must be submitted to the COR at the conclusion of the contract. The U.S. Government has  unlimited data rights to all deliverables and associated working papers and materials in accordance with FAR 52.227- All documents produced for this project are the property of the U.S. Government and cannot be reproduced or retained by the contractor. All appropriate project documentation will be given to the agency during and at the end of this contract. The contractor shall not release any information without the written consent of the CO.

Personnel working on any of the described tasks may, at Government request, be required to sign formal non-disclosure and/or conflict of interest agreements to guarantee the protection and integrity of Government information and documents.

7) information made available to the Contractor by the Government shall be used only for carrying out the provisions of this contract and shall not be divulged or made known in any manner to any persons except as may be necessary in the performance of the contract. In performance of this contract, the Contractor assumes responsibility for protection of the confidentiality of Government records and shall ensure that all work performed by its subcontractors shall be under the supervision of the Contractor or the Contractor's responsible employees. Each officer or employee of the Contractor or any of its subcontractors to whom any Government record may be made available or disclosed shall be notified in writing by the Contractor that information disclosed to such officer or employee can be used only for that purpose and to the extent authorized herein. Further disclosure of any such information, by any means, for a purpose or to an

extent unauthorized herein, may subject the offender to criminal sanctions imposed by 18 U.S.C. §§ 1030.

### 8)  FedRAMP Security Requirements Overview:

A)  The minimum requirements for low and moderate impact cloud systems are contained within the FedRAMP Cloud Computing Security Requirements Baseline. The contractor and Federal Government Agency share responsibility to ensure compliance with security requirements.

Attachment 1- PWS                                      70CDCR26D00000026

B) The implementation of a new Federal Government cloud system requires a formal process, known as Assessment and Authorization, which provides guidelines for performing the assessment.

C) FedRAMP requires cloud service providers to utilize a Third-Party Assessment Organization (3PAO) to perform an assessment of the cloud service provider's security controls to determine the extent to which security controls are implemented correctly, operate as intended, and produce the desired outcome with respect to meeting security requirements.

D) The FedRAMP PMO security staff will be available for consultation during the process. Both the FedRAMP PMO staff and JAB will review the results before issuing a Provisional Authorization decision. The Government reserves the right to verify the infrastructure and security test results before issuing an Authorization decision.

E) Federal agencies will be able to leverage the provisional Authorization granted by FedRAMP and any documentation prepared by the contractor to issue their own authority to operate.

F) The vendor is advised to review the FedRAMP guidance documents (see References below) to determine the level of effort that will be necessary to complete the requirements. All FedRAMP documents and templates are available at http://FedRAMP.gov.

## 9) FedRAMP Security Compliance Requirements

The contractor shall implement the controls contained within the FedRAMP Cloud Computing Security Requirements Baseline and FedRAMP Continuous Monitoring Requirements for low and moderate impact system (as defined in FIPS 199). These documents define requirements for compliance to meet minimum Federal information security and privacy requirements for both low and moderate impact systems. While the FedRAMP baseline controls are based on NIST SP 800-53, Revision 4. The contractor shall generally, substantially, and in good faith follow FedRAMP guidelines and Security guidance. In situations where there are no procedural guides, the contractor shall use generally accepted industry best practices for IT security.

## 10) Required FedRAMP Policies and Regulations

The contractor shall comply with FedRAMP Security Assessment Framework – describing a general security Assessment Framework for the Federal Risk and Authorization Management Program (FedRAMP). This document details the security assessment process which must be used to achieve FedRAMP compliance. Download here: https://www.fedramp.gov/assets/resources/documents/FedRAMP_Security_Assessment_Framework. pdf

Attachment 1- PWS                                           70CDCR26D00000026

### 11) Assessment and Authorization

DHS/ICE may choose to cancel the contract/award and terminate any outstanding orders if the contractor has its provisional authorization revoked and the deficiencies are greater than agency risk tolerance thresholds.

### 12) Assessment of the System

a) The contractor shall comply with FedRAMP requirements as mandated by Federal laws and policies, including making available any documentation, physical access, and logical access needed to support this requirement. The Level of Effort for the A&A is based on the System's NIST Federal Information Processing Standard (FIPS) Publication 199 categorization. The contractor shall create, maintain and update the following documentation using FedRAMP requirements and templates, which are available at http://FedRAMP.gov :

- Privacy Impact Assessment (PIA)
- FedRAMP Test Procedures and Results
- Security Assessment Report (SAR)
- System Security Plan (SSP)
- IT System Contingency Plan (CP)
- IT System Contingency Plan (CP) Test Results
- POA&M Continuous Monitoring Plan (CMP)
- FedRAMP Control Tailoring Workbook
- Control Implementation Summary Table
- Results of Penetration Testing
- Software Code Review
- Interconnection Agreements/Service Level Agreements/Memorandum of Agreements.

b) Information systems must be assessed by an accredited 3PAO whenever there is a significant change to the system's security posture in accordance with the FedRAMP Continuous Monitoring Plan.

c) The Government reserves the right to perform Penetration Testing. If the Government exercises this right, the contractor shall allow Government employees (or designated third parties) to conduct Security Assessment activities to include control reviews in accordance with FedRAMP requirements (https://www.fedramp.gov/assets/resources/documents/CSP_Penetration_Test_Guidance.pdf

d) Review activities include but are not limited to scanning operating systems, web applications, wireless scanning; network device scanning to include routers, switches, and firewall, and IDS/IPS; databases and other applicable systems, including general support structure, that support the processing, transportation, storage, or security of Government information for vulnerabilities.

Attachment 1- PWS                                      70CDCR26D00000026

e) Identified gaps between required FedRAMP Security Control Baselines and Continuous Monitoring controls and the contractor's implementation as documented in the Security Assessment Report shall be tracked by the contractor for mitigation in a POA&M document. Depending on the severity of the gaps, the Government may require them to be remediated before a provisional authorization is issued.

f) The contractor is responsible for mitigating all security risks found during A&A and continuous monitoring activities. All high-risk vulnerabilities must be mitigated within 30 days and all moderate risk vulnerabilities must be mitigated within 30 days from the date vulnerabilities are formally identified. The Government will determine the risk rating of vulnerabilities.

### 13) Authorization of System

The contractor shall provide access to the Federal Government, or their designee acting as their agent, when requested, in order to verify compliance with the requirements for an Information Technology security program. The Government reserves the right to conduct onsite inspections. The contractor shall make appropriate personnel available for interviews and provide all necessary documentation during this review.

### 14) Reporting and Continuous Monitoring

Maintenance of the FedRAMP Provisional Authorization will be through continuous monitoring and periodic audit of the operational controls within a contractor's system, environment, and processes to determine if the security controls in the information system continue to be effective over time in light of changes that occur in the system and environment. Through continuous monitoring, security controls and supporting deliverables are updated and submitted to the FedRAMP PMO as required by FedRAMP Requirements. The submitted deliverables (or lack thereof) provide a current understanding of the security state and risk posture of the information systems. The deliverables will allow the FedRAMP JAB to make credible risk-based decisions regarding the continued operations of the information systems and initiate appropriate responses as needed when changes occur. Contractors will be required to provide updated deliverables and automated data feeds as defined in the FedRAMP Continuous Monitoring Plan.

All deliverables shall be labeled *"Controlled Unclassified Information" (CUI)*. External transmission/dissemination of *Controlled Unclassified Information" (CUI)* to or from a Government computer must be encrypted. Certified encryption modules must be used in accordance with FIPS PUB 140 (as amended), "Security requirements for Cryptographic Modules."

Attachment 1- PWS                                      70CDCR26D00000026

CUI is government created or owned information that requires safeguarding or dissemination controls consistent with applicable laws, regulations and government wide parties.

### 15) Non-Repudiation

The Cloud Service Provider vendor shall provide a system that is capable of implementing NIST SP 800-53 Control AU-10 approved controls, which provides for origin authentication, data integrity, and signer non-repudiation. This binds the identity of the information producer with the information to and provides the means for authorized individuals to determine the identity of the producer of the information.

### 16) Identification and Authentication (Organizational Users)

The vendor shall support a secure, multi-factor method of remote authentication and authorization to identified Government Administrators that will allow Government designated personnel the ability to perform management duties on the system.
The vendor shall support multi-factor authentication including User ID and Password, digital certificate, PIV or smart card, PIN.

### 17) Identification and Authentication (Non-Organizational Users)

The vendor shall support a secure, dual factor method of remote authentication and authorization to identified Vendor Administrators that will allow vendor-designated personnel the ability to perform management duties on the system.

### 18) Incident Reporting Timeframes

Cloud Service Providers are required to report all computer security incidents to the United States Computer Emergency Readiness Team (U.S.-CERT) in accordance with U.S.-CERT "Incident Categories and Reporting Timeframes" in , Appendix J, Table J-1 of NIST SP 800-61 (as amended), "Computer Security Incident Handling Guide." Any Category (CAT) 1, CAT 2, or CAT 3 incident, must be reported immediately to their Information Systems Security Officer (ISSO) and the Senior Agency Information Security Officer (SAISO). Any incident that involves compromised Personally Identifiable Information (PII) must be reported to U.S.-CERT within 1 hour of detection regardless of the incident category reporting timeframe.

### 19) Media Transport

The vendor shall document activities associated with the transport of Federal agency

Attachment 1- PWS                                    70CDCR26D00000026

information stored on digital and non-digital media and employ cryptographic mechanisms to protect the confidentiality and integrity of this information during transport outside of controlled areas.

Digital media, containing Federal agency information, that is transported outside of controlled areas must be encrypted using AES 256; non-digital media including but not limited to CD-ROM, floppy disks, etc., must be secured using the same policies and procedures as paper.

Media, containing Federal Agency information that is transported outside of controlled areas must ensure accountability. This can be accomplished through logging and a documented chain of custody form.

Federal Agency data that resides on mobile/portable devices (e.g., USB flash drives, external hard 12 drives, and SD cards) must be encrypted using AES 256. All Federal Agency data residing on laptop computing devices must be protected with approved encryption software.

### 20) Boundary Protection

The CSP/Reseller shall route all external connections through a Trusted Internet Connection (TIC).

### 21) Protection of Information At Rest

The CSP shall provide security mechanisms for handling data at rest and in transit in accordance with FIPS 140-2.

### 22) Security Alerts, Advisories, and Directives

The CSP/Reseller shall provide a list of their personnel, identified by name and role, with system 1 administration, monitoring, and/or security responsibilities that are to receive security alerts, two advisories, and directives. This list shall include ICE SOC.

## 34.0.     COTS Software Contract Requirements

### 34.1. In accordance with ITAR 4.5.3.2 – Encryption Compliance Encryption Compliance Terms and Conditions

If encryption is required, the following methods are acceptable for encrypting sensitive information:

A)  FIPS 197 (Advanced Encryption Standard (AES)) 256 algorithm and cryptographic

Attachment 1- PWS                                     70CDCR26D00000026

modules that have been validated under FIPS 140-2.

B) National Security Agency (NSA) Type 2 or Type 1 encryption.

C) Public Key Infrastructure (PKI) (see paragraph 5.5.2.1 of the Department of Homeland Security (DHS) IT Security Program Handbook (DHS Management Directive (MD) 4300A) for Sensitive Systems).

### 34.2.   In accordance with ITAR 4.5.3.5 and ITAR 4.5.4.5– ISA

**ISA Terms and Conditions**

Interconnections between DHS and non-DHS IT systems shall be established only through controlled interfaces and via approved service providers. The controlled interfaces shall be authorized at the highest security level of information on the network. Connections with other Federal agencies shall be documented based on interagency agreements; memoranda of understanding, service level agreements or interconnection security agreements.

### 34.3.   In accordance with ITAR 4.5.3.8 – Personal Identification Verification (PIV) Credential Compliance

**Personal Identification Verification (PIV) Credential Compliance Terms and Conditions**

I.1 Procurements for products, systems, services, hardware, or software involving controlled federal facility or information system shall be PIV-enabled by accepting HSPD-12 PIV credentials as a method of identity verification and authentication.

II.1 Procurements for software products or software developments shall be compliant by accepting PIV credentials as the common means of authentication for access for federal employees and contractors.

III.1 PIV-enabled information systems must demonstrate that they can correctly work with PIV credentials by responding to the cryptographic challenge in the authentication protocol before granting access.

IV.1 If a system is identified to be non-compliant with HSPD-12 for PIV credential enablement, a remediation plan for achieving HSPD-12 compliance shall be required for review, evaluation, and approval by the CISO.

### 34.4.   Patch Management Terms and Conditions

Attachment 1- PWS                                70CDCR26D00000026

The Contractor shall perform patch management services. The Contractor shall push patches that are required by vendors and DHS system owner. This is to ensure that the infrastructure and applications that directly support DHS information system are current in their release and that all security patches are applied. The contractor shall be informed by DHS which patches are required by DHS through the Information Security Vulnerability Management bulletins and advisories. Core applications, the ones DHS utilizes to fulfill their mission, shall be tested by DHS. However, the contractor shall be responsible for deploying patches as directed by DHS. It is recommended that all other applications (host-based intrusion detection system (HIDS), network intrusion detection system (NIDS), Anti-malware, and Firewall) shall be tested by the contractor prior to deployment in a test environment.

### 35.0. Detention Services

### 35.1.   Language Access

The Service Provider is responsible for providing access (via accurate, timely, and effective communication at no cost to the alien) to all federal facility programs and services for individuals with limited English proficiency. This should be accomplished through professional interpretation and translation services or bilingual personnel for necessary communication with aliens who do not speak, read, write, or understand English. Oral interpretation should be provided for aliens who are illiterate or who speak another language in which written material has not been translated. The Service Provider shall secure and utilize its own contract for professional language services. Where a need for a particular language is unavailable, the Service Provider may utilize the ICE language services. All federal facility postings and written materials provided to aliens shall generally be translated via professional language services into Spanish and other languages spoken by significant segments of the detained ICE population with limited English proficiency at the federal facility. Other than in emergencies, and even then, only until appropriate language services can be procured, other aliens shall not be used for interpretation or translation services.

### 35.2.   Group Legal Orientation Space

The Service Provider will provide a multi-purpose space that can accommodate group legal orientation presentations. The space shall accommodate no less than ▮ aliens and include tables and chairs. The space shall also be equipped with speakers and/or headsets, audio-visual equipment for presentations, and video-conferencing capability for virtual presentations. The multi-purpose space shall be made available for legal presentations for

Attachment 1- PWS                                   70CDCR26D00000026

no less than two presentations for three hours in length (including group and individual orientations), three times a week (Monday through Friday).

### 35.3.   Manage and Maintain an Alien ICE Telephone System (ITS)

The ICE designated Alien Communication Services Service Provider shall be the exclusive provider of alien communications (phones, tablets) for this federal facility. The Service Provider shall be allowed to install vending debit machines and shall receive 100 percent of all revenue collected by sales of prepaid debit services. The Service Provider shall be responsible for the costs incurred for installation of the equipment, any monthly telephone charges incurred from the operation of an alien telephone system,
and the maintenance and operation of the system. The Service Provider shall not be entitled to any commissions, fees, or revenues generated using the alien telephone system or the alien telephones. Telephones should be in an area that provides for a reasonable degree of privacy and a minimal amount of environmental noise during phone calls.

If authorized to do so under applicable law, the Service Provider shall monitor and record alien conversations. If alien telephone conversations can be monitored under applicable law, the Service Provider shall provide notice to aliens of the potential for monitoring. However, the Service Provider shall also provide procedures at the federal facility for aliens to be able to place unmonitored telephone calls to their attorneys.

Telephone rates will not exceed the Federal Communications Commission rates for inmate telephone service, as well as established state rates where applicable, and shall conform to all applicable federal, state, and local telephone regulations.

### 35.4.   Alien Voluntary Work Program

Facility permitting, detainees may participate in a voluntary work program to earn money.

Participation in a voluntary work program is strictly voluntary and may include assignments in industrial, maintenance, custodial, service, or other tasks. Detainees shall not be required to work, except for personal housekeeping. Detainee volunteers shall not be used as substitutes for facility employees or assigned work in areas where sensitive documents are stored, such as designated ICE workspaces.

The facility shall provide sufficient security staff to supervise detainees participating in the

Attachment 1- PWS　　　　　　　　　　　　　　　70CDCR26D00000026

voluntary work program. Work assignments must remain within the security perimeter unless approved by the Contracting Officer's Representative (COR). High-custody detainees shall not, under any circumstances, work outside the secure outer perimeter.

STANDARDS AND PROCEDURES

1.　Voluntary Work Program

If the facility has a voluntary work program, the facility shall develop a voluntary work program plan, subject to approval by the COR.

Participation in the program is strictly voluntary.

It will be the sole responsibility of ICE to determine whether a detainee will be allowed to perform on voluntary work details and at what classification level. All detainees shall be searched when they are returned from work details.

All detainee volunteers shall be searched upon returning from a work detail.

Voluntary Special Details

Detainees may volunteer for temporary special work details, typically lasting several hours to several days, involving tasks such as digging trenches, removing topsoil, and other labor-intensive activities.

1.　Detainee Selection

The federal facility shall develop site-specific rules for selecting work detail volunteers.

Detainees shall not be denied voluntary work opportunities based solely on race, religion, national origin, color, sex, sexual orientation, age, or disability.

2.　Detainees with Disabilities

Where possible, the federal facility shall allow detainees with disabilities to participate in the voluntary work program through appropriate work assignments.

3.　Work Hours and Restrictions

Attachment 1- PWS                                    70CDCR26D00000026

Detainees participating in the voluntary work program shall adhere to a fixed schedule, working no more than 8 hours per day and 40 hours per week.

The federal facility may limit the number of work details assigned to a detainee in a single day.

4.    Reimbursement

Detainee volunteers participating in the voluntary work program are not considered federal facility and/or government employees and are not entitled to wages or benefits under applicable federal wage laws, state minimum wage laws, or labor regulations.

Detainees shall not receive a stipend exceeding the amount Congressionally allocated to ICE for reimbursing contract facilities in support of the Voluntary Work Program. The federal facility is responsible for ensuring detainees receive their owed reimbursement in cash (USD) before transfer or release.

5.    Removal of Detainee from Work Detail

A detainee may be removed from a work detail for cause. The federal facility shall document the justification for removal in the detainee's detention file or a retrievable electronic record.

6.    Detainee Responsibilities

The federal facility shall establish procedures to inform detainee volunteers of their job responsibilities and reporting procedures. Detainees must use safety equipment and follow other precautions as instructed by the work supervisor.

7.    Detainee Training and Safety

Detention facilities shall comply with all applicable federal health and safety regulations and standards. Detainees shall be provided basic OSHA protections and appropriate safety/protective clothing and equipment during work assignments.

Medical staff shall ensure detainees are medically screened and certified before undertaking food service assignments. The federal facility shall ensure all department heads develop appropriate training for detainee workers.

Before beginning any job or work detail, the supervisor shall provide the detainee with

Attachment 1- PWS                              70CDCR26D00000026

thorough instructions on safe work methods and, if applicable, hazardous materials. The detainee must sign a voluntary work program agreement, confirming they have received and understood the training provided by the supervisor. The agreement shall be placed in the detainee's detention file or retrievable electronic record.

8.   Detainee Injury and Reporting Procedures

The federal facility shall establish procedures to immediately and appropriately respond to on-the-job injuries, including immediate notification to ICE/ERO.

**36.0. Detention Facility ERO Case Processing Specialists**

**Position Description- Case Processing Specialists**
The Case Processing Specialist shall hold an accredited associate or bachelor's degree in an appropriate discipline or have a minimum of one year of directly related industry experience. The Case Processing Specialist will have knowledge of program objectives, policies, procedures, and requirements related to immigration case processing. The Case Processing Specialist must have prior experience and/or training related to reviewing law enforcement documentation such detention files, custodial records, or immigration case files including A-files and DHS databases, or previous experience conducting interviews for immigration or detention related purposes. Case Processing Specialists shall assist ICE Personnel with the following duties under the general direction of ICE field office personnel:

**Case Processing, Docket Management, Data Entry and Records Management duties:**
a. Process cases and perform all peripheral activities, immigration records management, and document preparation.
b. Prepare, review, and manage case files, ensuring accuracy and completeness in all documentation.
c. Ensure Alien Files (A-files) and ICE systems reflect a case status that is updated, accurate, and complete.
d. Accurately enter data into ICE systems, ensuring compliance with agency protocols and data integrity requirements.
e. Maintain and update electronic and paper-based case files, ensuring compliance with federal privacy laws, DHS policies, and federal data security requirements.
f. Retrieve, compile, and organize county, state, and federal court records, conviction documents, and supporting case materials from multiple databases, and other government sources.
g. Maintain up-to-date case status records, court scheduling details, and case tracking logs.
h. Generate case status reports and monitoring dashboards.
i. Assist with docket coordination with EOIR and USCIS. Coordinate with ICE officers to facilitate interviews, hearings, removals, and case updates.
j. Review appropriate paperwork for completeness and accuracy.
k. Ensure all administrative applications are reviewed, A-files are updated, and docket officers timely notified for appropriate law enforcement action.
l. Track compliance with release conditions and report violations, as applicable.

Attachment 1- PWS                                70CDCR26D00000026

m. Assist ICE Office of Principal Legal Advisor (OPLA) in obtaining criminal history checks and other supporting documentation as needed prior to court.
n. Assist ICE personnel with scheduling and coordinating interviews between detainees and ICE officers, consulates, and legal representatives, as assigned.

**Removal and Post Removal Management duties:**
a. Organize and prepare removal documents and coordinate with ICE personnel for scheduling removal and staging flights. Ensure all documentation is prepared and accurate.
b. Ensure aliens scheduled for removal have the necessary documentation in A-files per ICE instructions.
c. Ensure travel information, ICE Air scheduling and manifest(s) are completed, detention center release forms are prepared, and property inventories/receipts are ready on the scheduled time and day of departure.
d. Ensure detainees have the necessary legal paperwork, seven-day supply of medications, property, and valuables before transfer or removal.
e. Collect, review for completeness and accuracy, and file signed Form I-205 Warrant of Removal/Deportation departure verifications in A-file
f. Ensure case is closed in ICE data systems and file is transferred to the National Record Center for storage.

**Other duties:**
a. Schedule interviews between detainees and ICE officers, consulates, and legal representatives as applicable.
b. Communicate with all aliens in the alien's primary language.
c. Provide other logistical and administrative support for ICE personnel as assigned.
d. Provide surge support after hours, including expanded breadth and depth of tasks, as required.

**37.0   Robotics Process Automation (RPA) Contract Requirement**

The Detention Facility Robotics Process Automation (RPA) process requires that data supporting detention bed space, ground transportation, and any other additional costs covered by the current contract will be recorded utilizing the Detention Transportation Template (DTT) (Attachment 16). This data template should be completed in its entirety in the established format once all data supporting the monthly operations is available. Once completed, the DTT must be submitted via e-mail to both the ERO Field Office COR and the ERO RPA Team Mailbox. Please note that the requirement for submission of the DTT is prior to and in addition to the invoice submission requirement already included in this contract. Please note that DTT updates may be requested by the COR and will require timely resubmission to the COR and the ERO RPA Team Mailbox. The government reserves the right to update the federal detention facility invoice process, templates or other related documents, to fix issues, expand capabilities, and improve performance of the reconciliation process.

Attachment 1- PWS                                    70CDCR26D00000026

**38.0    Notification and Public Disclosures**

There shall be no public disclosure regarding this contract made by the Service Provider (or any subservice Providers) without review and approval of such disclosure by ICE Public Affairs. The government considers such information privileged or confidential.

**39.0    Records, Visits, and Disclaimers**

All records related to contract performance shall be retained in a retrievable format for the duration of the contract. The Service Provider shall, upon completion or termination of the contract, transmit to the government any records related to the performance of the contract, in a format acceptable to the CO.

The Service Provider shall comply with all statutes, regulations, and guidelines from the National Archives and Records Administration (NARA). Records and information management functions are required and mandated by the following laws and regulations: Chapters 21, 29, 31, and 33 of Title 44, U.S. Code; 36 CFR 12; 41 CFR 201 subchapters A and B; Office of Management and Budget (OMB) Circular A-130; and Department of Justice (DOJ) Order 2710.8A, *Removal and Maintenance of Documents*. Criminal penalties for unlawfully destroying, damaging, removing, or improperly handling or releasing federal records are addressed in Chapters 37 and 101 of Title 18, U.S. Code.

All alien files are to be prepared, maintained, retired, and disposed of in accordance with ICE policy. Policies and procedures shall be developed to ensure the confidentiality and security of all alien files. The Service Provider shall be responsible for alien record keeping services and personal property. See Attachment 15 – Personal Property Operations Handbook.

The Service Provider shall safeguard all records related to the operation of the federal facility.

Except as provided in the below paragraph, all records acquired or generated by the Service Provider in the contracting process, or its performance of this contract, or as a result of this contract, including records classified as Privacy Act systems of records, are federal records under the control of ICE and all determinations regarding the disclosure of this information will be made by ICE in accordance with applicable federal laws, regulations, policies, and executive orders or as ordered by a court.

ICE will comply with the provisions set forth in 6 C.F.R §5.7 "Confidential Commercial Information," as applicable, in the event ICE intends to release the contract documents or

Attachment 1- PWS                                        70CDCR26D00000026

any information relating to this contract, including clause (e) "Opportunity to Object to Disclosure" thereof.  Insofar as any documents created by the Service Provider contain any information related to one or more ICE aliens, these records shall be the property of ICE and all determinations regarding the disclosure of this information will be made by ICE in accordance with applicable federal laws, regulations, policies, and executive orders or as ordered by a court.  To the extent the Service Provider intends to release the contract or any information relating to the contract, the Service Provider agrees to coordinate with the CO and obtain an ICE concurrence prior to any such release.

Service Provider-owned records are considered the property of the Service Provider and are not within the scope of the paragraph above.  Service Provider-owned records include the following:

a)  Service Provider's employment related records,
b)  Service Provider's patents, copyright, and trademark applications, where the Service Provider has elected rights or has permission to assert rights and has not relinquished such rights or turned such rights over to the government,
c)  Service Provider's non-public financial records which are not related to the performance of this contract, and
d)  Service Provider's records which are not related to the performance of this contract.
All records acquired or generated by the Service Provider related to this contract and in possession of the Service Provider, including those described in the two paragraphs above, shall be subject to inspection, copying, and audit by the government or its designees at all reasonable times, and the Service Provider shall afford the government or its designees reasonable facilities for such inspection, copying, and audit; provided; however, that upon request by the CO, the Service Provider shall deliver such records to a location specified by the CO for inspection, copying, and audit.  The government or its officials shall use such records in accordance with applicable federal law, regulation, and policy (including, but not limited to, the Privacy Act), as appropriate.

