UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

THE GEO GROUP, INC.,

Plaintiff,

v.

ROBERT W. FERGUSON, in his official capacity as Governor of the State of Washington; NICHOLAS W. BROWN, in his official capacity as Attorney General of the State of Washington,

Defendant.

CASE NO. C23-5626 BHS

ORDER

THIS MATTER is before the Court on the defendant State's motion, Dkt. 63, to preliminarily enjoin plaintiff GEO Group from blocking the Department of Health from inspecting the Northwest Immigration and Customs Enforcement Processing Center,[1] GEO's motion to dismiss the State's counterclaim, Dkt. 88, and GEO's motion for sanctions, Dkt. 89.

---

[1] Notwithstanding the name, GEO owns and operates the facility.

ORDER - 1

The parties' motions are before the Court following the Ninth Circuit's remand. Dkt. 54; *GEO Grp., Inc. v. Inslee*, 151 F.4th at 1107, 1114 (9th Cir. 2025). The parties are well-versed in the facts and procedural history of this case. For brevity, the Court incorporates by reference the factual context described in its prior Orders, Dkt. 69 and 82.

The State moves to enjoin GEO from refusing the Department access to its Tacoma facility. Dkt. 63. It argues it will likely succeed on the merits because GEO's conduct violates the State's right to inspect under RCW 70.395.050, and that it will be irreparably harmed if it is not permitted to implement state law ensuring the health and safety of detainees within the facility. *Id.* at 13–19. It also contends the balance of equities and public interest weigh heavily in its favor. *Id.* at 19.

GEO responds that the State lacks Article III standing because an injunction would not redress its alleged injury. Dkt. 76 at 19. It further argues that the State is not likely to succeed on the merits because ICE is a required party whose joinder is impossible because it enjoys sovereign immunity. *Id.* at 20–22. GEO contends that ICE denied the Department access, and that to the extent GEO cooperated with ICE, it cannot be held liable for conduct that ICE lawfully authorized and directed it to perform. *Id.* at 23 (citing *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940)). GEO further contends that the State's requested injunctive relief violates the intergovernmental immunity doctrine. *Id.* at 25. It argues an injunction would cause it irreparable harm by requiring GEO to breach its contract with ICE. *Id.* at 31. GEO moves to dismiss the State's counterclaim for the same reasons. Dkt. 88.

## I.   DISCUSSION

A party seeking a preliminary injunction "must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). "Likelihood of success on the merits is the most important factor." *Inslee*, 151 F.4th at 1114 (citation modified). The last two factors merge when the government is a party. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). When considering whether to grant this "extraordinary remedy, . . . courts must balance the competing claims of injury and consider the effect of granting or withholding the requested relief, paying particular regard to the public consequences." *Winter*, 555 U.S. at 24.

A preliminary injunction "prohibits a party from taking action" and preserves the *status quo ante litem*, which refers not simply to any situation before the lawsuit was filed, but instead to the "last uncontested status which preceded the pending controversy." *Id*. at 1191.

**A.      The State is likely to succeed on the merits.**

**1.      The State has standing to seek an injunction because ICE is not a necessary party in this case.**

GEO argues that the State does not have Article III standing because its alleged injury is not redressable by an injunction against GEO. For the same reasons, it argues that ICE is a necessary and indispensable party under Federal Rule of Civil Procedure 19. These issues are addressed together.

Article III "limits federal court jurisdiction to 'actual, ongoing cases or controversies.'" *Wolfson v. Brammer*, 616 F.3d 1045, 1053 (9th Cir. 2010) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)). Accordingly, "[a] case or controversy must exist at all stages of review, not just at the time the action is filed." *Id.* (citing *Alvarez v. Smith*, 558 U.S. 87 (2009)). The "case or controversy" clause requires, among other things, that a plaintiff have standing, that the plaintiff's claims be ripe for adjudication, and that the plaintiff's claims not be moot. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006).

To establish standing, the plaintiff must show that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). "The existence of standing turns on the facts as they existed *at the time the plaintiff filed the complaint*." *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007) (emphasis added).

Redressability "analyzes the connection between the alleged injury and requested judicial relief." *Washington Env't Council v. Bellon*, 732 F.3d 1131, 1146 (9th Cir. 2013). To demonstrate redressability, a plaintiff must "show a predictable chain of events that would likely result from judicial relief and redress the plaintiff's injury." *G.B. by & through G.P. v. EPA*, 172 F.4th 1042, 1063 (9th Cir. 2026) (quoting *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 121 (2025)). A plaintiff "need not demonstrate that there is a guarantee that her injuries will be redressed by a favorable decision; rather, a

ORDER - 4

plaintiff need only show a substantial likelihood that the relief sought would redress the injury." *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018) (citation modified).