This clause applies to all records created, received and maintained by the Service Provider without regard to the date of origination of such records, including all records acquired from a predecessor Service Provider or predecessor contract or intergovernmental service agreement. The requirements of this clause shall flow down to all sub-Service Providers of the Service Provider in the performance of this contract.

The Service Provider shall notify the COR when a member of the U.S. Congress or any media outlet requests information or makes a request to visit the federal facility. The Service Provider shall coordinate all public information related issues with the CO. All press

Attachment 1- PWS                                    70CDCR26D00000026

statements and releases shall be cleared, in advance, with the ICE Office of Public Affairs, which can be reached through the Internet website: ICEMedia@ice.dhs.gov.

The Service Provider shall ensure employees agree to use appropriate disclaimers clearly stating the employees' opinions do not necessarily reflect the position of the U.S. government in any public presentations they make or articles they write that relate to any aspect of contract performance or the federal facility operations.

## 40.0    ICE/ERO Control Over Facility Access

Pre-clearance approvals are required for access to ICE field staff, facilities and information. Facilities shall notify and seek approval from ICE/ERO of any proposed law enforcement officer visit.

Public contact is prohibited unless authorized in advance by the COR or an ICE-designated official. Public contact consists of any visits with outsiders, not sanctioned by ICE, i.e. a visitor to see a detainee in the hospital. All requests by NGOs and other stakeholders (which include, but are not limited to, community service organizations, intergovernmental entities, state and local governmental agencies, faith based organizations, members of academia, and legal groups (e.g., pro bono legal service provider groups)) for tours, visits, or tours with visits must be submitted in writing to the local ICE/ERO Field Office supervising the facility or the ICE Office of State, Local and Tribal Coordination (OSLTC).

Tour requests should not be directed to the facility. All requests shall be forwarded to the Field Office for review. When deciding whether to approve or deny the request, the Field Office Director, or his or her designee, will take into consideration safety and security, and the availability of personnel to staff the tour, visitation, or tour with visitation. All tour or visit participants will be expected to submit personal information required by applicable ICE policies, so the Field Office can perform background checks as necessary.

## 41.0    Federal Judiciary

The contractor shall ensure all judicial inquiries and program recommendations are responded to in a timely and accurate manner. All judicial inquiries and contractor responses, specifically related to an alien, shall be made part of the alien's A-file.

## 42.0    Quality Control Plan (QCP)

The Service Provider is responsible for management and actions necessary to meet the

standards set forth  in the contract. The Service Provider shall provide an overall QCP that addresses critical operational performance standards for the services required under this contract. The Service Provider shall provide a QCP to the CO and the COR for concurrence not later than the post award conference (or as directed by the CO). The CO will notify the Service Provider of concurrence or required modifications to the plan before the contract's start date. The QCP shall ensure that services will be maintained at an acceptable level. At a minimum, the Service Provider shall review and update the QCP on an annual basis or as required.  The QCP shall identify deficiencies, appropriate corrective action(s), and timely implementation plan(s) to the COR.

**Quality Assurance Surveillance Plan (QASP)**
ICE has developed a Quality Assurance Surveillance Plan (QASP), incorporated in Section J *(See PWS Attachment – Quality Assurance Surveillance Plan)*, pursuant to the requirements of the PWS. It will present the financial values and mechanisms for applying adjustments to the contractor's invoices as dictated by work performance measured to the desired level of accomplishment.
1. The purpose of the QASP is to:
a) Define the roles and responsibilities of participating Government officials.
b) Define the types of work to be performed.
c) Describe the evaluation methods that will be employed by the Government in assessing the contractor's performance.
d) Describe the process of performance documentation.

2. Roles and Responsibilities of Participating Government Officials a) The COR(s) will be responsible for monitoring, assessing, recording, and reporting on the technical performance of the contractor on a day-to-day basis. The COR(s) will have primary responsibility for completing "Quality Assurance Surveillance Forms" to document their inspection and evaluation of the contractor's work performance.
b) The CO or designee has overall responsibility for evaluating the contractor's performance in areas of contract compliance, contract administration, cost, and property control. The CO shall review the COR's evaluation of the contractor's performance and invoices. If applicable, deductions or withholdings will be assessed in accordance with the evaluation of the contractor's performance, e.g., monetary adjustments for inadequate performance.

### 43.0    Service Provider's Failure to Perform Required Services

The rights of the government and remedies described in this section are in addition to all other rights and remedies set forth in the contract. Specifically, the government reserves its rights under the inspection of services and termination clauses. Any reductions on the Service Provider's invoice shall reflect the contract's reduced value resulting from the Service Provider's failure to perform the required services. The Service Provider shall not be relieved of the full performance of the services hereunder and may be terminated for default based upon the inadequate performance of services, even if a reduction was previously taken for any inadequate performance.

Attachment 1- PWS                                    70CDCR26D00000026

### 44.0    Performance Evaluation Meetings

The Service Provider's representatives shall meet with the COR monthly or as deemed necessary by performance, and a discussion and resolution of problems.

### 45.0    Organizational Chart

The Service Provider shall provide an organizational chart that describes the structure of authority, responsibility, and accountability within the facilities. The Service Provider shall update this chart as necessary. The Service Provider shall make the chart available for review by the CO or COR upon request.

### 46.0    Personnel and Staffing

### 46.1.    Federal Facility Staffing Plan and Key Personnel

The Service Provider shall have a staffing plan to effectively staff the federal facility in a safe and secure manner. The number, type and distribution of staff as described in the staffing plan shall be maintained throughout the term of the contract. Candidates that have been cleared by the support-service provider's screening process, and who are fully enrolled into the U.S. Government's suitability determination processing system, will be counted toward the minimum monthly staffing levels. Written requests to change the number, type and/or distribution of staff described in the staffing plan must be submitted to the CO and the COR, for approval prior to implementation and incorporation into this contract. Staffing levels should not fall below a monthly average of 85% for custody staff, 85% for health services staff, and 85% for all other departments of the approved staffing plan. The approved staffing levels for detention officers (custody) shall not fall below a monthly average of 85%. Staffing levels for all departments other than custody and health services will be calculated in the aggregate. If the Service Provider does not provide health services, the health services staffing level does not apply.

Each month, the Service Provider shall submit to the COR the current average monthly vacancy rate and indicate any individual positions that have been vacant more than 120 calendar days. Failure to fill any individual position within 120 calendar days of the vacancy may result in a deduction from the monthly invoice. In assessing deductions, ICE may also consider costs associated with overtime used to cover vacant positions.

Each month, the Service Provider shall submit to the COR any key personnel that will be absent from the federal facility for over five working days. If the key personnel will be absent for over five working days and the Service Provider will not provide an "acting" position to

73

Attachment 1- PWS                                           70CDCR26D00000026

backfill that key personnel position during the absence, the CO has the right to make a deduction based on the salary and benefits of the absent key personnel position.

### 46.2.   Federal Facility Floor Plan and Guard Post Map

The Service Provider shall provide a federal facility floor plan which clearly identifies all recommended detention guard posts and corresponding guard shift requirements (e.g., 24/7, 8 hours M – F, weekend-only, etc.). The floor plan shall be submitted with the federal facility staffing plan and shall be approved by the CO/COR prior to commencement of services under this contract.

Changes to the guard posts or shift requirements shall be approved by the CO/COR.

### 46.3.   Employment Eligibility

The Service Provider shall employ personnel whose qualifications are commensurate with job responsibilities and authority levels. The Service Provider shall assure that employees meet the standards of competency, training, appearance, behavior, and integrity. The Service Provider will affect disciplinary or adverse action against employees who disregard those standards.

Screening criteria under DHS Instruction 121-01-007-001 (Personnel Security, Suitability and Fitness Program), or successor thereto, that may exclude Service Provider employees from consideration to perform under this contract includes:

a)   Misconduct or negligence in employment.
b)   Criminal or dishonest conduct.
c)   Material, intentional false statement, or deception of fraud in examination or appointment.
d)   Refusal to furnish testimony as required by 5 CFR § 5.4 (i.e., a refusal to provide testimony to the Merit Systems Protection Board or the Office of Special Counsel).
e)   Illegal use of narcotics, drugs, or other controlled substances without evidence of substantial rehabilitation.
f)   Alcohol abuse, without evidence of substantial rehabilitation, of a nature and duration that suggests that the applicant or appointee would be prevented from performing the duties of the position in question or would constitute a direct threat to the property or safety of the applicant, appointee, or others.
g)   Knowing and willful engagement in acts or activities designed to overthrow the U.S. government by force.
h)   Any statutory or regulatory bar which prevents the lawful employment of the person involved in the position in question.
i)   Any other nondiscriminatory reason that an individual's employment (or work on a contract)

74

Attachment 1- PWS                                              70CDCR26D00000026

would not protect the integrity or promote the efficiency of the service.

The Service Provider shall agree that each employee working on this contract will have a Social Security Card issued and approved by the Social Security Administration. The Service Provider shall be responsible to the government for the acts and omissions of his own employees and for any subservice provider(s) and their employees.

Subject to existing law, regulations, and/ or other provisions of this contract, illegal or undocumented aliens will not be employed by the Service Provider, or with this contract. The Service Provider will ensure that this provision is expressly incorporated into all subcontracts or subordinate agreements issued in support of this contract.

### 46.4.  Key Personnel

The COR shall provide written approval before any employee is assigned as key personnel to perform duties under this contract. Rejection of any key personnel shall come in writing from the contracting officer. The Service Provider shall have key personnel employed and available for duty before the Service Provider can begin contract performance. Any subsequent changes to key personnel must meet these criteria and be approved in writing by the CO. The following are considered key personnel for the contract. The Service Provider may use other titles.

j)   Facility Administrator. The facility administrator shall hold an accredited bachelor's degree in an appropriate discipline, or significant military, or corrections experience at a minimum of 15 years, and have at least five years of

related administrative experience, and have knowledge of program objectives, policies, procedures, and requirements for managing a secure detention/correctional federal facility. The degree requirement may be satisfied by completion of a career development program that includes work related experience, training, or college credits at a level of achievement equivalent to the bachelor's degree, as practiced in the federal hiring process. The official holding this position, even in an acting capacity, shall meet ACA requirements.

k)   Assistant Facility Administrator. The assistant facility administrator shall hold an accredited bachelor's degree in an appropriate discipline or have a minimum of three years of related industry experience, and have knowledge of program objectives, policies, procedures, and requirements for managing a secure detention/correctional federal facility. The official holding this position, even in an acting capacity, shall meet ACA requirements.

l)   Supervisory Detention Officers. Supervisors must have a minimum of one year of experience as a detention officer and two years of successful experience in field supervision (e.g., civilian community law enforcement, commercial or industrial guard service, or supervisory security service positions). The two-year requirement may be satisfied by completion of a career development program that includes work-related experience, training,

Attachment 1- PWS                                    70CDCR26D00000026

> or college credits at a level of achievement equivalent to the basic requirement, as practiced in the federal hiring process.

m) Training Officers. Certified instructors shall conduct all instruction and testing of Service Provider personnel. A state or nationally recognized institution certification of instructors is mandatory unless otherwise approved in writing by the COR. Certification of instructors may be established by documentation of experience in teaching positions or by successful completion of a course of training for qualifying personnel as instructors. The COR must approve the

> instructor prior to any training.

n) Quality Assurance Manager. The quality assurance manager shall hold an accredited bachelor's degree in an appropriate discipline or have a minimum of three years of related industry experience, and have knowledge of program objectives, policies, procedures, and requirements for managing a secure detention/correctional federal facility.

o) Corporate Security Officer: The corporate security officer will interface with the ICE Office of Professional Responsibility (OPR) Personnel Security Division (PSD) through the COR on all security matters, to include physical, personnel, and protection of all government information and data accessed by the Service Provider.

### 46.5.   Health Requirements for all Detention Officers

The Service Provider is solely responsible for ensuring employees can perform essential functions described within this contract, with reasonable accommodation, if applicable. All officers who work under this contract shall pass a medical examination conducted by a licensed physician within 30 days prior to initial assignment.

### 46.6.   Employee Health and Health Records

**OSHA Publications By Search | Occupational Safety and Health Administration**

Employee health files for all Service Provider employees must be maintained on-site, in a locked cabinet. Health files are to be maintained in accordance with DHS and ICE Privacy Policies and the Privacy Act of 1974 and contain the following documents:

p) Initial and annual tuberculosis (TB) infection screening results.
q) Vaccination records including results, titers, and Immunization Declination Form(s).
r) OSHA 301 Incident forms.
s) Blood borne pathogen exposure documentation.
t) Respirator medical clearance.
u) Respirator fit test results.
v) Other employee health documents.

> The Service Provider may initiate employment of an individual who has initiated the required vaccines schedule, and the individual hired may begin work on the contract if they meet all subsequent vaccine schedule requirements until fully vaccinated.

Attachment 1- PWS                                          70CDCR26D00000026

**46.7.  Minimum Staffing Requirements**

Exclusive of the agreed upon ramp periods, the Service Provider shall fully staff the federal facility to secure, control, feed, and supervise aliens in custody regardless of the population. The Service Provider shall ensure daily detention officer assignment rosters, by shift, are maintained. The assignment rosters shall indicate the number of staff, job titles, names, hours, and days of work for each post. The daily roster shall be posted 24 hours in advance. Shift rosters must be provided to the COR daily.

**46.8.  Recommended Immunizations**

Individuals employed by the Contractor in a custody or detention environment are at significant risk for acquiring or transmitting Hepatitis B, measles, mumps, rubella, varicella, seasonal influenza, and COVID-19. These diseases are vaccine preventable. Therefore, the following vaccinations are highly recommended for the Contractor's personnel. If staff decline or refuse any of these recommended vaccines, an Immunization Declination Form is required, and the COR must be notified of the refusal. ICE reserves the right to refuse Contractor employees that refuse vaccines.

a) Hepatitis A.
b) Hepatitis B; (Note: The U.S. OSHA Blood-borne Pathogens (BBP) Standard requires employers to provide employees at risk of occupational exposure to blood and other potentially infectious material (OPIM) with the Hepatitis B vaccination series.  Refer to OSHA regulations Occupational Safety and Health Administration
c) Varicella.
d) Measles, Mumps, Rubella (MMR).
e) Diphtheria, tetanus, a-cellular pertussis (DTAP); and
f) Annual seasonal influenza.
g) COVID-19

The Service Provider's personnel will provide immunization documentation or titer results to the health services administrator or the employer's representative for placement in the employee health file. It is recommended that the CDCs Immunization of Healthcare Workers: Recommendations of the Advisory Committee on Immunization Practices and the Hospital

Infection Control Practices Advisory Committee be used as a reference for employee health immunization issues.

If requested by the COR, the Service Provider shall make medical records of contract employees available for review.  Prior to the officer's initial assignment or reassignment to the federal facility, the Service Provider shall certify in writing to the COR that each detention officer is in full compliance with the following:

Attachment 1- PWS                                              70CDCR26D00000026

a) Staff shall not have diseases that may be transmitted to and result in the disablement of other individuals and shall be physically and mentally able to perform the essential functions of their position, either with or without reasonable accommodation, and without creating a significant risk of substantial harm to the health or safety of that officer or others, which risk cannot be eliminated or reduced by a reasonable accommodation.

b) Detention officers are required to have the following:

- Correctable distant vision must be equal to or better than 20/20 in each eye.
- Binocular distant vision must be correctable to 20/20.
- Monocular vision is generally disqualifying; depth perception must be equal to or better than 70 seconds of arc.
- Peripheral vision must be normal.
- Color vision must be normal.

  Acceptable measure of color discrimination is the Ishihara color (14 plates).  X chrome lenses are not acceptable to ICE as a means of correcting color deficiencies. Any disease or condition which interferes with a person's vision may be considered disqualifying.  Cases will be reviewed on a case-by-case basis by the COR.

c) Detention officers are required to be able to hear in the frequency range from 500-2000 hertz (Hz), the deficit should not exceed 30 decibels in either ear.  At 3000 Hz, the deficit should not exceed 40 decibels in either ear.  Any disease or condition, which interferes with the ability to hear, may be considered disqualifying.  Cases will be reviewed on a case-by-case basis by the COR.

d) Detention officers shall not have heart, lung, skeletal, or other physical defects that would impair their ability to perform effectively in either normal or emergency situations.

e) Detention officers shall possess unimpaired use of hands, arms, legs, and feet.
   detention officers shall be able to run when necessary and be capable of handling portable fire extinguishers, building fire hoses, and related equipment.

f) Detention officers shall be able to wear all necessary equipment, or other protective items.

g) Officers shall be mentally alert and emotionally stable with an absence of detectable neurotic or psychoneurotic conditions that would affect their ability to act during a stressful situation involving mental stress.

h) As required by the OSHA, 29 CFR, Part 1910.1035 (Occupational Exposure to Tuberculosis), all employees in occupations with high-risk exposure are required to have a TB Skin Test completed annually.  The Service Provider shall complete a baseline test on all newly hired employees.  Each employee must have a TB Skin Test Certificate prior to entering on his/her first day of duty.  The Service Provider shall be responsible for re-testing employees annually.

i) The Service Provider shall report immediately any changes to (1) through (8) above, in a

detention officer's health status to the COR.  If the COR determines that Service Provider employees do not meet minimum health standards, the Service Provider's employee must undergo a "Fitness for Duty" examination at no cost to the government.

j)  Officers must have no hearing defects or no hearing defects with the use of a correctable device.

### 46.9.  Service Provider Staffing and Employee Requirements

The Service Provider shall provide employee requirements or policies, which, at a minimum, address the following:

- Organization.
- Recruiting procedures.
- Opportunities for equal employment.
- Qualifying for jobs, job descriptions, responsibilities, salaries, and fringe benefits.
- Screening employees for illegal drug use.
- Holidays, leave, and work hours.
- Personnel records, employee evaluations, promotion, and retirement.
- Training.
- Standards of conduct, disciplinary procedures, and grievance procedures.
- Resignation and termination.
- Employee-management relations.
- Security, safety, health, welfare, and injury incidents.

The Service Provider shall provide a copy of the rules or policies to federal facility employees. Upon request by the COR, the Service Provider shall document that all employees have reviewed a copy of the requirements or policies.

### 46.10.  Minimum Standards of Employee Conduct

The Service Provider shall develop standards of employee conduct and corresponding disciplinary actions that are consistent with the following standards of conduct. All employees shall certify in writing that they have read and understand the standards. A record of this certificate must be provided to the COR prior to each employee beginning work under this contract. The Service Provider will hold employees accountable for their conduct based on these standards, which are not restricted to, but should include:

a)  Employees shall not display favoritism or preferential treatment to one alien, or group of aliens, over another.

b)  Employees shall not discuss or disclose information from alien files or immigration cases, except, when necessary, in the performance of duties under this contract.

c)  The employee may not interact with any alien except in a relationship that supports the approved goals of the federal facility. Specifically, employees shall not receive nor accept

Attachment 1- PWS                                      70CDCR26D00000026

any personal (tangible or intangible) gift, favor, or service, from any alien, any alien's family, or associate no matter how trivial the gift, favor, or service may seem, for themselves or any members of their family. In addition, the employee shall not give any gift, favor, or service to aliens, alien's family, or associates.

d) The employee shall not enter any business relationship with aliens or their families (e.g., selling, buying, or trading personal property).

e) The employee shall not have any outside or social contact with any alien, his or her family, or associates, except for those activities which are part of the federal facility program and a part of the employee's job description.

f) All employees are required to immediately report to the warden/federal facility director or ICE supervisor any criminal or non-criminal violation or attempted violation of these standards.

g) The Service Provider or ICE supervisor shall report all violations or attempted violations of the standards of conduct or any criminal activity immediately to the COR. Violations may result in employee removal from the federal facility. Failure on the part of the Service Provider either to report a known violation or to take appropriate disciplinary action against an offending employee(s) shall subject the Service Provider to appropriate action including possible termination of the contract for default.

The Service Provider should not employ any person whose employment would present an actual or apparent conflict of interest. The Service Provider is specifically prohibited from hiring active-duty military personnel and civilians employed by the government to perform work under this contract.

### 46.11.  Minimum Personnel Qualification Standards

The Service Provider shall ensure that each person employed by the firm, or any subservice Provider(s) has a social security card issued and approved by the Social Security Administration, and shall be a U.S. citizen or a person lawfully admitted into the U.S. for permanent residence, have resided in the U.S. for the last five years (unless abroad on official U.S. government duty), possess a high school diploma or equivalent, and obtain a favorable suitability for employment determination. Each employee of the Service Provider and any subservice Provider(s) must complete and sign a Form I-9, "Employment Eligibility Verification," before commencing work.  The Service Provider shall retain the original Form I-9 and shall furnish the COR with a copy of Form I-9 before the employee commences work.  The Service Provider shall be responsible for the acts and omissions of its employees and of any subservice Provider(s) and their employees.

In addition, each contract employee shall meet the following requirements in accordance with the contract requirements:

a) All employees shall be at a minimum of 21 years of age.
b) Employees shall have at least one year of general experience that demonstrates the following:
   i.    The ability to greet and deal tactfully with the public.
   ii.   Capability of understanding and applying written and verbal orders, rules, and regulations.  All personnel shall be literate and be able to interpret printed rules and regulations, detailed written orders, training instructions and materials, and must be able to compose reports.
   iii.  Good judgment, courage, alertness, even temperament, and render satisfactory performance through knowledge of his/her position responsibilities.
   iv.   Ability to maintain poise and self-control during situations that involve mental stress, such as fires, explosions, civil disturbances, and building evacuations.
c) All employees on this contract must maintain current/physical residency in the continental U.S.
d) All qualified, armed employees working as transportation officers shall have a minimum of one year of experience as a law enforcement officer, military policeman, or as a security officer engaged in functions related to detaining civil or administrative aliens. A degree in a related or appropriate field/discipline may substitute for experience (i.e., detention, corrections, criminal justice, etc.).

### 46.12.  Random Drug Testing

The Service Provider will have a random drug-screening program.  ICE may require drug screening for cause at any time.  The Service Provider shall order and accomplish drug screening at the Service Provider's expense.  A laboratory approved by the National Institute of Drug Abuse shall perform the screening.  The Service Provider shall provide the results of all such drug screenings to the COR within 24 hours of receipt.

### 46.13.  Contraband Program and Inspection

A contraband control program shall be established in accordance with NDS 2025 on contraband and ACA standards.

The Service Provider's employees will be subject to random contraband inspection in accordance with federal facility standards and policies.  ICE may require contraband screening and inspection for cause at any time.  Upon notification of a violation by the COR, the

Service Provider shall immediately remove the employee from performing duties under this contract.  The Service Provider shall revoke employees' credentials, complete the required disposition, and immediately notify the COR when the employee is removed from duty.

Attachment 1- PWS                                                    70CDCR26D00000026

**46.14.  Required Documentation**

All Service Provider personnel must provide documentation regarding the following: History of testing for TB within the last 12 months:

 a)  Chest x-ray if employee has a history of latent TB infection (LTBI), treatment history for LTBI or TB disease, if applicable.

 b)  Additionally, on an annual basis and at Service Provider's expense, the Service Provider shall provide a current, tuberculin skin test or interferon-gamma release assays, test result. If the employee previously tested negative for LTBI, evaluate for TB symptoms. If the employee previously tested positive for LTBI and followed up as appropriate in accordance with Centers for Disease Control and Prevention (CDC) guidelines.

**46.15.  Removal from Duty**

If the COR or the Service Provider receives and confirms disqualifying information concerning a Service Provider employee, the Service Provider shall, upon notification by the COR, immediately remove the employee from performing duties under this contract. The Service Provider shall revoke the employee's identification credentials and complete any required dispositions. The Service Provider shall immediately notify the COR when the employee is removed from duty. Disqualifying information includes but is not limited to the following:

a)  Conviction of a felony, a crime of violence, domestic violence, or a serious misdemeanor.

b)  Possessing a record of arrests for continuing offenses.

c)  Falsification of information entered on suitability forms.

d)  Non-payment of court ordered payments (child support, liens, etc.) or excessive delinquent debt as determined by credit check.

e)  Misconduct or negligence in prior employment, which would have a bearing on efficient service in the position in question or would interfere with or
prevent effective accomplishment by the employing agency of its duties and responsibilities.

f)  Alcohol abuse of nature and duration which suggests that the applicant or appointee would be prevented from performing the duties of the position in question or would constitute a direct threat to the property or safety of others.

g)  Illegal use of narcotics, drugs, or other controlled substances, without evidence of substantial rehabilitation.

h)  Introduction of contraband into or unto the federal facility.

ICE may direct the Service Provider to remove any employee who has been disqualified either for security reasons or for being unfit to perform his/her duties as determined by the COR or the CO. The Service Provider shall act immediately and notify the COR when the employee is removed from duty. A determination to be unfit for duty may be made from, but

82

is not limited to, incidents of delinquency set forth below:

a)  Violation of the Rules and Regulations Governing Detention facilities set forth in ICE Publications entitled "Detention Officer Handbook."

b)  Violation of the Rules and Regulations Governing Public Buildings and Grounds, 41 CFR 101-20.3.

c)  Neglect of duty, including sleeping while on duty, loafing, unreasonable delays or failures to carry out assigned tasks, conducting personal affairs during official time, leaving post without relief, and refusing to render assistance or cooperation in upholding the integrity of the security program at the work sites.

d)  Falsification or unlawful concealment, removal, mutilation, or destruction of any official documents or records, or concealment of material facts by willful omissions from official documents or records.

e)  Theft, vandalism, immoral conduct, or any other criminal actions.

f)  Possessing, selling, consuming, or being under the influence of intoxicants, drugs, contraband, or substances which produce similar effects.

g)  Unethical or improper use of official authority or credentials.

h)  Unauthorized use of communication equipment or government property.

i)  Misuse of equipment or weapons.

j)  Violations of security procedures or regulations.

k)  Recurring tardiness.

l)  Undue fraternization with aliens as determined by the COR.

m)  Repeated failure to comply with visitor procedures as determined by the COR.

n)  Performance, as determined by investigation by the CO, involving acquiescence, negligence, misconduct, lack of diligence, good judgment, and/or good common sense resulting in, or contributing to, an alien escape.

o)  Failure to maintain acceptable levels of proficiency or to fulfill training requirements.

p)  Changes in an employee's ability to meet the physical and/or mental health requirements of this contract.

q)  Service Provider employees who are under investigation by any law enforcement agency will be removed from duties pending outcome of the disposition.

At the direction of the COR, the Service Provider shall reassign contract employees who have been arrested or who have alleged misconduct, to duties that do not permit direct contact with aliens pending the disposition of the charges. Any alleged misconduct shall be reported immediately to the COR. If such reassignments are not available, the Service Provider shall remove the employee from work under this contract and other ICE contracts.