GEO argues, as it has in various contexts, that ICE is a necessary and indispensable party under Federal Rule of Civil Procedure 19. This argument relies primarily on GEO's core factual contention that an ICE officer, not GEO, actually refused the statutory inspections. It argues that the Court cannot accord complete relief because even if the Court orders GEO to permit the Department access, ICE will still have the authority and power to require preclearance and to reject inspection requests. Dkt. 76 at 21 (citing *Confederated Tribes of Chehalis Indian Reservation v. Lujan*, 928 F.2d 1496, 1499 (9th Cir. 1991) (citing Rule 19(a)). It argues that proceeding without ICE would impair ICE's interests or expose GEO to inconsistent obligations. *Id.*

The Court does not agree. A party is "necessary" in two circumstances: (1) when complete relief is not possible without the party's presence, or (2) when the absent party claims a legally protected interest in the action. *United States v. Bowen*, 172 F.3d 682, 688 (9th Cir. 1999) (citing Rule 19(a)). Neither of these are present here. The Court can grant the State's requested relief without ICE, and ICE has not identified any legally protected interest in precluding the State from inspecting GEO's private facility.

GEO is the only plaintiff in this case. Its complaint seeks a declaration that HB 1470, now chapter 70.395 RCW, violates the United States Constitution's Supremacy and Contracts Clauses, and asks the Court to enjoin its enforcement and preclude the inspections it requires. Dkt. 1 at 27. It asserts that the State cannot bind the federal government, relying on the Supremacy Clause—the "great principle" that "the

constitution and the laws made in pursuance thereof are supreme; that they control the constitution and laws of the respective states, and cannot be controlled by them." Dkt. 1 at 2 (citing *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 426 (1819)). This is also the crux of GEO's defense to the State's counterclaim. But if ICE were the real party in interest, it would have been a plaintiff, and it has had every opportunity to appear and defend the counterclaim.

GEO does not assert, or cite any authority for the proposition that, a federal contractor enjoys immunity from state law to the same extent that the federal government does. GEO cannot, because a federal contractor does not. "Private contractors do not stand on the same footing as the federal government, so states can impose many laws on federal contractors that they could not apply to the federal government itself." *Geo Group, Inc. v. Newsom*, 50 F.4th 745, 750 (9th Cir. 2022); *see also Inslee*, 151 F.4th at 1116 ("[S]tates may impose some regulations on federal contractors that they would not be able to impose on the federal government itself.").

This distinction would be meaningless if the State could not enforce its non-preempted regulation in the absence of the sovereign.

GEO's primary factual contention in support of its standing and required party arguments here and in the related, parallel case, *Washington Dep't of Health v. GEO Grp., Inc.*, No. 24-5639-BHS ("*DOH*"),[2] is that ICE, not GEO, has refused to permit the Department of Health inspections required by state law: "Even if this Court orders GEO

---

[2] A similar pair of motions are pending in *DOH*, Dkts. 62 and 67.

not to deny the Department access, ICE will still have the authority and power to continue to require preclearance and to reject inspection requests by DOH." Dkt. 76 at 21. It asserts that "GEO acted under ICE's lawful authorization," *id.* at 23, but it has not yet identified any law, regulation, or constitutional provision giving ICE the lawful authority to immunize GEO from state law. Nor has GEO shown that any of these preempt the application of relevant Washington health laws.

Instead, GEO points to its contract. And, faced with contrary provisions in the contract in effect when it sued, GEO executed a new one purporting to explain that ICE, not GEO, controls access into GEO's private facility. ICE officer Matthew Cantrell[3] relied on the contract when denying GEO access. He explained, "Pursuant to both the current contract with GEO and the [NDS], ICE has final authority and control over access to the secure portions of the NWIPC[.]" Dkt. 33-1 at 3. But GEO has yet to articulate any Congressional authority under which ICE and GEO acted. The State persuasively argues that there is none: "An ICE officer cannot require GEO to defy a non-preempted state law." Dkt. 80 at 7–8.

The Ninth Circuit has rejected GEO's preemption defenses in this case, 151 F.4th at 1122–1124, and in *DOH*, No. 24-5639-BHS, Dkt. 22. Preemption requires Congressional intent, not a contract, and GEO's new contract cannot preempt state law,

---

[3] Cantrell's Declaration demonstrates that ICE had notice of the State's counterclaim. As the State points out, GEO's new contract includes a "Defense of Suit" provision that was deleted from the version GEO placed in the record. Dkt. 91 at 10 n.1 (citing Dkt. 77 at 48–49).

even if it purports to, which is not as clear as GEO suggests.[4] The Court agrees with the State that "[n]o act of Congress permits GEO to ignore Washington law." Dkt. 83 at 5. GEO's complaint implicitly but necessarily concedes that ICE's presence as a party is not required for the Court to determine that Washington law does *not* apply to GEO. It is inconsistent to assert that ICE's presence is required for the Court to determine that it *does*.

Indeed, in a different but similar case, *Washington Dep't of Labor and Industries v. GEO Grp., Inc.*, No. 24-5095-BHS, GEO ultimately stipulated to a permanent injunction permitting the Washington Department of Labor and Industries (L&I) to conduct inspections of its facility under RCW 49.17.070. *See* Dkts. 53 and 54. ICE was not a party to that case or to the stipulation, nor is there any claim or evidence that it was involved, undermining entirely GEO's claim that it is powerless to permit state inspections of its private facility, and thus that the State does not have standing or that ICE is a necessary party in this case.

Even if ICE was a necessary party under either of these tests, the Court concludes that it is not indispensable. A party is indispensable if in "equity and good conscience," the Court should not allow the action to proceed in its absence. *Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*, 276 F.3d 1150, 1161 (9th Cir. 2002) (citing Rule 19(b)).