### 47.0    Tour of Duty Restrictions

The Service Provider shall not utilize any uniformed Service Provider employee to perform duties under this contract for more than 12 hours in any 24-hour period and shall ensure that

Attachment 1- PWS                                           70CDCR26D00000026

such employees have a minimum of eight hours off between shifts. Authorization is required from the COR prior to an employee performing services that exceed 12 hours; provided, however, the Service Provider may utilize uniformed employees to perform duties under this contract for up to 16 hours in any 24-hour period in the event of an emergency or other non-routine circumstances. If an

employee is performing other duties for either the Service Provider or another employer, those hours shall count against the 12-hour or 16-hour limitation. Employees performing transportation duties can work up to 15 hrs. in a 24-hour period as needed in accordance with U.S. Department of Transportation regulations.

### 48.0    Dual Positions

If a supervisory detention officer is not available for duty the Service Provider shall provide a full-time supervisor as a replacement. A contract employee shall not hold the position of detention officer and supervisory detention officer simultaneously. The COR will document and refer to the CO the failure of the Service Provider to provide necessary personnel to cover positions.

### 49.0    Post Relief

As indicated in the post orders, the detention officer shall not leave his or her post until relieved by another detention officer. The Service Provider or Service Provider's supervisor authorizes rest or relief periods; the Service Provider shall assign undesignated officers to perform the duties of the detention officers on break.

### 50.0    General Training Requirements

All officers must have the training described in the ACA Standards and in this sub-section. The Service Provider shall provide the required refresher courses or have an institution acceptable to the COR to provide the training. Failure of any employee to complete training successfully is enough reason to disqualify him or her from duty.

All new detention officers will receive 60 hours of basic training, not including firearms, prior to EOD and 40 hours of on-the-job training. The Service Provider's training officer will be responsible for administering an on-the-job training (OJT) program for new employees. A senior detention officer, during the 40-hour OJT period, must always accompany the detention officers. The Service Provider shall provide a copy of the

Attachment 1- PWS                                          70CDCR26D00000026

documentation to the COR upon successful completion of the employees' on-the-job training.

In addition, after completion of the first 100 hours of training, the Service Provider has 60 days to complete an additional 40 hours of training for each employee. During the remainder of the
first year on duty, the Service Provider shall provide the employee with an additional 40 hours of training for a total of 180 hours within the first year of employment. The training program must directly relate to the employee's assigned position and afford application of necessary job skills.

Detention officers shall not perform duties under this contract until they have successfully completed all initial training, and the COR receives a written certification from the Service Provider. Alternative or e-training techniques, unless approved in writing by the CO via the COR, shall not be used.

### 50.1.   Basic Training Subjects

Officers must complete the training required in accordance with the ACA and NDS 2025. The required training may include but is not limited to the following:

| | |
|---|---|
| In-service Orientation | 2 HRS |
| Counseling Techniques/Suicide Prevention and Intervention* | 2 HRS |
| Conduct/Duties/Ethics and Courtroom Demeanor | 2 HRS |
| Bomb Defense and Threats | 1 HR |
| Telephone Communications/Radio Procedures | 1 HR |
| Annual IT Security Training | 1 HR |
| Fire and other Emergency Procedures | 2 HRS |
| Treatment and Supervision of Aliens | 2 HRS |
| ICE, Use of Force Policy | 2 HRS |
| Security Methods/Key Control/Count | 1 HR |
| Procedures/Observational Techniques | 4 HRS |
| Sexual Harassment | 2 HRS |
| Alien Escort Techniques | 1 HR |

Attachment 1- PWS                                    70CDCR26D00000026

| | |
|---|---|
| ICE Paperwork/Report Writing | 2 HRS |
| Alien Searches/Alien Personal Property | 4 HRS |
| Property/Contraband | 2 HRS |
| Alien Rules and Regulations | 2 HRS |
| First Aid* | 4 HRS |
| Cardiopulmonary Resuscitation (CPR)* | 4 HRS |
| Blood-borne Pathogens* | 2 HRS |
| Self Defense | 8 HRS |
| Use of Restraints | 5 HRS |
| Firearms Training** | |
| Sexual Abuse/Assault Prevention and Intervention* | 2 HRS |
| ICE 2025 National Detention Standards | 2 HRS |
| Disability Accommodations | 1 HR |
| Language Access and Effective Communications | 1HR |
| Cultural Competency | 1HR |

*All training shall be conducted in a classroom or on-the-job training environment and shall be in accordance with the ACA Standards and NDS 2025. Online training is specifically prohibited to meet these requirements, unless approved in writing by the COR.*
 *\* Critical training subjects*
*\*\* Firearm training for detention officers who are required to provide Armed Transportation shall be in accordance with state licensing requirements. The Service Provider shall certify proficiency in accordance with state requirements.*

### 50.2.   Refresher Training

Annually the Service Provider shall conduct 40 hours of refresher training for all detention officers including supervisory detention officers. Refresher training shall consist of the critical subjects listed above and a review of basic training subjects and others as approved by ICE.

The Service Provider shall coordinate recertification in CPR and first aid as required. Annually, upon completion, the Service Provider shall provide documentation of refresher

Attachment 1- PWS                                    70CDCR26D00000026

training to the COR.

In addition to the refresher training requirements for all detention officers, supervisors must receive refresher training relating to supervisory duties.

### 50.3.  On-the-job Training

After completion of the minimum of 60 hours basic training, all detention officers will receive an additional 40 hours of on-the-job training at specific post positions.

This training includes:

i)   Authority of supervisors and organizational code of conduct.
j)   General information and special orders.
k)   Security systems operational procedures.
l)   Federal facility self-protection plan or emergency operational procedures.
m) Disturbance Control Team training.

### 50.4.  Training during Initial 60 Day Period

The Service Provider shall provide an additional 40 hours of training for detention officers within 60 days after completion of the first 100 hours of training. The Service Provider shall provide the training format and subjects, for approval by the COR and/or CO, prior to the commencement of training.

### 50.5.  Basic First Aid and CPR Training

All Service Provider employees shall be trained in basic first aid and CPR. They must be able to:

n)   Respond to emergency situations within four minutes.
o)   Perform CPR.
p)   Recognize warning signs of impending medical emergencies.
q)   Know how to obtain medical assistance.
r)   Recognize signs and symptoms of mental illness.
s)   Administer medication.
t)   Know the universal precautions for protection against blood-borne diseases.

### 50.6.  Supervisory Training

All new supervisory detention officers assigned to perform the work under this contract must successfully complete a minimum of 40 hours of formal supervisory training provided by the Service Provider prior to assuming duties. This training is in addition to mandatory

Attachment 1- PWS                                70CDCR26D00000026

training requirements for detention officers. Supervisory training shall include the following management areas:

| | |
|---|---|
| Techniques for issuing written and verbal orders | 2 HRS Uniform |
| clothing and grooming standards | 1 HR  Security |
| post inspection procedures | 2 HRS |
| Employee motivation | 1 HR |
| Scheduling and overtime controls | 2 HRS |
| Managerial public relations | 4 HRS |
| Supervision of aliens | 4 HRS |
| Other company policies | 4 HRS |
| Non-violent Crisis Intervention | 8 HRS |
| ICE 2025 National Detention Standards | 12 HRS |

## 50.7.   Proficiency Testing

The Service Provider shall give a written examination following each training class to display proficiency.  To pass any examination, employees must achieve a minimum of 80 percent. Should an employee fail the written test on the initial attempt, the employee shall be given additional training and be given one additional opportunity to retake the test. If the employee fails the second attempt, the Service Provider shall remove the employee from the contract.

## 50.8.   Certified Instructors

Certified instructors shall conduct all instruction and testing. A state or nationally recognized institution shall certify instructors unless otherwise approved in writing by the COR. Certifications of instructors may be established by documentation of experience in teaching positions or by successful completion of a course of training for qualifying personnel as instructors. The COR must approve the instructor prior to the training  course.

## 50.9.   Training Documentation

The Service Provider shall submit a training forecast and lesson plans to the COR and ICE official at least 30 days prior to all training. The training forecast shall provide date, time, and location of scheduled training and afford the COR observation/evaluation opportunity.
The Service Provider shall certify and submit the training hours, type of training, date and

Attachment 1- PWS                                         70CDCR26D00000026

location of training, and name of the instructor monthly for each employee to the COR and ICE official.

### 51.0   Uniforms

The service provider shall provide uniforms to its employees, such as khaki pants and polo shirts. The design and color of the service provider's uniforms shall not be similar to those worn by ICE officers. All officers performing under this contract shall wear uniforms of the same style and color while on duty. Supervisory personnel should wear different color shirts to distinguish them from line staff. Each officer shall wear an identification nametag over the right breast shirt pocket. Uniforms and equipment do not have to be new but shall be in good condition and meet the standards at the start of duty. Officers who are not in proper uniform shall be considered "not ready for duty/not on duty" until properly uniformed. All uniforms shall be clean, neat, and in good order.

The complete uniform consists of seasonal attire that includes appropriate shirts, pants, belt (mandatory), cap (mandatory), jacket, shoes or boots (mandatory), duty belt, mini-mag flashlight and holder, handheld radio, and key-holder. The service provider shall ensure that each officer has a complete uniform.

Prior to the agreement's performance date, the service provider shall document to the COR, the uniform and equipment items that have been issued to each employee. The COR shall have the right to approve or disapprove any uniform apparel.

### 51.1.   Identification Credentials

The Service Provider shall ensure that all employees, both uniformed and non-uniformed (if applicable), have the required identification credentials in their possession while on the premises. The Service Provider identification credential document shall contain the following:

u) A photograph that is at least one-inch square that shows the full face and shoulders of the employee and is no more than 30 days old when the credential is issued.

v) A printed document that contains personal data and description consisting of the employee's name, sex, birth date, height, and eye color, as well as the date of issuance, the signature of the employee, and the signature of project manager or designated Service Provider personnel.

w) To avoid the appearance of having government issued badges, the Service Provider shall not possess wallet type badges or credentials. All credentials shall be approved by the COR or other ICE officials.

Attachment 1- PWS                                                70CDCR26D00000026

**52.0   Permits and Licenses**

The Service Provider shall ensure each employee has registrations, commissions, permits, and licenses as required by the district, municipality, county, and state in which ICE work site is performed prior to Entry on Duty (EOD). The Service Provider shall verify all licenses and certifications. If applicable, all Service Provider staff shall possess a current license/registration, in the state in which they are practicing.

**53.0   Jurisdiction**

The Service Provider's authority under this contract is limited to space or posts that are under the charge and control of ICE. The Service Provider shall not extend its services into any other areas.

**54.0   Encroachment**

Service Provider employees shall not have access to government equipment, documents, materials, or telephones for any purpose other than as authorized by ICE. Service Provider employees shall not enter any restricted areas of the detention centers unless necessary for the performance of their duties.

**55.0   Work Schedules**

The Service Provider shall follow the criteria described below when establishing work schedules, contract relief, rest periods, and starting and stopping work.

**56.0   Post Work Schedules**

One week in advance, the Service Provider shall prepare supervisory and detention officer work schedules, for a two-week period, and shall post them in work areas or locker rooms. A manpower report shall be submitted to the COR monthly. Schedules shall be prepared on a form designated by ICE. Changes in duty hours shall also be posted on this form in enough time to ensure 24-hour advance notice. At the completion of each shift, the Service Provider shall, upon request of the COR, also provide an employment report listing (copies of the sign-in sheets [GSA Form 139, Record of Arrival and Departure from Buildings during Security Hours, or approved equivalent Record of Arrival and Departure from Buildings during Security Hours] for each shift) for each employee who actually worked, work classification, post assignments, and hours worked, as well as total hours worked by supervisory and non-supervisory employees. A supervisor shall conduct regular post checks

90

Attachment 1- PWS                                    70CDCR26D00000026

to ensure personnel are on duty. When a contract employee is not being utilized at a given post, the Service Provider at the direction of the COR and ICE supervisor on duty may reassign him/her to another post.

### 57.0   Starting and Stopping Work

The Service Provider is responsible for all employees to be in complete uniform and ready to begin work promptly at the beginning of each shift. Each employee shall remain at the duty locations until the shift is completed.

 a)  Recording Presence
The Service Provider shall direct its employees to sign in when reporting for work and to sign out when leaving at the end of their period of duty. The Service Provider's supervisory and regular personnel are required to register at the applicable work site(s) and shall use a timekeeping system.  The government shall specify the registration points, which will be at the protected premises, and the Service Provider shall utilize those points for this purpose.

 b)  Rest Periods

When the Service Provider or a Service Provider supervisor authorizes rest and relief periods for the contract employees, a substitute officer shall be assigned to the duty location.

 c)  Work Relief
When the work assignments require that the Service Provider's employees do not leave the assigned duty locations until a substitute officer has provided relief, this condition shall be explicitly stated on GSA Form 2580 (Attachment 17), Guard Post Assignment Record, or other forms designated by the COR. The Service Provider shall enforce the procedure without exceptions.

### 58.0   Health and Medical Care Policies

The Service Provider shall comply with written policies and procedures for appropriately addressing the health needs of aliens in ICE custody. Written policies and procedures shall include, but not be limited to, the following:
a)  Policies and procedures for prompt summoning of emergency medical personnel.
b)  Policies and procedures for evacuation of aliens, if deemed necessary by qualified medical personnel.
c)  Policies, procedures, and post procedures for duty officers to ensure that medical

Attachment 1- PWS                                    70CDCR26D00000026

emergencies are recognized and promptly attended to.

### 59.0    Hospitalization of Aliens

Upon order of the COR and designated ICE officer, or in an emergency, the Service Provider shall take custody of and safeguard aliens at a hospital or clinic when the aliens are undergoing medical examination. The Service Provider shall remain until relieved by another employee.

Twenty-four-hour custody shall be maintained, with constant visual observation when practicable. The aliens shall not use telephones unless the Service Provider receives prior approval from the COR or other designated ICE officials. Service Provider employees shall not fraternize with clinic/hospital staff or with casual visitors to the clinic/hospital. Alien visitation is not permitted at the hospital. To prevent any situation which could result in a breach of security, requests for visitation while the alien is in detention, including hospital detention, shall be pre-approved by the COR(s) or other designated ICE officials prior to allowing access to the alien. The Service Provider is obligated to relay messages as requested by the alien to the COR or other designated ICE officials.

### 60.0    Federal Facility Requirements for Infectious Disease Screening

The Service Provider will ensure that there is adequate space and equipment to provide medical intake screening, including TB screening within the intake processing area.

### 61.0    Airborne Precautions

In order to prevent the spread of airborne infectious disease or cross contamination of zones within the federal facility, the HVAC system in the intake screening area shall be designed to exhaust to the exterior and prevent air exchange between the intake screening area and any other area within the federal facility (see CDC guidelines: Tuberculosis (TB) | Tuberculosis (TB) | CDC

### 62.0    Required Administration and Management Services

#### 62.1. Manage the Receiving and Discharge of Aliens

During the admissions process, aliens must undergo screening for medical purposes, have

92

their files reviewed for classification purposes, submit to a standard body search, and are personally observed and certified regarding the examination, categorization, inventorying, and safeguarding of all personal belongings. This includes fingerprinting of aliens.

The Service Provider shall ensure aliens are classified appropriately using objective criteria. Aliens will be classified upon arrival, before being admitted to the general population. The Service Provider will periodically re-classify aliens, in accordance with the NDS 2025.

The Service Provider may be required to access and utilize the ICE detention booking system to properly book aliens in and out of ICE custody.

The Service Provider shall effectuate departures. Effectuating departures require Service Provider employees to perform alien-related activities including but not limited to positive identification, documentation preparation and review, provision of any sack lunches required, transportation, escorting and returning all DHS documentation to the appropriate ICE supervisor upon completing the escort assignment. In addition, Service Provider employees shall, when required by proper authority, affirm, swear, and witness to all actions of effectuating departure that were accomplished, performed, carried out, and done, and in transactions involving the alien(s), when required in a legal setting, deposition, or court of law.

Aliens that are released should, prior to release, be given the opportunity to make a free phone call to arrange for pick up from the federal facility.

Aliens that are released shall be transported to a local airport, bus terminal, train station, or subway station prior to the time of the last departure at their destination, so the released individual would depart the same day, and not be required to spend time overnight in a transportation terminal. The time, point, and manner of release from a federal facility shall be consistent with safety considerations and consider special vulnerabilities.

If public transportation is within walking distance of the federal facility, aliens shall be provided with an information sheet that gives directions to and describes the types of transportation services available. However, the federal facility must provide transportation for any alien who is not reasonably able to walk due to age, disability, illness, mental health, or other vulnerability. In addition, the federal facility must provide transportation for any alien because of weather or other environmental conditions at the time of release that may endanger the safety of the alien.

If an alien resided in the local area near the federal facility prior to arrest and is released to the same local area upon release, they shall be provided with a list of shelter services

available, along with directions to each shelter. ICE may provide the Service Provider with national resource information to be distributed by the Service Provider to aliens upon release. These include lists of resources such as national hotline information.

As practicable, aliens shall be provided with a laundered set of their own clothing, or one set of non-institutional clothing and footwear that is weather-appropriate for their destination.

## 62.2.   Manage and Maintain a Commissary

A commissary shall be operated by the Service Provider as a privilege to aliens who will have the opportunity to purchase from the commissary at least once per week. All items available at the commissary must be approved by the COR and ICE officials. The commissary inventory shall be provided to the COR upon request. Notice of any price increases must be provided to the COR. The Service Provider may assess sales tax on the price of items if state sales tax is applicable.

Revenues shall be maintained in the federal facility commissary account and not commingled with any other funds. If funds are placed in an interest-bearing account, the interest earned shall be credited to the aliens. Any expenditure of funds from the account shall only be made with the approval of the CO. Any revenues earned in excess of what is required for commissary operations shall be used solely to benefit aliens at the federal facility. Using these funds for any expense for which the Service Provider is required to pay is prohibited. The Service Provider shall provide independent auditor certification of the funds to the COR every 90 days.

At the end of the contract period, or as directed by the CO, a check for any profits remaining in this account associated with alien commissary purchases shall be made payable to the Treasury general trust fund. The Service Provider shall coordinate with the COR to return funds as required.

Aliens are permitted to receive funds from outside sources (i.e., from family, friends, bank accounts). Outside funds or those generated from work may be used to pay for products and services from the commissary.

## 62.3.   Manage and Account for Alien Assets (Funds, Property)

The Service Provider is responsible for all alien personal property (i.e., stolen/misplaced goods due to Service Provider negligence and/or mishandling of alien personal property). The Service Provider shall have written policies and procedures in managing personal property.

Attachment 1- PWS                                          70CDCR26D00000026

The safeguarding of personal property will include: the secure storage and return of funds, valuables, baggage, and other personal property; a procedure for documentation and receipting of surrendered property; and the initial and regularly scheduled inventories of all funds, valuables, and other property.

Written procedures shall be established for returning funds, valuables, and personal property to an alien being transferred or released that adheres to the requirements of ICE policy. The Service Provider shall ensure that all aliens who are scheduled for either transfer or release are given all funds (in cash or check, whichever is deemed appropriate by the COR or designated ICE official) immediately prior to leaving the federal facility. Confiscated foreign currency funds are to be returned to the alien. This includes the out-processing of aliens on all removal flights. For such removal flights, the Service Provider will provide all necessary items for removal processing.

The Service Provider shall return or discard any unclaimed, undesired, or abandoned property to the last known address of the alien or his designated contact. The Service Provider shall log all property returned or discarded, the address where the property was sent, and the date the property was shipped or destroyed. Property shall be checked at least once per month to ensure that there is not an excess of property left in the federal facility.

### 62.4. Securely Operate the Federal Facility

Staff responsible for lock maintenance shall receive training and be certified from a government approved training program specializing in the operation of locks and locking mechanisms.

The Service Provider shall provide constant less than lethal armed perimeter surveillance of the federal facility. The federal facility shall have sufficient auxiliary power through generator or battery back-up to maintain secure operations.

### 62.5. Establish and Maintain a Program for the Prevention of Sexual Abuse/Assault

The Service Provider shall develop and implement a comprehensive sexual abuse/assault prevention and intervention program in accordance with NDS 2025, Standard 2.11, Sexual Abuse and Assault Prevention and Intervention, and all federal facility requirements of the DHS PREA (Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities, 79 Fed. Reg. 13100 (Mar. 7, 2014), as outlined in Attachment 11 – Prison Rape Elimination Act Regulations. This program shall include training and/or

Attachment 1- PWS                                       70CDCR26D00000026

information that is given separately to both staff and aliens.

### 62.6.  Visitation

The federal facility's perimeter will ensure that aliens remain within, and that public access is denied without proper authorization. Visitation and/or tours of the federal facility shall be conducted in accordance with the relevant provisions of NDS 2025 or as directed by ICE. For the safety and privacy of the aliens, no videotaping or audio recording devices are permitted by visitors or others (including Service Provider employees) within the secure perimeter without prior approval from ICE. This prohibition does not include approved closed-circuit television cameras operated by the Service Provider or the government for security purposes.

### 62.7.  Manage Computer Equipment and Services in Accordance with all Operational Security Requirements

The Service Provider shall comply with all federal security and privacy laws and regulations established to protect federal systems and data. The Service Provider shall inform all personnel of the confidential nature of ICE alien information.

The Service Provider shall restrict access to data information pertaining to ICE aliens to authorized employees with the appropriate clearance who require this information in the course of their official duties. In accordance with the Freedom of

Information/Privacy Act, the service provider shall not disclose information obtained pertaining to ICE detainees to a third party without written permission from the COR.

The Service Provider may not disclose information pertaining to ICE aliens to a third party without written permission from the COR.

The Service Provider shall develop a procedural system to identify and record unauthorized access or attempts to access ICE alien information. The Service Provider shall notify the COR and ICE officials within four hours of a security incident.

### 62.8.  Non-Segregated Protective Custody Housing

The federal facility shall include at least one non-segregated (i.e., not a segregation housing unit) protective custody housing option for placing aliens who may benefit from a more supportive or specialized general population setting together by biological sex. This unit would be used as an alternative to prolonged placement in administrative segregation. The

96

intended population for this housing option may include individuals who have been identified as having a vulnerability, at increased risk in detention, and/or who feel safer in a protective-custody-like setting (i.e., an alternative for those who request administrative segregation for protective custody reasons). The number of non-segregated protective custody housing options should appropriately reflect the federal facility population, and at a minimum, include both male and female housing options (if the federal facility houses female population).

The federal facility will determine an alien's risk and appropriateness for non-segregated protective custody housing during intake or any time while the alien is in custody. Non-segregated protective custody housing unit(s) are in addition to segregation or medical housing.

Placement in non-segregated protective custody housing may be based on a range of factors, including but not limited to, request by an alien (in lieu of protective custody administrative segregation), behavioral health needs, cognitive impairments, age, disability, or other identified vulnerability. Non-segregated protective custody housing criteria should not be prescriptive but rather based on an individualized assessment of risk and vulnerability.

Non-segregated protective custody housing will operate like a general population unit in terms of freedom of movement, and ICE detention standards for general housing will apply. Aliens in non-segregated protective custody housing will have equal access to all federal facility services and programming available to aliens in general population housing and shall not include any limitations not applied to the general population.

Non-segregated protective custody housing units shall be staffed by federal facility personnel who should be trained in working with vulnerable populations and trauma-informed care. Staff-to-alien ratios are expected to be higher than in general population housing units to provide for heightened security and care. The housing unit personnel will provide additional assistance (as needed) to aliens, including an enhanced federal facility orientation in the alien's language on federal facility programs and services and how to use various communication mechanisms (i.e., paper forms/requests, telephones, and tablets, where available) to communicate with federal facility staff, ERO, and external parties such as family and legal representatives.

Additional programming applicable to the population in non-segregated protective custody housing units shall be offered. Non-segregated protective custody housing units shall include self-help materials and pro-social organized activities, including those which will assist with promoting a calm environment. The Service Provider is expected to be knowledgeable in and implement effective programming for non-segregated protective custody housing units which are also responsive to the population's needs.

Attachment 1- PWS                                                70CDCR26D00000026

The federal facility shall maintain a multi-disciplinary team to oversee and manage placement in non-segregated protective custody housing units. The multi-disciplinary team may be the same group that conducts the weekly review of segregation placements but shall at least include behavioral health staff, custody staff, and a federal facility supervisor. Intake staff will identify and refer prospective candidates for the non-segregated protective custody housing unit to the multi-disciplinary team. Aliens may also request placement in non-segregated protective custody housing at any time while in the federal facility for consideration by the multi-disciplinary team. Monthly individualized assessments by the multi-disciplinary team will consider behavioral health and/or other factors which were the basis for placement in the non-segregated protective custody housing unit. The federal facility will document/track admissions to and departures from the non-segregated protective custody housing unit(s) and the reason for placement in and removal from the unit.

A minimum of two Service Provider employees shall be assigned each shift to verify that the segregation paperwork has been completed properly and entered in the alien's segregation file. The employees shall also be responsible for gaining and maintaining access to eSRMS. All required documentation for the segregation population will be entered daily into eSRMS by Service Provider employees.

Note: the Service Provider must comply with the needs and requirements stated in U.S. ICE Policy 11065.1: Review of the Use of Segregation for ICE Detainees.

### 63.0    Collect and Disseminate Intelligence Information

Policies and procedures for collecting, analyzing, and disseminating intelligence information regarding issues affecting safety, security, and the orderly running of the federal facility shall be developed. This information shall include but not be limited to gang affiliations; domestic terrorist groups; tracking of aliens having advanced skills in areas of concern (locksmiths, gunsmiths, explosives, and computers, etc.); narcotics trafficking; mail and correspondences; alien financial information; alien telephone calls; visiting room activity; and actions of high-profile aliens. The Service Provider shall share all intelligence information with the COR and ICE officials.

### 64.0    ICE Notifications

The Service Provider shall immediately report all serious incidents as outlined in the detention standards to the field office director or designee and the COR. Serious incidents include, but are not limited to the following: activation of disturbance control team(s);

disturbances (including gang activities, group demonstrations, food boycotts, work strikes, work place violence, civil disturbances/protests); staff uses of force including use of lethal and less-lethal force (includes aliens in restraints more than eight hours); assaults on staff/aliens resulting in injuries that require medical attention (does not include routine medical evaluation after the incident); fires; fights resulting in injuries requiring medical attention; full or partial lockdown of the federal facility; escape; weapons discharge; suicide attempts; deaths; declared or nondeclared hunger strikes; adverse incidents that attract unusual interest or significant publicity; adverse weather; fence damage; power outages; bomb threats; high profile alien cases admitted to a hospital; significant environmental problems that impact the federal facility operations; transportation accidents (e.g., airlift, bus) resulting in injuries, death or property damage; and sexual assaults.