---

[4] GEO's preemption defense and new contract are discussed in other contexts later in this Order.

To make this determination, the Court balances four factors: (1) the prejudice to any party or to the absent party; (2) whether relief can be shaped to lessen prejudice; (3) whether an adequate remedy, even if not complete, can be awarded without the absent party; and (4) whether there exists an alternative forum. *Id.* at 1161–62.

None of these factors require the Court to conclude that in equity and good conscience this case cannot proceed in ICE's absence. ICE will not be prejudiced by an injunction against GEO. An injunction requiring GEO to permit state statutory inspections is adequate even if as GEO asserts it is not complete; GEO, without ICE, stipulated to a similar injunction requiring similar inspections by a different state agency in the *L&I* case. There is no alternate forum, meaning that the State would have no legal remedy for a private company's refusal to comply with state law.

Furthermore, and in any event, the State persuasively argues that even if ICE is necessary and indispensable, the State seeks to vindicate purely public rights, and the public rights exception to traditional joinder rules applies. Dkt. 80 at 6–7.

In *Nwauzor v. GEO Grp.*, Judge Bryan rejected GEO's argument that ICE was a required party under the public rights exception.[5] No. 17-5806 RJB, Dkt. 58 (citing *Conner v. Burford*, 848 F.2d 1441, 1459 (9th Cir. 1988)). *Nwauzor* involved detainees' claims that GEO violated Washington's Minimum Wage Act (MWA) by paying them $1 per day to work at the facility. GEO asserted that complying with the MWA would violate its contract with ICE, which it argued required it to pay detainees at the lower

---

[5] *Nwauzor* is currently pending certiorari before the United States Supreme Court.

rate. It argued that ICE was a required party that could not be joined, and that the case should be dismissed.

Judge Bryan disagreed, concluding that the State sought to vindicate the public's interest in ensuring compliance with the MWA for detainees, non-detainee Washington residents, and other businesses competing in the marketplace. *Id*. at 11. "In a proceeding . . . narrowly restricted to the protection and enforcement of *public rights*, there is little scope or need for the traditional rules governing the joinder of parties in litigation determining private rights." *Id*.

Although "[t]he contours of the public rights exception have not been clearly defined," the exception applies at least where the litigation both (1) "transcend[s] the private interests of the litigants and seek[s] to vindicate a public right[,]" and (2) does not "destroy the legal entitlements of the absent parties." *Kescoli v. Babbitt*, 101 F.3d 1304, 1311 (9th Cir. 1996). The State plainly seeks to vindicate a public right.

Nor does the suit "destroy the rights" of ICE, the absent party. GEO's primary defense in this and the *DOH* case remains its contention that ICE, not GEO, refused to comply with state law. But the Ninth Circuit's remand in *DOH* did not suggest that if the answer was ICE, the case is over. Instead, it explained:

> Even under the first version of events—which is, curiously, the Department's—it is also not clear whether the ICE employee was acting within the scope of ICE's authority when he instructed GEO Group to deny access to Department employees, or whether he was acting *ultra vires*, that is, beyond "the powers delegated to him by the sovereign." *Larson v. Domestic & Foreign Com. Corp*., 337 U.S. 682, 693 (1949); see also *Watson v. Philip Morris Cos., Inc*., 551 U.S. 142, 157 (2007) (explaining that only "delegation of authority"—not "regulation"—can authorize removal under § 1442).

ORDER - 10

No. 24-5639-BHS, Dkt. 22. GEO has not articulated the authority for ICE's access denial.

In *DOH*, GEO points to ICE's "statement of interest" filed in a similar but different case in New Jersey as evidence that ICE controls access and that an order requiring GEO to permit the inspections would be toothless because it is a federal decision outside GEO's control. *See* No. 24-5639-BHS, Dkt. 70 at 16. ICE has filed no such statement in either of these cases, nor has it provided any affidavits or other evidence demonstrating that its interests are impaired by this matter. *See Citizen Band Potawatomi Indian Tribe of Oklahoma v. Collier*, 17 F.3d 1292, 1293 (10th Cir. 1994). GEO has not demonstrated that proceeding in ICE's absence would destroy ICE's rights.[6] In any case, if ICE wanted to participate to vindicate its rights, it could have intervened.

The State has standing to pursue its counterclaim. ICE is not a necessary party, and it is not an indispensable party. Even if it were, the State seeks to vindicate a public right and ICE's rights are not in jeopardy from an injunction requiring GEO to comply with state law.

**2.      GEO is not entitled to the *Yearsley* defense.**

GEO argues that the Supreme Court's holding in *Yearsley* provides it with a complete defense. Dkt. 76 at 23–25. It asserts that "ICE has lawful authorization to deny access to DOH inspectors," and to the extent it cooperated with ICE in denying the State

---

[6] GEO asserts that ICE specifically has an interest in access, its administrative areas, its detainee records, and the medical areas of GEO's facility. The Court agrees for the purpose of deciding this motion on three of these points, discussed below.

access, GEO "acted according to ICE's specific direction." *Id.* at 24. But the source of ICE's "lawful authorization" remains unclear. As discussed above, it is not and cannot be ICE's contract with GEO.