Pursuant to ICE instructions, the Service Provider shall counteract civil disturbances, attempts to commit espionage or sabotage, and other acts that adversely affect the normal site conditions, the security and safety of personnel, property, aliens, and the public.

## 65.0    Property Accountability

### 65.1.   General

ICE IT Equipment:  ICE shall provide and install IT equipment in office spaces for ICE personnel only, to include computer workstations and screens, printers, and fax machines. All infrastructure and cabling shall be provided by the service provider in accordance with the Attachment 12 – CDF Design Standards – ICE – OPLA - Structured Cable Plant Standard.

NOTE: ICE IT system must be a complete, independent, and physically separate system from the Service Provider's IT system. The system shall serve all operational components including ICE and EOIR.

The Service Provider personnel shall not permit any government property to be taken away or removed from the premises. The Service Provider shall enact practices to safeguard and protect government property against abuse, loss, or any other such incidents. Government property shall be used only for official business.

All government property furnished under this contract shall remain property of the government throughout the contract term. ICE shall maintain a written inventory of all government property issued to the Service Provider for performance hereunder. Upon expiration or termination of this contract, the Service Provider shall render a written account

Attachment 1- PWS                                      70CDCR26D00000026

to the COR of all such property. The Service Provider shall assume all risks and shall be responsible for any damage to, or loss of government furnished property used by Service Provider employees. Normal wear and tear will be allowed.

The Service Provider, upon expiration or termination of services, shall immediately transfer to the COR, all government property in its possession or in the possession of any individual or organization under its control, except as otherwise provided for in this contract. The Service Provider shall cooperate fully in transferring property to the successor Service Provider. The government shall withhold final payment until adjustments are made for any lost property.

### 65.2.   Use of Government Wireless Communication Devices

All personnel that have been issued a federal government owned wireless communication device, including but not limited to, cellular telephones, pagers, or wireless Internet devices, are authorized to possess and use those items in all areas of the federal facility. Cellular, telephone, and wireless boosters shall be provided, installed, and maintained by the Service Provider to ensure optimal service throughout the federal facility and ICE and/or DOJ administrative areas.

### 66.0   Firearms/Body Armor

### 66.1.   Firearms Requirements

The Service Provider shall provide well maintained and serviceable or new firearms and maintain enough licensed firearms and ammunition to equip each armed detention officer and armed supervisor(s) with a licensed weapon while on duty. Firearms may be re-issued to new employees throughout the life of the contract if the firearm is in a serviceable condition. See Attachment 14 – ICE Firearms and Use of Force Handbook.

Personal firearms shall not be used. A licensed gunsmith, in writing, shall certify all firearms safe and accurate.

Firearms shall be standard police service-type, semi-automatic capable of firing hollow-point ammunition that meets the recommendations of the firearms manufacturer.

Ammunition will be factory load only – no reloads. The Service Provider shall adhere to the manufacturer's specifications regarding ammunition retention, e.g., ammunition shall be properly rotated, and older ammunition utilized prior to utilization of newer ammunition. All firearms shall be licensed by the State. Armed officers are required to obtain a class G

Attachment 1- PWS                                    70CDCR26D00000026

license.

The Service Provider shall provide enough ammunition for each armed detention officer, including uniformed contract supervisor(s) to be issued three full magazines.

The Service Provider shall account for all firearms and ammunition daily. If any weapons or ammunition are missing from the inventory, the COR shall be notified immediately.
The Service Provider shall provide a complete listing of licensed firearms by serial numbers and by each safe location to the COR prior to beginning performance under this contract.

Firearms shall be inspected. This shall be documented by the warden/federal facility director. Loading, unloading, and cleaning of the firearms shall only take place in designated areas. Firearms shall be carried with the safety on, if applicable, with a round in the chamber.

The Service Provider shall maintain appropriate and ample supplies of firearms upkeep and maintenance equipment (cleaning solvents, lubricating oil, rods, brushes, patches, and other normal maintenance tools). The firearms shall be cleaned and oiled as appropriate to ensure optimum operating condition.

The Service Provider shall obtain and maintain on file appropriate state and municipality permits and weapons permits for each officer.

A copy of this permit shall be provided to the COR at least three working days prior to the anticipated assignment date of any individual. The Service Provider shall ensure that its employees always have all permits and licenses in their possession while in the performance of this contract.

The Service Provider shall provide safes/vaults for storage of firearms and ammunition, for each location where firearms are issued or exchanged, which meet ICE
requirements and are approved for the storage of firearms and ammunition. The COR is responsible for approving the proposed safes/vaults prior to usage. Contract supervisors and guards shall make accurate receipts and return entries on a Firearms and Equipment Control Register. Except when issuing or returning ammunition or firearms, each safe/vault shall always remain locked. The Service Provider shall change the combination of each safe/vault at least once every six months, or more often if circumstances warrant.

The Service Provider shall certify firearms training to the COR. The Service Provider shall certify staff proficiency every quarter.

The Service Provider shall provide an ICE approved intermediate weapon(s).

101

Attachment 1- PWS                         70CDCR26D00000026

The Service Provider shall assign one or more Service Provider staff to the positions of Ammunition Control Officer and Firearms Control Officer.

### 66.2.   Body Armor Requirements

The Service Provider shall provide body armor to all armed detention officers and armed supervisors. Body armor shall be worn while on armed duty. The body armor will meet all requirements set forth in the ICE Body Armor Policy. See Attachment 13 – ICE Body Armor Policy.

The Service Provider shall procure replacement body armor if the body armor becomes unserviceable, ill-fitting, worn/damaged, or at the expiration of service life.

All armed detention officers and armed supervisors need to be made aware of the health risks associated with the wearing of body armor in high heat/high humidity conditions and/or during strenuous exertion. When detention officers and supervisors are required to wear body armor, they shall be provided with opportunities to rehydrate and remove the body armor as necessary.

The use of personally owned body armor is not authorized.

Additional Equipment: The Service Provider shall provide the following equipment for each officer performing services under this contract: Metal handcuffs and a handcuff carrying case.

Handcuffs should be equal to or better than the basic Smith & Wesson brand. One mini-mag or comparable size, operational flashlight with batteries and a belt holder.

Inclement weather apparel appropriate to local conditions. Fully operational protection equipment that meets universal protection requirements. This includes but is not limited to gloves, face masks, ear, and eye protection. Hand restraints, leg restraints and belly chains. All operational protection equipment shall be replaced by the Service Provider as items begin to show wear and tear.

### 67.0    Records Management

The Service Provider will provide DHS basic records management training for all Government Service Provider employees and subservice Providers at the outset of their work on the contract and every year thereafter. A hard copy of the training will be provided as vendors will not have access to ICE systems. The Service Provider shall maintain copies of certificates as a record of compliance. The Service Provider must submit an annual e-mail notification to the Contracting Officer's Representative that the required training has been completed for all the Service Provider's employees and subservice Providers.

The Service Provider shall treat all federal records (as defined in 44 U.S.C. § 3301) under

Attachment 1- PWS                                          70CDCR26D00000026

the contract as the property of the U.S. government for which the agency shall have unlimited rights to use, dispose of, or disclose such data contained therein. Any records containing information regarding detainees are considered Federal records and the Service Provider shall comply with 8 C.F.R. §236.6. The Service Provider shall not retain, use, sell, or disseminate copies of any deliverable without the expressed permission of the CO or COR. As consistent with Federal records schedules and the terms of this contract, the Service Provider shall certify in writing the destruction or return of all government data at the conclusion of the contract or at a time otherwise specified in the contract. Prior to any destruction, the Service Provider shall consult with the CO or COR to ensure any such destruction follows the governing NARA records control schedule. The agency owns the rights to all information and records produced as part of this contract.

The Service Provider shall not create or maintain any records that are not specifically tied to or authorized by the contract using Government IT equipment and/or Government records. The Service Provider shall not create or maintain any records containing any Government agency data that are not specifically tied to or authorized by the contract.
The Government Agency owns the rights to all electronic information (electronic data, electronic information systems or electronic databases) and all supporting documentation created as part of this contract. The Service Provider must deliver sufficient technical documentation with all data deliverables to permit the Agency to use the data.
The Service Provider agrees to comply with Federal records management laws, regulations, and Agency policies, including those associated with the safeguarding of records covered by the Privacy Act of 1974, 44 U.S. Code Chapter 31 (Records Management by Federal Agencies), and CFR Title 36 Chapter XII Subchapter B (Records Management). These include the preservation of all records created or received regardless of format, mode of transmission, or state of completion.

No disposition of documents will be allowed without the prior written consent of the CO. The agency and its Service Providers are responsible for preventing the alienation or unauthorized destruction of records, including all forms of mutilation. Willful and unlawful destruction, damage or alienation of Federal records is subject to the fines and penalties imposed by 18 U.S.C. 2701. Records may not be removed from the legal custody of the agency or destroyed without regard to the provisions of the governing NARA records control schedules. The Service Provider must report any unlawful or accidental removal, defacing, alteration, or destruction of records to the COR immediately upon discovery.
Upon termination or expiration of the contract, the Service Provider must return all Federal and Agency records created or maintained as part of the contract. These records must be returned to the Contracting Officer, Contracting Officer's Representative, or other Designated Agency Representative in a format that ensures they are accessible to the Agency

Attachment 1- PWS                                  70CDCR26D00000026

without the use of proprietary software that requires the Agency to engage in additional acquisition or procurement actions.

Prior to the start of the contract, the Service Provider must submit a Records Plan outlining how it will maintain ICE records throughout the duration of the contract period. The plan must include the following items:

a)  A statement acknowledging awareness of relevant General Records Schedules (GRS); DHS records schedules; and ICE records schedules and their intent to comply with the applicable retention requirements. (ICE records schedules can be found at the following link: Records Control Schedules | National Archives)

b)  A summary of recordkeeping activities it plans to undertake to ensure all records are properly maintained during the entire records lifecycle (e.g., creation, disposition, etc.). This summary must include where and how ICE records will be stored in an acceptable climate-controlled environment.

c)  A summary of electronic recordkeeping activities it plans to undertake to ensure compliance with electronic records management (ERM) practices that are currently underway in ICE (e.g., cloud storage, metadata management). The plan must include details regarding any video/audio records it creates or uses and how they will be stored during lengthy periods of time.

d)  A point of contact for addressing recordkeeping issues and rectifying any discrepancies noted during a records assessment and/or inspection.

The Records Plan must be approved by the ICE Records Officer no sooner than 30 days before the start of the contract period.

## 68.0    Personnel Background Security Requirements

### 68.1.   General

ICE has determined that the performance of the tasks as described in this contract requires that the Service Provider, subservice Provider(s), vendor(s), etc. (herein known as Service Provider) have access to sensitive DHS information, and that the Service Provider will adhere to the following.

### 68.2.   Service Provider Employee Fitness Screening

Screening criteria under DHS Instruction 121-01-007, Revision 2, dated August 10, 2024, Personnel Security, Suitability and Fitness Program, dated June 14, 2017, or successor

104

Attachment 1- PWS                                  70CDCR26D00000026

thereto, and Title 5, CFR part 731, dated December 18, 2024, that may exclude Service Provider employees from consideration to perform under this agreement includes:

- Misconduct or negligence in employment.
- Criminal conduct.
- Material, intentional false statement or deception of fraud in examination or appointment.
- Dishonest conduct.
- Excessive alcohol use, without evidence of rehabilitation, of a nature and duration that suggests that the applicant or appointee would be prevented from performing the duties of the position in question or would constitute a direct threat to the property or safety of the applicant or appointee or others.
- Illegal use of narcotics, drugs, or other controlled substances, without evidence of substantial rehabilitation.
- Knowing and willful engagement in acts or activities designed to overthrow the U.S. Government by force.
- Any statutory or regulatory bar which prevents the lawful employment of the person involved in the position in question (for Excepted Service employees).
- Violent conduct; and
- Any other nondiscriminatory reason that an individual's employment (or work on a contract) would not protect the integrity or promote the efficiency of the service.
  Screening criteria under 6 CFR § 115.117 (Sexual Abuse and Assault Prevention Standards) implemented pursuant to Public Law 108-79 (DHS PREA Standards) or successor thereto, that WILL exclude Service Provider employees from consideration to perform under this agreement includes:
- Engaged in Sexual Abuse in a Prison, Jail, Holding facility, Community Confinement facility, Juvenile facility, or other Institution as defined under 42 USC 1997.
- Convicted of engaging or attempting to engage in sexual activity facilitated by force, overt or implied threats of force, or coercion, or if the victim did not consent or was unable to consent or refuse.
- Civilly or administratively adjudicated to having engaged in such activity.
  Subject to existing law, regulations and/or other provisions of this Agreement, undocumented aliens shall not be employed by the Service Provider.

### 68.3.   Position Designation

In accordance with Title 5, CFR part 731, dated December 18, 2024, and 5 CFR 1400. Agencies are required to designate position risk and sensitivity level for all Service Provider employees to determine the commensurate level of background investigation. The public trust risk in a position is the assessment of the degree of potential damage to the efficiency or integrity of the service that could arise from misconduct by the incumbent in the position. Therefore, once the contract is awarded and before the vendor starts submitting personnel

Attachment 1- PWS                                                70CDCR26D00000026

for security vetting, the Service Provider will provide, through the CORs, a list of all positions, to include titles and specific description of the duties for each of positions assigned to support the contract.

### 68.4.  Preliminary Fitness Determination

ICE will exercise full control over granting, denying, withholding or terminating unescorted government federal facility and/or sensitive Government information access for Service Provider applicants/employees, based upon the results of a Fitness screening process. ICE may, as it deems appropriate, authorize and make a favorable expedited preliminary Fitness determination based on preliminary security checks. The preliminary Fitness determination will allow the Service Provider employee to commence work temporarily prior to the completion of a Full Field Background Investigation. The granting of a favorable preliminary Fitness shall not be considered as assurance that a favorable final Fitness determination will follow as a result thereof. The granting of preliminary Fitness or final Fitness shall in no way prevent, preclude, or bar the withdrawal or termination of any such access by ICE, at any time during the term of the contract. No employee of the Service Provider shall be allowed to enter on duty and/or access sensitive information or systems without a favorable preliminary Fitness determination by OPR PSD. No employee of the Service Provider shall be allowed unescorted access to a federal Government facility without a favorable preliminary Fitness determination by OPR PSD. Contract employees are processed under 5 CFR 731 dated December 18, 2024, and DHS Instruction 121-01-007, Revision 2, dated August 10, 2024, or successors thereto; those having direct contact with Detainees will also have 6 CFR § 115.117 considerations made as part of the Fitness screening process. Sexual Abuse and Assault Prevention Standards implemented pursuant to Public Law 108-79 (DHS PREA Standards).

### 68.5.  Background Investigation

Service Provider employees (to include applicants, temporary, part-time and replacement employees) under the contract, needing access to sensitive information and/or ICE Detainees, shall undergo a position sensitivity analysis based on the duties everyone will perform on the contract. The results of the position sensitivity analysis shall identify the appropriate background investigation to be conducted. Background investigations will be processed through OPR PSD. Service Provider applicants/employees are nominated by a Contracting Officer Representative (COR)

for consideration to support this contract via submission of the DHS Form 11000-25 and ICE Supplement to the DHS Form 11000-25 to OPR PSD. This contract shall submit the following security vetting documentation to OPR PSD, through the COR, within 10 days of

106

Attachment 1- PWS                                     70CDCR26D00000026

notification of initiation of an Electronic Application for Background Investigations (eAPP), or successor thereto, in the Office of Personnel Management (OPM) automated on-line system:

a) Standard Form 85P (Standard Form 85PS (with supplement to 85P required for those with direct contact with detainees or armed positions)), "Questionnaire for Public Trust Positions" form completed online and archived by the Service Provider applicant/employee in their NBIS eAPP account.

b) Signature Release Forms (Three total) generated by NBIS eAPP upon completion of Questionnaire (e-signature recommended/acceptable). Completed online and archived by the Service Provider applicant/employee in their NBIS eAPP account.

c) Electronic fingerprints taken at an approved federal facility **OR** two (2) SF 87 Fingerprint Cards (current revision) sent to OPR PSD. Additional information regarding fingerprints will be sent to the Service Provider applicant/employee from OPR PSD.

d) Optional Form 306 Declaration for Federal Employment. This document is sent as an attachment in an e-mail to the Service Provider applicant/employee from OPR PSD.

e) Social Security Administration 89 form (SSA-89): Authorization for the Social Security Administration (SSA) to Release Social Security Number (SSN) Verification. This document is sent as an attachment in an e-mail to the Service Provider applicant/employee from OPR PSD.

f) If occupying PREA designated position: Questionnaire regarding conduct defined under 6 CFR § 115.117 (Sexual Abuse and Assault Prevention Standards). This document is sent as an attachment in an e-mail to the Service Provider applicant/employee from OPR PSD.

g) One additional document may be applicable if the Service Provider applicant/employee was born abroad. If applicable, the document will be sent as an attachment in an e-mail to OPR PSD from the Service Provider applicant/employee.

Service Provider employees who have an adequate, current investigation by another Federal Agency may not be required to submit complete security packages; the investigation may be accepted under transfer of trust. The questionnaire related to 6 CFR § 115.117 listed above in item 5 will be required for positions designated under PREA. OPR PSD will determine if personnel meet transfer of trust requirements at the initial stage of processing and prior to requesting a new security questionnaire.

With respect to break-in-service requirements for transfer of trust, OPM removed the 24-month break-in-service provision. This requirement is replaced with a new process, established in the Federal Personnel Vetting Investigative Standards issued by the Suitability, Credentialing, and Security Executive Agents, which expands this window of time up to sixty months using a tiered, risk-based approach of graduated levels of investigation.

IAW 5 CFR 731 and E.O. 13764, the fixed five-year periodic reinvestigation for public trust positions and national security positions will soon be eliminated and only once personnel

Attachment 1- PWS                                    70CDCR26D00000026

are enrolled in a continuous vetting program. Therefore, PSD will continue the reinvestigation process until this process is completed.

Required information for submission of the security packet will be provided by OPR PSD at the time of the award of the contract. Only complete packages will be accepted by OPR PSD as notified by the COR.

To ensure adequate background investigative coverage, Service Provider applicants/employees must currently reside in the United States or its Territories. Additionally, Service Provider applicants/employees are required to have resided within the United States or its Territories for three or more years out of the last five (ICE retains the right to deem a Service Provider applicant/employee ineligible due to insufficient background coverage). This timeline is assessed based on the signature date of the standard form questionnaire submitted for the applied position. Service Provider employees falling under the following situations may be exempt from the residency requirement: 1) work or worked for the U.S. Government in foreign countries in federal civilian or military capacities; 2) were or are dependents accompanying a federal civilian or a military employee serving in foreign countries so long as they were or are authorized by the U.S. Government to accompany their federal civilian or military sponsor in the foreign location; 3) worked as a Service Provider employee, volunteer, consultant or intern on behalf of the federal government overseas, where stateside coverage can be obtained to complete the background investigation; 4) studied abroad at a U.S. affiliated college or university; or

5) have a current and adequate background investigation (commensurate with the position risk/sensitivity levels) completed for a federal or Service Provider employee position, barring any break in federal employment or federal sponsorship.

Only U.S. citizens and Legal Permanent Residents are eligible for employment on contracts requiring access to DHS sensitive information unless an exception is granted as outlined under DHS Instruction 121-01-007, Revision 2, dated August 10, 2024. Per DHS Sensitive Systems Policy Directive 4300A, only U.S. citizens are eligible for positions requiring access to DHS Information Technology (IT) systems or positions that are involved in the development, operation, management, or maintenance of DHS IT systems, unless an exception is granted as outlined under DHS Instruction 121-01-007, Revision 2, dated August 10, 2024.

### 68.6.   Continued Eligibility

ICE will exercise full control over granting, denying, and/or restricting federal facility and information access of any Service Provider employee whose actions conflict with Fitness standards contained in 5 CFR 731 and DHS Instruction 121-01-007, Revision 2, dated August 10, 2024, or who violate standards of conduct under 6 CFR § 115.117. The

Attachment 1- PWS                               70CDCR26D00000026

Contracting Officer or their representative can determine if a risk of compromising sensitive Government information exists or if the efficiency of service is at risk and may direct immediate removal of a Service Provider employee from contract support.

The Federal Government is transitioning to Trusted Workforce (TW) 2.0. TW 2.0 is a whole-of-government background investigation reform effort overhauling the personnel vetting process by creating a government-wide system that allows transfer of trust across organizations. All Service Provider employees will be subjected to the transition and will be enrolled into a continuous vetting system. Enrollment will include multiple requirements from all personnel and potential changes to processes, procedures, and systems. This contract will comply with all requirements that facilitate the mandated transition to TW 2.0.

OPR PSD will evaluate concerns received via multiple sources under the continuous vetting process, to evaluate continued Fitness of Service Provider employees. If concerns cannot be mitigated, the Service Provider will be removed from the ICE contract upon notification from OPR PSD.

### 68.7.   Required Reports

The Service Provider will notify OPR PSD, via the COR providing an ICE Form 50-005, Service Provider Employee Separation Clearance Checklist, of all terminations/resignations of Service Provider employees under the contract within five days of occurrence to the ICEDepartureNotification@ice.dhs.gov group box. The Service Provider will return any expired ICE issued identification cards and building passes of terminated/resigned employees to the COR. If an identification card or building pass is not available to be returned, a report must be submitted to the COR referencing the pass or card number, name of individual to whom issued, the last known location and disposition of the pass or card. The COR will return the identification cards and building passes to the responsible ID Unit. IAW DHS Instruction 121-01-007, Revision 2, dated August 10, 2024, the Contracting Officer's Representatives (CORs) notify the servicing personnel and industrial security offices when a Service Provider employee is no longer working for DHS on any contract and report any derogatory information concerning the individual immediately, in accordance with the contract requirements. Report this information to PSD-CEP-REPORTING@ice.dhs.gov. The report should include the Service Provider employees' name and social security number, along with the adverse information being reported.

The Service Provider will provide, through the COR, a Quarterly Report (on a Microsoft Excel Spreadsheet) containing the names of Service Provider employees who are actively serving on their contract. The list shall include the Name, Position and SSN (Last Four) and should be derived from system(s) used for Service Provider payroll/voucher processing to

Attachment 1- PWS                                    70CDCR26D00000026

ensure accuracy. This list is what ICE Industrial Security uses to reconcile the contract quarterly. CORs will submit reports to PSD-Industrial-Security@ice.dhs.gov no later than the 10th day of each January, April, July and October.

Service Providers, who are involved with management and/or use of information/data deemed "sensitive" to include 'law enforcement sensitive" are required to complete the DHS Form 11000-6-Sensitive but Unclassified Information Non-Disclosure Agreement (NDA) for Service Provider employee access to sensitive information. The NDA will be administered by the COR to all contract personnel within 10 calendar days of the entry on duty date. The completed form shall remain on file with the COR for the purpose of administration and inspection.

Sensitive information as defined under the Computer Security Act of 1987, Public Law 100-235 is information not otherwise categorized by statute or regulation that if disclosed could have an adverse impact on the welfare or privacy of individuals or on the welfare or conduct of Federal programs or other programs or operations essential to the national interest. Examples of sensitive information include personal data such as Social Security numbers; trade secrets; system vulnerability information; pre-solicitation procurement documents, such as statements of work; and information pertaining to law enforcement investigative methods; similarly, detailed reports related to computer security deficiencies in internal controls are also sensitive information because of the potential damage that could be caused by the misuse of this information. All sensitive information must be protected from loss, misuse, modification, and unauthorized access in accordance with DHS Management Directive 11042.1, *DHS Policy for Sensitive Information* and ICE Policy 4003, *Safeguarding Law Enforcement Sensitive Information*."

Any unauthorized disclosure of information should be reported to ICE.ADSEC@ice.dhs.gov.

### 68.8.   Security Management

The Service Provider shall appoint a senior official to act as the Corporate Security Officer. The individual will interface with OPR PSD through the COR on all security matters, to include physical, personnel, and protection of all Government information and data accessed by the Service Provider.

The COR and OPR shall have the right to inspect the procedures, methods, and facilities utilized by the Service Provider in complying with the security requirements under this contract. Should the COR determine that the Service Provider is not complying with the security requirements of this contract, the Service Provider will be informed in writing by the Contracting Officer of the proper action to be taken to effect compliance with such

110

Attachment 1- PWS                                            70CDCR26D00000026

requirements.

### 68.9.  Information Technology Security

When sensitive government information is processed on Department telecommunications and automated information systems, the contract company agrees to provide for the administrative control of sensitive data being processed and to adhere to the procedures governing such data as outlined in DHS MD 4300.1, *Information Technology Systems Security* (or its replacement). Service Provider employees must have favorably adjudicated background investigations commensurate with the defined sensitivity level.

Service Provider employees who fail to comply with Department security policy are subject to having access to Department IT systems and facilities terminated, regardless of if the failure results in criminal prosecution. Any person who improperly discloses sensitive information is subject to criminal and civil penalties and sanctions under a variety of laws (e.g., Privacy Act).

### 68.10.  Information Technology Security Training and Oversight

In accordance with the Office of the Chief Information Officer (OCIO) requirements and provisions, all Service Provider employees accessing Department IT systems or processing DHS sensitive data via an IT system will require an ICE issued/provisioned Personal Identity Verification (PIV) card. Additionally, Cybersecurity Awareness Training (CSAT) will be required upon initial access and annually thereafter. CSAT training will be provided by the appropriate component agency of DHS.

Service Provider employees, who are involved with management, use, or operation of any IT systems that handle sensitive information within or under the supervision of the Department, shall receive periodic training at least annually in security awareness and accepted security practices, systems rules of behavior, to include Unauthorized Disclosure Training, available on the ICE Training System (ITS) or by contacting ICE.ADSEC@ice.dhs.gov. Service Provider employees with significant security responsibilities shall receive specialized training specific to their security responsibilities annually. The level of training shall be commensurate with the individual's duties and responsibilities and is intended to promote a consistent understanding of the principles and concepts of telecommunications and IT systems security.

All personnel who access Department information systems will be continually evaluated while performing these duties. System Administrators should be aware of any unusual or inappropriate behavior by personnel accessing systems. Any unauthorized access, sharing of passwords, or other questionable security procedures should be reported to the local Security

Attachment 1- PWS                                      70CDCR26D00000026

Office or Information System Security Officer (ISSO).

### 69.0    Data Ownership Contract Requirements

### 69.1.   Accessibility of Government-owned Data

All stored program data associated with this acquisition shall be owned by the Government. As such, it will be made accessible to the Government in accordance with the Minimum Data Access Capability described below. This accessibility is required to allow full data transparency, flexibility in performing data analytics, and integration with data from other government programs.