The State argues that "under the plain terms of the contract, GEO controls access to its facility." Dkt. 83 at 12. The State asserts that the contract "only requires background checks for those seeking to '**tour**' the facility and '**visit**' detainees," terms that, under their plain and ordinary meaning, do not include inspections. *Id.* (emphasis added). The State further contends that even if ICE directed GEO to deny the State access, any such order is not lawfully authorized by Congress. It asserts that "[w]ithout specific and lawful authorization, GEO's *Yearsley* defense must fail." Dkt. 83 at 14.

Under *Yearsley*, "a federal contractor cannot be held liable for conduct that the Government has lawfully 'authorized and directed' the contractor to perform." *Geo Grp., Inc. v. Menocal*, 607 U.S. 438, 441 (2026); *see also Hencely v. Fluor Corp.*, 608 U.S. ---, 146 S. Ct. 1086, 1099 (2026) (The *Yearsley* doctrine shields a private contractor "only when [it] is being sued precisely for accomplishing what the Federal Government requested."). That protection applies only "when the contractor has acted within legal bounds." *Id.* at 449.

In *Yearsley*, the Supreme Court considered whether a private contractor building river dikes at the direction of the United States Army Corps of Engineers could be held liable for a "taking" of plaintiff landowners' land when the dikes caused erosion to the plaintiffs' property. *Id.* The Court held it could not, because it was "undisputed that the work which the contractor had done in the river bed was all authorized and directed by

ORDER - 12

the Government of the United States." *Id.* at 20 (internal quotations omitted). The Court reasoned that because "the authority to carry out the project was validly conferred," or in other words, done "within the constitutional power of Congress," the contractor was not liable for executing the Army Corps' will. *Id.*

In contrast, liability *may* attach "if the [Government's] authorization was unlawful or if the contractor acted outside its scope." *Menocal*, 607 U.S. at 441. In *Hencely*, the Supreme Court declined to extend *Yearsley's* protection to a military contractor that hired an Afghan employee, pursuant to a military program to hire local Afghans, who later carried out a suicide bomb attack that killed and injured military service members. 146 S. Ct. 1086. The Court explained that because the contractor "negligently supervised" the employee in complying with base procedures, it "acted outside the authority the military granted it." *Id.* at 1099. As a result, *Yearsley* did not shield the government contractor from liability.

State inspectors have attempted three times since September 2025 to investigate complaints about drinking water at GEO's facility. Laxson Decl., Dkt. 64. Each time the inspectors were greeted by a GEO staff member who instructed them to fill out a form with their name, the reason for the visit, and the statute providing the basis for entry.[7] *Id.* That completed form was then provided to ICE officer Cantrell. Cantrell instructed the inspectors that they "had to contact the [ICE] Seattle office to get access to secure areas."

---

[7] On September 3, 2025, the State attempted to inspect the facility pursuant to RCW 43.70.170. On March 20, 2026, 2026, and April 20, 2026, the State attempted to inspect the facility pursuant to RCW 70.395.050. Laxson Decl., Dkt. 64 at 3–4.

*Id.* at 4. Cantrell marked "ICE's denial of access on the Inspection Access Form and signed the form on behalf of ICE." Dkt. 88 at 17; *see also* Scott Decl., Dkt. 73 at 2, 5. The State asserts that it has twice emailed the ICE Seattle office with no response. *Id.*

Although these facts are generally uncontested, the parties disagree about who is ultimately responsible for the denial.[8] The State argues that GEO denied the inspectors access to the facility. *See* Dkt. 63 at 7, 11, 13 and Dkt. 83 at 5, 15. GEO asserts that ICE is responsible and that ICE "barred GEO from authorizing access over ICE's denial." Dkt. 76 at 28. Regardless, GEO played the central role in denying state inspectors access. The facility is privately owned, possessed, and operated by GEO, and thus, GEO was ultimately the entity responsible for denying the State access. For the purpose of the *Yearsley* defense, the primary question is whether ICE lawfully authorized GEO to deny state inspectors access to the facility. The Court concludes it did not.

As an initial matter, the Court disagrees with GEO's contention that the contract requires GEO to seek ICE's approval before granting state inspectors access to the facility. GEO argues that the contract "limits full inspection access to DHS, ICE, federal entities, and ICE-approved third-party inspectors." Dkt. 88 at 24. But that is not what the contract says. Instead, the contract merely provides that "DHS, ICE, federal entities, and ICE-approved third-party inspectors (e.g., contracted support for conducting inspections)

---

[8] GEO seeks sanctions against the State for misrepresenting that it was GEO, and not ICE, who denied Department inspectors. Dkt. 89 at 4. The Court concludes as a matter of law that GEO, not ICE, retains possessory control over and is ultimately responsible for access to its privately owned, possessed, and operated facility. GEO's motion for sanctions, Dkt. 89, based on the factual assertion is **DENIED**.

will conduct scheduled and unscheduled audits and inspections of performance *to ensure contract compliance*." Dkt. 77 at 49 (emphasis added). The State is plainly not inspecting the facility to ensure GEO's compliance with its contract with ICE. The State is inspecting the facility to ensure that GEO is complying with chapter 70.395 RCW. Nothing in the cited contract explicitly restricts such inspections.