In addition to the Minimum Data Access Capability, the Government prefers, but does not require, that program data be accessible via Enhanced Access Capabilities as described below.

Definition of "program data": Program Data refers to any data resulting from ICE and DHS organizational activity. Examples of such data include but are not limited to administrative data resulting from human resources, management, and financial actions, as well as operational data resulting from performance of the ICE mission.

Definition of "associated with this acquisition": Program Data is associated with an acquisition if it is created by DHS organizational activity that is facilitated by the Service Provider. Examples of how a Service Provider might facilitate organizational activity follow:
- Program data is stored by Service Provider personnel
- Program data is stored by software that is managed, developed, or used by the Service Provider
- Program data is stored in a repository that is managed, developed, or used by the Service Provider

### 69.2.   Minimum Data Access Capability

x)  The current version of all Program Data is accessible to the Government within 24 hours of request, as well as on any pre-defined schedule as required by the Government.

y)  Data access can occur by various means, if Government security requirements are met, and data is accessible in a format that is acceptable to the Government. Examples include but are not limited to APIs that are consumable by the Government, files made available for Government

112

Attachment 1- PWS                                70CDCR26D00000026

download (e.g., Excel Spreadsheets), or direct database query by federal or Service Provider personnel.

z) The Service Provider shall format program data accessed by the Government to anticipate the maximum file size of any data to be accessed. File size shall be small enough to assure rapid processing by government applications.

The Service Provider shall provide the means for the Government to interpret accessible Program Data as follows:

a) Data elements and groupings of data elements shall be clearly identifiable by labels embedded in the data itself, or by a separate schema or file layout which allows such elements and groupings to be identified.

b) In the case of a relational database schema defined through Data Definition Language (DDL), data elements would be represented as columns, and groupings of data would be represented as tables. In addition, relationships between tables would be described as foreign key relations.

c) Labels or names used to identify data elements and groupings of data elements shall be approved by the Government. In addition, each label or name shall be associated with a government approved definition which describes the content of data held therein.

d) Program data delivered to the Government shall conform to the Government approved definition for each data element and grouping of data elements.

e) All data accessible by the Government shall be both machine readable and human-readable in plain text.

f) All reference data associated with Program Data also needs to be accessible to the Government. Such reference data is required to provide complete understanding of a record. **Reference Data Example:** Program data may include a city code which uniquely identifies a city. Reference data associated with a city code may include its name, geographic boundaries, population, median income, etc. This example is provided for clarification of the meaning of reference data and may or may not apply to this specific acquisition. Examples of other reference data codes would include codes representing eye color, gender, country of origin, etc.

### 69.3. Enhanced Access Capabilities

The Government prefers that sharing of program data take place via an Application Programming Interface (API) or multiple APIs. APIs allow the Government to efficiently consume data via a widely recognized standard where the data has been completely abstracted from the technology platform that produces it.

In addition, the Government prefers that sharing program data take place using techniques that enhance efficiency, such as Change Data Capture (CDC). CDC enhances efficiency of

113

Attachment 1- PWS                                70CDCR26D00000026

data transfer by providing only incremental updates to program data as opposed to providing all program data each time data is shared.

## 70.0    Transition

### 70.1.    Transition-In

The Service Provider shall be responsible for the transition of all activities identified in this Performance Work Statement (PWS). The Service Provider's transition-in shall be accomplished as expeditiously as possible, with a maximum transition-in period of 60 days after the contract award. The transition-in process shall not adversely impact the work being done by the outgoing Service Provider. It shall be conducted in a manner consistent with safe operation requirements. The Service Provider shall submit a final transition-in plan for approval by the COR within two (2) weeks after the award reflecting input from the COR as well as all necessary activities to facilitate the transition of services to the Service Provider and expected completion dates of those activities.  All activities must be completed during transition periods. The transition-in plan shall address, at a minimum, the following areas:

1. Inventory and orderly transfer of all government equipment and property, if applicable.
2. Transfer of documentation.
3. Transfer of current project activities.
4. Workplace logistics and staffing plan: Identification of the key personnel transition team members by name, position, EOD, clearance, start date, and responsibilities.
5. Coordination of knowledge transfer sessions with the incumbent Service Provider.
6. Favorable EOD for all Service Provider staff from the ICE PSD.
7. Coordination of transition with COR and local field office.
8. Any additional information required by other clauses contained in this contract.

The transition-in plan shall be approved by the COR and describe the Service Provider's process for transitioning from the incumbent with no disruption in operational services.

### 70.2.    Transition-Out

The Service Provider shall be responsible for the transition-out of all technical activities identified in this PWS during the final, awarded period of performance. The Service Provider shall submit the transition-out plan two (2) months prior to the completion of the period of performance of this contract. The Service Provider's transition-out plan shall be approved by the COR. The Service Provider shall complete the transition by the end of the period of performance of this contract. The transition-out plan shall address, at a minimum, the following areas:

1. Inventory and orderly transfer of all government equipment and property, if applicable.

Attachment 1- PWS                                70CDCR26D00000026

2. Briefing on all in-progress and committed items.
3. Any additional information required by other clauses contained in this contract.

The Service Provider shall fully support the transition of all requirements to any successor to ensure no disruption in operational services.

### 71.0   Glossary

ADMINISTRATIVE SEGREGATION: A non-punitive form of separation from the general population for administrative reasons. Authorized only as necessary to ensure the safety of the detainee, federal facility staff, and other detainees; the protection of property; or the security or good order of the federal facility, and therefore should be for the briefest term and under the least restrictive conditions practicable, consistent with the rationale for placement. Generally, detainees in administrative segregation shall receive the same privileges as detainees housed in the general population, consistent with safety and security concerns. Administrative segregation may be necessary for, among other reasons, detainees requiring or requesting protective custody from others who may be likely to harm them; detainees awaiting an investigation or hearing for a violation of federal facility rules; detainees scheduled for release, removal, or transfer within 24 hours; or detainees presenting a clear threat to the security of the federal facility.

ADULT LOCAL DETENTION FACILITY (ALDF): A federal facility which detains people over the age of 18.

AMERICAN CORRECTIONAL ASSOCIATION (ACA): The American Correctional Association is the oldest and largest international correctional association in the world. ACA serves all disciplines within the corrections profession and is dedicated to excellence in every aspect of the field.

BED-DAY: The total billable cost to the government to maintain and house one alien for one day. Bed- day means an alien that is referred to a Service Provider for detention. The bed days are calculated by subtracting the date booked into custody from the date released from custody. The Service Provider may charge for the day of arrival, but not the day of departure.

BED-DAY RATE: The rate charged for each individual alien per day. Bed-day rate is an all-inclusive burdened rate including direct costs, indirect costs, overhead, and profit necessary to provide the detention, and food service requirements as described in the PWS.

BOOKING: A procedure for the admission of an Immigration and Customs Enforcement (ICE) alien, which includes searching, fingerprinting, photographing, medical screening, and collecting personal history data. Booking also includes the inventory and storage of the individual's accompanying personal property. The Service Provider may be responsible for booking the alien into ICE systems upon receiving the alien.

Attachment 1- PWS                                    70CDCR26D00000026

BUREAU OF PRISONS (BOP):  The U.S. Federal Bureau of Prisons protects society by confining offenders in the controlled environments of prisons and community-based facilities that are safe, humane, cost-efficient, and appropriately secure, and that provide work and other self-improvement opportunities to assist offenders in becoming law-abiding citizens.

CATEGORICAL EXCLUSION (CATEX): Activities that do not need to undergo detailed environmental analysis in an Environmental Assessment (EA) or Environmental Impact Statement (EIS) because the activities have been determined to normally not have the potential, individually or cumulatively, to have a significant effect on the human environment.

CLASSIFICATION:  A process for determining the needs and requirements of aliens for whom detention has been ordered and for assigning them to housing units and programs according to their needs, security risk level, and existing resources of the federal facility.

CONTRABAND: Items that pose a threat to the security of people or property. A contraband item fits into either the category of hard or soft contraband as defined below:

-Hard Contraband: Any item that is inherently dangerous as a weapon or tool of violence, e.g., knife, explosives, "zipgun," brass knuckles. Because hard contraband presents an immediate physical threat in or to the federal facility, an alien found in possession of hard contraband could face disciplinary action or criminal prosecution.

-Soft Contraband: Any item that presents a nuisance, which does not pose a direct and immediate threat to an individual's safety. None-the-less, soft contraband has the potential to create dangerous or unsanitary conditions in the federal facility, such as excess papers that create a fire hazard, food items that are spoiled or retained beyond the point of safe consumption, etc.

CONTRACTING OFFICER (CO):  An employee of the government responsible for the complete conduct and integrity of the contracting process, including administration after award. The only individual authorized to issue changes to this contract.

CONTRACTING OFFICER'S REPRESENTATIVE (COR): Employees of the government responsible for monitoring all technical aspects and assisting in administering the contract.

SERVICE PROVIDER:  The entity which provides the services described in this PWS.

SERVICE PROVIDER EMPLOYEE:  An employee of a private Service Provider hired to perform a variety of detailed services under this contract.

CONTROL ROOM: Integrates all internal and external security communications networks within a secure room. Activities conducted within the control room have a critical impact on the institution's orderly and secure operation.

CREDENTIALS:  Document providing primary source verification including education, training, licensure, experience, board certification, and expertise of an employee.

DEPARTMENT OF HOMELAND SECURITY (DHS):  A department of the U.S. government, which includes ICE.

Attachment 1- PWS                                       70CDCR26D00000026

DEPARTMENT OF JUSTICE (DOJ): A department of the U.S government, which includes the Executive Office of Immigration Review (EOIR), the Federal Bureau of Investigation (FBI), the federal BOP, and the U.S. Marshals Service (USMS).

DESIGNATED SERVICE OFFICIAL: An employee of ICE designated in writing by ERO FOD to represent ICE on matters pertaining to the operation of the federal facility.

DETAINEE: Any person confined under the auspices and the authority of any Federal agency. Many of those being detained may have substantial and varied criminal histories.

DETAINEE RECORDS: Information concerning the individual's personal, criminal, and medical history, behavior, and activities while in custody, including, but not limited to:
-Alien, Personal Property
-Receipts, Visitors List, Photographs
-Fingerprints, Disciplinary Infractions
-Actions Taken, Grievance Reports, Medical
-Records, Work Assignments, Program Participation
-Miscellaneous Correspondence, etc.

DETENTION OFFICERS: Service Provider's uniformed staff members responsible for the security, care, transportation, and supervision of aliens during all phases of activity in a detention federal facility. The officer is also responsible for the safety and security of the federal facility.

DETENTION OVERSIGHT UNIT (DOU): The purpose of the DOU is to develop and prescribe policies, standards, and procedures for ICE detention operations and to ensure detention facilities are operated in safe, secure, and humane condition for both aliens and staff.

DIRECT SUPERVISION: A method of alien management that ensures continuing direct contact between aliens and staff by posting an officer(s) inside each housing unit. Officers in general housing units are not separated from aliens by a physical barrier. Officers provide frequent, non-scheduled observation of and personal interaction with aliens.

DIRECTIVE: A document issued by the U.S. government and signed by the President, Departmental Secretary, or an Assistant Secretary that establishes policy, delegates' authority, and/or assigns responsibilities.

DISCIPLINARY SEGREGATION: A punitive form of separation from the general population for disciplinary reasons. Authorized only pursuant to the order of a federal facility disciplinary panel, following a hearing in which the detainee is determined to have committed serious misconduct in violation of a federal facility rule, consistent with the Disciplinary Severity Scale, and only when alternative dispositions would inadequately regulate detainee behavior.

EMERGENCY: Any significant disruption of normal federal facility procedure, policy, or activity caused by riot, strike, escape, fire, medical exigency, natural disaster, or other serious incident.

EMERGENCY CARE: Care for an acute illness or unexpected serious health care need that

Attachment 1- PWS                                           70CDCR26D00000026

cannot be deferred until the next scheduled sick call.

ENFORCEMENT AND REMOVAL OPERATIONS (ERO):  A division within ICE, whose mission is the planning, management, and direction of broad programs relating to the supervision, detention, and removal of aliens who are in the U.S illegally.

ENTRY ON DUTY (EOD):  The first day the employee begins performance at a designated duty station on this contract.

ENVIRONMENTAL ASSESSMENT (EA): A concise public document for which a Federal agency is responsible that serves to briefly provide sufficient evidence and analysis for determining whether to prepare an EIS or a Finding of No Significant Impact (FONSI), aid an agency's compliance with the National Environmental Policy Act (NEPA) when no EIS is necessary, and facilitate preparation of an EIS when one is necessary.

ENVIRONMENTAL IMPACT EVALUATION: The process of determining the level of significance of a potential impact on the human environment.  It includes all necessary studies,

consultation, and public involvement needed to analyze the potential for environmental impact of a proposed action, assign a value to the level of impact (e.g., minor, moderate, or major), consider mitigation, and determine the level of significance; whether significant or not.  An environmental impact evaluation results in either the application of a CATEX, documentation in the form of an EA and FONSI or a final EIS and record of decision (ROD).

ENVIRONMENTAL IMPACT STATEMENT (EIS):  A detailed written statement as required by section 102(2)(C) of the NEPA.  It is a comprehensive document that provides full and fair discussion of significant environmental impacts caused by the proposed action(s).  It also states the reasonable alternatives, and which of those would avoid or minimize the adverse impact(s) or enhance the quality of the human environment.

EXECUTIVE OFFICE OF IMMIGRATION REVIEW (EOIR):  An agency of DOJ. The primary mission of EOIR is to adjudicate immigration cases by fairly, expeditiously, and uniformly interpreting and administering the Nation's immigration laws. Under delegated authority from the Attorney General, EOIR conducts immigration court proceedings, appellate reviews, and administrative hearings.

FEDERAL FACILITY:  A structure(s) similar to a detention center, comprised of buildings and residential care services, where a support-service provider delivers secure residential support services under the oversight of the U.S. Government to house its detainees on a 24-hour per day, 7-day per week, 365 day per year basis.

FEDERAL FACILITY ADMINISTRATOR: The support-service provider's official, regardless of local title (e.g., jail administrator, warden, federal facility director, superintendent), who has the ultimate responsibility for managing the operations of the contracted detention federal facility. The qualifications for the holder of this office shall be consistent with ACA standards.

Attachment 1- PWS                                     70CDCR26D00000026

FEDERAL FACILITY MAINTENANCE: The upkeep of a facility through cleaning, repairs, and similar work so as to keep the facility in good working order in accordance with all applicable federal laws, regulations, codes, guidelines, and policies.

FEDERAL FACILITY OPERATIONS CHARGE: A fixed fee designated for the maintenance and management of a U.S. Government-operated federal detention center.

FEDERAL DETENTION FACILITY: A federal detention facility, comprised of buildings and residential care services provided by the non-governmental support service provider, to enable the United States Government to house its detainees on a 24-hour per-day, 7-day per-week, 365-day per-year basis.

FINDING OF NO SIGNIFICANT IMPACT (FONSI): A document by a federal agency briefly presenting the reasons why an action, not otherwise excluded, will not have a significant effect on the human environment, and for which an EIS therefore will not be prepared.

FIRST AID: Health care for a condition that requires immediate assistance from an individual trained in first aid care and the use of the federal facility's first aid kits.

FLIGHT OPERATIONS UNIT (FOU): The FOU is the principal mass air transportation and manages government and contract flights.

GRIEVANCE: A written complaint filed by an alien with the federal facility administrator concerning personal health/welfare or the operations and services of the federal facility.

HEALTH AUTHORITY: The physician, health administrator, or agency on-site that is responsible for health care services pursuant to a written agreement, contract, or job description.

HEALTH CARE: The action taken, preventive and therapeutic. To provide for the physical and mental well-being of the alien population. Health care may include medical services, dental services, behavioral health services, nursing, personal hygiene, dietary services, and environmental conditions at the federal facility.

HEALTH CARE PERSONNEL: Duly licensed individuals whose primary duties are to provide health services to aliens in keeping with their respective levels of health care training or experience.

HEALTH UNIT (HU): The physical area in the federal facility and organizational unit set aside for routine health care and sick call. The HU is the designated part of the federal facility for the delivery of care to aliens on an ambulatory or observation basis.

ICE HEALTH SERVICE CORPS (IHSC): The ICE Health Service Corps serves as the medical authority for ICE on a wide range of medical issues, including the agency's comprehensive alien health care program.

Attachment 1- PWS                                      70CDCR26D00000026

IMMIGRATION PROCESSING CENTER (IPC): To fulfill ICE's critical mission, ERO operates federal, civil immigration detention facilities nationwide that house detainees to secure their presence for immigration proceedings or removal from the U.S.

IMMEDIATE RELATIVES: Spouses, children (including stepchildren and adopted children) and their spouses, parents (including stepparents), brothers and sisters (including stepbrothers and sisters and half- brothers and sisters) and their spouses.

INCIDENT REPORT:  A written document reporting an event, such as minor disturbances, officer misconduct, any alien rule infraction, etc.

JUVENILE DETAINEE:  Any alien under the age of 18 years.

LIFE SAFETY CODE:  A manual published by The National Fire Protection Association specifying minimum standards for fire safety necessary in public interest.

LIMITED ENGLISH PROFICIENT/PROFICIENCY (LEP): A person who does not speak English as his or her primary language and who has a limited ability to read, speak, write, or understand English. LEP individuals may be competent in English for certain types of communication (e.g., speaking or understanding), but still be LEP for other purposes (e.g., reading or writing). LEP designations are also context-specific; an individual may possess sufficient English language skills to function in one setting, but these skills may be insufficient in other settings.

LOGBOOK:  The official record of post operations and inspections.

MAN-HOUR:  Man-hour means productive hours when the required services are performed. Only productive hours can be billed and invoiced.

MEDICAL SCREENING:  A system of structured observation and/or initial health assessment to identify newly arrived aliens who could pose a health or safety threat to themselves or others.

MILEAGE RATE:  A fully burdened rate inclusive of the mileage rate in accordance with General Service Administration Federal Travel Regulation, vehicle equipment, maintenance, and fuel costs.

NON-CONTACT VISITATION:  Visitation that restricts aliens from having physical contact with visitors using physical barriers such as screens and/or glass. Voice communications between the parties are typically accomplished by telephones or speakers.

NON-DEADLY FORCE:  The force a person uses with the purpose of not causing or which would not create a substantial risk of causing death or serious bodily harm.

OFFICE OF PROFESSIONAL RESPONSIBILITY, PERSONNEL SECURITY DIVISION (OPR-PSD): The
ICE office which implements a component-wide personnel security program.

ON-CALL/REMOTE CUSTODY OFFICER POST:  Posts operated as requested by the COR, or other ICE officials designated by COR, and including, but not limited to, escorting and custody of aliens for hearings, ICE interviews, medical watches, and any other location requested by the COR.

Attachment 1- PWS                                      70CDCR26D00000026

PAT DOWN SEARCH:  A quick patting of the alien's outer clothing to determine the presence of contraband.

POLICY: A definite written course or method of action, which guides and determines present and future decisions and actions.

POST ORDERS:  Written orders that specify the duties of each position, hour by hour, and the procedures the post officer will follow in carrying out those duties.

PREVENTIVE MAINTENANCE:  A system designed to enhance the longevity and/or usefulness of buildings and equipment in accordance with a planned schedule.

PROCEDURE:  The detailed and sequential actions that must be carried out to ensure that a policy is implemented. It is the method of performing an operation or a manner of proceeding on a course of action. It differs from a policy in that it directs action required to perform a specific task within the guidelines of that policy.

PRODUCTIVE HOURS:  These are the hours when the required services are performed and can be billed.

PROJECT MANAGER:  Service Provider employee responsible for on-site supervision of all Service Provider employees, with the authority to act on behalf of the Service Provider. The Project Manager cannot simultaneously serve in the role of manager and detention officer or supervisory detention officer.

PROPERTY:  Refers to personal belongings of an alien.

PROPOSAL:  The written plan submitted by the Service Provider for consideration by ICE in response to the solicitation.

QUALIFIED HEALTH PROFESSIONAL:  Physicians, dentists, and other professional and technical workers who by state law engage in activities that support, complement, or supplement the functions of physicians and/or dentists who are licensed, registered, or certified, as appropriate to their qualifications, to practice.

QUALITY ASSURANCE:  The actions taken by the government to assure requirements of the PWS are met.

QUALITY ASSURANCE SURVEILLANCE PLAN (QASP):  A government-produced document that is based on the premise that the Service Provider, and not the government, is responsible for the day-to-day operation of the federal facility and all the management and quality control (QC) actions required to meet the terms of the contract. The role of the government in quality assurance is to ensure performance standards are achieved and maintained. The QASP validates that the Service Provider is complying with ERO-mandated quality standards in operating, maintaining, and repairing detention facilities.

QUALITY CONTROL (QC):  The Service Provider's inspection system which covers all the services to be performed under the contract. The actions that a Service Provider takes to control the production of services so that they meet the requirements stated in the contract.

QUALITY CONTROL PLAN (QCP):   A Service Provider-produced document that addresses critical operational performance standards for services provided.

Attachment 1- PWS                                70CDCR26D00000026

RECORD OF DECISION (ROD): A document that explains an agency's decision describes the alternative the agency considered, and discusses the agency's plans for mitigation and monitoring, if necessary.

RELIEF FACTOR: Indicates how many individuals it takes to fill a single job position for a single shift, considering vacation, sick leave, training days, and other types of leave.

RESPONSIBLE PHYSICIAN: A person licensed to practice medicine with whom the federal facility enters into a contractual agreement to plan for and provide health care services to the alien population of the federal facility.

RESTRAINT EQUIPMENT: This includes but is not limited to handcuffs, belly chains, leg irons, straitjackets, flexi cuffs, soft (leather) cuffs, and leg weights.

SAFETY EQUIPMENT: This includes but is not limited to firefighting equipment, i.e., chemical extinguisher, hoses, nozzles, water supplies, alarm systems, portable breathing devices, gas masks, fans, first aid kits, stretchers, and emergency alarms.

SALLYPORT: An enclosure situated either in the perimeter wall or fence to the federal facility or within the interior of the federal facility, containing gates or doors at both ends, only one of which

opens at a time. This method of entry and exit helps to ensure that there shall be no breach in the perimeter or interior security of the federal facility.

SECURITY DEVICES: Locks, gates, doors, bars, fences, screens, hardened ceilings, floors, walls, and barriers used to confine and control aliens. In addition, electronic monitoring equipment, security alarm systems, security light units, auxiliary power supply, and other equipment used to maintain federal facility security.

SECURITY PERIMETER: The outer portions of a federal facility, which provide for secure confinement of aliens.

SECURITY RISK – HIGH, MEDIUM, LOW:

- High-Risk– (Level 3) Aliens exhibit behavioral problems, or manifest a pattern of such behavior, or have a history of violent and/or criminal activity. These aliens may not be co-mingled with low custody aliens.

- Medium High-Risk– (Level 2) Aliens exhibit minor behavioral problems or have a history of nonviolent criminal behavior. These aliens have a history of violent or assaultive charges, convictions, institutional misconduct, or those with gang affiliation.

- Medium Low-Risk– (Level 1.5) Aliens with no history of violent or assaultive charges or convictions, no institutional misconduct, and no gang affiliation.

- Low-Risk– (Level 1) Aliens exhibit no behavioral problems and have no history of violent criminal behavior. This level may not include any alien with a felony conviction that included an act of physical violence. Low-risk level aliens may not be co-mingled with high custody aliens.

SEXUAL PRESENTATION OR EXPRESSION: refers to how an individual outwardly communicates or displays aspects of their sex, such as through behavior, clothing,

mannerisms, speech, or personal interactions

Perception thereof: refers to how others interpret or assume an individual's sexual orientation, or sexual presentation or expression based on outward characteristics, behavior, appearance, or other cues, regardless of the individual's self-identification

SIGNIFICANT EVENT NOTIFICATION REPORT: A written document reporting a special event (e.g., the use of force, use of chemical agents, discharge of firearms).

SPECIAL MANAGEMENT UNIT: A designated area or unit used to house detainees who require separation from the general population for specific reasons (e.g., administrative segregation, disciplinary segregation, medical observation). These areas are designed to ensure the safety, security, and orderly operation of the federal facility while addressing the unique needs or circumstances of certain detainees.

STRIP SEARCH: An examination of an alien's naked body for weapons, contraband, and physical abnormalities. This also includes a thorough search of the individual's clothing while not being worn.

SUPPORT-SERVICE PROVIDER EMPLOYEE: An employee of a non-governmental support-service provider hired to perform a variety of detailed services under these standards.

TRAINING: An organized, planned, and evaluated activity designed to achieve specific learning objectives. Training may occur on site, at an academy of training center, at an institution of higher learning, through contract service, at professional meetings or through closely supervised on-the-job training. Meetings of professional associations are considered training when there is clear evidence of the above elements. All trainers must be certified, and certification shall be approved by the COR or ICE- designee.

TRANSPORTATION COSTS: The cost of all materials, equipment, and labor necessary to respond to requests by designated officials for secure movement of aliens from place to place necessary for processing, hearings, interviews, etc.

TRAVEL COST: Cost inclusive of lodging and meals and incidental expenses for Transportation Officers exceeding the standard working hours. Service Provider tours of duty will comply with all current federal laws. This includes but is not limited to the Federal Motor Carrier Safety Administration, CFR 395.5 - Maximum driving time for passenger-carrying vehicles. Cost is based on actual charges per occurrence, not to exceed the allowable Federal Travel Regulation rates/costs in effect on the dates of travel.

WEAPONS: This includes but is not limited to firearms, ammunition, knives, slappers, Billy clubs, electronic defense modules, chemical weapons (mace), and nightsticks.

LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACHMENTS

Attachment 1- PWS                                    70CDCR26D00000026

LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACHMENTS
Appendix 1 – Quality Assurance Surveillance Plan (QASP)
Appendix 2 – Contract Discrepancy Report (CDR)
Appendix 3 - Performance Requirements Summary (PSR)
Appendix 4 – Deliverables
Appendix 5 – Transportation Routes
Appendix 6 – Form G-391
Appendix 7 – GSA Form 139

Appendix 1  Quality Assurance Surveillance Plan
**Introduction**
ICE's Quality Assurance Surveillance Plan (QASP) is based on the premise that the Service Provider, and not the Government, is responsible for the day-to-day operation of the Federal facility and all the management and quality control actions required to meet the terms of the Agreement.  The role of the Government in quality assurance is to ensure performance standards are achieved and maintained.  The Service Provider shall develop a comprehensive program of inspections and monitoring actions and document its approach in a Quality Control Plan (QCP).  The Service Provider's QCP, upon approval by the Government, will be made a part of the resultant Agreement.