Instead, the contract makes clear that GEO, not ICE, is responsible for "operat[ing] and control[ling] all designated points of ingress and egress on the site, such as housing units, courtrooms, . . . and hold rooms." *Id.* at 62. The contract also incorporates ICE's Quality Assurance Plan, which "is based on the premise that [GEO], and not the Government, is responsible for the day-to-day operation of the Federal facility and all the management and quality control actions required to meet the terms of the" contract. *Id.* at 165. And despite GEO's contention that "ICE requires pre-clearance approval for any visitor who seeks to enter the secure portions of NWIPC," the contract imposes no such requirement. Dkt. 88 at 9. Rather, the contract plainly requires ICE pre-clearance only for access to "ICE field staff, facilities and information." Dkt. 77 at 115. Applying these terms, GEO must seek ICE's preclearance approval before the Department seeks to inspect "ICE facilities,"[9] i.e. ICE administrative areas (which the

---

[9] It is unclear from the record whether GEO or ICE controls the facility's medical areas. On one hand, the contract asserts GEO controls "ingress and egress" to "medical facilities," *id*. at 62, but on the other, it provides that ICE Health Services Corps is "responsible for the provision of health care services for ICE detainees at the facility," *id*. at 67. As of late 2025, ICE appears to retain control over medical services, choosing to subcontract another medical contractor, STG International. *See* Dkt. 91 at 11 n.3 (citing OIDO Inspection of Northwest ICE Processing Center, Office of the Immigration Detention Ombudsman (Nov. 20, 2024), https://www.dhs.gov/sites/default/files/2024-12/24_1120_oido_inspection-report-northwest-ice-

Department has never sought to inspect and concedes is ICE-controlled, Dkt. 91 at 4), and ICE "information," including ICE detainee records. *See* Dkt. 77 at 147. But nothing in that provision requires GEO to seek ICE pre-clearance for state inspectors seeking access to areas under GEO's control.

The Court is also unpersuaded by GEO's argument that the contract's prohibition on unauthorized "public contact" applies to state inspectors. By its terms, this section applies only to individuals or organizations seeking access to the facility for "tours," "visits," or "tours with visits." Dkt. 52 at 75. It does not apply to state health officials seeking to inspect conditions pursuant to their statutory authority, as occurred here.

This reading is confirmed by GEO's longstanding practice of apparently allowing other state inspectors (L&I) into the facility without ICE's prior approval. *See* Stip. Mot. & Order, No. 24-5095-BHS, Dkt. 54 (GEO stipulating to L&I's access to inspect its facility). GEO argues that the L&I stipulation is distinguishable because those inspections did not proceed after an ICE denial. Dkt. 93 at 8. But that misses the point. The relevant question is whether inspectors needed ICE's prior approval in the first place. Nothing in

---

processing-center .pdf, at 3, 26). The State argues that county health inspections of the facility's medical areas is proof that it is not a "third rail for non-federal inspectors." *Id*. at 24. But the record shows ICE affirmatively approves county inspections in other contexts. *See, e.g.,* No. 24-5639-BHS, Dkt. 70 at 15; Dkt. 72 at 4. The Court is unconvinced that, at this stage of the proceeding, that the State has met its burden in seeking an injunction to prove the facility's medical areas are under GEO's control. It appears that ICE, not GEO, has a possessory interest in the medical facilities, as it does in its administrative areas, but unlike the facility's remaining areas.

the contract or National Detention Standards[10] imposes such a requirement, nor do they prevent compliance with state health regulations.

More importantly, even if ICE did require GEO to deny access to state inspectors, either by contract or through a verbal directive by one of its employees, such a directive is not authorized by federal law. Under Art. I, § 8, cl. 4, the federal government exercises "broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). Pursuant to that authority, Congress authorizes the Secretary of Homeland Security[11] to "arrange for appropriate places of detentions for aliens detained pending removal or a decision on removal." Immigration and Nationality Act (INA), 8 U.S.C. § 1231(g)(1). Congress also authorizes the Secretary to contract with private contractors. 6 U.S.C. § 112; *cf.* 48 C.F.R. § 3017.204–90 (2021) (authorizing ICE to enter into fifteen-year contracts for detention facilities).

But that authority is not unlimited. States have a broad power to regulate public health and safety within their borders and, as the Ninth Circuit made clear, "these historic powers extend to laws regulating health and safety in federal detention facilities located within a state." *Inslee*, 151 F.4th at 1117 (quoting *Newsom*, 50 F.4th at 766 (Murguia, J., dissenting)). Nothing in the INA grants ICE the authority to disregard Washington State's power to implement health and safety laws for federal detainees residing within its

---

[10] The 2025 NDS recognized that GEO must comply with state health regulations. *See, e.g.*, Dkt. 84-1 at 11, 14 (requiring compliance with state drinking water regulations as well as state and local detention standards). Nothing in the 2026 NDS precludes compliance with state law.

[11] Although the statute specifies the Attorney General, this reference is "deemed to refer" to the Secretary of Homeland Security. *See* 6 U.S.C. §§ 557, 251(2).

ORDER - 17

borders. *See United States v. Amdahl Corp.*, 786 F.2d 387, 392 (Fed. Cir. 1986) ("The government has the power to act only through its agents whose authority and manner of exercise thereof is rigidly prescribed and limited by statute, regulation, and judicial and administrative determinations.").