This QASP is designed to provide an effective surveillance method to monitor the Service Provider's performance relative to the requirements listed in the Agreement.  The QASP illustrates the systematic method the Government (or its representative) will use to evaluate the services the Service Provider is required to furnish.

This QASP is based on the premise that the Government will validate that the Service Provider is complying with mandated quality standards in operating and maintaining  detention facilities. Performance standards address all facets of detainee handling, including safety, health, legal rights, federal facility, and records management, etc. Good management by the Service Provider and use of an approved QCP will ensure that the Federal facility operates within acceptable quality levels.
Definitions

a)  Performance Requirements Summary (Attachment 3): The Performance Requirement Summary (PRS) communicates what the Government intends to qualitatively inspect.  The PRS is based on the American Correctional Association (ACA) Standards for Adult Local

Attachment 1- PWS                                70CDCR26D00000026

Detention Facilities (ALDF) and NDS 2025. The PRS identifies performance standards grouped into nine (9) functional areas, and quality levels essential for successful performance of each requirement. The PRS is used by ICE when conducting quality assurance surveillance to guide them through the inspection and review processes.

b) Functional Area: A logical grouping of performance standards.
c) Contracting Officer's Representative (COR): The COR interacts with the Service Provider to inspect and accept services/work performed in accordance with the technical standards prescribed in the Agreement. The Contracting Officer issues a written memorandum that appoints the COR to the Agreement. Other individuals may be designated to assist in the inspection and quality assurance surveillance activities.
d) Performance Standards: The performance standards are established in the NDS 2025 found here NDS 2025  as well as the ACA standards for ALDF. Other standards may also be defined in the Agreement.
e) Measures: The method for evaluating compliance with the standards.
f) Acceptable Quality Level: The minimum level of quality that will be accepted by ICE to meet the performance standard.
g) Withholding: Amount of monthly invoice payment withheld pending correction of a deficiency. See Attachment 3 for information on the percentages of an invoice amount that may be withheld for each functional area. Funds withheld from
payment
are recoverable (See Sections 7 & 8) if the COR and Contracting Officer confirm resolution or correction, it should be included on next month's invoice.
h) Deduction: Funds may be deducted from a monthly invoice for an egregious act or event, or if the same deficiency continues to occur. The Service Provider will be notified immediately if such a situation arises. The Contracting Officer in consultation with COR will determine the amount of the deduction. Amounts deducted are not recoverable.

Quality Control Plan
The Service Provider shall develop, implement, and maintain a Quality Control Plan (QCP) that illustrates the methods it will use to review its performance to ensure it conforms to the performance requirements. (See Attachment 3 for a summary list of performance requirements.) Such reviews should be performed by the Service Provider to validate its operations and assure ICE that the services meet the performance standards.
The Service Provider's QCP shall include monitoring methods that ensure and demonstrate its compliance with the performance standards. This includes inspection methods and schedules that are consistent with the regular reviews conducted by the COR. The reports and other results generated by the Service Provider's QCP activities should be provided to the COR as requested.
The frequency and type of the Service Provider's reviews should be consistent with what is necessary to ensure compliance with the performance standards.
The Service Provider is encouraged not to limit its inspection to only the processes outlined in the NDS 2025; however, certain key documents shall be produced by the Service Provider

Attachment 1- PWS                              70CDCR26D00000026

to ensure that the services meet the performance standards.  Some of the documentation that shall be generated and made available to the COR for inspection is listed below.  The list is intended as illustrative and is not all-inclusive.  The Service Provider shall develop and

implement a program that addresses the specific requirements of each standard and the means it will use to document compliance.

Written policies and procedures to implement and assess operational requirements of the standard.

Documentation and record keeping ensuring ongoing operational compliance with the standards (e.g., inventories, logbooks, register of receipts, reports, etc.).

- Staff training records
- Contract Discrepancy Reports (CDRs).
- Investigative reports.
- Medical Records.
- Records of investigative actions taken.
- Equipment inspections.
- System tests and evaluation. Methods of Surveillance

ICE will monitor the Service Provider's compliance with the Performance Standards using a variety of methods.  All facilities will be subject to a full annual inspection, which will include a review of the Service Provider's QCP activities.  ICE may conduct additional routine, follow-up, or unscheduled ad hoc inspections as necessary (for instance, because of unusual incidents or data reflected in routine monitoring).  ICE may also maintain an onsite presence in some facilities to conduct more regular or frequent monitoring.  Inspections and monitoring may involve direct observation of federal facility conditions and operations, review of documentation (including QCP reports), and/or interviews of federal facility personnel and detainees.

Documentation Requirements: The Service Provider shall develop and maintain all documentation as prescribed in the NDS (e.g., post logs, policies, and records of corrective actions).  In addition, the Service Provider shall develop and maintain documentation that demonstrates the results of its own inspections as prescribed in its QCP.  The Government may review 100% of the documents, or a representative sample, at any point during the period of performance.

Functional Performance Areas and Standards

To facilitate the performance review process, the required performance standards are organized into nine (9) functional areas.  Each functional area represents a proportionate share (i.e., weight) of the monthly invoice amount payable to the Service Provider based on meeting the performance standards.  Payment withholdings and deductions will be based on these percentages and weights applied to the overall monthly invoice.

ICE may, consistent with the scope of the Agreement, unilaterally change the functional areas and associated standards affiliated with a specific functional area.  The Contracting Officer will notify the Service Provider at least 30 calendar days in advance of

126

implementation of the new standard(s).  If the Service Provider is not provided with the notification, adjustment to the new standard shall be made within 30 calendar days after notification.  If any change affects pricing, the Service Provider may submit a request for equitable price adjustment in accordance with the "Changes" clause.  ICE reserves the right to develop and implement new inspection techniques and instructions at any time during performance without notice to the Service Provider, so long as the standards are not more stringent than those being replaced.

Failure to Meet Performance Standards

Performance of services in conformance with the PRS standards is essential for the Service Provider to receive full payment as identified in the Agreement.  The Contracting Officer may take withholdings or deductions against the monthly invoices for unsatisfactory performance documented through surveillance of the Service Provider's activities gained through site inspections, reviews of documentation (including monthly QCP reports), interviews and other feedback.  As a result of its surveillance, the Service Provider will be assigned the following ratings relative to each performance standard:

| Rating | Description |
| --- | --- |
| Acceptable | Based on the measures, the performance standard is demonstrated. |
| Deficient | Based on the measures, compliance with most of the attributes of the performance standard is demonstrated or observed with some area(s) needing improvement.  There are no critical areas of unacceptable performance. |
| At-Risk | Based on the performance measures, the majority of the performance standard's attributes are not met. |

Using the above standards as a guide, the Contracting Officer will implement adjustments to the Service Provider's monthly invoice as prescribed in Attachment 3.

Rather than withholding funds until a deficiency is corrected, there may be times when an event or deficiency is so egregious that the Government *deducts* (vs. "withholds") amounts from the Service Provider's monthly invoice. This may happen when a significant event occurs, when a particular deficiency is noted multiple times without correction, or when the Service Provider has failed to take timely action on a deficiency about which he was properly and timely notified. The amount deducted will be consistent with the relative weight of the functional performance area where the deficiency was noted. The deduction may be a one-time event or may continue until the Service Provider has either corrected the deficiency or made substantial progress in the correction.

Further, a deficiency found in one functional area may tie into another.  If a detainee escaped,

Attachment 1- PWS                                         70CDCR26D00000026

for example, a deficiency would be noted in "Security" but may also relate to a deficiency in "Administration and Management". In no event will the withhold or deduction exceed 100% of the invoice amount.

Notifications

Based on the inspection of the Service Provider's performance, the COR will document instances of deficient or at-risk performance (e.g., noncompliance with the standard) using the CDR located at Attachment 2. To the extent practicable, issues should be resolved informally, with the COR and Service Provider working together. When documentation of an issue or deficiency is required, the procedures set forth in this section will be followed.

- When a CDR (see attachment 2) is required to document performance issues, it will be submitted to the Service Provider with a due date for the response. Upon receipt of a CDR, the Service Provider shall immediately assess the situation and either correct the deficiency as quickly as possible or prepare a corrective action plan. In either event, the Service Provider shall return the CDR with the action planned or taken noted. After the COR reviews the Service Provider's response and its planned remedy or corrective action taken, the COR will either accept or reject the plan, corrections, or plan for revision and provide an explanation. This process should take no more than one week. The CDR should not be used as a substitute for quality control by the Service Provider.


- The COR and the designated ICE official shall be notified immediately in the event of all emergencies. Emergencies include but are not limited to the following:
  o Activation of disturbance control team(s).
  o Disturbances (including gang activities, group demonstrations, food boycotts, work strikes, work-place violence, civil disturbances, or protests).
  o Staff use of force including use of lethal and less lethal force (includes detainees in restraints more than eight (8) hours).
  o Assaults on staff or detainees resulting in injuries requiring medical attention (does not include routine medical evaluation after the incident).
  o Fights resulting in injuries requiring medical attention.
  o Fires.
  o Full or partial lock down of the Federal facility.
  o Escape.
  o Weapons discharge.
  o Suicide attempts, deaths.
  o Declared or non-declared hunger strikes.
  o Adverse incidents that attract unusual interest or significant publicity
  o Adverse weather (e.g., hurricanes, floods, ice or snowstorms, heat waves, tornadoes).
  o Fence damage, power outage, bomb threats, or significant environmental problems that impact Federal facility operations.
  o Transportation accidents resulting in injuries, death, or property damage.
  o Sexual assault.

  * *Note: In an emergency, a CDR may not be issued until an investigation has been completed.*

128

Attachment 1- PWS                                     70CDCR26D00000026

- If the COR concludes that the deficient or at-risk performance warrants a withholding or deduction, the COR will include the CDR in its monthly report, with a copy to the Contracting Officer. The CDR will be accompanied by the COR's investigation report and written recommendations for any withholding. The Contracting Officer will consider the COR's recommendation and forward the CDR along with any relevant supporting information to the Service Provider to confirm or further discuss the prospective cure, including the Government's proposed course of action. As described in section 6 above, portions of the monthly invoice amount  may be withheld until such time as the corrective action is completed, *or* a deduction may be taken.

- Following receipt of the Service Provider's notification that the correction has been made, the COR may reinspect the Federal facility. Based upon the COR's findings, he or she will recommend that the Contracting Officer continue to withhold a proportionate share of the payment until the correction is made or accept the correction as final and release the full amount withheld for that issue.

- If funds have been withheld and either the Government or the Service Provider terminates the Agreement, those funds will not be released. The Service Provider may only receive withheld payments upon successful correction of an instance of noncompliance. Further, the Service Provider is not relieved of the full performance of the required services hereunder; the Agreement may be terminated upon adequate notice from the Government based upon any one instance, or failure to remedy deficient performance, even if a deduction was previously taken for any inadequate performance.

- The COR will maintain a record of all open and resolved CDRs. Detainee or Member of the

Public Complaints

The detainee and the public are the ultimate recipients of the services identified in this Agreement. Any complaints made known to the COR will be logged and forwarded to the Service Provider for remedy. Upon notification, the Service Provider shall be given a prespecified number of hours after verbal notification from the COR to address the issue. The Service Provider shall submit documentation to the COR regarding the actions taken to remedy the situation. If the complaint is found to be invalid, the Service Provider shall document its findings and notify the COR.

Attachments
- Contract Discrepancy Report
- Performance Requirements Summary

Attachment 1- PWS                                   70CDCR26D00000026

Appendix 2 Contract Discrepancy Report (CDR)

| CONTRACT DISCREPANCY REPORT | 1. CONTRACT NUMBER |
|---|---|
| **Report Number:** | **Date:** |
| 2. TO: (Contractor and Manager Name) | 3. FROM: (Name of COR) |

| DATES | | | |
|---|---|---|---|
| CONTRACTOR NOTIFICATION | CONTRACTOR RESPONSE DUE BY | RETURNED BY CONTRACTOR | ACTION COMPLETE |
| 4. DISCREPANCY OR PROBLEM *(Describe in Detail: Include reference in PWS / Directive: Attach continuation sheet if necessary.)* | | | |
| 5. SIGNATURE OF CONTRACTING OFFICER'S REPRESENTATIVE (COR) | | | |
| 6. TO: (*COR*) | | 7. FROM: (*Contractor*) | |
| 8. CONTRACTOR RESPONSE AS TO CAUSE, CORRECTIVE ACTION AND ACTIONS TO PREVENT RECURRENCE. ATTACH CONTINUATION SHEET IF NECESSARY. (*Cite applicable Q.A. program procedures or new A.W. procedures.*) | | | |
| 9. SIGNATURE OF CONTRACTOR REPRESENTATIVE | | | 10. DATE |
| 11. GOVERNMENT EVALUATION OF CONTRACTOR RESPONSE/RESOLUTION PLAN: (*Acceptable response/plan, partial acceptance of response/plan, rejection: attach continuation sheet if necessary*) | | | |

130

Attachment 1- PWS                                  70CDCR26D00000026

| 12. GOVERNMENT ACTIONS (*Payment withholding, cure notice, show cause, other.*) | | | |
|---|---|---|---|
| **CLOSE OUT** | | | |
| | NAME AND TITLE | SIGNATURE | DATE |
| CONTRACTOR NOTIFIED | | | |
| COR | | | |

| CONTRACTING OFFICER | | | |
|---|---|---|---|

Attachment 1- PWS                                    70CDCR26D00000026

Appendix 3 Performance Requirements Summary

| Functional Area/Weight | Performance Standard (NDS 2025) | Withholding Criteria |
|---|---|---|
| Safety (20%) Addresses a safe work environment for staff, volunteers, contractors, and detainees. | NDS References: Part 1 – Safety<br>1.1 Environmental Health and Safety<br>1.2 Transportation (by Land) | A Contract Discrepancy Report that cites violations of NDS and PWS (contract) sections that provide a safe work environment for staff, volunteers, contractors, and detainees, permits the Contracting Officer (CO) to withhold or deduct up to 20% of a monthly invoice until the CO determines there is full compliance with the standard or section. |

Attachment 1- PWS                                      70CDCR26D00000026

| | | |
|---|---|---|
| Security (20%) Addresses protection of the community, staff, contractors, volunteers and detainees from harm | NDS References: Part 2 – Security<br>2.1  Admission and Release<br>2.2  Classification System<br>2.3  Federal facility Security and Control<br>2.4 Funds and Personal Property<br>2.5  Hold Rooms in Detention Facilities<br><br>2.6  Post Orders<br>2.7  Searches of Detainees<br>2.8  Use of Force and Restraints<br>2.9  Special Management Unit<br>2.10  Staff-Detainee Communication | A Contract Discrepancy Report that cites violations of NDS and PWS (contract) sections that protect the community, staff, contractors, volunteers, and detainees from harm, permits the CO to withhold or deduct up to 20% of a monthly invoice until the CO determines there is full compliance with the standard or section. |

| | | |
|---|---|---|
| | 2.11 Sexual Abuse and Assault Prevention and Intervention (SAAPI) | |

Attachment 1- PWS                                          70CDCR26D00000026

| | | |
|---|---|---|
| Order (10%) Addresses contractor responsibility to maintain an orderly environment with clear expectations of behavior and systems of accountability | NDS Reference: Part 3 – ORDER<br>3.1 Disciplinary System | A Contract Discrepancy Report that cites violations of NDS and PWS (contract) sections that maintain an orderly environment with clear expectations of behavior and systems of accountability permits the CO to withhold or deduct up to 10 % of a monthly invoice until the CO determines there is full compliance with the standard of the section. |
| Care (20%) Addresses contractor responsibility to provide for the basic needs and personal care of detainees | NDS References: Part 4 – Care<br>4.1 Food Service<br>4.2 Hunger Strikes<br>4.3 Medical Care<br>4.4 Personal Hygiene<br>4.5 Significant Self-Harm and Suicide Prevention and Intervention<br>4.6 Terminal illness, and Death<br>4.7 Disability Identification, Assessment, and Accommodation | A Contract Discrepancy Report that cites violations of NDS and PWS (contract) sections that provide for the basic needs and personal care of detainees, permits the CO to withhold or deduct up to 20% of a monthly invoice until the CO determines there is full compliance with the standard or section |
| Activities (10%) Addresses contractor responsibilities to reduce the negative | NDS References: Part 5 – Activities<br>5.1 Correspondence and other mail<br>5.2 Recreation | A Contract Discrepancy Report that cites violations of NDS and PWS (contract) sections that reduce the negative effects of confinement permits the CO to withhold or deduct up to 10% of a monthly invoice until the CO determines |

Attachment 1- PWS                                    70CDCR26D00000026

| effects of confinement | 5.3 Religious Practices<br>5.4 Telephone Access<br>5.5 Visitation<br>5.6 Voluntary Work Program | there is full compliance with the standard or section |
| --- | --- | --- |
| Justice (10%)<br>Addresses contractor responsibilities to treat detainees fairly and respect their legal rights | NDS References: Part 6 – Justice<br>6.1 Detainee Handbook<br>6.2 Grievance System<br>6.3 Law Libraries and Legal Materials<br>6.4 Legal Rights Group Presentations | A Contract Discrepancy Report that cites violations of NDS and PWS (contract) sections that treat detainees fairly and respect their legal rights, permits the CO to withhold or deduct up to 10% of a monthly invoice until the CO determines there is full compliance with the standard or section |
| Administration and Management (10%)<br>Addresses contractor responsibilities to administer and manage the federal facility in a professional and responsible manner consistent with legal requirements | NDS References: Part 7 – Administration and Management<br>7.1 Detention files<br>7.2 Detainee Transfers Accommodations for the Disabled, 4-ALDF-6B-04, 4-aldf-6B-07 | A Contract Discrepancy Report that cites violations of NDS and PWS (contract) sections that require the Contractor's administration and management of the federal facility in a professional and responsible manner consistent with legal requirements, permits the CO to withhold or deduct up to 10% of a monthly invoice until the CO determines there is full compliance with the standard or section |
| Workforce Integrity (10%)<br>Addresses the adequacy of the detention/corrections officer hiring process, staff training, and licensing/certification | Staff Background and Reference Checks (Contract) 4-ALDF-7B-03<br><br>Staff Misconduct 4-ALDF-7B-01 | A Contract Discrepancy Report that cites violations of the ALDF Standards associated with Workforce Integrity and PWS (contract) sections permits the CO to withhold or deduct up to 10% of a monthly invoice until the CO determines there is full compliance with the standard or section |

Attachment 1- PWS                              70CDCR26D00000026

| and adequacy of systems | Staffing Pattern Compliance within 10% of required (Contract) 4-ALDF-2A-14<br><br>Staff Training, Licensing, and credentialling (Contract) 4-ALDF-4D-05, 4-ALDF-7B-05, $-ALDF-7B-08 | |
|---|---|---|
| Detainee Discrimination (10%) Addresses the adequacy of policies and procedures to prevent discrimination against detainees based on their gender, race, religion, national origin, or disability | Discrimination Prevention 4-ALDF-6B-02-03 | A Contract Discrepancy Report that cites violations of the ALDF Standards associated with Detainee Discrimination and PWS (contract) sections permits the CO to withhold or deduct up to 10% of a monthly invoice until the CO determines there is full compliance with the standard or section. |

Attachment 1- PWS                                   70CDCR26D00000026

Appendix 4 Deliverables

|   | Deliverable | Due Date |
|---|---|---|
| 1 | Quality Control Plan | Within 30 days of contract award. |

|   | Deliverable | Due Date |
|---|---|---|
| 2 | Plans, Policy and Procedures Manual | 30-days after award of contract |
| 3 | Standard Operating Procedures | Within 30 calendar days of award of contract |
| 4 | Post Orders | Within 30 calendar days of award of contract; updated annually and as requested by the COR. |
| 5 | Communication Plan | Within 30 days of contract award, updated as needed |
| 6 | Resumes of Key Personnel | As requested by COR |
| 7 | Organizational Chart | Within 30 days of contract award and as requested. |
| 8 | Staffing Plan | With proposal submission and as requested by the COR. |
| 9 | Documentation of employee receipt of ICE Operations Policy/Procedure Manual | As requested by COR |
| 10 | Service Provider employee certification for standards of conduct | As requested by COR |
| 11 | Service Provider employee violation of standards of conduct and disciplinary action | Reported immediately* to COR |
| 12 | Notification of change in employee's health status | Notification immediately to COR (immediate verbal report, with written follow-up) |
| 13 | Employee termination, transfer, suspension, personnel action relating to disqualifying information or incidents of delinquency | Notification immediately to COR (immediate verbal report, with written follow-up) |

Attachment 1- PWS                                      70CDCR26D00000026

| 14 | Report on any contract employee misconduct | Notification immediately to COR (immediate verbal report, with written follow-up) |
|---|---|---|
| 15 | e-QIP Security Process | Prior to EOD |

| 16 | Physical Force Incident Reports | Reported to COR immediately (immediate verbal report, with written report within two (2) hours of incident) |
|---|---|---|
| 17 | Report of escapes | Reported to COR immediately (immediate verbal report, with written report within two (2) hours of incident) |
| 18 | Physical harm or threat to safety, health or welfare | Reported to COR immediately (immediate verbal report, with written report within 24 hours of incident) |
| 19 | Drug Test Results | Upon EOD and as requested by COR, or reported immediately to COR upon found violation |
| 20 | Emergency Call Back Roster | Quarterly or as needed |
| 21 | Training Plan with Curriculum | Within 30 calendar days of award of contract; Updated as Needed |
| 22 | Quarterly Training Forecast | Quarterly |
| 23 | Training certification and reports for formal and on the job training (including Supervisors and refresher) | As requested by COR |
| 24 | Daily Time Sheet | As requested by COR |
| 25 | Emergency Action Plan to include Auxiliary Power procedures | Within 30 calendar days of award of contract; Updated as Needed |
| 26 | Sexual Assault & Suicide Prevention Program | No later than the post award conference |

Attachment 1- PWS                                      70CDCR26D00000026

| 27 | Firearms Training Certificates | Annually |
|----|--------------------------------|----------|

| 28 | Employee Weapon Permit | To COR 3 days prior to EOD, and then after as requested by COR |
|----|------------------------|----------------------------------------------------------------|
| 29 | Notification of employee criminal activity | Reported immediately to COR and an appropriate law enforcement agency. |

| 30 | Officer Testing Questions and Results | Post award, as needed by the COR |
|----|---------------------------------------|----------------------------------|
| 31 | Key, Tool Cabinet Inventory Class A and Class B Log | At the beginning of day and end of each shift |
| 32 | Equipment Inventory | Within 30 calendar days after the award of contract, then annually or as requested by COR |
| 33 | Intervention Equipment Inventory | Within 30 calendar days after the award of contract, then annually or as requested by COR |
| 34 | Regular Tool Control Log | Monthly |
| 35 | Detainee Volunteer Work Screening Form (Request Form) | As required |
| 36 | Detainee Volunteer Work Program Training Form | As required |
| 37 | ACA Accreditation | Within 18 months of contract award |
| 38 | Proposed daily transportation routes | Within 30 calendar days of contract award |
| 39 | Safety Devices/Equipment Training Plan | Quarterly |
| 40 | Chemical Perpetual Inventory Sheet | As requested by COR |
| 41 | Compliance and Independent Audit Report | Annually |
| 42 | Key Indicators Report | Monthly, by 5th of each month for previous month's data |

139

Attachment 1- PWS                                    70CDCR26D00000026

| 43 | General Supply/Inventory Plan | Within 30 calendar days after the award of contract, then annually or as requested by COR |
|---|---|---|

| 44 | Commissary Inventory List | As requested by COR |
|---|---|---|
| 45 | Statement of Detainee Funds Accounts | As requested by COR |
| 46 | IT Security Plan | Within 30 calendar days after the award of contract |

| 47 | Finalized List of Approved Food Vendors | Within 30 calendar days after the award of contract and upon any changes thereafter |
|---|---|---|
| 48 | Prime Vendor/Food Service Expenditures | As requested by COR |
| 49 | Employee Meal Ticket Sales Report | As requested by COR |
| 50 | Number of Meals Served/Daily Meal Count | Quarterly, or as requested by COR |
| 51 | Detainee Records | Continuous |
| 52 | Detainee Death | Reported immediately to COR (immediate verbal report, with written report within two (2) hours of incident) |
| 53 | Detainee Departure Documents | Continuous, prior to detainee departing. |
| 54 | Detainee Volunteer Food Service Worker Contingency Plan | Within 30 calendar days of award of contract and after that anytime as requested by the COR. |
| 55 | 35 Day Regular Menu | Monthly |
| 56 | Physical damage to the federal facility documentation | Immediate verbal report to COR, with written report within five (5) days. |
| 57 | Detainee Special Needs Menu | As requested by COR |
| 58 | Daily Diet List (Medical & Religious) | As requested by COR |

Attachment 1- PWS                                    70CDCR26D00000026

| 59 | Holiday Menus | Annually |
|---|---|---|

| 60 | Emergency Food Preparation and Service Schedule | Within 30 calendar days of award of contract |
|---|---|---|
| 61 | ACA Temperature Log Report (refrigerators, freezers, dishwasher temperatures and water) | As requested by COR |
| 62 | Food Service Weekly Inspection Log | Weekly or as requested by COR |

| 63 | Food Handler Certification | Always maintained for all food service employees, and as requested by COR |
|---|---|---|
| 64 | Food and Non-Food Inventory | Monthly or as requested by COR |
| 65 | Maintenance Service Work Orders | As requested by COR |
| 66 | Common Fare Cost for Detainees | Quarterly, or as requested by COR |
| 67 | Authorized Detainee Worker List Weekly Schedule | Weekly, or as requested by COR |
| 68 | Detainee Volunteer Food Service Work Detail Pay List | Monthly |
| 69 | Monthly Medical Inspection Corrective Actions | Monthly |
| 70 | Certified Dietician In-Service Staff Training and Department Inspection | Quarterly or as requested by the COR |
| 71 | Medical Clearance including TB test | For all new employees and after diagnosed with illness or communicable disease.