The State contends that "[i]t simply does not matter if an ICE officer purported to deny Department inspectors' access to GEO's private facility." Dkt. 80 at 4. The Court agrees. Congress has not "demonstrated any intent, let alone a clear and manifest intent, to preempt [chapter 70.395 RCW]." *Inslee*, 151 F.4th at 1123; *see Cal. Div. of Labor Standards Enf't v. Dillingham Const., N.A.,* 519 U.S. 316, 334 (1997) ("We could not hold pre-empted a state law in an area of traditional state regulation based on so tenuous a relation without doing grave violence to our presumption that Congress intended nothing of the sort."). Neither has GEO pointed to any authority that suggests "an ICE employee's verbal directive carries preemptive effect in the absence of any indication of Congressional intent that it should." *DOH*, 2025 WL 2986482, at *3.

Without lawful authorization, *Yearsley* does not apply to protect GEO from liability for its actions in denying state health inspectors access to its own controlled areas of the facility.

**3.      GEO is not immune from chapter 70.395 RCW.**

The intergovernmental immunity doctrine is a product of the Constitution's Supremacy Clause. *United States v. Washington*, 596 U.S. 832, 835 (2022); *United States v. King Cnty.*, 122 F.4th 740, 756 (9th Cir. 2024). The doctrine immunizes the federal

ORDER - 18

government from state laws that (1) directly regulate it or (2) discriminate against it. *Newsom*, 50 F.4th at 754; *Washington*, 596 U.S. at 835.

"[A] direct regulation regulates the government *qua* government; it controls how the government conducts specifically governmental functions." *United States v. California*, 173 F.4th 1060, 1067 (9th Cir. 2026) (citation modified). A state law that "directly regulates the conduct of the United States . . . is void irrespective of whether the regulated activities are essential to federal functions or operations, and irrespective of the degree to which the state law interferes with federal functions or operations." *Id.*

Federal contractors are immune from direct regulation as well, although states have "considerable room" in enforcing laws against them. *Newsom*, 50 F.4th at 755. "[S]tates may impose some regulations on federal contractors that they would not be able to impose on the federal government itself." *Inslee*, 151 F.4th at 1116 (internal quotation marks omitted). For example, states may enact "a nondiscriminatory tax on private parties with whom the United States does business, even though the financial burden of the tax may fall on the United States." *Newsom*, 50 F.4th at 755. But state regulations of contractors are nonetheless unconstitutional if they directly regulate the federal government's control of its operations or contracting decisions. *Id.* at 756.

In *Newsom*, the Ninth Circuit determined that a California statute barring private detention facilities fell into the latter category. *Id.* at 761. The statute impermissibly gave California control over ICE's decisions by interfering with ICE's "discretion to arrange

ORDER - 19

for immigration detention in the privately run facilities it has deemed appropriate." *Id.* [12] The law effectively required ICE "to cease its ongoing immigration detention operations in California and adopt an entirely new approach." *Id.* at 758.

The Ninth Circuit similarly deemed a county executive order that barred ICE's private contractors from using a King County-owned airfield to deport immigration detainees unconstitutional. *United States v. King County*, 122 F.4th 740, 756 (9th Cir. 2024). The order impermissibly gave King County "the power to control ICE's transportation and deportation operations" and required "ICE to entirely transform its approach to its sovereign function of transporting and removing noncitizen detainees." *Id.* (internal quotation marks omitted).

"A state law discriminates against the federal government or its contractors if it singles them out for less favorable treatment, or if it regulates them unfavorably on some basis related to their governmental status." *Washington*, 596 U.S. at 839 (citation modified). In effect, a state law cannot "treat[] a state entity more favorably than it treats a comparable federal entity." *Inslee*, 151 F.4th at 1118; *see Boeing Co. v. Movassaghi*, 768 F.3d 832, 842 (9th Cir. 2014) (state law discriminates against the federal government or its contractor "if it treats someone else better than it treats the government").

---

[12] Washington had passed HB 1090 (codified at RCW 70.395.030) which similarly prohibited the operation private detention facilities in Washington. GEO sought a declaration that the law was unconstitutional as applied to it. *See GEO Group, Inc. v. Inslee*, No. 21-5313 BHS, at Dkt. 1. After *Newsom*, the State conceded that it could not enforce its law against GEO. See *id.*, Dkt. 76 (citing Dkt. 65). The Court dismissed the case as moot. *Id.*

The Ninth Circuit has made clear that a state law is not discriminatory when it "merely references or singles out federal activities in an otherwise innocuous enactment." *United States v. California*, 921 F.3d 865, 881 (9th Cir. 2019). The "mere fact that the actions of the federal government are incidentally *targeted* by [a state law] does not mean they are incidentally *burdened*, and while the latter scenario might implicate intergovernmental immunity, the former does not." *Id.* at 880.

GEO argues the State is unlikely to succeed on the merits because it is protected by intergovernmental immunity. Dkt. 76 at 25, 27. It contends chapter 70.395 RCW constitutes direct regulation because it "seeks to override ICE's contracting decisions and . . . its discretion to arrange for immigration detention." *Id.* at 28 (citing *Newsom*, 50 F.4th at 750, 760–61). It also contends the statute discriminates against GEO by burdening it more than other state detention facilities. *Id.* at 26–27.