Employees must be re-examined and medically cleared before returning to work. TB test certification annually. |
| 72 | Vehicle inventory log and interior specification for each vehicle type | Within 30 calendar days of award of contract, annually and as requested by COR |

Attachment 1- PWS                              70CDCR26D00000026

| 73 | Menu Cycle (Revisions and Registered Dietician Recertification of all menus) | Annually |
|---|---|---|
| 74 | End of Month Food Service Cost Report, including Cost Per Meal Data | Annually |
| 75 | Firearms Control Register | As requested by COR |
| 76 | Surveillance Video | As requested by COR |
| 77 | Detainee or Service Provider Employee Contraband Found Report | Immediately to COR (immediate verbal report, with written follow-up) |

| 78 | Staff Vacancy Report | To COR by 5th of each month for previous month's data |
|---|---|---|
| 79 | Additional Reports as requested by the COR | As needed |
| 80 | Notice of federal facility readiness | 10 days prior to the end of the Transition Period |
| 81 | Records related to performance by Service Provider | As requested by CO or COR at any time during the term of the contract or at termination/expiration. |
| 82 | Litigation | As requested by CO or COR at any time during the term of the contract or at/after termination/expiration. |
| 83 | Congressional Inquiry | Immediately to COR and CO (immediate verbal report, with written follow-up) to FOD, DFOD, COR, and CO |
| 84 | Press statements and/or releases | To FOD, DFOD & COR prior to release |
| 85 | Correctional Officer assignment, Names of Supervisory Correctional Officers, and Shift Rosters | As requested by COR |
| 86 | Overnight lodging requests | Advance of commencement of overnight trip |

142

Attachment 1- PWS                                   70CDCR26D00000026

| 87 | Non-returned ID Badges/Credentials | Immediately to COR |
|---|---|---|
| 88 | Intelligence Information | Immediately to COR |
| 89 | Serious Incidents | Immediately to COR |
| 90 | Service Provider Employee Manual | Within 30 calendar days of award of contract and after that anytime as requested by the COR. |
| 91 | requested Detainee medical documentation | Immediately to COR |
| 92 | Medical and Personnel Records of Service Provider Employees | As requested by COR |
| 93 | Service Provider Business Permits and Licenses | Within 30 calendar days of the award of contract and after that anytime as directed by COR. |
| 94 | Service Provider Employee Registrations, Commissions, Permits, and Licenses | Prior to EOD and then after, as requested by COR |
| 95 | Correctional Officer Post Assignment Record | As requested by COR |
| 96 | Count Records | As requested by COR |
| 97 | GSA Form 139 or ICE equivalent | As requested by COR |
| 98 | Authorization to exceed a change in duty | To COR for approval prior to commencement of change of duty |
| 99 | Lost and found | As requested by COR |
| 100 | Security incidents – computers | To COR within four (4) hours of incident |
| 101 | Daily Detainee Manifest | As requested by COR |
| 102 | Contract Discrepancy Report, Corrective Action Plan, or outcome measures required by any inspection or accreditation review, QASP (see Attachment 1) or NDS requirements | As outlined within the requiring document |

Attachment 1- PWS                                      70CDCR26D00000026

| 103 | Spill Report | Immediately to COR |
|---|---|---|
| 104 | Transition-Out | 1 week after notification of transition to new vendor |
| 105 | Small Business Subcontracting Plan | Submitted with Proposal |
| 106 | Operational Data/Metrics Summary | Due within three (3) days of request |
| 107 | Personnel Files | As requested by COR |
| 108 | Uniform approval by COR | Within 7 days of contract award. Any changes require CO and COR approval prior to implementation |
| 109 | Log Books | As requested by COR |
| 110 | Evacuation Plan | Within 30 days of contract award |
| 111 | DHS Non-Disclosure Form, DHS 100-6 | Prior to EOD |
| 107 | Cybersecurity Compliance Plan, including the Authorization Readiness Report | Within 6 months of contract effective date. See Attachment "Cybersecurity Deliverables Sensitive Information Systems_HIGH_MOD 05.08.24." |

*Note: The word "immediately" or "immediate," as used above in the Deliverables Chart is defined as "as soon as reasonably possible." The Service Provider should use prudent and reasonable judgement to determine the timeframe necessary to notify the government as defined above based on the situation, but it should not exceed a reasonable timeframe to notify the government.*

The CO or COR will provide written acceptance, comments and/or change requests, if any, within 30 business days of receipt by the government of the initial deliverables.

Upon receipt of the government comments, the Service Provider shall have 15 business days to incorporate the government's comments and/or change requests and to resubmit the deliverables in its final form.

If written acceptance, comments and/or change requests are not issued by the government within 30 calendar days of submission, the draft deliverable shall be deemed acceptable as written and the Service Provider may proceed with the submission of the final deliverable product. The Service Provider shall provide all deliverables to the COR utilizing Microsoft Excel, PowerPoint or Word format as deemed appropriate.

Attachment 1- PWS                                    70CDCR26D00000026

**Appendix 5 Transportation Routes**

ICE anticipates normal transportation requirements other than hospital visits and local needs consisting of the following. The mileage is based on a start location of Seattle Tacoma (SeaTac) International Airport in the state of Washington, plus 20 miles per route to allow for geographic diversity.

Seattle area transportation includes but is not limited to the below schedules and routes. The COR may direct the Service Provider to transport detainees to unspecified miscellaneous locations with the same conditions as listed in Armed Transportation Services.

Transportation services may be requested by the U.S. Marshall's Service. Transportation will be provided if staff is available and transportation is provided during normal business hours.

Transportation on an ad hoc basis may be necessary to effectively remove aliens. These ad hoc runs must be approved by the COR and an ICE official.

| Route | Destination | Frequency | Round-trip Mileage per Trip | Number of Crews |
|-------|-------------|-----------|-----------------------------|-----------------|
| 1 | Yakima, WA to Spokane, WA | 7 days per week | 400 | ▮ |
| 2 | Yakima, WA to Richland, WA | 7 days per week | 160 | ▮ |
| 3 | Yakima, WA to Wenatchee, WA | 7 days per week | 220 | ▮ |
| 4 | NWIPC to Yakima | 7 days per week w/ad hoc ability for 2 runs per day when needed | 510 | ▮ |
| 5 | NWIPC to Seattle, WA – Tukwila, SeaTac airport, anything approved by the COR | 7 days per week | 500 | ▮ - ▮ per shift (am, afternoon, and pm) |

Attachment 1- PWS                                    70CDCR26D00000026

| 6 | NWIPC to Ferndale, WA | 7 days per week | 164 | ██ – ██ crew am or pm and ██ as needed for late shift and misc. runs |
|---|---|---|---|---|
| 7 | NWIPC to Portland, OR | 7 days per week | 390 | ██ (am, afternoon, and pm) |
| 8 | Portland, OR to Eugene, OR to NWIPC | 7 days per week – twice daily (am, pm) | 930 | █ |
| 9 | Portland, OR to Eugene for Medford, OR | Ad hoc runs when needed | | █ |
| 10 | Seattle local runs* - medical appts., jails, etc., and anywhere approved by the COR | Daily – 2 am, 2 pm, and 2 late | 500 | ██ – █ am, ██ pm, and █ late |
| 11 | Portland local runs* | Daily | 500 | █ - █ am and pm |
| 12 | Flight Operations Unit Support (ICE Air or successor entity): | Up to two times per week or as needed | 80 | █ |

Attachment 1- PWS                                    70CDCR26D00000026

| | | | | |
|---|---|---|---|---|
| | 1. King County International Airport<br>2. Boeing Field<br>3. Yakima Airport | | 80<br>510 | |
| 13 | Yakima, WA to Pendleton, OR for Boise, ID | 4 days per week – GTI's choice (ex. M, Th, Sat, Sun) | 263 | ▮ |
| 14 | Ad Hoc | As needed | varies | ▮ |

\* Local Runs: A local run begins and ends in the city designated or at an agreed location by the COR. i.e. the Seattle local run (mileage) begins at the Seattle Field Office or other approved location near Seattle. Detainee transportation takes place throughout the metro area and at the conclusion of the day's work the local run is concluded at the start location or at a COR approved location. This same method would be used for Portland, in that the local run (mileage) for these offices would begin and end in the COR approved locations.

In the ICE offices that have Service Provider transportation officers (Tukwila, WA/Tacoma, WA, Yakima, WA, and Portland, OR), when these Service Provider employees are not actively providing transportation services, they shall be assigned stationary guard services as designated by the COR or the ICE designated official. These duties are generally associated with but not limited to ICE detainees in holding cells. The Service Provider agrees to augment such practices as may be requested by ICE to enhance specific requirements for security, detainee monitoring, visitation and contraband control. Public contact is prohibited unless authorized in advance by the COR or the designated ICE official. These assignments shall not be considered Remote Post assignments, and their performance will not result in any additional expense to the Government.


**\*\*\* All overtime will be approved by the COR prior to any transportation \*\*\***

# Appendix  6

# Form G-391 – Official Detail

Form G-391 – Official Detail

**UNITED STATES DEPARTMENT OF HOMELAND SECURITY**

***U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT***

**OFFICIAL DETAIL**



File:     000 000 000

DATE:     xx-Xxx-20XX

TO:  *Deportation Officers:*

SUBJECT:  Order to Escort     **NAME     DOB:  DD-MMM-YYYY     (M/F)     Country**
Alien

Beginning     XXXX     Hours          On     XX-Xxx-20XX     , you are directed to perform escort at

duty in the case of the above-named alien as follows:

 Pick Up At:

Deliver To:

148

Other Instructions:

_____

_____

_____

_____

_____

<mark>Agent(s) will familiarize themselves with and observe Escort Standards Policy.</mark>

Upon conclusion of this detail, complete the report in the spaces provided below, account for all times chargeable

and return this detail to the office immediately.

_____     _____

**Agent Responsible for Arrangements**     **(Signature of Supervisor)**

REPORT:        TIME ACCOUNTING:

Date:

_____

       EOD FOR THIS DETAIL AT       HRS

149

I hereby certify I have complied with

the above Order exactly as directed.

(If not, exceptions below.)

RETURNED FROM DETAIL AT _____ HRS

**Time charged to:**

CONVEYANCE, Productive _____ Hours

CONVEYANCE, Lost Time _____ Hours

TOTAL HOURS THIS DETAIL _____

_____

**(Signature of Escorting Agent)**

150

Appendix 7 - GSA form – 139
## Record of Arrival and Departure from the Building

| DATE (a) | PRINT NAME (Last - First - Initial) (b) | SIGNATURE (c) | AGENCY OR FIRM (d) | ROOM NUMBER (e) | PURPOSE OF VISIT (f) | SEE FOOTNOTE* (g) | TIME OF ARRIVAL (h) | TIME OF DEPARTURE (i) |
|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |

* Federal Protective Service and Contract Administration personnel, when conducting an investigation, must place an "X" in this column.

GSA 139 (REV. 12/2006) **BACK**

# EXHIBIT G

# EXHIBIT A

I, Matthew Cantrell, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am an Assistant Field Office Director ("AFOD") employed by the U.S. Immigration and Customs Enforcement ("ICE"), Enforcement and Removal Operations ("ERO") division. I have been employed by ICE since 2006, having held various ERO roles involving detention, processing, and removal operations. I have been AFOD since 2020. I am currently assigned to the ERO office at the Northwest ICE Processing Center ("NWIPC") where I manage ERO personnel and provide oversight to ICE operations at the facility. I am familiar with the operations of the Tacoma ERO Office, as well as ICE's processing, detention and transfer policies, guidance and protocols.

2. This declaration is submitted in support of *Washington v. The GEO Group Inc.*, No. 24-05639 (W.D. Wash. filed Aug. 5, 2024), and sets out ICE's role in access to facility, including access to health care facilities within the facility, by outside individuals.

3. The statements in this declaration are based on my personal knowledge, information provided to me in the course of my official duties, and records maintained by DHS in the ordinary course of business.

4. As an operational program of ICE, ERO is responsible for the planning, management, and direction of broad programs relating to the supervision, detention, and removal of noncitizens from the United States under the U.S. immigration laws. ERO's statutory responsibilities include detention of noncitizens during the pendency of proceedings to determine whether they will be removed from the United States, as well as detention of noncitizens subject to an administratively final removal order, pending their removal from the United States.

5.      ICE ERO is responsible for the detention, health, welfare, transportation, and deportation of detainees in removal proceedings, and those subject to final order of removal from the United States.

6.      The NWIPC is a private detention center owned and operated by The GEO Group, Inc. ("GEO") on behalf of ICE.  GEO is an independent contractor that provides the facility, management, personnel and services for 24-hour supervision of immigrant detainees in ICE custody at the NWIPC.  GEO personnel are not employed by ICE.  The NWIPC operates pursuant to the Performance-Based National Detention Standards 2011 ("PBNDS").  *See* PBNDS, available at: https://www.ice.gov/detention-standards/2011.

7.      Medical care at the NWIPC is overseen by the ICE Health Services Corps ("IHSC"), which provides medical services through a combination of U.S. Public Health Service Commissioned Corps ("USPHS") officers, federal civil servants, and contract health professionals.

8.      Pursuant to both the current contract with GEO and the PBNDS, ICE has final authority and control over access to the secure portions of the NWIPC, which includes any health care facilities within the NWIPC.

9.      There are specific procedures laid out for different types of potential visitors to follow in the PBNDS for various types of visitation requests, and all require authorization, coordination, and/or approval by the ERO Field Office as well as pre-clearance approvals and background checks as necessary.

10.      On July 18, 2024, the Facility Administrator Bruce Scott met with ERO (the former AFOD, Geoff White), at the facility in ICE offices located within the NWIPC and provided him with a copy of Ms. Muniz's written request for access to the NWIPC.

11.     At approximately 11:20 AM, ERO (former AFOD Mr. White) went to the front lobby and explained to Ms. Muniz and Ms. Chien that ICE was denying their entry to the secure side of the facility, but explained that they could take water and air samples from the non-secure side of the facility.

I declare under penalty of perjury that the foregoing declaration is true and correct to the best of my knowledge and belief.

Executed at Tacoma, Washington on February 12, 2026.

MATTHEW M
CANTRELL

Digitally signed by MATTHEW M
CANTRELL
Date: 2026.02.12 15:18:19 -08'00'

Matthew Cantrell
Assistant Field Office Director
United States Department of Homeland Security
United States Immigration and Customs Enforcement
Tacoma, Washington

# EXHIBIT H



The Honorable Robert J. Bryan

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

STATE OF WASHINGTON,

               Plaintiff,

    v.

THE GEO GROUP, INC.,

               Defendant.

Civil Action No. 17-5806 RJB

**STATEMENT OF INTEREST OF THE
UNITED STATES**

STATEMENT OF INTEREST OF THE UNITED STATES
*State of Washington v. The Geo Group, Inc.*, No. 3:17-cv-05806-RJB

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 353-4537**

The United States submits this Statement of Interest to address an aggressive and legally unjustified effort by the State of Washington to interfere with federal immigration enforcement.[1] The State of Washington excludes its state inmates from the minimum wage—and according to state policy documents, pays them as little as thirty-four to sixty-five cents an hour—yet it seeks to impose the state minimum wage of $12 per hour for individuals in federal immigration detention. This is a quintessential violation of intergovernmental immunity principles. Federal contractors, including the GEO Group, operate residential facilities for immigration detainees on behalf of U.S. Immigration and Customs Enforcement "(ICE"). Under a Voluntary Work Program specifically authorized (and required) by ICE, the GEO Group allows detainees in its facilities to perform work. Although the GEO Group's contract with ICE specifies that the federal government will pay GEO $1 a day for work performed by detainees, Washington wants GEO to pay much more. The State insists that these federal immigration detainees are "employees" under state law, even though it simultaneously *exempts* similarly-situated detainees in state facilities from the minimum wage. Basic constitutional principles prevent a State from interfering with the federal government's activities in the way Washington is trying to do here.

The United States has a strong interest in countering discriminatory state efforts to regulate federal contractors, in the proper application of the Supremacy Clause, and in the foundational principles that protect the Federal Government from unlawful state interference. The United States accordingly submits that the doctrine of intergovernmental immunity precludes application of Washington's Minimum Wage Act ("MWA"), RCW 49.46.0001 *et seq.* (2019), to the GEO Group, Inc. ("GEO"), a federal contractor, because the MWA unlawfully discriminates against "the Federal Government and those with whom it deals." *North Dakota v. United States*, 495 U.S. 423, 438 (1990). Specifically, the State exempts its detainees from the minimum wage, yet seeks to impose that wage on federal detention operations. Further, the MWA exempts state and

---

[1] 28 U.S.C. § 517 authorizes the Attorney General to attend to the interests of the United States as a non-party in a suit pending in a court of the United States.

STATEMENT OF INTEREST OF THE UNITED STATES-1
*State of Washington v. The Geo Group, Inc.*, No. 3:17-cv-05806-RJB

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 353-4537**

private corporations with whom the State of Washington contracts—but not the Federal Government and those with whom it contracts—from paying minimum wage to institutionalized persons for their work.  Intergovernmental immunity bars application of the statute to GEO.

The United States recognizes that the Court rejected GEO's intergovernmental immunity argument at an earlier stage of the litigation (albeit without the benefit of the United States' views).  Given the importance of this matter and the issues it raises under the Supremacy Clause, however, the United States respectfully urges the Court to find that the doctrine of intergovernmental immunity bars the State of Washington from enforcing the MWA against GEO.[2]

## BACKGROUND

Congress authorizes DHS to pay an "allowance[] (at such rate as may be specified from time to time in the appropriation Act involved) to aliens, while held in custody under the immigration laws, for work performed."  8 U.S.C. § 1555(d).  In 1979, Congress appropriated funds to provide for "payment of allowances (at a rate not in excess of $1 per day) to aliens, while held in custody under the immigration laws, for work performed."  Appropriations Act for Fiscal Year 1979, Pub. L. No. 95-431, tit. II, 92 Stat. 1021 (1978).  Since 1979, Congress has not directly appropriated funds to pay the allowances, nor has it set a rate different than the $1 per day rate set in that Act.  *See* Declaration of Tae Johnson ("Johnson Decl.") ¶ 13, ECF No. 91.  The work program created by this law has been known as the "Voluntary Work Program," and ICE detention standards require it to be offered by detention facilities and provide that "compensation is at least $1.00 (USD) per day."  *See* 2011 Operations Manual ICE Performance-Based National Detention Standards (PBNDS), Part 5.8, VI.C, https://www.ice.gov/doclib/detention-standards/2011/5-8.pdf.

---

[2] Although the Court ruled on intergovernmental immunity at an earlier stage of the litigation, the Court is free to reconsider that issue at "'any time before the entry of judgment.'" *City of Los Angeles, Harbor Div.* v. *Santa Monica Baykeeper*, 254 F.3d 882, 888 (9th Cir. 2001) (emphasis in original) (quoting *United States* v. *Houser*, 804 F.2d 565, 567 (9th Cir. 1986)).

STATEMENT OF INTEREST OF THE UNITED STATES-2
*State of Washington v. The Geo Group, Inc.*, No. 3:17-cv-05806-RJB

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 353-4537**

GEO operates the Northwest Detention Center in Tacoma, Washington under contract with United States Immigration and Customs Enforcement ("ICE"). Johnson Decl. ¶ 8, ECF No. 91. The Northwest Detention Center houses aliens ICE has arrested on probable cause to believe that they are removable from the United States under federal immigration law. *Id.* ¶ 10; *see also* 8 U.S.C. §§ 1182(a) (classes of inadmissible aliens), 1225(b) (detention of aliens applying for admission), 1226 (detention of aliens pending removal proceedings), 1227(a) (classes of deportable aliens), and 1231(a) (detention of aliens ordered removed). Through its contracts, ICE requires that all facilities where such individuals are detained on its behalf adhere to certain standards and operate in accordance with certain specifications, including the requirement to provide a Voluntary Work Program for detainees. *Id.* ¶¶ 10-11. ICE's purpose in requiring a Voluntary Work Program is to decrease detainee idleness, improve detainee morale, and reduce disciplinary incidents. *Id.* ¶ 11. At the Northwest Detention Center, detainees participating in that program must receive at least $1 per day for their voluntary work. *Id.* ¶ 13.

This work program operates similarly to the program Washington State operates at its own detention facilities. Residents of those State-managed facilities are exempted from the MWA. *See* RCW 49.46.010(3)(k) (exempting any "[a]ny resident, inmate, or patient of a state, county, or municipal correctional, detention, treatment or rehabilitative institution"). And Washington operates a work program that pays wages well below minimum wage—at rates that State policy documents indicate range from $55 per month (which is around 35 cents per hour for four 40 hour weeks of work) for certain work programs, to an hourly wage ranging from 65 cents to $2.70 under another program. Offender Work Program Policies 700.100 & 710.400, *available at* https://www.doc.wa.gov/information/policies/default.aspx?show=700.

The State of Washington filed this action in state court in September 2017, alleging that GEO violated the MWA and was unjustly enriched by compensating civil immigration detainees housed at its facilities $1 per day for their work. *See* Complaint ¶ 1.4, ECF No. 1-1. GEO timely removed the action to this Court. *See* Notice of Removal, ECF No. 1.

STATEMENT OF INTEREST OF THE UNITED STATES-3
*State of Washington v. The Geo Group, Inc.*, No. 3:17-cv-05806-RJB

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 353-4537**

In November 2018, GEO moved for summary judgment on Washington's cause of action under the MWA, arguing that the doctrine of intergovernmental immunity barred Washington's claim. Def.'s Mot. for Summ. J. on Pl.'s First Cause of Action ("Mot. for Summ. J."), ECF No. 149. The Court denied GEO's motion, concluding that the MWA "does not discriminate against the Federal Government" because it "is neutral on its face." Order Den. Def.'s Mot. for Summ. J. on Pl.'s First Cause of Action ("Order Den. Def.'s MSJ") 9, ECF No. 162. In denying GEO's motion to reconsider that decision, the Court tacitly recognized that the MWA does not apply to state detainees, distinguishing the detainees at issue here from state detainees on the ground that they "are not residents of a 'state, county, or municipal […] institution'" and "are not 'state inmates.'" Order Den. Def.'s Mot. for Reconsideration of Order Den. Mot. for Summ. J. on First Cause of Action 2, ECF. No. 165 (alteration in original). On August 6, 2019, the Court issued an order on the Parties' Cross Motions for Summary Judgment, which, *inter alia*, granted the State's motion to dismiss GEO's preemption defense. Order on Cross Mots. for Summ. J. 1-2, ECF No. 288.

## DISCUSSION

This case presents a compelling example of a State discriminating against the Federal Government and those with whom it deals. When a resident of a *state* detention facility performs work, Washington allows itself to pay that resident less than the minimum wage. But when a resident of a detention facility operated for the Federal Government by a *federal contractor* performs work, Washington insists that the federal contractor pay the resident the full state minimum wage. Under the longstanding doctrine of intergovernmental immunity, Washington's approach can be justified only if significant differences between the two classes justify the differential treatment. But there are no such significant differences here, because work is permitted under both the federal immigration detention scheme and the state detention scheme. While Congress has authorized DHS to use private contractors to conduct these detention operations, "[f]or purposes of intergovernmental immunity, federal contractors are treated the

STATEMENT OF INTEREST OF THE UNITED STATES-4
*State of Washington v. The Geo Group, Inc.*, No. 3:17-cv-05806-RJB

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 353-4537**

same as the federal government itself," *United States v. California*, 921 F.3d 865, 882 n.7 (9th Cir. 2019), and the relevant question is whether federal detention contractors are similarly situated to state detention facilities for purposes of the MWA. By requiring federal detention contractors to pay the minimum wage but relieving similarly-situated state facilities from that obligation, the State accordingly runs afoul of basic principles of intergovernmental immunity that have shielded federal activities from state interference since the Founding.

Like preemption, intergovernmental immunity is grounded in the Supremacy Clause. *See United States v. California*, 921 F.3d 865, 878 (9th Cir. 2019) ("The doctrine of intergovernmental immunity is derived from the Supremacy Clause, which mandates that the activities of the Federal Government are free from regulation by any state.") (citation and internal quotation marks omitted); *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) ("[U]nder the Supremacy Clause, from which our pre-emption doctrine is derived, '"any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield."'") (citation omitted). Under the intergovernmental immunity doctrine, state laws that "discriminate [ ] against the Federal Government or those with whom it deals" "are invalid." *Boeing Co. v. Movassaghi*, 768 F.3d 832, 839 (9th Cir. 2014) (quoting *North Dakota,* 495 U.S. at 435 (alteration in original)). "'A state or local law discriminates against the federal government if it treats someone else better than it treats the government.'" *Movassaghi*, 768 F.3d at 842 (quoting *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010)) (internal quotation marks omitted).

As with preemption, the intergovernmental immunity doctrine is critically important to the Federal Government's ability to function free from improper interference by the states. *Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 128 (1993) ("The purpose of the intergovernmental immunity doctrine is to protect the rights of the Federal Sovereign against state interference."). Such interference, as here, can occur when state legislation treats the Federal Government or its contractors, *i.e.*, "those with whom it deals," less favorably than comparable

STATEMENT OF INTEREST OF THE UNITED STATES-5
*State of Washington v. The Geo Group, Inc.*, No. 3:17-cv-05806-RJB

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 353-4537**

state entities—particularly when the federal contractors' efforts are in service of a federal policy to which the State is opposed. *See, e.g.*, *Movassaghi*, 768 F.3d at 842-43 ("Boeing cannot be subjected to discriminatory regulations because it contracted with the federal government. . . . SB 990 discriminates . . . against Boeing as a federal contractor. Therefore, it is invalid under the doctrine of intergovernmental immunity."). Thus, "when [a] state law is discriminatory, a private entity with which the federal government deals can assert immunity." *Id.* at 842.[3]

## I. The Doctrine of Intergovernmental Immunity Bars Washington's Attempt to Apply the MWA against Federal Contractors.

Washington's attempt to enforce its minimum wage law against GEO unconstitutionally discriminates against a federal contractor for work performed in support of the Federal Government's enforcement of federal immigration law. Under the MWA, all employers in the State are required to pay their "employees" a minimum wage specified by the statute. RCW 49.46.020. But not every person permitted or paid to work is classified as an "employee" under the MWA. *See* RCW 49.46.010. As relevant here, the definition of "employee[s]" subject to the MWA excludes "[a]ny resident, inmate, or patient of *a state, county, or municipal* correctional, detention, treatment or rehabilitative institution." RCW 49.46.010(3)(k) (emphasis added). The law does not similarly exclude those who are in federal custody and who the Federal Government does not treat as employees, however, and does not exclude residents of equivalent facilities that house federal inmates, whether operated by the Federal Government or its contractors. *See id.*

---

[3] Congress provided for a detention scheme that utilizes private contractors and provides for a detainee work program subject to a federally-set allowance rather than a wage subject to federal or other minimum wage laws. *See* 8 U.S.C. § 1555(d) & 8 U.S.C. § 1231(g). In addition to violating principles of intergovernmental immunity, a State's imposition of the state minimum wage law on such a scheme would be preempted to the extent it poses an "obstacle to the accomplishment and execution of the full purposes of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012); *see Crosby v. National Foreign Trade Council*, 530 U.S. 363, 380 (2000) (statutory scheme "drawn not only to bar what they prohibit but to allow what they permit").