The State argues the statute permissibly regulates GEO as a federal contractor. Dkt. 63 at 9. It argues *Inslee* already established that chapter 70.395 RCW does not directly regulate GEO's operation of the facility, and that it is not discriminatory because it does not single out GEO for its status as a federal contractor. Dkt. 83 at 9–10.

The Court agrees. The Ninth Circuit already decided that chapter 70.395 RCW does not directly regulate ICE's conduct. *Inslee*, 151 F.4th at 1118.[13] The fundamental flaw in GEO's argument is that it, not the federal government, owns and operates the

---

[13] In *DOH*, GEO similarly argues that RCW 43.70.170 directly regulates the federal function of immigration detention. No. 24-5639-BHS, Dkt. 70. The Ninth Circuit's analysis in *Inslee* holds true for RCW 43.70.170, which, much like RCW 70.395.050, simply permits the Department of Health to investigate public health threats.

ORDER - 21

detention facility—aside from the ICE-controlled administrative areas and perhaps medical areas. *See Nwauzor*, 127 F.4th at 761. Chapter 70.395 RCW mandates that GEO, not ICE, maintain certain health and safety standards in its facility and allow inspections. Imposing these state health standards on GEO is akin to a "tax on private parties with whom the United States . . . does business, even though the financial burden of the tax may fall on the United States." *Newsom*, 50 F.4th at 755. But it does not impermissibly control federal immigration functions. ICE need not "adopt an entirely new approach" to immigration detention. *Id.* at 758. So long as the law does not interfere with ICE's operations in the facility's administrative and medical areas, it does not directly regulate the federal government.

The Ninth Circuit remanded the issue of whether the statute is discriminatory. "The fact that HB 1470 applies only to the NWIPC does not, by itself, mean it violates the intergovernmental immunity doctrine." *Inslee*, 151 F.4th at 1119. Rather, the Court must determine whether the statutory requirements imposed by RCW 70.395.040, .050 burden GEO more than "the requirements imposed by Washington law on the two [other] types of civil detention facilities," residential treatment centers and involuntary civil commitment facilities. *Id.* at 1121.

The Ninth Circuit spelled out the health and safety requirements imposed on each of these facilities under Washington law.[14] 151 F.4th at 1121. Under RCW 70.395.040,

---

[14] In May 2025, the Legislature removed "for profit" from the definition of "private detention facility." *See* Engrossed Second Substitute H.B. 1232, 69th Leg., Reg. Sess. (Wash. 2025). Chapter RCW 70.395 now applies to private detention facilities "operated by a private,

ORDER - 22

GEO must (1) maintain a safe, clean, and comfortable environment; (2) clean and sanitize living areas, including bathrooms, regularly; (3) provide laundry facilities; (4) provide "basic personal hygiene items . . . at no cost; (5) provide at least three "nutritious and balanced" meals per day and potable water; (6) maintain safe indoor air quality; (7) have heating and air conditioning equipment adjustable by room or area; and (8) operate an infection control program. *See* 151 F.4th at 1121. RCW 70.395.050 permits the Department to conduct "routine, unannounced inspections," investigate complaints, regularly review food items, and test drinking water.

Residential treatment centers "providing health care services to persons with mental disorders or substance use disorders" are required to implement (1) an infection control program; (2) serve "at least three meals" per day, factoring in residents' nutritional needs; (3) provide clean laundry services; (4) maintain heating ventilation, air conditioning, plumbing, and water supply; (5) provide sanitary garbage disposal and collection; and (6) ensure clean and sanitary conditions. WAC 246-337-060, 246-337-111, 246-337-112, 246-337-120, 246-337-124, 246-337-128, 246-337-135, 246-337-146; *Inslee*, 151 F.4th at 1121. The Department may perform "unannounced on-site surveys" to check for compliance and "investigate complaints alleging noncompliance." WAC 246-337-005(32), 246-337-021(1)(a)–(b).

---

nongovernmental entity and operating pursuant to a contract or agreement with a federal, state, or local governmental entity." The statute still does not apply, however, to the other civil detention facilities referenced in *Inslee*. *See* RCW 70.395.100(2), (6).

Finally, private involuntary commitment centers under WAC chapters 246-322 must establish (1) an infection control program; (2) provide a "safe and clean environment" with adequate lighting, ventilation and heating, potable water, and housekeeping services; (3) provide adequate bathroom facilities; (4) serve "well-balanced meals and nourishments" adjusted for patients' needs; and (5) provide "laundry and linen services." WAC 246-332-100, 246-332-120, 246-332-140, 246-332-160, 246-332-230, 246-332-240; *Inslee*, 151 F.4th at 1121. The Department may "conduct on-site inspections at any time" to check for compliance with these requirements and "[i]nvestigate allegations of noncompliance . . . when necessary, in consultation with law enforcement personnel." WAC 246-332-025(2)(c), 246-332-025(7)(b).

The Court is unpersuaded that chapter 70.395 RCW burdens GEO more than its state-regulated counterparts. The requirements imposed on GEO are substantially similar to those imposed on other civil detention facilities in Washington. All these facilities are required by law to implement an infection control program; provide detainees with nutritious meals, potable water; include laundry facilities; and maintain clean and hygienic premises with adequate heating and ventilation. The Department may conduct unannounced inspections to check for compliance with these standards and to investigate complaints. Although GEO insists that allowing Department inspections is "burdensome," it fails to elucidate what exactly that burden is. Dkt. 76 at 25–27. That GEO is incidentally targeted by chapter 70.395 RCW does not mean it is incidentally burdened any more than its state counterparts. *California*, 921 F.3d at 881.