STATEMENT OF INTEREST OF THE UNITED STATES-6
*State of Washington v. The Geo Group, Inc.*, No. 3:17-cv-05806-RJB

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 353-4537**

Thus, as written (assuming *arguendo* it is otherwise applicable), the MWA requires the Federal Government and its contractors to pay minimum wage to individuals in federal custody who are not employees under federal law, but does not require the state and its contractors to pay minimum wage to individuals in State custody, who it deems not to be employees. The MWA thus unconstitutionally discriminates against the Federal Government—and the contractors who operate facilities that house federal detainees. *See Movassaghi*, 768 F.3d at 839.

The State basically concedes most of this. In response to GEO's previous motion asserting intergovernmental immunity, see Def.'s Mot. for Summ. J., ECF No. 149, the State effectively agreed that the statute would be unconstitutional if applied as written to require federally-owned facilities to pay the state minimum wage. Pl.'s Resp. to Def.'s Mot. for Summ. J. 1, ECF No. 155. The State thus took the position that—notwithstanding the statutory language—"Washington's minimum wage laws do not extend to federally owned facilities," *id.*, because "the intergovernmental immunity component of sovereign immunity doctrine bars Washington from directly regulating the Federal Government." *Id.* at 4 n.2. Recognizing "these core principles of federalism," the State explicitly recognized, as it must, that "Washington's minimum wage laws do not regulate the federal government's pay practices at any federal detention facility located in Washington State." *Id.* at 4-5 n.2.

In the State's view, however, the fact that GEO is a private contractor makes all the difference. The State emphasized (and this Court agreed) that the minimum wage law applies generally to all private entities and thus does not target GEO because of its status as a contractor for the Federal Government.[4] Order Den. Def.'s MSJ 6-8, ECF No. 162 (citing *North Dakota,*

---

[4] Regardless of whether the statutory *text* targets GEO because it is a federal contractor, this *lawsuit*, through which the State seeks to impose liability on a federal contractor for its actions

STATEMENT OF INTEREST OF THE UNITED STATES-7
*State of Washington v. The Geo Group, Inc.*, No. 3:17-cv-05806-RJB

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 353-4537**

495 U.S. at 438); *id.* at 8. This is wrong for two reasons. First, even generally applicable laws are invalid if they treat the state or its associates better than the Federal Government and those with whom it deals. Second, the State's own interpretation of the MWA makes clear that it is not generally applicable to all private corporations, but rather specifically exempts private corporations from paying minimum wage to individuals detained under *state* law.

A. **Generally Applicable Laws that Privilege the State and Those with Whom It Deals over the Federal Government and Those with Whom It Deals Are Invalid.**

The Supreme Court has made clear that the intergovernmental immunity doctrine requires invalidation of otherwise generally applicable state laws that treat the state and those with whom it deals better than the Federal Government and those with whom it deals. *See Davis v. Michigan Department of Treasury*, 489 U.S. 803 (1989).

In *Davis*, a state law taxed federal employee retirement benefits, but not similar state employee retirement benefits. *Id.* at 805-06. Like the MWA, the text of the law was generally applicable, except that it provided a specific exception for the state that did not apply to the Federal Government: "Th[e] statute defines taxable income in a manner that excludes all retirement benefits received from the State or its political subdivisions, but includes most other forms of retirement benefits," including federal retirement benefits. *Davis*, 489 U.S. at 806. "The

---

in administering a federal contract, undoubtedly does. It is precisely to prevent this type of interference with the Federal Government's effective execution of federal law, whether on its own or through contractors, that the intergovernmental immunity doctrine exists. *See, e.g.*, *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 608 (1973) ("The doctrine of intergovernmental immunity enunciated in *McCulloch v. Maryland*, 4 Wheat. 316, 4 L. Ed. 579 (1819), however it may have evolved since that decision, requires at least that the United States be immune from discriminatory treatment by a State which in some manner interferes with the execution of federal laws.").

STATEMENT OF INTEREST OF THE UNITED STATES-8
*State of Washington v. The Geo Group, Inc.*, No. 3:17-cv-05806-RJB

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 353-4537**

effect of this definition is that the retirement benefits of retired state employees are exempt from state taxation while the benefits received by retired federal employees are not." *Id.*

The Court held the law invalid under the intergovernmental immunity doctrine because the state was unable to justify the distinction between the two classes of retirees. *Id.* at 814-17. Although federal employees were not targeted specifically by the state law, the statute singled out the state for preferential treatment and did not extend that preferential treatment to the Federal Government and its employees. *Id*. at 806; *cf.* RCW 49.46.010(3)(k). Thus, intergovernmental immunity applied in *Davis* because—notwithstanding the statute's general applicability—the state tax system "discriminate[d] in favor of retired state employees and against retired federal employees." *Davis*, 489 U.S. at 814.

Importantly, the burden of the challenged statute in *Davis* did not fall directly on the Federal Government. Instead, the tax was levied on retired federal employees. But this did not prevent the intergovernmental immunity doctrine from invalidating the state law. *See Davis*, 489 U.S. at 814 ("[I]t does not follow that private entities or individuals who are subjected to discriminatory taxation on account of their dealings with a sovereign cannot themselves receive the protection of the constitutional doctrine. Indeed, all precedent is to the contrary.").[5]

But it did not matter that the burden of the law did not fall directly on the Federal Government. Nor did it matter that the law at issue was generally applicable to everyone except employees of the State. All that mattered in *Davis* was the law treated associates of the State better than it treated associates of the Federal Government. *Davis*, 489 U.S. at 806; *see Phillips*

---

[5] Accordingly, the United States respectfully notes that this Court's observation that whether or not the MWA applies here "may not affect the Federal Government at all" because ICE need not reimburse GEO for the moneys used to compensate the detainees in the Voluntary Work Program, Order Den. Def.'s MSJ 9, ECF No. 162, has no bearing on whether the intergovernmental immunity doctrine applies.

STATEMENT OF INTEREST OF THE UNITED STATES-9
*State of Washington v. The Geo Group, Inc.*, No. 3:17-cv-05806-RJB

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 353-4537**

*Chem. Co. v. Dumas Indep. Sch. Dist.*, 361 U.S. 376, 385 (1960) ("[I]t does not seem too much to require that the State treat those who deal with the Government as well as it treats those with whom it deals itself.").

Here, as in *Davis*, there is little question that the MWA treats the Federal Government and its contractors worse than the State.[6] Washington's own relevant Administrative Policy states that "[r]esidents, inmates, or patients of *state, county or municipal* correctional, detention, treatment or rehabilitative institution[s] [are] not . . . required to be paid minimum wage if they perform work directly for, and at, the institution's premises where they are incarcerated, and remain under the direct supervision and control of the institution." State of Washington Department of Labor Industries Employment Standards Administrative Policy: Minimum Wage Act Applicability (2014) ("Administrative Policy") 5, ECF 160-1 (emphasis added). There is no equivalent exemption for residents, inmates, or patients of federal facilities. Thus, under the MWA's own terms, state and local detention facilities, regardless of who owns and operates them, need not pay detainees minimum wage for work, while federal facilities, whether operated by the Federal Government itself or a federal contractor, must.[7] Such discriminatory treatment is barred

---

[6] The United States respectfully notes that this Court's observation that "the MWA leaves open the question, and places no limitation on, whether Congress *could* decree that detainees must be compensated at a certain wage," Order Den. Def.'s MSJ 8, ECF No. 162, has no bearing on the question of whether the State's discriminatory attempt to apply its law to GEO in this case is barred by intergovernmental immunity. The fact that the MWA discriminates in favor of the State and does not extend a similar benefit to the Federal Government and those with whom it deals is enough to trigger the intergovernmental immunity doctrine.

[7] Washington state law expressly allows private contractors to operate "state, county or municipal correctional, detention, treatment or rehabilitative institution[s]" in a variety of circumstances. *See*, *e.g.*, RCW 72.09.015(6) ("Correctional facility' means a facility or institution operated directly *or by contract* by the secretary for the purposes of incarcerating adults…") (emphasis added); RCW 70.48.210(4) (local special detention facility "may be operated by a noncorrectional agency *or by noncorrectional personnel by contract* with the governing unit")

STATEMENT OF INTEREST OF THE UNITED STATES-10
*State of Washington v. The Geo Group, Inc.*, No. 3:17-cv-05806-RJB

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 353-4537**

by intergovernmental immunity. *See Dumas*, 361 U.S. at 379 (holding that statute "discriminates unconstitutionally against the United States and its lessees" because it "imposes a distinctly lesser burden on similarly situated lessees of exempt property owned by the State and its political subdivisions").[8]

The State's litigation concession that the MWA—notwithstanding its plain terms—does not apply to federally owned facilities does not change this conclusion. For one, the law as written plainly discriminates against federally managed detention facilities, casting doubt on the post-hoc effort to reform a state statute through a litigation concession. Moreover, as noted, "[f]or purposes of intergovernmental immunity, federal contractors are treated the same as the federal government itself," *California*, 921 F.3d at 882 n.7, and the relevant inquiry is whether the federal contractor is similarly situated to the state facility for purposes of the MWA. The need to compare the

_____

(emphasis added); RCW 71.05.020(21) ("Evaluation and treatment facility" includes "any facility which can provide directly, *or by direct arrangement with other public or private agencies*, emergency evaluation and treatment") (emphasis added); RCW 71.05.320(1)(a) (court may remand certain individuals to "custody of the department of social and health services *or to a facility certified for ninety day treatment . . .* for a further period of . . . treatment") (emphasis added).

[8] In its Opposition to GEO's motion, the State focused on the MWA's applicability to private corporations generally, rather than addressing the specific statutory provision relevant here, which exempts residents of state institutions. *See* Pl.'s Resp. to Def.'s Mot. for Summ. J. 7-8, ECF No. 155. That was wrong. To be sure, the *North Dakota* Court instructed that the "broader regulatory context" must be considered in determining whether the intergovernmental immunity doctrine applies. *North Dakota*, 495 U.S. at 438. But it did so in the course of explaining that the doctrine did not apply in that case—notwithstanding that the challenged state law treated the Federal Government differently from other actors—because in the context of the broader statutory scheme the challenged state law was actually *favorable* to the Federal Government. *Id.* at 438-39. Here, by contrast, the relevant state law provision, both when considered on its own *and* when considered as part of the broader statutory scheme, discriminates in favor of the State and against the Federal Government and other actors. This renders application of the MWA to GEO—which, as a federal contractor, is one with whom the federal government "deals," see, for example, *Movassaghi*, 768 F.3d at 842-43—unconstitutional under the intergovernmental immunity doctrine, *see North Dakota*, 495 U.S. at 438 (intergovernmental immunity doctrine bars state laws that discriminate against the "Federal Government and those with whom it deals").

STATEMENT OF INTEREST OF THE UNITED STATES-11
*State of Washington v. The Geo Group, Inc.*, No. 3:17-cv-05806-RJB

U.S. DEPARTMENT OF JUSTICE
1100 L Street, NW
Washington, DC 20005
Tel: (202) 353-4537

detention roles of the comparative governments, rather than the method implementing that detention role through public ownership of the facility or private contracting, is most critical in these circumstances.  This principle has particular force in the immigration context, where the Ninth Circuit has recognized that the housing of noncitizens "for purposes of civil immigration proceedings" is a quintessential "federal activity." *Id.* at 882; *see also United States v. California*, 314 F. Supp. 3d 1077, 1096 (E.D. Cal. 2018) ("Given that immigration enforcement is the province of the Federal Government, it demands no stretch of reason to see that [state laws imposing fines on employers who cooperate with federal immigration officials] in effect, target the operations of <u>federal</u> immigration enforcement."), *rev'd in part on other grounds*, 921 F.3d 865.  Indeed, as the Ninth Circuit has noted, "the INA contemplates use of both federal facilities *and* nonfederal facilities with which the federal government contracts" for the purpose of holding noncitizens pending removal proceedings. *California*, 314 F.3d at 882 n.7. Any notion that discrimination against a federal contractor housing federal immigration detainees should be allowed when discrimination against the federal government itself would be prohibited is thus unsupported.  This is all the more true where, as here, the federal contract *requires* the contractor to take the action that is the subject of the state discrimination—here, to offer detainees the opportunity to work for an allowance.  *See, e.g.,* Decl. of Joan K. Mell Attaching GEO-ICE Contract ("GEO-ICE Contract") 371, ECF No. 19 (listing "Voluntary Work Program" on "Performance Requirements Summary"); 2011 PBNDS, Part 5.8, VI.C, https://www.ice.gov/doclib/detention-standards/2011/5-8.pdf ("Detainees shall be provided the opportunity to participate in a  voluntary work program"); Johnson Decl. ¶¶ 10-11.

The conclusion that intergovernmental immunity prohibits the State from discriminating against federal immigration contractors also applies regardless of whether contractors who own

STATEMENT OF INTEREST OF THE UNITED STATES-12
*State of Washington v. The Geo Group, Inc.*, No. 3:17-cv-05806-RJB

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 353-4537**

and operate *state* detention facilities are similarly discriminated against under state law. As the Supreme Court explained just last term, the relevant question for purposes of intergovernmental immunity "isn't whether federal [entities] are similarly situated to state [entities] who *don't* receive [the] benefit; the relevant question is whether they are similarly situated to those who *do*." *Dawson v. Steager*, 139 S. Ct. 698, 705–06 (2019). Thus, as in prior cases, the Court rejected "the State's effort to compare the class of federal [entities] with state [entities] who did *not* benefit from the . . . exemption rather than those who *did*." *Id.* (emphasis added).

This inquiry looks to "how the State has defined the favored class." *Id.* at 705. The "favored class" in these circumstances are entities that conduct state detention operations, and there is no relevant basis on which to distinguish entities that conduct federal detention operations—whether owned by the federal government or by one of its contractors—from state detention facilities for purposes of Washington's minimum wage law. Both house individuals involuntarily and offer them the opportunity to receive compensation for performing various activities during their period of detention for detention management purposes that serve aims distinct from simply providing compensation for work performed. Accordingly, exempting state detention facilities from having to pay minimum wage while at the same time failing to exempt contractor-owned federal detention facilities (like the Northwest Detention Center) from having to pay minimum wage violates intergovernmental immunity. *See North Dakota*, 495 U.S. at 438 (intergovernmental immunity prohibits a state from "treat[ing] someone else better than" "the Federal Government *and those with whom it deals*") (emphasis added).

STATEMENT OF INTEREST OF THE UNITED STATES-13
*State of Washington v. The Geo Group, Inc.*, No. 3:17-cv-05806-RJB

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 353-4537**

**B.** **Under the State's Own Interpretation of the MWA, the Statute Is Not Generally Applicable to All Private Corporations, but Specifically Exempts Companies for Whom State Detainees Work.**

The MWA also is not "generally applicable" to all private entities involved in detention labor, as the State's own Administrative Policy makes clear. The Administrative Policy explains that "State inmates assigned by prison officials to work on prison premises *for a private corporation* at rates established and paid for by the state are not employees of the private corporation and *would not be subject to the MWA*." Administrative Policy at 5 (emphasis added). In other words, private contractors *with the State* for the labor of institutionalized persons *are exempt* from the Act, but a private contractor *with DHS* for the detention and labor of institutionalized persons *are covered* by the Act. Contrary to the State's claims, then, the MWA is not even "generally applicable" and does not "plac[e] private firms that contract with the Federal Government on equal footing with all other private entities." Order Den. Def.'s MSJ 6, ECF No. 162. Applying the statute to GEO in these circumstances is unconstitutional. *See Dumas Indep. Sch. Dist.*, 361 U.S. at 385.

**II.** **GEO Did Not Waive Intergovernmental Immunity by Contract.**

In denying GEO's motion for summary judgment, this Court raised the possibility (without deciding the question) that language in the contract between ICE and GEO could be construed as a waiver of intergovernmental immunity. Order Den. Def.'s MSJ 8, ECF No. 162. It does not.

The Supreme Court has explained that, "[b]ecause of the fundamental importance of the principles shielding federal . . . activities from regulation by the States, an authorization of state regulation is found only when and to the extent there is 'a clear congressional mandate,' 'specific congressional action' that makes this authorization of state regulation 'clear and unambiguous.'" *Hancock v. Train*, 426 U.S. 167, 167 (1976) (footnotes omitted); *cf. Al-Haramain Islamic Found., Inc. v. Obama*, 705 F.3d 845, 850 (9th Cir. 2012) ("Contrary to the district court's reliance on

STATEMENT OF INTEREST OF THE UNITED STATES-14
*State of Washington v. The Geo Group, Inc.*, No. 3:17-cv-05806-RJB

U.S. DEPARTMENT OF JUSTICE
1100 L Street, NW
Washington, DC 20005
Tel: (202) 353-4537

implied waiver, '[a] waiver of sovereign immunity cannot be implied but must be unequivocally expressed.'") (alteration in original).

In particular, the Court observed that one provision in the nearly 400-page contract between ICE and GEO includes a nonexclusive list of 25 "constraints" that the contractor "is expected to be knowledgeable of . . . and perform in accordance with the most current versions of," one of which is "[a]pplicable federal, state and local labor laws and codes." GEO-ICE Contract 48, ECF No. 19. That language, however, neither mentions the MWA explicitly nor refers to "immunity" or "waiver" of immunity, and thus is not the sort of "clear and unambiguous," "unequivocal express[ion]" necessary to constitute a waiver of intergovernmental immunity.

While these basic principles alone preclude a finding of waiver based on this provision, it is also inappropriate to construe the phrase "applicable . . . laws" to include the MWA here. First, similar language in contracts between ICE and its contractors have not been viewed as precluding a finding of intergovernmental immunity in the past. *See California*, 921 F.3d at 885 (enjoining state law "requiring examination of the circumstances surrounding the apprehension and transfer of immigration detainees" on intergovernmental immunity grounds); *id.* at 886 n.10 (noting contract governing immigration detention facility at issue "includes a provision requiring "compl[iance] with all applicable ICE, federal, state and local laws, statutes, regulations, and codes."). Second, if the term "applicable" is to mean anything, it must at a minimum exclude laws that are invalid as applied to the circumstances of the contract. Indeed, even without that term, references to state or federal law in contracts are presumed to refer only to valid laws. *See DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 469, 193 L. Ed. 2d 365 (2015) ("Absent any indication in the contract that this language is meant to refer to *invalid* state law, it presumably takes its

STATEMENT OF INTEREST OF THE UNITED STATES-15
*State of Washington v. The Geo Group, Inc.*, No. 3:17-cv-05806-RJB

**U.S. DEPARTMENT OF JUSTICE**
1100 L Street, NW
Washington, DC 20005
Tel: (202) 353-4537

ordinary meaning: *valid* state law."). The MWA is invalid as applied to federal contractors on intergovernmental immunity grounds. *See supra* Part I. The contract thus cannot be read to include the MWA as among the "constraints," and cannot be read to waive immunity to the MWA or any other invalid or otherwise inapplicable law.

### CONCLUSION

For the foregoing reasons, the United States urges the Court to find that the doctrine of intergovernmental immunity bars the State of Washington from enforcing the MWA against GEO.

DATED:  August 20, 2019                          Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

ETHAN P. DAVIS
Principal Deputy Assistant Attorney General

CHRISTOPHER A. BATES
Senior Counsel to the Assistant Attorney General

ALEXANDER K. HAAS
Director

JACQUELINE COLEMAN SNEAD
Assistant Branch Director

*/s/ Christopher M. Lynch*
CHRISTOPHER M. LYNCH
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 353-4537
Fax: (202) 616-8460
Email: christopher.m.lynch@usdoj.gov

*Counsel for the United States*

STATEMENT OF INTEREST OF THE UNITED STATES-16
*State of Washington v. The Geo Group, Inc.*, No. 3:17-cv-05806-RJB

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 353-4537**

**CERTIFICATE OF SERVICE**

I certify that on August 20, 2019, a copy of the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

DATED this 20th day of August, 2019.

           */s/ Christopher M. Lynch*
           CHRISTOPHER M. LYNCH

STATEMENT OF INTEREST OF THE UNITED STATES-17
*State of Washington v. The Geo Group, Inc.*, No. 3:17-cv-05806-RJB

**U.S. DEPARTMENT OF JUSTICE**
**1100 L Street, NW**
**Washington, DC 20005**
**Tel: (202) 353-4537**

# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

THE GEO GROUP, INC.,

                    Plaintiff,

       v.

ROBERT W. FERGUSON, in his official capacity as Governor of the State of Washington; NICHOLAS W. BROWN, in his official capacity as Attorney General of the State of Washington,

                    Defendants.

No. 3:23-cv-05626-BHS

**DECLARATION OF MATTHEW CANTRELL**

DECLARATION OF MATTHEW CANTRELL

## DECLARATION OF MATTHEW CANTRELL

I, Matthew Cantrell, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am an Assistant Field Officer Director ("AFOD") employed by the U.S. Immigration and Customs Enforcement ("ICE"), Enforcement and Removal Operations ("ERO") division. I have been employed by ICE since 2006, having held various ERO roles involving detention, processing, and removal operations. I have been AFOD since 2020. I am currently assigned to the ERO office at the Northwest ICE Processing Center ("NWIPC") where I manage ERO personnel and provide oversight to ICE operations at the facility. I am familiar with the operations of the Tacoma ERO office, as well as ICE's processing, detention and transfer policies, guidance and protocols.

2.      This Declaration is submitted in support of *GEO Group, Inc. v. Ferguson*, No. 23-05626 (W.D. Wash. filed Jul 13, 2023), and sets out ICE's role in access to the NWIPC, including access to health care facilities within the NWIPC, and how multiple attempts by Washington State Department of Health ("DOH") inspectors to access and inspect the secure portion of the NWIPC were handled.

3.      The statements in this declaration are based on my personal knowledge, information provided to me in the course of my official duties, and records maintained by DHS in the ordinary course of business.

4.      As an operational program of ICE, ERO is responsible for the planning, management, and direction of broad programs relating to the supervision, detention, and removal of noncitizens from the United States under the U.S. immigration laws. ERO's statutory responsibilities include detention of noncitizens during the pendency of proceedings to determine whether they will be removed from the United States, as well as detention of noncitizens subject to an administratively final removal order, pending their removal from the United States.

5.      ICE ERO is responsible for—and has primary responsibility for—the detention, health, welfare, transportation, and deportation of detainees in removal proceedings, and those subject to final order of removal from the United States.

DECLARATION OF MATTHEW CANTRELL - 1

6.      The NWIPC is a private detention center owned and operated by The GEO Group, Inc. ("GEO") pursuant to its contract with ICE. GEO provides the facility, management, personnel, and certain services for 24-hour supervision of immigrant detainees in ICE custody at the NWIPC. The NWIPC operates pursuant to the National Detention Standards 2025 ("NDS"). *See* NDS, available at: https:www.ice.gov/doclib/detention-standards/2025/nds2025.pdf

7.      The ICE Health Services Corps ("IHSC") oversees medical care, both physical and mental, at the NWIPC. IHSC provides medical services through a combination of U.S. Public Health Service Commissioned Corps ("USPHS") officers, federal civil servants, and contract health professionals. GEO neither provides nor is involved in the provision of medical services at the NWIPC.

8.      ICE imposes frequent and comprehensive inspections and audits of GEO's performance at the NWIPC. When ICE determines that GEO has performed deficiently, ICE may withhold funds from GEO or take other punitive actions under the contract as appropriate.

9.      Under the contract that was in effect until March 2026, as well as the Performance-Based National Detention Standards 2011, ICE had final authority and control over access to the secure portions of the NWIPC.

10.     Under the current contracts with GEO and the NDS, ICE has final authority and control over access to the secure portions of the NWIPC.

11.     GEO is without independent authority to provide access to the secure portions of the NWIPC absent ICE clearance and approval.

12.     GEO has no authority to provide access to the secure portions of the NWIPC over ICE's express denial.

13.     There are specific procedures laid out for different types of potential visitors, including state inspectors, to follow for various types of visitation requests, and all require request, authorization, and coordination with the ERO Field Office and if approved, pre-clearance approvals and background checks.

DECLARATION OF MATTHEW CANTRELL - 2

14. On March 20, 2026, two individuals who identified themselves as employees of the Washington State Department of Health ("DOH") arrived unannounced at the NWIPC and stated they sought to inspect the secure portion of the NWIPC under RCW 70.395.050.

15. Pursuant to GEO's contract requirements and standard operating procedures governing state and local inspector access to the secure portions of the NWIPC, Facility Administrator ("FA") Bruce Scott, a GEO employee, informed me that the DOH inspectors were seeking to access the secure portions of the NWIPC.

16. I reviewed the Inspection Access Form completed by the DOH inspectors.

17. I went to the lobby to speak to the DOH inspectors without FA Scott or any GEO representative with me.

18. On behalf of ICE, I denied DOH's access for this inspection attempt.

19. I informed DOH that they had to get approval from the Seattle Field Office to access the secure portions of the NWIPC.

20. I marked ICE's denial of access on the Inspection Access Form and signed the form on behalf of ICE.

21. My decision to deny access to DOH's inspectors was consistent with ICE ERO's security protocols and within the scope of my responsibilities.

22. On April 20, 2026, Todd Laxson, Policy Director, Environmental Public Health, DOH, and Todd Phillips, Director, Office of Environmental Health and Safety, DOH, arrived at the NWIPC.

23. Pursuant to GEO's contract requirements and standard operating procedures governing state and local inspector access to the secure portions of the NWIPC, Facility Administrator ("FA") Bruce Scott, a GEO employee, informed me that the DOH inspectors were seeking to access the secure portions of the NWIPC.

24. I reviewed the Inspection Access Form completed by the DOH inspectors.

25. I went to the lobby to speak to the DOH inspectors without FA Scott or any GEO representative with me.

DECLARATION OF MATTHEW CANTRELL - 3

26. On behalf of ICE, I denied DOH's access for this inspection attempt.

27. I informed DOH that they had to get approval from the Seattle Field Office to access the secure portions of the NWIPC.

28. The DOH inspectors stated that they had been attempting to contact U.S. Immigration and Customs Enforcement (ICE) regarding entry into the facility but had not received a response.

29. I marked ICE's denial of access on the Inspection Access Form and signed the form on behalf of ICE.

30. My decision to deny access to DOH's inspectors was consistent with ICE ERO's security protocols and within the scope of my responsibilities.

31. GEO did not deny access to the DOH inspectors on either March 20, 2026, or April 20, 2026. I denied access on behalf of ICE in the scope of my duties.

32. It would be a violation of the contract with ICE if GEO allowed DOH inspectors into the facility and coordinated with DOH's requested inspections over ICE's access denial.

I declare under penalty of perjury of the laws of the State of Washington that the foregoing statements are true and correct.

Executed this 14th day of May, 2026, at Tacoma, Washington.

MATTHEW M CANTRELL
Digitally signed by MATTHEW M CANTRELL
Date: 2026.05.14 11:14:44 -07'00'

Matthew Cantrell

DECLARATION OF MATTHEW CANTRELL - 4