Chapter 70.395 RCW is not discriminatory. The State is therefore likely to succeed in arguing that GEO is not immune from it.

### 4.    Federal law does not preempt chapter 70.395 RCW.

GEO again asserts state law is preempted, raising field and conflict preemption. Dkt. 76 at 29. It argues the federal government regulates "immigration detention" as a whole and the "investigation regime supporting the State's requested relief obstructs federal immigration policy. *Id.*

"Federal law preempts state law when Congress has occupied the 'field,' enacting a 'scheme of federal regulation ... so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Inslee*, 151 F.4th at 1123 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). "In other words, courts will infer that Congress intended 'to displace state law altogether' when Congress enacts 'a framework of regulation so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Knox v. Brnovich*, 907 F.3d 1167, 1174 (9th Cir. 2018) (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)).

Federal law also preempts state law when such laws "conflict with federal law," such that "compliance with both federal and state regulations is a physical impossibility, and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *California*, 921 F.2d at 878–79 (internal quotation marks omitted).

ORDER - 25

In *Inslee*, the Ninth Circuit confirmed that federal law did not preempt chapter 70.395 RCW, regardless of the "small changes" enacted in the statute. 151 F.4th at 1123. It held this case implicated the state's historic power to regulate the health and welfare of detainees within its borders, triggering a presumption against preemption. *Id.* (citing *California*, 921 F.3d at 875–76). GEO had not overcome the presumption for both field and conflict preemption. *Id.* at 1124.

Although GEO acknowledges that the Ninth Circuit has already "rejected [its] arguments on . . . both field and conflict preemption," it continues to raise them. Dkt. 76 at 14. GEO still does not show a "'clear and manifest purpose of Congress'" to preempt state law. *Inslee*, 151 F.4th at 1123 (quoting *Arizona*, 567 U.S. 400)). GEO's preemption arguments fail.

**B.      Irreparable harm and balance of equities weigh in the State's favor.**

Irreparable harm is "harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). The final two elements of *Winter*'s preliminary injunction standard—the balance of equities and the public interest—merge when the government is a party. *Drakes Bay*, 747 F.3d at 1092. The Court must balance the competing claims of injury and must consider the effect on each party of granting or withholding the requested relief. *N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843–44 (9th Cir. 2007).

The State argues these *Winter* factors weigh heavily in its favor. It argues the health and safety of its residents is at stake. Dkt. 63 at 16, 19. It has received a range of complaints, including lack of adequate and necessary medical care, "black mold in the

ORDER - 26

showers," food containing "burned plastic, metal string, splinters, hair, and worms," and detainees' laundered clothes "returned wet and dirtier than before." Nanto Decl., Dkt. 65 at 2–3. It argues that equity and public interest require that it enters GEO's facility to check for compliance with chapter 70.395 RCW's health and safety standards. Dkt. 63 at 20–27.

GEO contends that with an injunction, it will be forced to breach its contract with ICE. Dkt. 76 at 31. It further argues that the State's alleged harm is speculative because it "rests on the assumption that ICE will deny access." *Id.*

The Court agrees with the State on these factors. The State raises compelling concerns for the health and safety of the detainees held at GEO's Tacoma facility. Although they are detained, their welfare remains within the State's purview. *See California*, 921 F.3d at 886. The State has an interest in effectuating its own health and safety laws. As for its argument that ICE ultimately controls entry into the facility, the record is clear that GEO has the duty to allow the State access.

GEO's claimed irreparable harm is similarly a red herring. A Court Order preliminarily enjoining GEO prevails over the consequences of any potential breach of contract. This alleged injury does not rise to the level required to persuade the Court not to enter a preliminary injunction against GEO.

## II.   ORDER

The State's motion for a preliminary injunction, Dkt. 63, is **GRANTED**, as hereafter limited.

The GEO Group shall admit Washington Department of Health inspectors to the Tacoma facility to enforce RCW 70.395.050(2), except with respect to ICE-controlled administrative and medical areas. The State has not demonstrated it is likely to succeed in enforcing its statutory authority in those ICE-operated areas.

It is up to GEO's discretion whether its employees or agents accompany the State's inspectors. Any inspection does not authorize review and copying of any ICE records. If the Department of Health deems necessary specific documents, it may seek additional relief.

GEO seeks the Court's direction in the event ICE refuses access. The Court's injunction is directed at GEO, and if GEO disregards the Order, the Court will consider appropriate sanctions upon the State's request.

To ensure compliance, GEO shall provide written notice of this Order within 48 hours to all employees employed at the Tacoma facility.

The injunction is **STAYED** for 14 days to allow the parties the opportunity to appeal.

GEO's motion to dismiss the State's counterclaim, Dkt. 88, is **DENIED**.

GEO's motion for sanctions, Dkt. 89, is **DENIED**.

Dated this 9th day of July, 2026.

BENJAMIN H. SETTLE
United States District Judge

ORDER - 28